Luc A. Despins (LD 5141)
Scott A. Edelman (SE 5247)
Sander Bak (SB 2263 )
**MILBANK, TWEED, HADLEY & McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY  10005
(212) 530-5000



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAPITAL MANAGEMENT SELECT FUND LTD.,  INVESTMENT & DEVELOPMENT FINANCE CORPORATION, IDC FINANCIAL S.A., <br><br> Plaintiffs, <br><br>                    - against - <br><br> PHILIP R. BENNETT, WILLIAM M. SEXTON, SANTO C. MAGGIO, JOSEPH J. MURPHY, PHILIP SILVERMAN, ROBERT C. TROSTEN, RICHARD N. OUTRIDGE, THOMAS H. LEE PARTNERS, L.P., THOMAS H. LEE ADVISORS LLC., THL MANAGERS V, LLC., THL EQUITY ADVISORS V, LLP., THOMAS H. LEE EQUITY FUND V, L.P., THOMAS H. LEE PARALLEL FUND V, L.P., THOMAS H. LEE EQUITY (CAYMAN) FUND V, L.P., THOMAS H. LEE INVESTORS LIMITED PARTNERSHIP, 1997 THOMAS H. LEE NOMINEE TRUST, THOMAS H. LEE, DAVID V. HARKINS, SCOTT L. JAECKEL, AND SCOTT A. SCHOEN, <br><br> Defendants. | No. 07 **'07 CIV 8688** <br><br><br> <u>COMPLAINT</u> <br><br><br> JURY TRIAL DEMANDED |

NY2:#4742866

## COMPLAINT

1.        Capital Management Select Fund Ltd., Investment & Development Finance Corporation, and IDC Financial S.A., (together "Plaintiffs") make the allegations herein based upon their own knowledge and belief, together with information obtained by Plaintiffs' counsel.  The information obtained by Plaintiffs' counsel arises from a review of, among other things:

(a) the filings by Refco Inc (collectively with its direct and indirect subsidiaries "Refco"[1]) with the United States Securities and Exchange Commission ("SEC");

(b) the voluminous filings, documents and testimony produced pursuant to Refco's proceedings under Chapters 7 and 11 of the United States Bankruptcy Code in the United States Bankruptcy Court of the Southern District of New York (the "Bankruptcy Cases") (assigned to the Honorable Judge Robert Drain and jointly administered under the caption "*In re Refco Inc., et al.*, Case No. 05-60006 (RDD)");

(c) Refco's internal files, including books and records, corporate minutes and employee emails;

(d) documents produced in response to subpoenas issued pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") in the Bankruptcy Cases;

---

[1] Prior to the formation of Refco, Inc., the parent entity was Refco Group Ltd.  The defined term Refco will be used to include both RGL and Refco Inc, as the successor parent level entity, collectively with its direct and indirect subsidiaries.

(e) the Final Report of the Court-appointed Independent Examiner in the Bankruptcy Cases (the "Examiner's Report") with supporting exhibits;

(f) the Third Superseding Indictment in *U.S. v Phillip R. Bennett, et al.,* No. S3 05 Cr. 1192 (NRB) (S.D.N.Y. Jan 16, 2007);

(g) select interviews with employees and former employees of Refco; and

(h) other relevant public documents.

## I.  INTRODUCTION

### A.  Overview Of The Scheme

2.      The defendants named in this complaint (the "Defendants") perpetrated a fraudulent and deceptive scheme through which they converted for their own benefit customer securities owned by Plaintiffs and other customers of Refco Capital Markets Ltd. ("RCM").

3.      RCM agreed, and otherwise led Plaintiffs to believe, that the securities owned by Plaintiffs would be safeguarded by RCM in non-discretionary trading accounts that Plaintiffs maintained with RCM.  Instead, at the direction of the Refco officer defendants named in this complaint (the "Officer Defendants"), without Plaintiffs' knowledge and contrary to representations that were made to Plaintiffs, Plaintiffs' securities were stolen from these accounts.

4.      On an almost daily basis, Refco senior management, including the Officer Defendants, directed Refco employees to sell, or cause to be sold -- through hypothecations or subject to agreements to repurchase ("Repos") --  securities owned by Plaintiffs and other RCM customers that had been entrusted to RCM.  The sales of these

securities took place without Plaintiffs' knowledge, authorization or consent. This unauthorized sale of customer securities was not disclosed to securities customers in the customer account statements. As a stockbroker, RCM was obligated to hold Plaintiffs' and other RCM customers' securities in safekeeping. Instead, at the direction of the Officer Defendants, Refco raided the RCM customer accounts and not only converted Plaintiffs' and other customers' securities to cash without the customer's authorization but then used the proceeds to finance Refco's daily operations, trading losses, and significant acquisitions.

5.       Neither Refco nor any of the named Defendants had any right to use customer securities for their own benefit. Had the Defendants advised Plaintiffs that their securities were being sold for Refco's benefit, through hypothecations or pursuant to Repos, Plaintiffs could have, and would have, demanded compensation or collateral commensurate with the increased risk to which they were being unknowingly exposed, as lenders of securities routinely do when their securities are borrowed. Alternatively, RCM customers could have chosen to entrust their securities to a secure and faithful custodian instead of RCM.

**B.       The Scheme Was Fraudulent In Several Respects**

6.       Defendants' deception regarding their conversion of securities was an essential element of the scheme. The scheme continued unabated only because of fraudulent misrepresentations made to Plaintiffs and other RCM customers.

7.       Defendants' conduct was contrary to written and oral representations, that Refco representatives made to Plaintiffs and other RCM customers over the course of the customer relationship, that the securities would be held in safekeeping in custodial accounts maintained by RCM. The Plaintiffs and other RCM customers routinely deposited and held securities in their RCM accounts believing that RCM was acting as a custodian for those

NY2:#4742866

securities. The truth was just the opposite. RCM was, in fact, placing those securities at risk by converting them and upstreaming the proceeds to various Refco entities and "booking" only worthless receivables in return.

8.      Because RCM was purporting to provide custodial services to Plaintiffs and other RCM customers by holding securities for safekeeping, it owed fiduciary duties to its customers with respect to those custodial services as Bankruptcy Judge Drain stated following a six day trial in connection with the Bankruptcy Cases. Defendants caused RCM to violate this fiduciary duty both by: (1) failing to disclose the existence of the fraudulent scheme; and (2) perpetrating the scheme.

9.      In addition, Defendants' conversion of the securities was contrary to the terms of Plaintiffs' customer agreements with RCM and its sister company Refco Securities, LLC ("RSL"), which provided that RCM and RSL were not permitted to effect any transaction in customer securities without the customers' authorization. As found by Judge Drain, those agreements gave RCM and RSL no authority to sell, hypothecate or otherwise use securities held in Plaintiffs' accounts, except to the extent that Plaintiffs had a margin balance, and even then only in limited circumstances. Through the fraudulent scheme, Defendants caused RCM to breach the customer agreements while hiding that breach from Plaintiffs.

10.     In furtherance of this deception, RCM routinely provided Plaintiffs and other RCM customers with paper and online account statements identifying the securities purportedly held in custody in their accounts. These account statements were false and deceptive because, as a result of the fraudulent scheme, customer securities were not kept in safekeeping in the customers' accounts as represented by the account statements, but instead were routinely sold

by RCM, so Refco could use the proceeds to sustain Refco's business operations and fund its acquisitions.

11.    The scheme would not have worked unless it remained hidden from Plaintiffs. Plaintiffs and other RCM customers received no compensation for the risk to which they were exposed by the fact that their securities were converted from their accounts. No rational customer would have left his securities in what was purported to be a custodial account had RCM truthfully disclosed that it was converting those securities to cash and using the proceeds.

12.    The Defendants recognized that, had they disclosed RCM's practices, customers would have entrusted their securities to other financial institutions at which the customers would not have been exposed to the same risks. The Defendants also knew that truthful disclosure of RCM's practices would have jeopardized the lucrative payouts that they hoped to obtain as a result of liquidity events, such as a leveraged buyout of Refco and a successful initial public offering ("IPO"). Accordingly, the Defendants at all times fraudulently concealed RCM's practices.

13.    Only after Refco (including the subsidiary RCM) filed for bankruptcy on October 17, 2005, did a series of disclosures concerning its financial condition and practices for the first time reveal to Plaintiffs and other RCM customers that the Defendants were financing the activities of the various Refco companies by engaging in unauthorized sales, through hypothecations or subject to Repos, of billions of dollars of customer securities held in the custody of RCM. Such transactions were executed to benefit the Defendants with no corresponding benefit to Plaintiffs and other RCM customers, and were done without the Plaintiffs' knowledge, authorization or consent.

## C.    The Fraudulent Scheme Was Known To All Defendants

14.    Although the scheme remained hidden from Plaintiffs and other customers of RCM, it was well-known to the Defendants. The fraudulent scheme was so fundamental to the operation and financing of Refco and its ability to proceed with a number of major corporate transactions during the relevant period that it required the participation of, and had to have been apparent to, all of the Defendants. In light of the sheer size and number of the intercompany transfers from RCM to other Refco entities, the scheme would have been known to anyone who was managing or controlling the Refco entities in a non-reckless manner. Indeed, during the relevant period, the amounts stolen from RCM customer accounts dwarfed Refco's total capital. The fraudulent scheme was so vital to the entire operation of Refco that, without continued fresh infusions of RCM customer assets, Refco would not have had sufficient liquidity to continue to function, attract and maintain its securities customer base, or complete major acquisitions.

15.    Thomas H. Lee Partners, L.P ("THL") and related entities took control of Refco as a result of their August 2004 leveraged buyout of Refco (the "LBO"). Following the LBO, THL and those related entities and THL officers named as defendants in this complaint (the "THL Defendants") had access to all material facts concerning the fraudulent scheme alleged herein. In light of their access to Refco books and records that include documentary evidence of the fraud, their control over Refco, their Management Agreement with Refco pursuant to which the THL Defendants were paid over $30 million, the sheer size and number of the transfers made in furtherance of the fraudulent scheme, and the importance of the misappropriated funds both to the ongoing viability of Refco and its ability to complete a number of significant acquisitions, it is inconceivable that the THL Defendants would not have known

about the misuse of the RCM customer assets over the course of the fifteen months they controlled Refco prior to Refco's bankruptcy.

16.     The fraudulent scheme began prior to the LBO. Following the LBO, however, during the period in which the THL Defendants controlled and directed Refco and its affairs, the fraudulent scheme was not only allowed to continue, but it substantially increased in size.

17.     As described in more detail below, even before their investment in Refco, the THL Defendants learned of Refco's checkered past through numerous examples of the legal and regulatory problems faced by the company. Thus, even as early as the LBO, the THL Defendants were attuned to potential red flags within Refco.

18.     Any suspicion that the THL Defendants had of irregularities prior to the LBO was confirmed after they took control of Refco. For example, shortly after the LBO, the THL Defendants learned of significant deficiencies in the auditing of the company conducted by Grant Thornton LLP ("Grant Thornton"). Nevertheless, the THL Defendants determined not to change auditors because doing so might have delayed the profitable sale of THL's equity in Refco.

19.     RCM's sister corporation, RSL, was a United States registered and regulated broker-dealer. Both RCM and RSL were parties to the customer agreements entered into by Plaintiffs.

20.     RCM's business was operated on a daily basis from Refco's offices in New York, New Jersey, and Miami by employees who acted jointly for RCM and RSL. It was in those offices that trades were regularly executed and/or cleared and settled on behalf of RCM

customers and where, on an almost daily basis, employees who acted for both RCM and RSL were directed by Refco senior management, including the Officer Defendants, to sell or cause to be sold, through hypothecation or pursuant to Repos, RCM customers' securities. The sales of securities entrusted to RCM by the Plaintiffs were effected without Plaintiffs' knowledge, authorization or consent. The proceeds of the Repos were then siphoned out of RCM and used to make "loans" to other Refco entities that lacked the intention and/ or the financial wherewithal to repay those loans.

21. RSL was required under federal law to comply with net capital and segregation rules that did not permit the fraudulent conversion of customer securities being held in customer accounts. Under federal law, RCM was likewise subject to such rules and regulations, whether or not RCM was required to be a registered broker-dealer (as in fact RCM was, but falsely at times may have claimed it was not) and whether or not it was incorporated in a foreign country. RCM's securities customers had no reason to suspect that RCM was, as a matter of course, converting RCM customer securities to Refco's own use in violation of RCM's and RSL's agreements with, and representations to, RCM customers, as well as in violation of federal and state law.

**D.    Each Defendant Had A Motive To Participate In The Fraudulent Scheme**

22. Each Defendant not only had knowledge of the fraudulent scheme, but also had a clear motive for participating in the scheme. For the Officer Defendants, their ultimate goal was to present Refco as more profitable and successful than it was in order to monetize and cash out their interests in the company for more than they were worth. To accomplish this objective, they needed to present Refco as a financially strong and healthy company, with high profitability, high growth rates, a low-risk business model, excellent

liquidity, strong credit ratings, and the ability to satisfy its substantial working capital needs and growth objectives from what it called its legitimate cash flow and available funds. The fraudulent scheme alleged herein was critical to the Officer Defendants' ability to represent Refco in such positive light.

23.    The THL Defendants had their own motive for participating in the fraudulent scheme. THL and related entities obtained a controlling stake in Refco in August 2004 and, as of that date, the THL Defendants were control persons over RCM and related Refco entities. As discussed below, the THL Defendants knew, or were reckless in not knowing, of the existence of the fraudulent scheme. From the moment they invested in Refco, the THL Defendants were driven to take the company public as quickly as possible to secure for themselves a huge financial windfall. To avoid any delay in a lucrative IPO, the THL Defendants allowed the fraudulent scheme described herein to continue (and even expand in size), and to remain hidden from RCM's customers, creditors, regulators and the public. The THL Defendants allowed the deception of Plaintiffs and other RCM customer to continue under their control so as not to undermine their objective of securing for themselves a substantial payday by taking the company public as quickly as possible. Indeed, the THL Defendants and their affiliates received approximately $223.5 million as selling shareholders and otherwise when the company went public.

24.    In addition to the significant financial gain to be made from an IPO, the THL Defendants had a further motive to allow the fraudulent scheme to continue unabated. The THL Defendants were preparing to raise a new multi-billion dollar private equity fund for which they hoped to raise approximately $7.5 billion from institutional investors. They knew that a profitable IPO in Refco – which could take place only if the fraudulent scheme alleged herein

continued and remained undetected by the public – was critical to create a favorable recent track record that they could then use to market their new fund.

**E.    The Fraudulent Scheme Caused Plaintiffs' Losses**

25.    As a result of the Defendants' fraudulent conversion of Plaintiffs' securities, Plaintiffs in fact held nothing more than an "IOU" from RCM purportedly to repay an amount equal to the value of the customer securities that Plaintiffs delivered to RCM to be held in custody in their accounts, rather than the securities themselves as Plaintiffs were led to believe. Because of the fraudulent scheme, when Refco, including RCM, filed for bankruptcy, Plaintiffs and other RCM customers were left with massive losses resulting directly from the fraudulent conversion of their securities.

26.    Plaintiffs' losses would have been avoided, or significantly reduced, had customer securities actually been held at RCM, as Plaintiffs understood to be the case, rather than having been converted pursuant to the fraudulent scheme.

## II.        JURISDICTION AND VENUE

27.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act 1934 [15 U.S.C. §§ 78j(b) and 78t(a)] (the "Exchange Act") and Rules 10b-5 and 10b-16 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

28.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1332 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. The Plaintiffs are residents of a foreign country. Nevertheless, substantial acts – if not all of the acts — in furtherance of the fraud alleged herein were committed in the United States.

Additionally, THL, as well as many of its subsidiaries, and each of Defendants Thomas H. Lee, David V. Harkins, Scott L. Jaeckel, and Scott A. Schoen, filed proofs of claim in this judicial district related to their involvement with Refco.[2]  By doing so, the THL Defendants submitted themselves to the jurisdiction of this Court.

  29. Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b) in that Refco is, and was, headquartered, and many of the acts and transactions alleged herein occurred, in substantial part, in this judicial district.

  30. In connection with the wrongs alleged herein, the Defendants used the instrumentalities of interstate commerce, including the United States mails, interstate wire and telephone facilities, and the facilities of the national securities markets.

### III. **PARTIES**

#### A. **Plaintiffs**

  31. Plaintiff Capital Management Select Fund Ltd.  Capital Management Select Fund Ltd ("Capital Management") is an investment company incorporated under the laws of the Bahamas.  Since June 2004, Capital Management maintained a securities brokerage account with RCM, account number 10014082.

  32. Plaintiff Investment & Development Finance Corporation.  Investment & Development Finance Corporation ("IDF") is an investment company incorporated under the

---

[2] The entities and persons filing proofs of claim include THL., THL Equity Advisors V, L.P., Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., Thomas H. Lee Investors Limited Partnership, the 1997 Thomas H. Lee Nominee Trust, Thomas H. Lee, David V. Harkins, Scott L. Jaeckel, and Scott A. Schoen.

laws of the British Virgin Islands.  Since October 1996, IDF maintained two securities brokerage accounts with RCM, account numbers 10001626 and 10012110.

33.    Plaintiff IDC Financial S.A.  IDC Financial S.A ("IDC") is an investment company incorporated under the laws of Panama.  IDC and IDF have common owners and advisors.  Since February 1998, IDC maintained a securities brokerage account with RCM, account number 10010247.

**B.    Certain Refco Entities**

34.    Refco Group Ltd., LLC.  Refco Group Ltd., LLC ("RGL") was organized under the laws of Delaware, with its principal place of business, at all relevant times, at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281.  RGL filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17, 2005.

35.    New Refco Group Ltd., LLC.  New Refco Group Ltd., LLC ("New Refco") was organized under the laws of Delaware, with its principal place of business, at all relevant times, at One World Financial Center, 200 Liberty Street, Tower A, New  York, New York, 10281.  New Refco filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17, 2005.

36.    Refco Inc.  Refco Inc., the corporate parent of both RGL and RCM, was organized under the laws of Delaware, with its principal place of business, at all relevant times, at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281.  Refco Inc. filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17, 2005.  Prior to its bankruptcy filing, Refco Inc. was a publicly-traded holding company that, through its subsidiaries, provided securities brokerage, execution and clearing services for

exchange-trade derivatives, and prime brokerage services in the fixed income and foreign exchange markets. Refco Inc. was formed in connection with Refco's August 2005 Initial Public Offering ("IPO"), and was the issuer of the stock sold pursuant to the August 2005 IPO.

37.    Refco Capital LLC. Refco Capital LLC ("RCC"), an indirect RGL subsidiary was organized under the laws of Delaware, with its principal place of business, at all relevant times, at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281. RCC filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17, 2005. RCC functioned as the "treasury" and "disbursing agent" for all of Refco; it collected the proceeds from the fraudulent conversion of RCM customer assets and distributed them to other Refco entities as needed. As detailed below, virtually all of the transfers of RCM customer assets to RCC were documented as a series of purported "loans" from RCM to Refco Global Finance Ltd. In fact, the funds obtained from RCM's unauthorized selling, through hypothecations or pursuant to Repos, of RCM customer securities, were siphoned out of RCM and transferred to other Refco entities, including RCC. Using the proceeds of the unauthorized sale of RCM customer securities, RCC in turn made purported "loans" to other Refco entities that were then used, *inter alia,* to pay operating expenses of various Refco companies, advance margin loans to customers of RSL and Refco LLC, pay down RGL's revolving bank facilities and fund major business acquisitions for Refco affiliates. In this way, RCC functioned as a conduit of improperly converted funds from RCM, using those funds to make "loans" to other Refco entities that could not repay them.

38.    Refco Global Finance Ltd. Refco Global Finance Ltd. ("RGF"), a wholly-owned subsidiary of Refco, was organized under the laws of Delaware. At all relevant times, RGF had its principal place of business at One World Financial Center, 200 Liberty Street,

Tower A, New York, New York, 10281.  RGF filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17, 2005.

39.    Refco Capital Markets Ltd.  Refco Capital Markets Ltd. ("RCM") was a company organized under the laws of Bermuda.  At all relevant times, RCM had its principal place of business at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281.  RCM filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on October 17, 2005.  RCM was a securities broker and foreign exchange broker and one of the three principal operating subsidiaries of Refco.  RCM traded in over-the-counter derivatives and other financial products on behalf of its clients.  Although RCM was organized under the laws of Bermuda, it had no significant operations in Bermuda.  RCM closed its Bermuda office in 2001 and, since that time, its presence in Bermuda has been limited to a mailbox address.  As alleged below, at all times during the relevant period RCM and its registered representatives used U.S. jurisdictional means to effect and induce securities transactions with RCM customers pursuant to Section 15 of the Exchange Act [15 U.S.C. §78o(a)].

40.    Refco Securities, LLC.  Refco Securities, LLC ("RSL"), a wholly-owned subsidiary of Refco, is a Delaware limited liability company and registered broker-dealer with its principal place of business, at all relevant times, at One World Financial Center, 200 Liberty Street, 23rd Floor, New York, NY 10281.  As alleged below, at all times during the relevant period RSL and its registered representatives used U.S. jurisdictional means to effect and induce securities transactions with RCM customers pursuant to Section 15 of the Exchange Act.  Many Refco employees alternatively acted on behalf of RCM or RSL in the course of their daily activities at Refco.

41.   _Refco LLC_.  Refco LLC, a wholly-owned subsidiary of Refco, is a Delaware limited liability company and registered broker-dealer with its principal place of business, at all relevant times, at One World Financial Center, 200 Liberty Street, 23rd Floor, New York, NY 10281.  Refco LLC was a registered Futures Commission Merchant.  Refco LLC improperly received benefits from the sale of RCM customer assets through the illegal scheme described herein.

42.   Set out below is an organizational chart of Refco demonstrating the relationships of the relevant Refco entities:



## C.   The Officer Defendants

43.   Defendants Philip R. Bennett, Santo C. Maggio, Joseph J. Murphy, William M. Sexton, Philip Silverman, Robert C. Trosten and Richard N. Outridge (the "Officer Defendants") played key roles by virtue of their executive positions with Refco, and their direct involvement in Refco's day-to-day operations, including its finance and accounting functions.

44.    Defendant Philip R. Bennett.  Philip R. Bennett ("Bennett") was the

highest ranking corporate officer at Refco.  Bennett was President, Chief Executive Officer

("CEO") and Chairman of RGL from September 1998 until he was forced to resign following the

disclosure of massive fraud at Refco in October 2005.  He also served as President, CEO and

Chairman of Refco Inc., and as President and CEO of New Refco, at all relevant times.  Bennett

controlled Refco by virtue of being one of Refco's largest shareholders.  From August 2004,

Bennett owned approximately 43% of the equity interests of Refco through RGHI, an entity he

owned and controlled.  Following the August 2005 IPO, Bennett owned 33.8% of Refco's

outstanding common stock through RGHI and another entity, The Phillip R. Bennett Three Year

Annuity Trust (the "Bennett Trust").  Among his other positions within Refco, Bennett served on

the Refco board's compensation committee and acted as a director and officer of RCM at all

relevant times.  Bennett therefore owed fiduciary duties both to RCM and to RCM's securities

customers and, independently, was responsible by virtue of his position within RCM for ensuring

that RCM properly discharged its fiduciary duties to RCM's customers.  Prior to becoming CEO

of RGL in 1998, Bennett held the position of Chief Financial Officer ("CFO") since 1983,

having joined RGL in 1981.  Bennett directly conceived, orchestrated and supervised the illegal

theft of RCM customer assets alleged herein.  He is currently under indictment in the United

States District Court for the Southern District of New York, charged with, inter alia, securities

fraud, wire fraud, bank fraud, money laundering, false filing with the SEC and material

misstatements to auditors, as a result, in part, of acts alleged herein.[3]

45.    Defendant Santo C. Maggio.  Santo C. Maggio ("Maggio"), also known

as "Sandy" Maggio, joined Refco in 1985, and was Executive Vice President of RGL and

---

[3] *See* Superseding Indictment ("Indict.") in *U.S. v. Phillip R. Bennett, et al.*, No. S3 05 Cr. 1192 (NRB)
(S.D.N.Y. Jan. 16, 2007).

President and CEO of RSL since 1991. Maggio was also President and a member of the board of directors of RCM since 2001 and held various other executive positions with Refco entities until he was forced to resign following the disclosure of massive fraud at Refco in October 2005. Maggio therefore owed fiduciary duties both to RCM and to RCM's securities customers and, independently, was responsible by virtue of his position within RCM for ensuring that RCM properly discharged its fiduciary duties to RCM's customers. Maggio ran the brokerage operations of RSL and RCM and directly participated in, orchestrated and supervised the fraudulent conversion of RCM customer assets alleged herein. According to press reports, Maggio is cooperating with the U.S. Justice Department and the SEC in relation, *inter alia*, to their investigations into various frauds perpetrated during his tenure at Refco.

46. Defendant Joseph R. Murphy. Joseph R. Murphy ("Murphy") was Executive Vice President of RGL and responsible for global marketing since 1999. Murphy was also President of various Refco subsidiaries, including Refco LLC and Refco Global Futures LLC, that were beneficiaries of the fraudulent conversion of RCM customer assets. Both Refco LLC and Refco Global Futures LLC improperly received transfers of the proceeds from the sale of RCM customer securities pursuant to the fraudulent scheme described herein.

47. Defendant William M. Sexton. William M. Sexton ("Sexton") served as Executive Vice President and Chief Operating Officer ("COO") of RGL beginning in August 2004, and was responsible for information technology, operations, accounting and finance, credit, margins, and risk control for Refco's futures businesses. He joined RGL in April 1999 and served as Executive Vice President and COO of Refco LLC, an RGL subsidiary that received illegal transfers of RCM customer assets, from July 2001 until August 2004.

48. Defendant Philip Silverman. Philip Silverman ("Silverman") began

serving as Secretary of RGL in 1997, and held numerous high-level executive positions within Refco and its subsidiaries, including Controller of RGL.  As Controller, Silverman was directly responsible for overseeing intercompany and related-party transactions (including transactions between RCM and RCC and RCM and Refco Global Finance), the closing of Refco's books, implementation and maintenance of adequate internal financial controls, as well as the adoption and implementation of appropriate accounting policies for Refco.  Silverman was also Controller of RGHI and Secretary of numerous Refco subsidiaries.  Silverman has been a certified public accountant ("CPA") since 1982, was a close confidant of Bennett, and, on information and belief, was Bennett's personal accountant and had principal accounting oversight over RGHI.

49.    Defendant Robert C. Trosten.  Robert C. Trosten ("Trosten") was Executive Vice President and CFO of RGL from 2001 until October 2004.  Prior to becoming CFO, Trosten was a member of Refco's corporate finance team from 1997 until 2001.  He is a CPA.  Trosten's responsibilities as CFO of Refco included global accounting and budgeting, regulatory reporting, establishment of accounting policies, and the development and execution of key strategic initiatives at the corporate level.  He was directly responsible for Refco's financial affairs, the adoption and compliance with appropriate accounting policies, and Refco's maintenance of adequate internal financial controls.  Refco's SEC filings highlighted Trosten's importance to Refco's success as a central member of its management team.  Upon the closing of the LBO, Trosten received two payments totaling approximately $48 million.  Trosten resigned two months later, after serving only three years as CFO.  Defendants did not publicly disclose the huge payment to Trosten but instead simply announced that Trosten had resigned to "pursue other financial interests."  Trosten is currently under indictment in the United States District Court for the Southern District of New York, charged with, inter alia, securities fraud, wire

NY2:#4742866

fraud, bank fraud, money laundering, conspiracy to make false filings with the SEC and conspiracy to make material misstatements to auditors, as a result, in part, of acts alleged herein.[4]

50.     Defendant Richard N. Outridge.   Richard N. Outridge ("Outridge") was CFO of RCM from early 2004 until August 10, 2005.  Outridge joined Refco in June, 2001, as Vice President and Controller of RCM.  As CFO of RCM, Outridge was directly responsible for RCM's financial affairs, the adoption of, and compliance with, appropriate accounting policies, and RCM's maintenance of adequate internal financial controls.  On information and belief, Outridge was a close confident of Maggio and, along with Maggio, had the most detailed knowledge of RCM's financial practices.

## D.     The THL Defendants

51.     Defendant Thomas H. Lee Partners, L.P.   Thomas H. Lee Partners, L.P. ("THL"), a Delaware limited partnership, is a private equity investment fund headquartered in Boston, Massachusetts, with approximately $12 billion of capital under management.  THL's business focuses on the acquisition of substantial equity stakes in mid-to-large capitalization companies.

52.     THL, founded in 1974, describes itself as "one of the oldest and most successful private equity investment firms in the United States" and holds itself out to the financial community as extraordinarily sophisticated in business and financial matters.  THL has invested approximately $12 billion of equity capital in more than 100 businesses with an aggregate purchase price of more than $100 billion.  The firm currently manages approximately $20 billion of committed capital.  Notable transactions sponsored by THL include Dunkin

---

[4] *See id.*

Brands, Nielsen, Michael Foods, Houghton Mifflin Company, Fisher Scientific, Experian,

TransWestern, Snapple Beverage and ProSiebenSat1 Media. THL has also sponsored less

successful transactions, including Spectrum Brands Inc., which has lost 90% of its value since

March 2005 and bears a $2.5 billion debt load (ten times the value of its market capitalization).

        53.      In August 2004, THL and related entities and affiliates purchased a

controlling 57% equity stake in Refco for approximately $507 million. As a result, THL and

related entities held a majority stake in Refco and had de-facto control over its operations. As

detailed below, in addition to having voting control over Refco, THL and related entities had a

variety of contractual rights that provided them with additional control over, and access to

information about, Refco's affairs. The THL entities involved with Refco transactions include:

- Thomas H. Lee Equity Advisors V, L.P. ("Equity Advisors V"), a Delaware limited partnership owned and controlled by THL with its principal office in Boston, Massachusetts;

- THL Managers V, LLC ("THL Managers V"), a Delaware limited liability company with its principal office in Boston, Massachusetts, of which at all times THL was the managing and controlling member;

- Thomas H. Lee Equity Fund V, L.P. and Thomas H. Lee Parallel Fund V, L.P., each a Delaware limited partnership with its principal office in Boston, Massachusetts, owned and controlled by Equity Advisors V and THL Managers V;

- Thomas H. Lee Equity (Cayman) Fund V, L.P., an exempted limited partnership formed under the laws of the Cayman Islands, owned and controlled by THL Managers V and Equity Advisors V (registered in the Cayman islands as a foreign company) (together with Thomas H. Lee Equity Fund V, L.P. and Thomas H. Lee Parallel Fund V, L.P., the "Fund V Entities");

- Thomas H. Lee Advisors, LLC ("THL Advisors"), a Delaware limited liability company with its principal office in Boston, Massachusetts, and general partner of THL;

- Thomas H. Lee Investors Limited Partnership, a Massachusetts limited partnership controlled by Thomas H. Lee; and

- The 1997 Thomas H. Lee Nominee Trust, a trust over which Thomas H. Lee has voting and investment control.

54.     THL, THL Advisors, THL Managers V, Equity Advisors V, Fund V Entities, Thomas H. Lee Investors Limited Partnership, and the 1997 Thomas H. Lee Nominee Trust are collectively referred to herein as the "THL Entities." As discussed in more detail below, the THL Entities always acted in concert. They owned a majority stake in Refco from the date of THL's LBO of Refco until Refco's IPO. Additionally, from the date of the LBO until Refco's bankruptcy filing, the THL Entities controlled and directed Refco and exercised discretion over its affairs.

55.     <u>Defendant Thomas H. Lee</u>.  Thomas H. Lee ("Lee") was at all relevant times subsequent to the LBO a director of Refco. Lee founded the Thomas H. Lee Company, the predecessor of THL in 1974 and served as its Chairman and CEO since its inception until reportedly leaving that entity after October 2005. As a director of Refco and as Chairman and CEO of THL, Lee was actively involved in the decision to invest in Refco and in THL's subsequent monitoring of its investment.

56.     <u>Defendant David V. Harkins</u>.  David V. Harkins ("Harkins") was at all relevant times subsequent to the LBO a director of Refco. Harkins also served on Refco's nominating and governance committee. Harkins is Vice Chairman and Managing Director of Private Equity Funds of THL, and has also served as President of THL. As a director of Refco and as Chairman and a top executive of THL, Harkins was actively involved in the decision to invest in Refco and in THL's subsequent monitoring of its investment.

57.     <u>Defendant Scott L. Jaeckel</u>.  Scott L. Jaeckel ("Jaeckel") was at all relevant times subsequent to the LBO a director of Refco. Jaeckel also served as Treasurer of New Refco, Treasurer of Refco Finance Holdings, LLC., and Treasurer of Refco Finance Inc., a

co-offeror in Refco's Bond Offering of August 2004. Jaeckel is a Managing Director of THL. He previously served as Vice President of THL from 2001 until December 2004, and as an Associate from 1994 to 1996 and from 1998 to 2001. Jaeckel holds an M.B.A. from Harvard University and has extensive experience in corporate finance, including previous employment in the Corporate Finance Department of Morgan Stanley & Co. As a director and officer of Refco and a top executive at THL, Jaeckel was actively involved in the decision to invest in Refco and in THL's subsequent monitoring of its investment. Jaeckel also attended meetings of the audit committee of Refco's Board of Managers.

58.    Defendant Scott A. Schoen. Scott A. Schoen ("Schoen") was at all relevant times subsequent to the LBO a director of Refco. Schoen served as President of New Refco, President of Refco Finance, Inc., a co-offeror in Refco's Bond Offering of August 2004, and sole director of Refco Finance, Inc. He also served on Refco's nominating and governance committee as well as its compensation committee. Schoen joined THL in 1986 and currently serves as its Co-President. He previously served as a Managing Director of THL from 1992 to 2004 and as Vice President from 1988 to 1992. Schoen received an M.B.A. and law degree from Harvard University and was in the private finance department of Goldman, Sachs & Co. before he joined THL. As a director and officer of Refco and a top executive at THL, Schoen was actively involved in the decision to invest in Refco and in THL's subsequent monitoring of its investment.

59.    The THL Entities together with Defendants Lee, Harkins, Jaeckel and Schoen are collectively referred to herein as the "THL Defendants." At all relevant times subsequent to the LBO, the THL Defendants collectively and as a group managed and controlled Refco. One year after the LBO, the THL Defendants brought Refco public in the August 2005

IPO.  The THL Defendants and their affiliates received approximately $223.5 million as selling

shareholders and otherwise in the deal, while still maintaining a controlling ownership stake of

42.7% of Refco.  In a number of Refco's SEC filings prior to the bankruptcy, the THL

Defendants publicly acknowledged being familiar with all aspects of the financial affairs of

Refco and its subsidiaries.

## IV. THE FRAUDULENT SCHEME

### A.    RCM's Position Within Refco's Operations

60.    Before its collapse in 2005, Refco had three major operating subsidiaries

each of which had its principal place of business in New York: RSL, a registered broker-dealer;

Refco LLC, a regulated futures commission merchant; and RCM, a securities and foreign

exchange broker.  In addition to its major operating subsidiaries, Refco also maintained the entity

RCC as the "bank", "treasury" or "disbursing agent" for Refco.

61.    At all relevant times, a substantial portion of the funds disbursed by RCC

to, or on behalf of, various Refco entities in performing its "bank", "treasury" or "disbursing

agent" function for Refco were derived from the theft and conversion of assets from the accounts

of RCM customers, including the accounts of securities customers.  The proceeds of the

converted securities improperly stolen from RCM customer accounts were used for a wide

variety of general and specific funding purposes.  All such purposes were completely unrelated

to RCM, and none benefited RCM customers in any way.  For instance, the proceeds from the

sale of misappropriated RCM customer assets were disbursed by RCC to other Refco entities

which in turn used the funds to, among other things, make payroll payments, fund daily

operations of other Refco entities, extend margin credit to their own customers, and finance

major acquisitions and other substantial transactions entered into by Refco. If not for the conversion of the customer property improperly stolen from RCM customer accounts, RCC would not have been able to perform its "bank", "treasury", or "disbursing agent" function, and Refco's house of cards would have collapsed for lack of liquidity, as in fact occurred immediately after the fraud at Refco was publicly disclosed in October 2005.

62. In addition, Bennett, Maggio, and others, were perpetrating another fraudulent scheme (the "RGHI Scheme") that was also being carried out in order to portray Refco's financial position as substantially more successful than it in fact was. The purpose of that scheme, which is described in detail in the Examiner's Report, was also to enable Bennett and others to enrich themselves through a liquidity event. Bennett and his co-conspirators operated this scheme in part through RCM and at times used the proceeds from converted customer securities in furtherance of the scheme.

63. In order to improve the appearance of Refco's financial position, Bennett and his co-conspirators, with the assistance of others, created substantial related-party receivables to hide Refco's trading losses and to move, among other things, certain operating expenses off Refco's books. The multi-hundred million dollar related-party receivable that Bennett and others created to hide these losses and expenses (the "RGHI Receivable") was purportedly payable by Bennett's entity RGHI, to RCM and to RCC. Then, in order to hide over the end of key reporting periods the magnitude and related-party nature of the RGHI Receivable, Bennett and his co-conspirators caused RCM and other Refco entities to engage in a series of transactions (the "Round-Trip Loans" or "RTLs"). As part of the RTLs, RCM would make loans, sometimes in cash, to third parties. The loans that Bennett and his co-conspirators caused

RCM to make in cash, were funded by the proceeds of the conversion of RCM's customers' securities.

**B.    Capital Management's Account With RCM**

64.    In May 2004, a representative of Plaintiff Capital Management met with representatives of Refco, including Stafford Bucknall and Executive Vice President Thomas Yorke, in Refco's New York offices to discuss the possibility of Capital Management opening a securities brokerage account with one or more Refco entities to trade in securities and borrow money on margin.

65.    Capital Management stated at this initial meeting with Refco that it was seeking an efficient broker who could also act as a dependable custodian for its securities, which included a large position in Lukoil stock.  Capital Management also explained that it might also, in the future, want the ability to borrow against securities that were to be held by RCM as a custodian.  During periods when Capital Management was not seeking to borrow against the Lukoil shares, it did not need to leave the shares in custody with RCM.  Moreover, to the extent that Capital Management obtained credit based on the shares, Capital Management did not need to leave any shares in the custody of RCM beyond the number of shares RCM required as collateral to support the amount that Capital Management wished to borrow on margin.

66.    An email communication between representatives of Refco and RCM immediately following the meeting confirms that Capital Management expected "Refco" to act as a custodian for its securities.  In that email, Bucknall (acting on behalf of RSL and RCM), who attended the meeting with Capital Management's representatives in Refco's New York Office, wrote to defendant Maggio stating, among other things, that Capital Management was

seeking a "dependable" "custodian" for its securities and asking Maggio whether Refco should open Capital Management's securities account at RSL or at RCM.

67.    Upon receiving from Refco, and subsequently executing, the standard form RCM/RSL customer agreement, Capital Management opened a securities brokerage account with RCM in June 2004, account number 10014082. By June 23, 2004, Capital Management had transferred 500,000 shares of Lukoil stock, then worth approximately $52.6 million dollars, from its securities brokerage account at Bear Stearns, to its RCM account to be held by RCM as custodian. Capital Management intended that the Lukoil stock held at RCM for safekeeping would also be available as collateral in the event that Capital Management determined to engage in margin financing.

68.    During the relevant period, Capital Management did not actively trade its Lukoil stock, instead strategically holding its Lukoil positions in light of what Capital Management correctly perceived to be a strengthening oil market. In order to potentially increase its Lukoil holdings, in August 2004 Capital Management placed a "good until cancelled" order at RCM instructing RCM to purchase additional Lukoil shares if and when the Lukoil share price dropped to $105. However, the price of Lukoil shares did not drop to that level and, instead, increased substantially over the next year in accordance with Capital Management's predictions. Capital Management also once used the margin credit facility that was available to it at RCM, taking out in June 2005 a margin loan for $25 million (far less than the approximately $73.5 million value represented at that time by the Lukoil shares) against its Lukoil stock, which was repaid in full by August 2005.

69.    By the time of the bankruptcy, all of Capital Management's securities held in custody at RCM were fully paid and unencumbered by any lien in favor of RCM. No margin call was ever made on Capital Management's account at RCM.

70.    Based on its customer agreement and other representations made in the course of its course of dealings with Refco, Capital Management understood that RCM was only authorized to purchase and sell securities on Capital Management's behalf in accordance with its instructions and that RCM otherwise held as custodian the property entrusted to it by Capital Management. No disclosures to the contrary were ever made to Capital Management.

71.    Capital Management had every reason to believe that its securities were safe at Refco. As agent and as custodian of its securities, Refco owed a fiduciary duty to Capital Management with respect to the Lukoil securities in Capital Management's account. Based on the course of its dealings with RCM, Capital Management understood and believed RCM to be acting in a custodial capacity and that RCM treated Capital Management as beneficial owner of its securities. At the time it opened its account and thereafter until Refco's filing for bankruptcy, Capital Management was unaware the RCM purported not to be subject to U.S. registration requirements.

72.    Refco repeatedly represented throughout the course of the brokerage relationship that the securities in Capital Management's account belonged to Capital Management. Indeed, as described below, Capital Management regularly received account statements identifying the Lukoil securities Refco was holding on behalf of Capital Management.

73.    RCM did not provide Capital Management with a written statement disclosing the nature of any interest or lien retained by RCM in the security held as collateral, as it was required to do under SEC Rule 10b-16 (as discussed below).

74.     According to the last monthly RCM account statement that Capital Management received before RCM entered into bankruptcy, as of September 30, 2005, the net equity value of the securities and other customer property in Capital Management's securities account was $116,271,904.69, consisting of a cash balance of $771,904.69 and two million shares of Lukoil stock, then worth $115.5 million.  As of the petition date, Capital Management's securities brokerage account number 10014082 included the custody of two million shares of Lukoil stock valued at $108,500,000 and a credit balance of $1,682,444.69, for a net equity value of $110,182,444.69.

75.     During the period from June 2004 to October 2005, unbeknownst to Capital Management, Capital Management's Lukoil stock was sold by RCM to various third parties, through hypothecations or pursuant to Repos, without Capital Management's knowledge, authorization or consent, in furtherance of the fraudulent scheme.  But for the Defendants' fraudulent scheme perpetrated on Capital Management and other RCM securities customers, Capital Management would have received the full value of its securities, plus interest from the date of the bankruptcy filing, as a result of the Bankruptcy Cases.  Because of the fraudulent scheme detailed herein, Capital Management will obtain an eventual recovery in a much lower amount.  Accordingly, Capital Management has been damaged in an amount yet to be determined but believed to be in the tens of millions of dollars.

## C.     IDF's Account With RCM

76.     In approximately October 1996, an executive of Plaintiff IDF met on several occasions with representatives of Refco, including Rodrigo Alvarez, Victor Enriquez, Sixto Campano, and Carlos Alvarez, to discuss the possibility of IDF opening a brokerage

account to trade securities and borrow money on margin. These meetings took place in Guatemala, while Refco representatives visited customers in that country, and in Refco's offices in Miami.

77.    During these meetings, IDF explained its conservative, low risk investment philosophy and that it was seeking an efficient broker who could also act as a dependable custodian for its securities. As a result of these discussions, the Refco representatives had a clear understanding of IDF's investment objectives, including its limited risk tolerance. IDF also explained that it might, in the future, want the ability to borrow against securities acquired or deposited by IDF and held by RCM as a custodian. During periods when IDF was not seeking to borrow against the securities it had on deposit, it did not need to leave the securities in custody with RCM. Moreover, to the extent that IDF obtained credit based on its securities, IDF did not need to leave any securities in the custody of RCM beyond the number of shares RCM required as collateral to support the amount that IDF wished to borrow on margin.

78.    IDF opened two securities brokerage accounts with RCM in October 1996, account numbers 10001626 and 10012110. During the relevant period, IDF's strategy was to use account number 10001626 as a conservative "safe mode" or "fall-back" account, in which it would invest on a rolling basis in three-month U.S. treasury bills and certain index equities. IDF's decision to invest in U.S. treasury bills reflected the very conservative, low risk strategy it wanted to adopt for the purposes of this account. At various times during the relevant period, the account also held surplus cash until reinvested.

79.    During the relevant period, IDF's strategy was to use account number 10012110 to invest in a mixture of emerging market bonds while trading within a clear set of defined parameters to adhere to IDF's limited risk tolerance.

80.     From the time it opened the accounts in October 1996 until the end of 1999, IDF made regular use of the margin credit facility offered to it by RCM. However, beginning in 2000, IDF used the margin credit facility only rarely. When Refco filed for bankruptcy, all of IDF's securities held at RCM were fully paid and unencumbered by any lien in favor of RCM. No margin call was ever made on either of IDF's accounts at RCM.

81.     Based on its customer agreement and other representations made in the course of its course of dealings with Refco, IDF understood that RCM was only authorized to purchase and sell securities on IDF's behalf in accordance with its instructions and that RCM otherwise held as custodian the property entrusted to it by IDF. No disclosures to the contrary were ever made to IDF.

82.     IDF had every reason to believe that its securities were safe at Refco. As agent and as custodian of its securities, Refco owed a fiduciary duty to IDF with respect to the securities held in IDF's account. Based on the course of its dealings with RCM, IDF understood and believed RCM to be acting in a custodial capacity and that RCM treated IDF as beneficial owner of its securities.

83.     Refco repeatedly represented during the course of the brokerage relationship that the securities in IDF's account belonged to IDF. IDF regularly received account statements, showing which securities Refco held on behalf of IDF.

84.     RCM did not provide IDF with a written statement disclosing the nature of any interest or lien retained by RCM in the security held as collateral, as it was required to do under SEC Rule 10b-16 (as discussed below).

85.     On October 12, 2005, a representative of IDF instructed RCM to deliver free of payment all securities held by RCM on its behalf in accounts 10001626 and 10012110 to an account held by IDF with a third party broker. On November 3, 2005, Refco advised that it was unable to comply with these instructions due to its entry into bankruptcy.

86.     According to a report that IDF received from Refco following its entry into bankruptcy, the net equity value of the securities and other customer property in IDF's securities account 10001626, as of November 3, 2005, was $12,639,418.95.

87.     According to a report that IDF received from Refco following its entry into bankruptcy, the net equity value of the securities and other customer property in IDF's securities account 10012110, as of October 31, 2005, was $7,464,006.89.

88.     Therefore, following Refco's entry into bankruptcy and as of November 3 2005, the aggregate net equity value of IDF's two RCM accounts was $20,103,425.84.

89.     During the period from October 1996 to October 2005, unbeknownst to IDF, IDF's securities were sold by RCM to various third parties, through hypothecations or pursuant to Repos, without IDF's knowledge, authorization or consent, in furtherance of the fraudulent scheme. But for the Defendants' fraudulent scheme, IDF would have received the full value of its securities, plus interest from the date of the bankruptcy filing, as a result of the Bankruptcy Cases. Because of the fraudulent scheme detailed herein, IDF will obtain an eventual recovery in a much lower amount. Accordingly, IDF has been damaged in an amount yet to be determined but believed to be many millions of dollars.

### D.    IDC's Account With RCM

90.    Plaintiff IDC opened a brokerage account with RCM in February 1998, account number 10010247. IDC and IDF shared common investors and advisors.

91.    Based on the course of IDF's and IDC's dealings and discussions with Refco and its representatives and the terms of IDC's customer agreement, IDC understood that in opening its account with RCM it was only authorizing RCM to purchase and sell securities on IDC's behalf in accordance with its instructions and that otherwise RCM held as custodian the property entrusted to it by IDC. No disclosures to the contrary were ever made to IDC. During periods when IDC was not seeking to borrow against the securities it had on deposit, it did not need to leave the securities in custody with RCM. Moreover, to the extent that IDC obtained credit based on its securities, IDC did not need to leave any securities in the custody of RCM beyond the number of shares RCM required as collateral to support the amount that IDC wished to borrow on margin.

92.    During the relevant period, IDC used its RCM account to trade corporate bonds and securities. At various times during the relevant period, the account also held surplus cash until reinvested.

93.    From the time IDC opened its accounts in February 1998 until the end of 1999, IDC made regular use of the margin credit facility offered to it by RCM. However, beginning in 2000 IDC used the margin credit facility only rarely. At the time of Refco's entry in bankruptcy, all of IDC's securities held at RCM were fully paid and unencumbered by any lien in favor of RCM. No margin call was ever made on either of IDC's accounts at RCM.

94.    IDC had every reason to believe that its securities were safe at Refco. As agent and as custodian of its securities, Refco owed a fiduciary duty to IDC with respect to the securities held in IDC's account. Based on the course of its own and IDF's dealings with RCM, IDC understood and believed RCM to be acting in a custodial capacity and RCM treated IDC as beneficial owner of its securities.

95.    Refco repeatedly represented during the course of the brokerage relationship that the securities in IDC's account belonged to IDC. IDC regularly received account statements, showing which securities Refco held on behalf of IDC.

96.    RCM did not provide IDC with a written statement disclosing the nature of any interest or lien retained by RCM in the security held as collateral, as it was required to do under SEC Rule 10b-16 (as discussed below).

97.    On October 12, 2005, a representative of IDC instructed RCM to deliver free of payment all securities held by RCM on IDC's behalf to an account held by IDC with a third party broker. On November 3, 2005, Refco advised that it was unable to deliver the securities in accordance with IDC's instructions due to its entry into bankruptcy.

98.    According to a report that IDC received from Refco following its entry into bankruptcy, the net equity value of the securities and other customer property in IDC's securities account as of October 31, 2005 was $22,729,411.97.

99.    During the period from February 1998 to October 2005, unbeknownst to IDC, IDC's stock was sold by RCM to various third parties, through hypothecations or pursuant to Repos, without IDC's knowledge, authorization or consent, in furtherance of the fraudulent scheme. But for the Defendants' fraudulent scheme, IDC would have received the full value of

its securities, plus interest from the date of the bankruptcy filing, as a result of the Bankruptcy

Cases. Because of the fraudulent scheme detailed herein IDC will obtain an eventual recovery in

a much lower amount. Accordingly, IDC has been damaged in an amount yet to be determined

but believed to be many millions of dollars.

## E.    The Customer Agreements

100.    The Plaintiffs each entered into a standard form "Securities Account

Customer Agreement" (the "Customer Agreement") with both RCM and RSL. Each of the

Plaintiffs correctly understood the Customer Agreement to provide that Plaintiffs would own all

fully-paid securities deposited and held in their customer accounts and that those securities could

be traded or otherwise dealt with by Refco only in accordance with the Plaintiffs' instructions.

101.    Section A of the five-page Customer Agreement, governed by New York

law, is entitled "Authorization" and clearly sets out that Refco is only authorized to deal with a

customer's securities in accordance with the instructions of that customer:

> 1.    *Authority to Act.* You hereby authorize Refco to purchase, sell,
> borrow, lend, pledge or otherwise transfer Financial Instruments
> (including any interest therein) for your account in accordance with your
> oral or written instructions. You hereby waive any defense that any such
> instructions are not in writing as may be required by any law, rule or
> regulation. The authority hereby conferred shall remain in force until
> written notice of its revocation is received by Refco. Refco shall be
> under no duty or obligation to inquire into the purpose or propriety of any
> instruction given by you and shall be under no obligation concerning the
> application of any funds delivered to you upon your order. Except to the
> extent you have expressly authorized someone else to buy, sell and
> otherwise effect Transactions on your behalf and for your account, all
> Transactions introduced to Refco by RSL on your behalf and entered into
> pursuant to this Agreement shall be initiated orally or in writing by you.
> All securities and other financial instruments delivered by you to Refco
> shall be in good deliverable form.

102.    The remaining sections B through H of the Customer Agreement are

variously titled "Margin", "Prime Brokerage", "Netting", "Default", "Representations and

Warranties", "Miscellaneous" and "Law and Jurisdiction".  None of these provisions gave Refco

the right to sell customers' fully-paid securities entrusted to RCM other than in accordance with

those customers' express instructions.  To the extent that a customer borrowed funds from RCM

and thereby created a margin balance, consistent with industry practice and applicable state and

federal law, RCM had the right under the Customer Agreement to hypothecate securities with a

value equivalent to the margin balance, but no more than that value (such a right, and the

corresponding limitation, is common in the securities industry).   Consistent with securities

industry practice, and federal regulations with respect to the conduct of broker-dealers, nothing

in the Customer Agreement gave RCM the right to take any action with respect to Plaintiffs'

fully-paid securities that were held in RCM accounts.   Moreover, to the extent that Plaintiffs had

a margin balance, RCM's right to use customer securities would have been limited to securities

with a value equal to the margin balance and no more.

103.    In connection with Refco's Bankruptcy Cases, Judge Drain reviewed the

Customer Agreement during a six day trial in which that agreement and the relationship between

RCM and Plaintiffs and other RCM customers was the primary focus.  Consistent with Plaintiffs'

understanding of the Customer Agreement, Judge Drain held that the Customer Agreement did

not give RCM any right to sell or otherwise deal with fully-paid customer securities.  Rather,

Judge Drain held that such fully-paid securities belonged to the customers in whose accounts

those securities were reflected and that the Customer Agreement did not give RCM any right to

hypothecate, sell or otherwise use those securities or proceeds from those securities.

Specifically, Judge Drain held:

> [t]he objectors to the motion point to the customer agreement, and in
> particular, Paragraph B of that agreement where they had a margin, to

suggest that the customers of RCM normally took the risk that RCM could do whatever it pleased with the securities and other property that they left with RCM in their customer accounts notwithstanding Section A of the customer agreement, quoted above, and therefore, that there was no real entrustment.  Having read the two paragraphs in Section B of the customer agreement, I don't accept that argument.

It appears clear to me from the language of that agreement and those provisions that those provisions apply in the situation where customers have engaged in margin or financing transactions with RCM or its affiliates and that what the customers have given to RCM in those paragraphs is a security interest in their property until those transactions are paid off and the debt satisfied...

... So I do not see anything in these two paragraphs that will take the moving customer group members out of the notion that they entrusted their securities, or cash to purchase securities, with RCM.

104.    Plaintiffs in this action did not have any margin balance at the point in time when Refco filed for bankruptcy.  Accordingly, RCM had no right to do anything with securities that were held in Plaintiffs' accounts as of that time, except the one thing that RCM had represented it would do:  hold the securities in safekeeping as a custodian for Plaintiffs.  As a result, Plaintiffs were deceived about the treatment of their securities because, unbeknownst to Plaintiffs, RCM had sold, "repoed" or hypothecated Plaintiffs' securities and use the proceeds for the benefit of Refco, RCM and the defendants.  RCM's theft of Plaintiffs' securities contradicted the terms and conditions of the Customer Agreement and the understanding that Plaintiffs had justifiably reached concerning the manner in which their securities were being held.

## F.    Conversion Of RCM Customers' Securities

105.    Refco's senior management, including the Officer Defendants, were aware of the substantial need for cash to maintain the appearance that Refco was a fast-growing group of companies and the illusion that Refco was highly profitable, healthy, and able to satisfy

its substantial working capital needs from what the Defendants described as Refco's "internally generated cash flow and available funds", rather than having to access the capital markets and borrow money. For the THL Defendants, once they had made their investment in Refco as part of the LBO transaction, this deception was critical to their goal of securing for themselves a substantial payday by taking the company public as quickly as possible.

106. Those cash needs were satisfied largely by the fraudulent conversion of RCM customer securities and by siphoning the resulting funds from RCM to other Refco entities that provided no assurances of their ability, intent, or obligation to repay the funds on demand or otherwise, that had provided no security for the funds, and that lacked the financial wherewithal to repay the funds on demand or otherwise.

107. Unbeknownst to Plaintiffs, RCM was not acting as a custodian for the securities that were entrusted to it by its customers. Instead, as described below, RCM customers' securities were routinely sold without the customers' knowledge, authorization or consent, with the proceeds being used to finance the business and acquisitions of RCM's parent and affiliated companies. RCM did not have the legal right to sell, loan, pledge or re-hypothecate or otherwise misappropriate its customers' cash, fully paid securities, and other property held in their RCM brokerage accounts.

108. Typically, Refco senior management, including Defendants Maggio and Bennett, and other persons acting on behalf of Refco Global Finance, RCC and RGL, having determined that a further injection of capital was required to meet Refco's operational and funding needs, would direct Refco employees, including Executive Vice President Thomas Yorke, who acted both for RSL and RCM on the so-called Global Execution and Finance Desk, to sell, or cause to be sold, through hypothecation or pursuant to Repos, whatever amount of

RCM customer securities was required to raise the required funds. Yorke testified in the Bankruptcy Cases that Refco would sell or re-hypothecate "anything held in a Refco account." Consistent with Yorke's testimony, Refco re-hypothecated customer securities to generate cash that it transferred to other Refco entities for any number of purposes. Moreover, Refco used customer securities in Refco's Euroclear accounts to secure Refco's line of credit with Euroclear.

109.    At all times, Plaintiffs were unaware that their securities (and the securities of other RCM customers) were being sold without Plaintiffs' authorization or consent. Yorke testified in the Bankruptcy Cases that RCM's customers were not told that entrusted property was swept from their accounts at RCM to other Refco entities. Given the opportunity to testify that RCM's customers were told that this might happen, Yorke could identify no such communications to customers. Indeed, Yorke testified that he would not have expected RCM's customers to have known "about the inner workings, relative to what the upstream bank was doing, no." Yorke's reference to the "bank" was a reference to RCC.

110.    As part of the Defendants' scheme, Plaintiffs' securities, and those of other RCM customers, were fraudulently converted by RCM, at the direction of Bennett, Maggio, and the other Officer Defendants, to sustain Refco's business operations and fund acquisitions. The proceeds of the fraudulent conversions were siphoned out of RCM and transferred to other Refco entities including RCC. RCC then used the funds to make "loans" to other Refco entities that could not repay those "loans." Pursuant to this scheme, the proceeds of the converted securities improperly stolen from RCM customer accounts were used for a wide variety of general and specific funding purposes. All such purposes were completely unrelated to RCM, and none benefited RCM customers in any way. For instance, the proceeds from the sale of misappropriated RCM customer assets were used, among other things, to make payroll

payments, and to fund the daily operations of other Refco entities. The proceeds from the sale of misappropriated RCM customer assets were also transmitted to RSL and Refco LLC, where they were used to extend margin credit to customers of those entities.

111.    The proceeds from the fraudulent conversion of RCM customer assets were also used to finance major acquisitions and other substantial transactions entered into by Refco, including two significant transactions that occurred while the THL Defendants were in control of Refco. For example, Refco's purchase of Cargill Investor Services ("Cargill") for $209 million in the summer of 2005 was paid for with stolen RCM customer assets. RCM customer securities were sold and the proceeds were transferred to RCC, which made the Cargill purchase on RGL's behalf. Similarly, in 2005, while the THL Defendants were in control of Refco, RCC loaned $204 million to Suffolk, LLC, the controlling shareholder of the PlusFunds, to finance Suffolk's buyout of PlusFunds. The source of funds for the Suffolk transaction was, in substantial part, RCM customer securities which were sold to raise the desired funds and then used by RCM's corporate affiliates to make the loan.

112.    At all times, a key motivation behind the conception and continuation of the fraudulent scheme was to enable the Defendants to paint a rosy picture of a financially sound and stable Refco that would allow it fraudulently to attract more customers to open and maintain securities accounts with Refco. The more cash and securities that Refco managed on behalf of its securities customers, the more attractive Refco would be to the market when the Defendants decided to cash out their interests in Refco.

113.    Rather than holding customer securities at RCM or engaging in transactions pursuant to customer instructions with appropriate regard for the legitimate and reasonable interests and expectations of RCM's customers, the Officer Defendants, who had

clear conflicts of interest and divided loyalties, caused customer securities to be converted

fraudulently and the proceeds to be "upstreamed," "side-streamed," and "down-streamed" to

other Refco entities to sustain Refco's business operations and acquisitions.  These transfers,

which purportedly took the form of intercompany "loans", occurred without any loan

documentation between RCM, RCC and the Refco entities that received assets that had been

wrongfully siphoned from the accounts of RCM customers.  The purported "loans" of RCM

customer funds to other Refco entities for purposes unrelated to the business of RCM and

without benefit to RCM reflected blatant and undisclosed conflicts of interest by the Officer

Defendants, and were made:

    (a)  without the knowledge, authorization or consent of the RCM customers who owned the securities;

    (b)  without compensation, security, or collateral to the RCM customers who owned the securities;

    (c)  without assurances that the resulting funds would or could be repaid on demand or at all by the Refco entities that received them;

    (d)  without informed decision making at RCM or any analysis, much less informed and objective analysis, on behalf of RCM or RCM's customers of the ability of the Refco entities to which the funds were "loaned" to repay the funds on demand or at all;

    (e)  to other Refco entities that in fact lacked the intent and/or the financial wherewithal to repay the siphoned funds on demand or at all;

    (f)  for the purpose of enriching the Officer Defendants;

    (g)  for the purpose of enriching the THL Defendants; and

(h) in transactions that provided no benefits to the affected RCM customers and in which the legitimate and reasonable interests and expectations of the RCM customers were entirely ignored.

114.    The purported "loans" made with the proceeds of the fraudulent conversion of RCM customer securities were uncollectible because the Refco entities to which the loans were made lacked the financial ability or intention to repay them. RCM received no margin, collateral or security and the loans were improperly and fraudulently documented. RCM did not receive security interests in any of the assets (such as Cargill) that were purchased with the transferred funds. The monies were simply transferred to and spent by RCM's corporate affiliates.

115.    The transfer of capital obtained through the unauthorized sale of customer securities, from RCM to RCC and then to other Refco entities, was accepted as a regular business practice within Refco. Such transfers were critical elements of Refco's ability to finance its operations and its acquisition plans. The practice was approved and executed by senior management of Refco, and was known to, or recklessly disregarded by, the THL Defendants and each of the Officer Defendants. According to one executive responsible for effecting the fraudulent transactions with RCM customer securities, employees involved in the transfer of capital made no effort to hide the practice within Refco. Instead, the practice was discussed openly among relevant members of Refco management with the constant flow of additional capital being essential to the continued operation of Refco. As of October 2005, RCM had more than $2.4 billion of outstanding, undisclosed and uncollectible intercompany receivables as a result of the fraudulent conversion of entrusted customer securities and the distribution of the resulting funds to other Refco entities that did not have the intention and/ or

NY2:#4742866

financial wherewithal to repay such loans. RCM's customers were left with losses of more than $2 billion as a result of these fraudulent transactions.

**G.    The Theft Of RCM Customer Securities Was Hidden From Plaintiffs**

116.    The Officer Defendants' ultimate goal of cashing out of Refco, in whole or in part, through one or more liquidity events depended on the fraudulent conversion of customers' securities to fund Refco's business and for other purposes. Similarly, the THL Defendants' motivation to reap substantial profits from taking the company public as quickly as possible required theft of RCM customers' securities through the scheme described herein.

117.    The Officer Defendants recognized that Refco's business faced inherent reputational risks and that customers would not place securities in their accounts with RCM if they did not believe that RCM was financially healthy and strong and was a safe entity to which customers could entrust their securities for specific, limited purposes -- a fact that was confirmed by the "run" on RCM precipitated by the belated public disclosure of Refco's pervasive fraud in October 2005.

118.    Accordingly, the Officer Defendants needed to, and did, commit fraud in order to keep RCM's customers in the dark and RCM's doors open long enough so that they could continue to siphon funds from RCM customers' property until they could find a way to sell some or all of their interests in Refco.

119.    By allowing and causing RCM to use U.S. jurisdictional means to induce and effect transactions in securities, and by falsely presenting RCM to the public as financially healthy and strong and as a safe entity to which customers could entrust their securities for specific, limited purposes, the Officer Defendants enabled RCM to attract a substantial volume

NY2:#4742866

of business from securities customers, including the Plaintiffs. As a result, billions of dollars worth of securities entrusted to RCM by its customers were made available for fraudulent conversion, and Refco's business operations and acquisitions could be sustained by the proceeds. The false picture of financial health and strength to which these activities contributed was in turn used by the Defendants to enable them to cash out their interests in Refco.

120.    In the course of the Refco Bankruptcy Cases, Judge Drain concluded, following analysis of the Customer Agreements, that the relationship between RCM and its customers was a fiduciary one with respect to the securities that were deposited and held in accounts at RCM. After a factual hearing, Judge Drain found that RCM customers had entrusted their securities to RCM, and that a fiduciary duty existed with respect to that entrustment of securities. Judge Drain went on to find:

> [T]he customers had every reasonable indication that they did own the securities [held by RCM on behalf of RCM customers], although if they were trading on margin RCM would have a collateral security interest in them for the margin loan, and it was reasonable for them to expect that those securities or infungible like property would be returned to them on their instruction.

121.    In these circumstances, RCM, acting in relevant respects as a fiduciary, was not authorized to sell customer securities entrusted to it as a custodian. Further, in its capacity as a fiduciary, RCM had an affirmative obligation to inform its customers of material facts relating to the customer securities entrusted to RCM by its customers. RCM's practice of selling customer securities and up-streaming and side-streaming the proceeds to Refco entities that did not have the intent and/or financial wherewithal to repay those funds without the requisite authorization of those customers was clearly a material fact that RCM was under an affirmative obligation to disclose.

122.    To the detriment of Plaintiffs and other RCM customers, however, the sale of securities entrusted to RCM in furtherance of the fraudulent scheme was never disclosed. Rather, the sale of RCM customers' securities were done without the customers' knowledge, authorization or consent.  This deception was integral to the success of the Defendants' scheme. Had Plaintiffs known that their securities were being sold and placed at risk, they would not have kept them in the RCM accounts.

123.    Refco and the Defendants knew that if they had disclosed RCM's practices to RCM's customers, those customers would likely have withdrawn their securities from RCM and instead entrusted their securities to other financial institutions where the securities would not have been subject to the same risks.  Such a withdrawal of securities would have threatened Refco's continued existence because the availability of the proceeds of the sale of customer securities was essential to Refco's ability to finance its own activities.

124.    Accordingly, the Defendants at all times acted in a manner to conceal RCM's practices from its customers.

## H.    The Fraud Was Perpetuated By Misleading Account Statements And Non-Disclosures

125.    The customer account statements that Plaintiffs and other RCM customers received at least monthly contained lists of securities purportedly held in their accounts under the legend "SECURITY POSITIONS IN YOUR ACCOUNT".  These account statements were intended to lead RCM customers to believe that their securities were held in their accounts when,  in truth, the Defendants treated those securities as RCM's property that could be sold to finance the business activities of other Refco entities.

NY2:#4742866

44

126.    The way in which the RCM account statements reported Plaintiffs' margin financing transactions and the apparent treatment of securities posted as collateral in connection therewith, furthered the deceit.  When a RCM customer borrowed money on margin against securities, the number of securities reported in "SECURITY POSITIONS IN YOUR ACCOUNT" would be reduced by the amount of securities posted as collateral.  The type and amount of securities posted by the customer and held by RCM as collateral against the margin loan would instead appear on the account statements listed under the legends "ACCOUNT ACTIVITY" and "OPEN FINANCING TRANSACTIONS".  As a customer paid off the margin loan, the account statements would report that the some or all of the securities posted as collateral were returned to the customer.  That is, the statements would evidence a proportionate reduction in the quantity of securities that RCM held as collateral against the remaining loan balance in the "OPEN FINANCING TRANSACTIONS" section, and would reflect a corresponding increase in the quantity of securities in the "SECURITY POSITIONS IN YOUR ACCOUNT".  This reporting of the margin financing transactions clearly demonstrated to Plaintiffs that once they had paid off a margin loan in whole or in part, RCM would return to the Plaintiffs' account the corresponding securities pledged as collateral against that loan and would then hold those securities for Plaintiffs in custody.  This reporting of the margin financing transactions was, therefore, also entirely consistent with the Customer Agreement.

127.    The RCM account statements were false and deceptive because RCM, in fact, treated *all* customer securities in its possession as its own property that could be sold to finance the business activities of Refco's affiliated companies, not only those securities held by RCM as collateral against a loan balance, as was falsely represented by the account statements.

128.    Because RCM enabled customers regularly to check their account statements and made them available online, Plaintiffs and other RCM customers were led to believe that they were informed of every transaction made with respect to those securities entrusted to RCM.  As Judge Drain noted:

> [T]he customer statements which [RCM customers] received on a monthly basis ... showed the customers' orders being fulfilled and showed them being fulfilled in a way that reflected their ownership of the securities.

129.    RCM further concealed the fraudulent scheme from its customers by failing to comply with SEC Rule 10b-16.

130.    By way of example, as of May 2005, Capital Management had entrusted a total of 2,000,000 fully paid Lukoil ADRs to RCM.  Although Capital Management had held an account with RCM for almost a year, Capital Management had not in that period engaged in any margin financing and RCM had provided custodial services during that period.  Consistent with Capital Management's understanding, its account statements from RCM for the period ended May 31, 2005, reported, under the heading "SECURITY POSITIONS IN YOUR ACCOUNT," that Capital Management held 2,000,000 Lukoil ADRs and had no open financing transactions.

131.    In June 2005, Capital Management engaged in margin financing, borrowing $25 million from RCM and pledging its 2,000,000 Lukoil ADRs as collateral for that loan.  Capital Management's June 2005 account statement from RCM reported, under the heading "SECURITY POSITIONS IN YOUR ACCOUNT," that Capital Management held 2,000,000 Lukoil ADRs but reported under "OPEN FINANCING TRANSACTIONS" that Capital Management had a $25 million loan outstanding and that the 2,000,000 Lukoil ADRs were pledged as collateral for that loan.

132.    Capital Management's July 2005 monthly statement shows that Capital Management repaid $15 million of its $25 million margin loan from RCM on July 8, 2005, when a $15M wire was received by RCM from Harris Trust. Capital Management's July 2005 monthly statement reflected that, after the $15 million partial repayment, 800,000 of Capital Management's 2,000,000 Lukoil ADRs remained pledged to RCM as collateral for the $10 million margin loan balance. (At a value of approximately $41.25 a share, the 800,000 Lukoil ADRs that were pledged to RCM had a market value of approximately $33 million, which provided more than adequate collateral for the $10 million loan balance.) The outstanding $10 million margin loan and collateral for that loan was reported, among other places, in Capital Management's July 2005 account statement from RCM under the heading "OPEN FINANCING TRANSACTIONS." The statement effectively reported that until Capital Management repaid the $10 million margin loan, only 1,200,000 of its 2,000,000 Lukoil ADRs were available for Capital Management's disposition.

133.    On or about August 24, 2005, Capital Management repaid the $10 million (plus interest) margin loan balance to RCM via wire transfer from an external account. Capital Management's August 2005 account statement from RCM reflected in the "ACCOUNT ACTIVITY" section the reversal of the $10 million margin loan and the return of the 800,000 Lukoil ADRs that had been pledged as collateral in connection therewith. Further, the RCM August 2005 account statement did not contain an "OPEN FINANCING TRANSACTIONS" section, and instead, reported under "SECURITY POSITIONS IN YOUR ACCOUNT," that RCM was holding 2,000,000 Lukoil ADRs in custody for Capital Management.

134.    Contrary to what was reported to Capital Management in the RCM account statements, as of August 31, 2005, RCM's internal books and records demonstrate that

RCM was not holding 2,000,000 Lukoil ADRs in safekeeping for Capital Management. Rather, as RCM's internal reports reflect, collectively, RCM customers owned a total of approximately 2,635,000 Lukoil ADRs at that time. Of these 2,635,000 securities, RCM had loaned or sold subject to Repo approximately 2,315,000 to third parties in return for cash.

135.    Thus, even though Capital Management repaid the $10 million margin loan balance to RCM on August 24, 2005, RCM had not, in fact, returned the Lukoil ADRs to Capital Management's account. Indeed, as of August 31, 2005, RCM held only approximately 320,000 Lukoil ADRs in total, which was not even close to the 2,000,000 ADRs reported by RCM as being held in custody in Capital Management's account.

136.    RCM's loans and repos to third parties of approximately 2,315,000 Lukoil ADRs were still open as of October 17, 2005. Thus, RCM customers' Lukoil ADRs (including Capital Management's ADRs) were still pledged to third parties when RCM filed for chapter 11 protection.

137.    Pursuant to SEC Rule 10b-16, RCM was obligated to provide express notice to its customers of the "nature of any interest or lien retained by RCM in the security held as collateral." Specifically, Rule 10b-16 provides:

> It shall be unlawful for any broker or dealer to extend credit, directly or indirectly, to any customer in connection with any securities transaction unless such broker or dealer has established procedures to assure that each customer:
>
> 1.    Is given or sent at the time of opening the account, a written statement or statements disclosing
>     *              *              *              *
>     vii.    the nature of any interest or lien retained by the broker or dealer in the security or other property held as collateral and the conditions under which additional collateral can be required

2.      Is given or sent a written statement, or statements, at least
        quarterly, for each account in which credit was extended,
        disclosing

        i.      the balance at the beginning of the period; the date,
                amount and a brief description of each debit and credit
                entered during such period; the closing balance; and, if
                interest is charged for a period different from the period
                covered by the statement, the balance as of the last day of
                the interest period

138.    RCM failed to provide the disclosures required by Rule 10b-16.

Plaintiffs were provided with neither a written statement disclosing the nature of any interest or

lien retained by RCM in the security held as collateral nor quarterly statements describing each

debit and credit entered during such period.  Had the Defendants caused RCM to comply with

the requirements of 10b-16,  Plaintiffs and other RCM customers would have become aware of

RCM's misuse of its customers' securities.  Instead, the Defendants hid the scheme from RCM's

customers.

## I.    The Scheme Violated Regulatory Requirements

139.    Had the Defendants properly safeguarded RCM customers' funds and

securities as they were obligated to do under applicable U.S. regulatory requirements and in

accordance with applicable New York law and their fiduciary obligations, the fraudulent scheme

would not have been possible and the Defendants could not have effected RCM's conversion and

theft of RCM customer assets.

140.    Broker-dealers operating within the U.S. are subject to a comprehensive

regulatory regime consisting of numerous U.S. regulations and supervisory structures intended to

protect investors.  Foremost among those regulatory requirements are Rule 15c3-1 (17 CFR

240.15c3-1), which requires broker-dealers to maintain sufficient capital to operate safely, and

NY2:#4742866