Rule 15c3-3 (17 CFR § 240.15c3-3), which requires broker-dealers to protect and segregate certain customer funds and securities.

141.    Brokers and dealers engaging in international activities from within the U.S. are not exempt from U.S. regulation. The SEC has determined that the definitions of "broker" and "dealer" do not refer to nationality and that the scope of these definitions includes both domestic and foreign persons performing activities described in Section 15(a) of the Exchange Act (15 U.S.C. § 78o(a)), which include making any use of U.S. jurisdictional means to induce or effect transactions in securities. Under this approach, all broker-dealers physically operating within the United States that effect, induce, or attempt to induce any securities transactions, even if these activities are directed only to foreign investors outside the United States, are required to comply with regulatory requirements such as 15c3-1 and 15c3-3.

142.    Under Rule 15c3-3, broker-dealers must obtain and maintain physical possession or control over all fully paid securities and excess margin securities carried for the account of customers. This rule is a critical deterrent against the misuse and misallocation of customer funds and securities. Rule 15c3-3 restricts a broker-dealer's ability to place customer monies and securities at the risk of the broker-dealer's business.

143.    As a United States registered and regulated broker-dealer, RSL was required to comply with both Rule 15c3-3 and 15c3-1. Likewise, whether or not RCM was required to be a United States registered broker-dealer (which Defendants knew, or were reckless in not knowing, RCM was required to be), RCM was also required to comply with both of these rules.[5]

---

[5] Securities and Exchange Commission Release No.34-27017, Registration Requirements for Foreign Broker Dealers RIN:3235-AD27, July 11, 1989.

144.    Plaintiffs had every reason to believe that both RSL and RCM would comply with these provisions of federal law. This was the case whether or not RCM was U.S. registered and whether or not it was incorporated overseas. At no time did any Refco representative ever inform Plaintiffs that either RSL or RCM were not complying with either Rule 15c3-3 and 15c3-1 as they were obligated to. To the extent that Refco may have represented to some customers that RCM was not subject to U.S. registration requirements, at no time did any Defendant advise Plaintiffs that such a lack of registration would permit (which it did not) RCM to convert customer securities to its own use.

145.    Under the control of the Defendants, Refco blurred the corporate forms of RSL and RCM to the point that they had no meaningful independent existence from one another. From at least 2001, RCM had no employees in Bermuda. Rather, RCM operated solely from the U.S. through a sales force of account officers and brokers employed by RSL. These account officers and brokers all carried business cards that identified them as RSL officers and employees. Likewise, all back office functions of RCM were also performed from Refco's office in New Jersey. RCM and RSL shared the same leadership, the same workforce, the same sales force, the same account officers, the same trading desk and the same back offices, as well as the same types of business forms (including customer agreements, trade confirmations, and customer account statements) and the same office space. Both entities effected securities transactions for their customers. Both RCM and RSL were run by the same person – Defendant Maggio. In sum, all of the Defendants, including the THL Defendants, knew or were reckless in not knowing, that RCM had no independent existence of its own.

146.    RSL maintained the following Euroclear-numbered accounts: 92917, 99099, and 10190. Euroclear required that RSL maintain a line of credit in order to clear trades

in these accounts. Ignoring corporate distinctions, RSL secured its Euroclear lines of credit with collateral from RCM customer accounts. Until October 2005, Euroclear was under the mistaken belief that the securities held in accounts 92917 and 99099 were securities that were proprietary to RSL. In that same month, however, Euroclear learned that some securities in those accounts were actually customer securities, and therefore could not permissibly be pledged as collateral to maintain RSL's line of credit. Euroclear therefore requested that Refco open a new account (account 11982) containing segregated customer securities. Refco then moved hundreds of millions of dollars of customer securities into that account, without regard to any instructions from the beneficial owners of those securities, the RCM customers.

147.    In fact, RSL, and not RCM, was the sole legal owner with authority over Refco's Euroclear and DTC accounts. But Refco, created an internal fiction that its securities customers placed trades with RCM, who in turn, relied upon RSL to effect those transactions. As discussed above, however, this theoretical construct did not absolve Refco from its duties under the securities regulations, and internally designated "RCM accounts" should have been treated in accordance with the same regulatory requirements that Refco applied to internally designated "RSL accounts."

148.    RCM and RSL conducted their activities using the mails and instrumentalities of interstate commerce to, among other things, induce RCM customers to conduct business with RCM so that RCM could thereafter convert those customers' securities and place them at risk by selling them for RCM's account without the customers' knowledge, authorization or consent.

149.    To the extent that RCM had any independent existence separate and apart from RSL, RCM was clearly physically operating within the United States to effect, induce, and

attempt to induce securities transactions. Accordingly, at all times, Defendants (including the

THL Defendants) knew, or were reckless in not knowing, that both RCM and RSL were subject

to the relevant regulations promulgated under Section 15(a) of the Exchange Act, including Rule

15c3-3, which requires broker-dealers to protect and segregate certain customer funds and

securities. Given the interconnection between RSL and RCM, RSL was also responsible to

ensure that RCM's business was operated in accordance with applicable state and federal law

and that RCM customers' funds and securities were protected and segregated at all times.

150.    Indeed, during the relevant period, Refco's counsel, Mayer, Brown,

Rowe & Maw LLP ("Mayer Brown"), expressed the view in a draft memorandum that:

(a)    RCM would be deemed to be engaging in "significant" conduct in the U.S.
and could not properly claim to be exempt from the regulatory
requirements of U.S. law;

(b)    RCM did not maintain any personnel or operations in Bermuda and all
RCM's functions and operations were performed by RSL personnel within
the U.S.;

(c)    RSL negotiated and executed all RCM's transactions in the U.S. without
any need for further approval by RCM;

(d)    RCM did not possess any operations or facilities by which RCM could
conduct its own transactions and activities;

(e)    RCM was not a "foreign broker-dealer" but a broker-dealer resident in the
U.S. and therefore unable to rely on the exemption from U.S. registration
provided by SEC Rule 15a-6(b)(3); and

(f)     With RCM being subject to U.S. federal securities laws, RCM should consider terminating its securities related activities and transferring its securities trading operations and customers to RSL.

151.    In sum, to the extent that the Defendants sought any legal advice from Refco's principal outside counsel or other knowledgeable legal counsel, they knew that RCM's business model was illegal.  To the extent that any of the Defendants failed to seek such advice they were consciously avoiding the truth.

152.    To the extent that any RCM customer had entered into any agreement inconsistent with these requirements of the federal securities laws, such agreement would have been void by reason of Section 29 of the Exchange Act, which provides in pertinent part:

a.      Any condition, stipulation, or provision binding any person to waive compliance with any provision of this title or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void.

b.      Every contract made in violation of any provision of this title or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this title or any rule or regulation thereunder, shall be void

1.      as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and

2.      as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule or regulation.... .

153.    Had the Defendants caused RCM and RSL to properly safeguard RCM customer accounts in accordance with U.S. regulatory requirements to which they were subject,

including the segregation rules, the fraudulent scheme alleged herein would not have been possible. The Defendants were able to effect their conversion and theft of RCM customer assets only as a result of RCM and RSL's failure to comply with applicable U.S. broker-dealer laws and rules that were enacted to prevent the very type of conversion and theft of customer property that occurred here.

154.    Neither RCM, Refco nor any of the Defendants ever disclosed to Plaintiffs that RCM and RSL were not properly protecting RCM customer assets and so were failing to comply with applicable U.S. broker-dealer laws and rules. Had Plaintiffs been advised of RCM's and RSL's business practices, including their failure to comply with U.S. laws requiring segregation of customer securities, Plaintiffs would not have left their fully-paid securities in the custody of RCM.

## V.        THE FRAUDULENT SCHEME IS REVEALED

155.    On October 10, 2005, just two months after Refco's IPO, Refco publicly announced that, through an internal review, it had discovered a receivable in the amount of $430 million owed to Refco by RGHI, the entity then owned and controlled by Bennett. As a result of this "undisclosed affiliate transaction," Refco announced that its financial statements for fiscal years 2002, 2003, 2004 and 2005 could no longer be relied upon.

156.    In response to these disclosures, many RCM customers, including Plaintiffs, sought to withdraw securities and funds that they entrusted to RCM. On October 13, 2005, Refco announced that it was unilaterally imposing a 15-day moratorium on all trading activities of RCM.

157.    Four days later, on October 17, 2005, Refco (including RCM, RGL, Refco Global Finance, RCC and Refco LLC) filed voluntary petitions for reorganization under

Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Court") in the United States

Bankruptcy Court for the Southern District of New York, (Case No. 05-60006).

158.    On October 27, 2005, RCM customers, including Plaintiffs, received a

letter from William Sexton, as acting President and CEO of Refco, informing them that a

timetable for returning funds to customers would be determined by the Bankruptcy Court.

Sexton's letter failed to inform RCM customers that their securities had, in many cases, already

been sold by RCM with the proceeds being used to sustain Refco's business operations and

acquisitions.

159.    It was not until December 5, 2005, that, under Court order, RCM

disclosed that it no longer possessed sufficient customer property to return to RCM customers

more than two billion dollars worth of securities that customers entrusted to RCM to hold on

their behalf.  The December 5, 2005, disclosure also revealed that the majority of RCM's

customer property had been transferred to other Refco entities, including Refco Global Finance

and RGL through a series of intercompany "loans".  Neither Refco Global Finance nor RGL are

operating entities or have significant assets.  Against customer claims of approximately

$3.675 billion, RCM held approximately $1.905 billion in assets.

160.    On December 30, 2005, RCM disclosed in a bankruptcy filing that it in

fact owed customers approximately $4.16 billion – some $486 million more than previously

estimated in Refco's December 5 disclosure.

## VI.    THE FRAUDULENT SCHEME CAUSED PLAINTIFFS' DAMAGE

161.    Plaintiffs and other RCM customers were directly damaged by

Defendants' scheme.

NY2:#4742866

162.    As a direct result of the fraudulent scheme, Plaintiffs' fully- owned securities were repoed, sold or hypothecated by RCM, with the proceeds being used to finance Refco's other business activities, when those securities instead should have been held in custody and safekeeping by RCM as it was obligated to do in accordance with the Customer Agreement, RCM's course of dealings with Plaintiffs, as well as applicable state and federal law. As a direct result of the fraudulent conversion scheme, RCM become insolvent and was left in a position where it was unable to return customer securities after Refco's bankruptcy filing.

163.    The Defendants' fraudulent conversion of Plaintiffs' securities meant that although Plaintiffs received account statements indicating that the securities were in safekeeping in their accounts, they actually were holding nothing more than an "IOU" from RCM equal to the value of the customer securities that they delivered to RCM. By fraudulently converting Plaintiffs' own securities and deceiving Plaintiffs about the scheme, Defendants directly exposed Plaintiffs to RCM's credit risk, *i.e.*, the risk that RCM was not sufficiently creditworthy to make good on its "IOUs." Thus, when RCM filed for bankruptcy and proved unable to repay the IOUs, Plaintiffs were left with massive losses resulting directly from the fraudulent conversion of their securities.

164.    In a factual hearing in the Refco Bankruptcy Cases, Judge Drain found that RCM was a stockbroker, and accordingly, would be subject to liquidation under subchapter 3 of chapter 7 of the Bankruptcy Code (the "Stockbroker Liquidation Rules"). Under the Stockbroker Liquidation Rules, customer property (which includes securities entrusted to brokers for investment purposes), is liquidated and the proceeds pooled. The customers are then entitled to share ratably in the pooled proceeds that, after payment of the expenses of the bankruptcy case, are dedicated exclusively to the satisfaction of customer claims. As a result of the

fraudulent conversion of customer securities, RCM did not have sufficient securities on hand at the time of the bankruptcy to pay its customers in full. Accordingly, Plaintiffs were directly and forseeably damaged when Defendants fraudulently converted RCM customers' securities. Defendants' theft of customers' property directly reduced the pool of customer property in which Plaintiffs would share ratably and effectively guaranteed that there would be insufficient funds from the proceeds of the liquidation of that property for Plaintiffs to recover the value of the securities that Defendants had caused RCM fraudulently to convert for use by Refco.

## VII.   DEFENDANTS' INVOLVEMENT AND KNOWLEDGE OF THE FRAUDULENT SCHEME

### A.   The Fraudulent Scheme Was Known, Or Recklessly Disregarded, By All Defendants

165.   The fraudulent scheme perpetrated on the RCM customers was so fundamental to the operation and financing of Refco that it had to have been apparent to each Defendant. The sheer magnitude and size of the transfers raise a very strong inference that the Defendants participated in, and knew of, the fraudulent scheme alleged herein. The volume and size of the transfers involved -- on many occasions hundreds of millions of dollars each day -- ensured that the amounts stolen in RCM customer assets substantially outsized Refco's total capital. Without continued, fresh infusions of RCM customer assets, Refco would not have had sufficient liquidity to continue functioning, and would have collapsed long before it did. By the time Refco filed for bankruptcy, the net uncollectible transfers exceeded $2 billion, while RGL claimed, respectively, at each fiscal year end, only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004, and only $153 million in 2005.

166.   Not surprisingly, given the size of the funds generated for Refco through the fraudulent conversion of customer securities, each of the Defendants was well aware that

RCM customer funds were not being protected and segregated in accordance with the relevant state law and federal regulatory requirements. While Refco Board papers in the relevant period monitored segregation and net capital requirements for other Refco entities, those same Refco Board papers made clear that no such segregation requirements were observed in relation to RCM. Refco management also kept careful track of the intercompany transactions and of the customer assets that were held at RCM at any given time. Refco's treasury operations were managed by the treasury department of another Refco entity. Regular reports were generated for Refco management showing the amount of customer assets that could be fraudulently converted and used to sustain Refco's business operations and acquisitions. Defendants had access to these reports during the relevant period. On information and belief, it was by examining reports such as these that Refco management, including the THL Defendants, ascertained that Refco was experiencing severe liquidity problems and thus decided to impose a moratorium on RCM customer withdrawals in October 2005.

167.    Refco management tracked, in regularly produced financial reports, the amount of customer assets available at RCM and the amount required to repurchase customer securities that had been sold by RCM. The THL Defendants had access to such reports throughout the relevant period.

168.    Refco management went so far as to implement a bonus incentive compensation structure that encouraged the conversion of RCM customer assets to support Refco's otherwise unsustainable business operations. During the relevant period, Yorke and other employees working on behalf of RCM and RSL who were responsible for carrying out the sales and transfer transactions in question received bonuses that were determined based on, among other things, the aggregate amount of interest imputed to the intercompany indebtedness

to RCM.  On February 28, 2006, Yorke testified at a hearing in the Bankruptcy Cases that he and the other RSL employees responsible for carrying out the sales and transfer transactions "were paid for raising money for the firm.  That was part of our job."

169.    This compensation structure was overseen and approved by Refco senior management, including the Officer Defendants and the THL Defendants, who, as alleged above, had a representative, defendant Schoen, on the compensation committee.  As alleged above, the compensation committee, including Schoen, oversaw Refco's compensation and employee benefit plans and practices, and produced a report on executive compensation as required by SEC rules.  On information and belief, the compensation committee including Schoen knew about and approved the bonus structure described above with the understanding that it would incentivize the theft of RCM customer assets.

170.    As noted, RCM received no margin, collateral, or security, and RCM's loans to other Refco entities were improperly and fraudulently documented.  Nor did RCM receive any security interests in any of the assets purchased with the transferred funds.  The monies were simply transferred and dissipated.  The up-stream and side-stream transactions constituted huge red flags of potential irregularities that were known by all Defendants.

**B.    Knowledge And Involvement Of The Officer Defendants**

171.    The positions of the Officer Defendants with respect to Refco, and their access to inside information, raise a strong inference that the Officer Defendants knew of the fraudulent scheme alleged herein.  The Officer Defendants were responsible for Refco's operations and played a critical role in its management.  Refco's IPO registration statement, for example, highlighted the critical role played by Refco's management in Refco's operations,

NY2:#4742866

stating that Refco's "success depends to a significant degree upon the continued contributions of our management team, particularly our President and Chief Executive Officer, Philip Bennett."

172.    The Officer Defendants each acted with scienter with respect to the fraudulent scheme alleged herein in that they knew, or were reckless in not knowing, that the fraudulent scheme was occurring.  The scienter of these Defendants is demonstrated by both direct and circumstantial evidence, as well as by the fact that these Defendants had motive and the opportunity to commit securities fraud.  Each of the Officer Defendants was part of a small group of senior executives who conducted and oversaw the day-to-day operations of Refco. Based on their respective roles and their seniority within Refco, each of them individually and as a group had the power and opportunity to control or influence the specific actions that constituted the fraudulent scheme.

173.    As alleged above, defendant Bennett as President, CEO and Chairman of RGL, conceived the fraud in order to keep Refco alive long enough to enable him to liquidate his investment in Refco.  Bennett directly participated in and supervised the fraudulent conversion and subsequent transfer of RCM customer assets.

174.    Defendant Sexton served as Executive Vice President and COO of RGL. Sexton's responsibilities at Refco included overall responsibility for accounting and finance. From July 2001 until August 2004, Sexton also served as Executive Vice President and COO of Refco LLC, an RGL subsidiary that received illegal transfers of the proceeds from the fraudulently converted RCM customer assets.  As a result of these high-level executive positions and responsibilities not just within RGL but within Refco LLC, a company in direct receipt of illegally transferred customer assets, Sexton knew, or was reckless in not knowing, that the fraudulent scheme was occurring.

175.    From 1991, Defendant Maggio was Executive Vice President of RGL and President and CEO of RSL.  Maggio was also President and senior risk officer of RCM and sat on RCM's board of directors.  Maggio ran the brokerage operations of RSL and RCM and directly participated in, and orchestrated and supervised the fraudulent conversion of RCM customer assets alleged herein.  Yorke and the other RSL employees who improperly sold, loaned, pledged, hypothecated or converted customer securities frequently did so on Maggio's instructions.  In instigating and overseeing the fraudulent conversion and subsequent transfer of customer assets, Maggio was a critical player in the fraudulent scheme.

176.    Defendant Murphy was Executive Vice President of RGL, and was President of various up-streaming Refco subsidiaries, including Refco LLC, that were direct beneficiaries of the fraudulent conversion of RCM customer assets during the same period.  He was also President of Refco Global Futures, LLC.  Refco LLC improperly received transfers of the proceeds from sales of RCM customer assets pursuant to the fraudulent scheme described herein.  As a result of Murphy's high-level executive positions and responsibilities not just within RGL but within other Refco companies in direct receipt of illegally transferred customer assets, Murphy knew or, or was reckless in not knowing, that the fraudulent scheme was occurring.

177.    Defendant Silverman began serving as Secretary of RGL in 1997, and held numerous high-level executive positions within Refco, including Controller of RGL.  As Controller, Silverman was directly responsible for overseeing intercompany and related-party transactions (including transactions between RCM and RCC and RCM and Refco Global Finance), the closing of Refco's books and its internal audits, implementation and maintenance of adequate internal financial controls, as well as the adoption and implementation of appropriate

accounting policies for Refco. A CPA and a close confidant of Bennett, Silverman was also Controller of RGHI and Secretary of numerous Refco subsidiaries. As a result of his high-level executive positions and responsibilities within Refco, in particular in relation to supervising Refco's finances, including intercompany and related-party transactions and accounting policies, Silverman knew, or was reckless in not knowing, that the fraudulent scheme was occurring. Silverman resigned at or about the same time as Bennett and Maggio.

178.    As CFO of Refco through October 2004, Defendant Trosten was in a unique position to access inside information concerning the fraudulent scheme. Trosten's responsibilities included global accounting and budgeting, regulatory reporting, establishment of accounting policies, and the development and execution of key strategic initiatives at the corporate level. Trosten was ultimately responsible for Refco's finances and played a critical role in its management. Trosten's opportunity and obligation to monitor Refco's financial status raise a strong inference of scienter. Given the size of the transfers from RCM to the other Refco entities, and the extent to which those transfers were essential to those entities' continued operation, it is inconceivable that Refco's CFO could have been unaware of the manner in which RCM was raising such funds.

179.    Upon the closing of the THL Entities' LBO in August 2004, Trosten received two payments totaling approximately $48 million. Shortly thereafter, in October 2004, Trosten resigned as CFO, having served in that position for only three years. The Defendants did not disclose the $48 million payment to Trosten, and it became public only after Trosten was forced to admit receiving it during testimony in an arbitration proceeding in the summer of 2005. Notably, Trosten's resignation and the large payment occurred at the same time he knew that Grant Thornton was conducting a re-audit of Refco's fiscal year 2002 financial statements.

180.    The size of the payment at the LBO and the timing of Trosten's resignation – just as the IPO planning had begun – are very suspicious, and raise a strong inference that the payment was an effort to buy Trosten's silence. The approximately $48 million payment was exponentially greater than Trosten's annual compensation of $6 million in salary and bonuses for year 2004 and was grossly disproportionate to his level of experience and expertise. These circumstances raise a strong inference that Trosten knew about each of the fraudulent schemes alleged herein, and that the Officer Defendants, who were aware of and approved the $48 million payment, paid him off to buy his silence. The THL Defendants either knew, or should have known, of these payments to Trosten before Refco's IPO.

181.    As CFO of RCM, Defendant Outridge was primarily responsible for RCM's financial affairs, including RCM's adoption of, and compliance with, appropriate accounting policies, and RCM's maintenance of adequate internal financial controls. In his role as CFO of RCM, Outridge presented details of RCM's finances to members of the Audit Committee. A qualified member of the Association of Chartered Certified Accountants, Outridge was directly involved in the day-to-day management of RCM from 2001 when he was appointed as Vice President and Controller of RCM. Throughout his time at Refco, Outridge was also heavily involved in the preparation of RCM's Financial Statements. Outridge directly participated in, orchestrated and supervised the fraudulent scheme alleged herein. As CFO of RCM and a close confident of Maggio, Outridge played a critical role in the financial management of RCM and oversaw the massive transfers from RCM to other Refco entities of the proceeds of the unauthorized conversion of customer securities. As a result of his detailed knowledge of RCM's finances and his obligation as CFO to monitor RCM's financial status, Outridge was aware of key details of the RGHI Scheme and the related financial manipulations

at Refco, including that part of the RGHI Receivable that was housed at RCM and the substantial

cash and book transfers that were made in and out of RCM pursuant to the RGHI Scheme.  Grant

Thornton's audit workpapers and related notes also evidence Outridge's knowledge of the details

of a number of the RTLs.

**C.    Knowledge and Involvement Of The THL Defendants**

182.    Upon taking control of Refco after the LBO, the THL Defendants must

have become aware of the fraudulent scheme.  Although the scheme began even prior to the THL

Entities' August 2004 investment in Refco it continued – and substantially increased in size –

after the LBO, when the THL Defendants were at Refco's helm.

183.    Rather than put an end to the fraudulent scheme, the THL Defendants

allowed the fraud to flourish.  The primary focus of the THL Defendants' interest in Refco was

always the financial benefits associated with taking Refco public.  Indeed, on October 19, 2004,

just ten weeks after the LBO, THL held a key IPO planning meeting with its professionals and

set the gears in motion for the IPO.

184.    In addition to their single-minded pursuit of the profit to be made from

taking Refco public, the THL Defendants were also readying themselves to raise a new multi-

billion dollar private equity fund with which to grow their business.  The THL Defendants'

ability to mark their Refco investment to market at a significant profit through a seemingly

successful IPO was a critical ingredient in their plan to create the appearance of a favorable track

record that they could draw upon to market their new fund.

185.    Because of their desire for a substantial payday and favorable publicity

that would allow them to raise billions of dollars to fuel their own investment activities, the THL

Defendants, upon learning of the fraudulent scheme, chose to allow it to continue and grow under their control.

**1.     The Leveraged Buyout**

> **(a)     The THL Defendants Undertake Due Diligence, Putting Them On Notice of Refco's Management Problems**

186.     THL was contacted by Credit Suisse First Boston ("CSFB") in October 2003 regarding an investment opportunity in Refco.  At this early stage, THL already viewed Refco as a candidate for a THL-led IPO.  THL analyzed Refco to determine whether it could make a substantial investment in Refco and then quickly turn around and sell Refco or its equity to a third party or the public.

187.     THL expressed interest in purchasing Refco, and received a detailed "Confidential Information Memorandum" prepared by CSFB.  By mid-November 2003, THL was in talks with CSFB regarding THL's intent to submit an indication of its interest to acquire Refco.

188.     In connection with their leveraged buyout of Refco, the THL Defendants undertook due diligence.  THL hired outside professionals to assist in its due diligence as it prepared to acquire Refco.  These professionals included Weil, Gotshal & Manges LLP ("Weil"), to conduct legal due diligence; KPMG, to review Refco's financial statements; and McKinsey & Co., which analyzed financial market structures and trends.  After the consummation of the LBO, Refco (rather than THL) paid approximately $10 million in professional fees generated by these due diligence efforts.  Had the THL Defendants determined not to go forward with the LBO, THL would have been required to pay those professional fees with its own funds.

189.    The THL Defendants were tantalized by the prospect of a profitable IPO of Refco and were not motivated to undertake a complete and thorough review of Refco's operations prior to the LBO.   Had THL undertaken a thorough and complete review of Refco's operations at that time, it would, undoubtedly, have been on notice of the true state of Refco's problematic financial situation prior to taking control of Refco.  As Federal District Court Judge Gerard Lynch recently stated in another proceeding concerning the fraud at Refco, the problems at Refco were "glaringly suggestive of fraud…[T]here was certainly a monster under the bed…".[6]

### (b)    THL's Knowledge Of Regulatory And Legal Problems

190.    In connection with their due diligence, the THL Defendants did learn of numerous issues concerning Refco, including what THL later described as "past regulatory, ethical and accounting issues," that put the THL Defendants on notice of irregularities and financial manipulations within Refco and of the need to examine closely the financial information to which they had access upon taking control of Refco.  The THL Defendants ignored those clear warning signs.

191.    For example, the THL Defendants learned that Refco had a long record of regulatory infringements, including fines for filing false trading reports and inadequate record keeping.  Refco had a highly publicized history of serious regulatory and legal problems, including repeated fines imposed by the Commodity Futures Trading Commission ("CFTC"), among other regulators.  Refco paid millions of dollars to the CFTC as penalties for Refco's improper pooling of and misuse of customer funds.

---

[6] *In re Refco Inc. Sec. Litig.*, 05 Civ. 8626, at 57 (S.D.N.Y., April 30, 2007).

192.    The THL Defendants learned of this checkered past prior to the LBO.  In a March 12, 2004 email, Jaeckel informed THL executives that Refco was a company that played "fast and loose [with] compliance issues." Likewise, in a May 31, 2004 email to his THL colleagues, Schoen noted that "the old operation [Refco] was in fact fined heavily for activities such as mixing with client funds and parceling winnings out selectively between Refco and clients . . . ."

193.    Another internal THL email in March 2004 informed Schoen that Lee had spoken to Arthur Levitt, former head of the SEC, regarding THL's impending acquisition of Refco.  The email stated: "Arthur [Levitt] said it (Refco) had been known as a 'pump and dump' operation."

194.    The THL Defendants knew that disciplinary actions brought by Refco's regulators ensnared even the most senior Refco executives.  For example, the SEC investigated Refco and Maggio in connection with an investigation into inappropriate short selling of stock in the Sedona Corporation.

195.    In July 2005, RGL publicly announced that Maggio was near a settlement with the SEC that would result in his 1-year suspension from any supervisory duties as a result of his actions with respect to the Sedona manipulation.  RGL also noted the likelihood of a "substantial civil penalty," for which it had set aside $5 million.

196.    The THL Defendants also knew that Refco had a history of nondisclosure of uncollectible losses incurred by its customers.  One such instance came to light in litigation related to Eastern Trading Company ("Eastern"), a client of what was then Refco Inc. (and later Refco LLC).

197.    In the late 1990s, Eastern experienced large trading losses that resulted in a deficit of $28 million in its account at Refco. During Refco's lawsuit to recover this sum, Judge Richard Posner of the United States Court of Appeals for the Seventh Circuit said: "for reasons having to do with reporting requirements imposed by the commodities exchanges, Refco [Inc.] did not want to reveal the debit in Eastern's account, and that is why it funded it with a loan from its affiliate [RCC] . . . ."[7]

198.    As discussed below, the Officer Defendants' concealment of customer losses continued during THL's period of majority ownership of Refco and it was the public disclosure of such concealment that precipitated Refco's bankruptcy.

199.    These and other well-known legal and regulatory problems put the THL Defendants on clear notice of Refco's checkered past and the THL Defendants' need, upon taking control of the company, to be especially vigilant in investigating and remedying the deficiencies that caused Refco's serious and widespread previous violations.

200.    Throughout its diligence, THL knew that its professionals repeatedly were stonewalled when they tried to obtain key information from the Officer Defendants. As a result, the THL Defendants were placed on notice of the possibility of irregularities and financial manipulations within Refco and were well aware of the need to examine closely the financial information to which they had access following the LBO.

201.    For example, in March 2004, KPMG reported on at least three separate occasions regarding roadblocks in KPMG's diligence effort thrown up by the Officer Defendants. KPMG reported the following to the THL Defendants:

---

[7]  *Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 626 (7th Cir. 2000).

- The Officer Defendants had not provided KPMG with key financial information, including information regarding the nature of receivables owed to Refco;

- Trosten, RGL's CFO, was unwilling to provide data underlying certain Refco financial figures; and

- KPMG attempted to engage some of the Officer Defendants in a discussion regarding the company's financial information, but those persons restricted the conversation to anecdotal, high-level information.

202.    Initially, THL grew so frustrated with the Officer Defendants that it called off its due diligence. A THL memo dated March 29, 2004 made the point clearly: "we have been disappointed by management's ability to answer diligence questions and respond to data requests." On March 24, 2004, THL's Jaeckel emailed KPMG: "please do not spend time & $ on Refco until further notice - we are struggling on diligence." Indeed the THL Defendants were repeatedly warned by their due diligence professionals that they were not receiving the information necessary to conduct competent due diligence.

203.    On May 10, 2004, Ram Menon of KPMG emailed Jaeckel, George Taylor ("Taylor," a Vice President at THL), and Max Strasburg, an Analyst at THL, ("Strasburg"), alerting them to additional due diligence difficulties. Menon's email attached a document summarizing KPMG's discussion with Mark Ramler of Grant Thornton, Refco's outside auditor. This document indicated that Grant Thornton had not provided KPMG with workpapers regarding "credit risk loss reserves," among other things.

204.    KPMG also informed THL of the Officer Defendants' questionable tax treatment of the liquidation of the former Refco, Inc. into its successor Refco LLC. KPMG stated: "We have requested the [relevant documents] in case they describe the basis for management's opinion that no gain was recognized as a result of the conversion...We have not received this information."

205.    KPMG further informed THL that Grant Thornton "did not provide us with access to their audit planning memoranda, work programs, test work papers, schedule of audit adjustments and audit conclusion memoranda...[Grant Thornton's] audit conclusions on the fair value or [sic] [Refco's] proprietary investments were not also made available."

206.    Nevertheless, the THL Defendants determined to move ahead with the acquisition with full knowledge that they could not expect cooperation or candor from the Officer Defendants.

### (d)    THL Learns Of Facts Hidden By Certain Members of Refco's Management

207.    The Officer Defendants' lack of candor became particularly apparent late in THL's due diligence process, when the THL Defendants learned that the Officer Defendants had repeatedly failed to be forthright with them.

208.    Shortly before the LBO, the THL Defendants learned that a Refco executive attempted to hide from THL a significant legal obligation that Refco may have owed to Edward McElwreath, who demanded a commission for introducing Refco to THL. By letters dated May 6, 2004, McElwreath's attorney made his demand known to Bennett and to THL's Schoen. The letter to THL stated that Peter McCarthy, Executive Vice President of RSL, had suggested that McElwreath wait until the close of the THL Recapitalization to make his demand, in order to "keep the contract's existence from [Thomas H. Lee Partners]." This surprise disclosure did not deter THL from going forward.

209.    The THL Defendants also were aware that the Officer Defendants had failed to share key information regarding a litigation between Tradewinds Financial and RSL. On or around June 17, 2004, just six weeks before the LBO, a jury in New York returned a

NY2:#4742866

verdict in favor of Tradewinds and against Refco.  Tradewinds had sued Refco for $45 million.

Although the THL Defendants had been generally aware of a litigation involving Tradewinds

and Refco, they were not told by the Officer Defendants that the matter either was on the verge

of trial or that the trial had been lost.

210.    After THL and/or Weil raised their concern about the Officer

Defendants' failure to voluntarily disclose the current status of the Tradewinds litigation, Schoen

discussed this topic with Bennett.  On June 19, 2004, Schoen sent an email to THL executives

including Jaeckel and Jay Tabor, an attorney at Weil, stating:

> Phil [Bennett] and I spoke for about an hour.  He obviously went to
> great lengths to try to reassure me that there was no deliberate
> attempt on Dennis [Klejna's (Refco's General Counsel)] part to
> mislead us.  I focused on the need to have the kind of open
> communication and transparency that we need as partners, and that
> he and we need as Directors on an ongoing basis.  I referred to the
> discussion on the SEC matter [Sedona] as a similar experience, and
> he understood exactly what I was talking about.  While I do not
> have satisfaction as to how this
> miscommunication/misunderstanding occurred, we have at least
> raised the bar on disclosure.  Phil also understands that this cuts at
> our credibility with the lenders...

211.    Although Schoen recognized that the THL Defendants required "open

communication and transparency" in order to fulfill their duties, the THL Defendants knew they

were not receiving this from the Officer Defendants.  Collectively, these examples of a lack of

transparency and co-operation from Refco and the Officer Defendants throughout the LBO due

diligence put the THL Defendants on clear notice of the possibility of financial manipulations

and fraud within Refco and the need to examine very closely all the financial and other

information to which, following the LBO, the THL Defendants had unfettered access.

212.    After the LBO, when the THL Entities became Refco's majority owner and the THL Defendants assumed direct oversight and management of Refco, the THL Defendants could obtain, and indeed had fiduciary obligations to obtain, answers to questions that had been raised but not answered in the course of their due diligence.  In obtaining answers to these previously unanswered questions, the THL Defendants would have learned of the fraudulent scheme operating within Refco.

**2.    THL Buys 57% Stake In Refco For $507 Million**

213.    Despite the unanswered questions and risks associated with an acquisition of Refco, THL, one of the world's most sophisticated leveraged buyout firms, forged ahead and entered into an agreement with various Refco entities.  The THL Entities and their affiliates agreed to purchase 57% of RGL, a company purportedly valued at $2.25 billion.

214.    To facilitate and fund the LBO, THL created two new entities: New Refco and Refco Finance Holdings LLC ("Refco Finance").  THL arranged for $1.4 billion in debt financing at Refco Finance.  As part of the transactions, Refco Finance borrowed a total of approximately $1.4 billion: $800 million pursuant to a senior secured credit facility, and $600 million from the issuance by Refco Finance of unsecured subordinated notes.  As part of the same series of transactions, Refco Finance merged with and into RGL with RGL as the surviving entity.

215.    RGL then purportedly distributed $500 million, supposedly representing excess cash held on RGL's books, to New Refco, which in turn purportedly distributed those funds to RGHI.  As Refco and THL agreed, RGL also distributed certain businesses valued at over $238 million, referred to as the Asset Management entities, to New Refco, which in turn

distributed those businesses to RGHI. These distributions to RGHI, and its sole owner, Bennett, had been endorsed by THL prior to the LBO.

216. Subsequently, RGHI, and the THL Entities contributed their ownership interests in RGL to New Refco in exchange for the following consideration:

- Bennett, sole owner of RGHI, monetized a portion of his ownership in RGL in the amount of $875 million, and exchanged the remainder of his interest in RGL, with a stated value of $382.5 million, for an approximate 43% interest in New Refco.

- The THL Entities and affiliates received an aggregate of 283 Class A Common Units of New Refco, which amounted to approximately 57% ownership interest.

As a result of these transactions, New Refco owned 100% of RGL and became its sole member.

**3.    THL Executives Join Refco's Board**

217. As part of the LBO, the THL Entities gained significant control over Refco, notably including the power to appoint board members. The THL Entities designated four THL executives to New Refco's board. In addition, certain THL executives became officers of New Refco: Schoen, Jaeckel, and Taylor became President, Treasurer, and Secretary, respectively. As a result of their positions as Board members and officers of New Refco, these THL executives formally assumed fiduciary duties to New Refco.

218. The THL Defendants derived their control from their ownership position in Refco, as well as the Amended and Restated Limited Liability Company Agreement (the "New Refco LLC Agreement"). The New Refco LLC Agreement stated that "The business and affairs of the Company shall be managed and controlled by or under the direction of a Board of Managers...The initial Board of Managers shall be comprised of the individuals set forth on Schedule D." Schedule D listed the following Managers: David V. Harkins (THL); Scott L.

Jaeckel (THL); Thomas H. Lee (THL); Scott A. Schoen (THL); Phillip R. Bennett; Robert C. Trosten; and Phillip Silverman.

219.    The New Refco LLC Agreement included a section titled "Duties" that stated: "The Managers, in the performance of their duties, shall owe to the Company and the Members duties of loyalty and due care of the type owed by the directors of a corporation to such corporation and its stockholders under the laws of the State of Delaware."

220.    Lee, Harkins, Jaeckel and Schoen also owed fiduciary duties to RGL.  A Fifth Amended and Restated Limited Liability Company Agreement of RGL (the "RGL LLC Agreement") was entered into by New Refco (the sole member of RGL) on August 5, 2004.  The RGL LLC Agreement included a section titled "Management" that stated:

> The business and affairs of the Company [RGL] shall be managed by the Member [New Refco]…Member shall have complete and absolute control of the affairs and business of the Company, and shall possess all powers necessary, convenient or appropriate to carrying out the purposes and business of the Company, including, without limitation, doing all things and taking all actions necessary to carrying out the terms and provisions of this Agreement.

**4.    THL's Lucrative Management Agreement**

221.    As part of the LBO, THL Managers V agreed that it would serve in an oversight and managerial capacity for Refco in return for tens of millions of dollars in fees.  This Management Agreement was entered into on August 5, 2004 by New Refco (the "Company" for purposes of the Management Agreement), RGL, and THL Managers V (the "Sponsor").

222.    The Management Agreement was entered into after the THL Entities and their affiliates had made their $507 million investment in the LBO, for which they received a controlling 57% ownership share of New Refco.

NY2:#4742866

223.    The preamble to the Management Agreement reads in part as follows:

WHEREAS, the Sponsor has staff specifically skilled in corporate finance, strategic corporate planning, and other management skills and advisory services.

WHEREAS, the Company will require the Sponsor's special skills and management advisory services in connection with its business operations and execution of its strategic plan.

WHEREAS, the Sponsor is willing to provide such skills and services to the Company.

224.    The Management Agreement provided that THL Managers V would provide advisory services to Refco under the following circumstances:

The Sponsor hereby agrees that if…[New Refco or RGL] reasonably and specifically requests that the Sponsor provide the services set forth below and the Sponsor agrees to provide such services, the Sponsor or one of its affiliates will provide the following services to the Company and its subsidiaries:

(a)    advice in connection with the negotiation and consummation of agreements, contracts, documents and instruments related to the Company's or any of its subsidiaries' finances or relationships with banks or other financial institutions; or

(b)    advice with respect to the development and implementation of strategies for improving the operating, marketing and financial performance of the Company and , and [sic] other senior management matters related to the business, administration and policies of the Company and its subsidiaries.

New Refco and RGL agreed to pay THL Managers V's fees "[i]n exchange for the Sponsor's arrangement of the equity financing and agreement to provide the services set forth" in the Management Agreement.

225.    The first fee to be paid by New Refco and RGL to THL Managers V was an initial lump sum payment of $31.6 million (the "Initial Management Fee").  The second fee

NY2:#4742866

was a recurring management fee (the "Annual Management Fee") payable semi-annually and

was to be the greater of (a) $2.5 million per year or (b) 1% of Refco's EBITDA.[8]

226.    The Management Agreement was to continue in effect until one of three

events took place:

- termination by THL Managers V;

- automatic termination on the date that THL Managers V and its affiliates no longer owned at least 25% of the equity of New Refco; or

- termination by THL Managers V upon the consummation of an initial public offering by New Refco or any successor entity.

227.    If the Management Agreement were terminated upon an IPO (as was

foreseen all along), New Refco and RGL were to pay THL Managers V a buyout fee (the

"Management Agreement Buyout Fee").  The Management Agreement Buyout Fee was to be

equal to the net present value of the fees payable for five years from the termination of the

Management Agreement.  In August 2005, a termination fee of $12.9 million was paid to THL as

a result of the IPO.

228.    The Management Agreement was signed by Bennett on behalf of New

Refco and RGL.  Signing on behalf of THL Managers V were other members of the THL

Entities - THL (as its Managing Member) and Equity Advisors V (as its General Partner) - and

Schoen (as Managing Director of THL Managers V).

---

[8]    "EBITDA" was defined in the Securityholders Agreement between the parties to the Management
Agreement as consolidated earnings for a given fiscal year of New Refco and its subsidiaries before
interest, taxes, depreciation, and amortization.

**5.     THL's Awareness Of Financial Deficiencies At Refco Post-LBO**

229.    After the leveraged buyout, the THL Entities became Refco's majority owner and the THL Defendants assumed direct oversight, management and control of Refco. Moreover, after the leveraged buyout, the THL Defendants had unfettered access to all information regarding Refco's internal functioning.

230.    Once on board and at the helm, the THL Defendants learned that Refco's accounting and auditing function, both internal and external, was a disaster. The THL Defendants knew and discussed the fact that Refco's accounting function was inadequate for a company seeking to go public, and that Refco needed to hire a "Big Four" accounting firm.

231.    As fiduciaries, the THL Defendants had a duty to put Refco's interests ahead of their own. Moreover, to justify the tens of millions of dollars they reaped in the Management Agreement, the THL Defendants should have, at a minimum, insisted on correcting the problems that they knew to be afflicting Refco. Instead, for the THL Defendants, the choice was simple and had nothing to do with fiduciary duties. Taking Refco public would greatly benefit the THL Defendants, so they pushed ahead without regard for the adverse consequences to Refco. On October 19, 2004, just ten weeks after the LBO, THL held a key IPO planning meeting with its professionals, and set the gears in motion for the IPO.

232.    Aside from the financial gain to be made from a sale of Refco stock, the THL Defendants knew that a successful IPO was critical because they were making preparations to market a new private equity fund, for which THL hoped to raise approximately $7.5 billion from institutional investors. In an email exchange with an investor in March 2005, even as a THL executive was discussing THL's current investments such as Refco, the executive was soliciting interest in "our new fund - Fund VI and hopefully Q1 2006."

233.     In March 2005, during the push toward an IPO, the THL Defendants
learned that Refco executives had lied to THL about the existence of a letter to Refco's
management from Refco's outside auditors, Grant Thornton (the "Management Letter"), that
discussed significant internal accounting deficiencies at Refco.  The Management Letter had
been prepared by Grant Thornton and dated October 15, 2004, but it was not provided to THL by
the Officer Defendants.

234.     When Jaeckel learned of the Management Letter on or about March 31,
2005, he forwarded a copy of the Management Letter internally within THL, and asked: "What
does this letter say? I don't recall ever hearing about this letter. you guys?" THL executive
Taylor responded in another internal THL email stating: "I have never seen the [Management]
letter before the email and it is as horrendous as it sounds."

235.     On April 1, 2005, Jaeckel wrote an internal THL email expressing his
anger that the Officer Defendants, with the assistance of Refco's outside auditors, had not
provided the Management Letter to THL:

> when was the letter issued? i can't remember if we sa[w] auditor letters
> during diligence, perhaps we should send it to berndsen [at KPMG] to get
> his views and see if he remembers it.  if this letter was release[d] in oct
> and neither mgmt nor gt [Grant Thornton] told us about it i am ANGRY at
> both [.]

236.     On April 1, 2005, Strasburg sent an internal THL email explaining that, at
or about the time that Grant Thornton had provided the Management Letter to Refco
management, management had pressured Grant Thornton to change or retract many of its
conclusions in an effort to avoid taking appropriate steps to remedy the significant deficiencies
identified by Grant Thornton:

> These are the facts as I've heard them…A draft of the letter was first issued in October. Gerry [Sherer, Refco's then Chief Financial Officer] received it when he first got there [date] and "tore GT a new one" for using the words "significant deficiency" with regard to the systems. GT printed a revised version of the letter omitting those words and without management's response on March 29th and gave to Gerry. Gerry responded in writing two days ago with regard to the systems comment.

237.    On April 6, 2005, Jaeckel sent an internal THL email discussing how the Management Letter had not been provided to THL:

> [W]e wanted to chat about 2 issues raised by Weil. First is the GT management letter. As we discussed on Monday neither the company nor GT shared this letter with us, the audit committee or Weil. Weil believes they asked both the company and GT if there were management letters and was told no.

238.    The Management Letter listed nine broad and important "Internal Control Deficiencies" at Refco:

- IT Environment;

- Consolidation Process;

- Formalized Reporting and Closing Process;

- Internal Audit Function;

- Fixed Asset Subsidiary Ledger;

- Accounting Procedures and Policies;

- Accounting Function;

- Refco Capital Markets Ltd. Custody Reconciliations; and

- Audit Coordination.

239.    The identification of these specific deficiencies put the THL Defendants on further notice of significant financial irregularities within Refco. Of critical importance in light of the fraudulent conversion of RCM customer securities is Grant Thornton's comment

regarding a "Refco Capital Markets Ltd. Custody Reconciliations" deficiency in the
Management Letter, which read: "The Company could not produce any custody reconciliations
at or around year end for EQ."

240.    Only through the fraudulent "up-streaming" of customer funds in
accounts held at RCM was Refco able to fund its operations.  Had the THL Defendants asked for
RCM's custody reconciliations (which were essential to understanding how Refco functioned),
they would have seen that Refco's business model, as directed by the Officer Defendants, was
rooted in fraud and unsustainable.  They did not ask for them, either because they already knew
about the fraudulent misappropriation of RCM customer securities or because they were seeking
to avoid learning the truth about those practices.

241.    Grant Thornton's comment regarding Refco's "Internal Audit Function"
deficiency stated that "it has become essential to establish an internal audit function [at Refco]."

242.    Had the THL Defendants acted appropriately in light of this information,
they would have ensured that the internal audit function was staffed and operating properly.  A
proper internal audit function would have revealed to the THL Defendants, before the IPO, the
various accounting improprieties and frauds within Refco.

243.    Grant Thornton's comment regarding Refco's "Accounting Function"
deficiency read in relevant part:

> At present, the accounting function does not have the necessary resources
> or expertise in accounting and financial reporting expected of a public
> issuer.  Although the Company has taken stop gap measures in engaging
> PWC to fill these gaps, it is not a solution.  The Company needs to hire
> qualified people with the necessary skills and expertise . . . . (emphasis
> added).

244.    The identification of these specific deficiencies and irregularities within

Refco put the THL Defendants, at a minimum, on clear notice of the real possibility of financial manipulation within Refco. Had the THL Defendants acted appropriately in light of this information, they would have taken steps to ensure that control deficiencies were remedied and the internal accounting and financial reporting functions were staffed and operating properly. Had they done so, the THL Defendants – purportedly among the most sophisticated financial players on the street – would surely have uncovered the various accounting improprieties and frauds conducted by the Officer Defendants within Refco. Their failure to do so can be explained only by recklessness or actual knowledge of the fraud.

### 5.    THL's Refuses To Provide Refco Quarterly Financial Statements

245.    Had the THL Defendants undertaken the rudimentary step to analyze Refco's balance sheet and income statement on a quarterly basis for the period leading up to the LBO, the RGHI Scheme would have been apparent to them. Until the LBO, Bennett, together with the Bennett Co-Conspirators, had only effected the RTLs at the end of Refco's fiscal year; as a result, in contrast to Refco's balance sheet at its fiscal year end, a review of the large items on Refco's balance sheet at the end of each of the three interim quarters in the pre-LBO years would have revealed the large receivables from RGHI.

246.    Incredibly, the THL Defendants went out of their way to avoid doing such a quarterly analysis. In a January 20, 2005 email, THL's counsel relayed a request from potential IPO underwriters' counsel for quarterly financial information for the previous seven quarters. Underwriters' counsel had explained to Refco's counsel that such quarterly information would have shown "the quarterly effect of both seasonality and the THL transaction", items that it would have been logical for the THL Defendants to want to understand as well. An analysis of the large balance sheet items on a quarterly basis would likely have

revealed the ongoing fraud at Refco.

247.    In response, defendant Jaeckel made clear that Refco would not provide quarterly numbers: "As for quarterly financials we are not going to do this. If the bankers have questions they can call me." Plainly, Jaeckel did not want to be put to the task of having accountants review the historical numbers on a quarterly basis, something that the THL Defendants surely should have reviewed for themselves in connection with the discharge of their fiduciary responsibilities, their obligations under the management agreement, and even minimal due diligence as controlling stockholders.

**6.    THL's Failure To Ensure A Proper Audit**

248.    Soon after the LBO, the THL Defendants realized that Refco needed to replace Grant Thornton. The THL Defendants were well aware that Grant Thornton had done a substandard job auditing Refco and conceded among themselves that Refco's audited financial statements could well be inaccurate. Based on, among other things, Grant Thornton's handling of the management's opposition to the Management Letter, the THL Defendants knew that Grant Thornton was not sufficiently independent of the Officer Defendants to discharge its responsibilities to audit the various financial statements for Refco. In email traffic, THL executives noted that in order to clean up Refco's accounting and financial statements, Grant Thornton should be replaced with one of the "Big Four" accounting firms.

249.    The THL Defendants knew, however, that a new auditor would need time to conduct a proper audit, and therefore would require THL to delay Refco's IPO. The THL Defendants were unwilling to accept such a delay.

250.    The THL Defendants also knew and discussed the fact that, besides the question of delay, there was a "restatement risk" that came with hiring competent outside

auditors. This frank admission by the THL Defendants that Refco's audited financial statements

had a significant likelihood of being materially inaccurate, coupled with the decision not to hire

competent auditors so as not to interfere with their self-serving drive to the IPO, was reckless

and constituted a breach of the THL Defendants' fiduciary duties to Refco.

251.    The THL Defendants' conflict was clear. In an October 6, 2004 email to

persons at THL and KPMG, Jaeckel highlighted two possible courses of action with respect to

Refco's outside auditors. Jaeckel expressed concern about the "restatement risk" as well as a

possible delay in THL's planned sale of its equity stake in Refco:

> Auditors. I think we narrowed this down to 2 main options. Option A -
> file [the IPO] as soon as possible so we are on the road in January. We
> will have to stay with GT under option A…Frank [Casal of KPMG]
> cautions that we run 'restatement risk' by switching auditors (we run this
> risk in either option but it is magnified when you have public equity). He
> said the big four take a very hard and long look at the books of companies
> audited by second tier firms. Option B - replace current auditors for fiscal
> 2005 audit. Big four are currently swamped with year end and SOX
> work…Likely to mean that we wouldn't be selling equity until summer.

252.    The THL Defendants faced a stark choice: improve the dysfunctional and

inadequate audit situation but delay the IPO, or push ahead with the IPO notwithstanding serious

audit shortcomings. Knowing that Refco's audited financial statements could well be in need of

a restatement, the THL Defendants chose the latter. Aware of the poor financial controls that

existed at Refco and concerned that a replacement auditing firm in looking closely at Grant

Thornton's work would require a restatement of Refco's financial statements, the THL

Defendants exercised their control over Refco to retain Grant Thornton as Refco's outside

auditor so that their highly profitable IPO could proceed as expeditiously as possible. The THL

Defendants so acted despite their knowledge that Refco's financial statements were not reliable.

253.    The THL Defendants decided to retain Grant Thornton even though it took ten months from Jaeckel's email to consummate the IPO - more than enough time to change auditors and long enough for the fraud within Refco to continue and indeed grow in size while Refco was without the safeguard of a capable auditor. The real reason for the THL Defendant's decision was their recognition that bringing in a new, objective auditor would reveal the "monster under the bed" prior to a successful IPO with disastrous financial and reputational consequences to the THL Defendants.

254.    In addition to raising issues about THL's outside auditors, THL executives repeatedly (and justifiably) expressed concern over Refco's internal accounting staff:

- On March 28, 2005, Jaeckel wrote an internal THL email in which he said that "[t]he staff departures [of two senior Refco accounting personnel] are troubling - [I]'m getting increasingly worried about our audit."

- On March 30, 2005, Strasburg sent an internal THL email regarding an "Auditor call" with Mark Ramler from Grant Thornton. Strasburg said: "Ramler pulled no punches - essentially calling [Refco's] finance staff ex[cept] Gerry [Sherer] 'lazy.'"

- On April 1, 2005, Taylor sent an internal THL email in which he concurred that "Gerry [Sherer] is clearly a one man band in the short run."

255.    Notwithstanding their well grounded concerns, the THL Defendants did not remedy these internal accounting deficiencies. To fix the problems at Refco would again have placed THL's much-desired IPO at risk.

## 7.    THL Becomes Aware of the Profit Sharing Agreement

256.    Subsequent to the LBO, the THL Defendants learned first-hand that the Officer Defendants had not been honest with them. One stark example is the THL Defendant's discovery that before and after the LBO multiple Refco executives withheld information from the THL Defendants and others regarding an important and lucrative compensation scheme.

NY2:#4742866

257.     In or around 2001, eight Refco executives, including Officer Defendants Bennett, Murphy, Trosten, Maggio and Sexton, purportedly entered into an arrangement with RGL, pursuant to which they would receive substantial payments from RGL in the event that RGL was sold to a third party for more than $900 million (the "Equity-Like Arrangement"). By January 1, 2002, the Equity-Like Arrangement had been restructured in an effort to provide favorable tax treatment to the participants. Under the revised scheme, the participants purportedly obtained profit participation interests in RGL pursuant to which they would share in RGL's net annual income equal to their respective equity-like interest in RGL (the "Profit Sharing Agreement" or "PSA").

258.     This arrangement purportedly was implemented by amending the RGL partnership agreement on January 1, 2002 to allow for profits-only members, who were entitled to share in the annual net profits of RGL but were not entitled to vote.

259.     In June 2004, shortly before the consummation of the LBO, Refco agreed to redeem the purported equity-like interests by paying the executives a portion of the proceeds derived from a sale of Refco in amounts ranging from $2 to $25 million. The participants did not disclose to the THL Defendants their purported equity-like interest in RGL, nor that they were to receive substantial redemption payments upon the LBO.

260.     In the pre-LBO due diligence period, Weil, at THL's behest, had asked Refco to provide its "employment arrangements or arrangements with key employees." Weil sent questionnaires to Refco executives asking them to disclose information concerning their respective backgrounds and regarding Refco's executive compensation structure. The questionnaires specifically asked the Refco executives whether they had any personal financial interest in the LBO. None of the eight participating directors or officers disclosed their

participation in the PSA. Thus, none of the eight participating directors or officers disclosed that they would gain substantially from a high-priced sale of Refco.

261.    Immediately after the closing of the LBO, the THL Defendants began preparing for the IPO. Weil, again at THL's behest, sent identical questionnaires to Refco executives again asking whether they had any personal financial interest in the contemplated transaction.

262.    This time around, two Officer Defendants decided to come clean. Having already been paid millions of dollars, these executives had less to lose by telling the truth. Thus, in March 2005, Murphy contacted Weil to determine whether he had to reveal his participation in the PSA. Murphy informed Weil that he understood that Sexton  planned to disclose his participation in the PSA. On his questionnaire, Sexton disclosed that Refco had agreed to acquire his "outstanding profits participation interest" for a total of $9,043,850.

263.    Following this partial and belated airing of the truth, Refco informed Weil that two other executives  also participated in the PSA. The THL Defendants therefore had knowledge that on August 5, 2004, upon consummation of the LBO, the PSA interests held by these four individuals had been partially redeemed for a total of approximately $26 million, using RGL funds routed through RGHI. The THL Defendants also knew that the remaining redemption payments for the PSA interests were to be accelerated upon consummation of the IPO. As a result, the THL Defendants knew that certain of the Officer Defendants - particularly Bennett, the 100% owner of RGHI - had yet another reason to take Refco public at a high price and had taken affirmative steps to conceal their equity-like interests in Refco.

264.    Faced with blatant evidence that certain of the Officer Defendants engaged in fraudulent conduct by failing to disclose the existence of their profit participation

arrangements, the THL Defendants were on plain notice that at least a substantial part of Refco's management was not fit to be leading a public company. Rather than take appropriate steps to address the issue, the THL Defendants chose to ignore it and move forward with the IPO that was vital to THL's future financial and reputational success. Worse still, the THL Defendants opted to keep hidden from Refco's various constituencies, including its securities customers, the fraudulent conduct and character of these Refco executives in order to ensure that the THL Defendants were able to follow through on their plan to go forward with the IPO.

8.      **THL's Knowledge Of Acquisitions Consummated Without Proper Diligence**

        (a)      **The Cargill Acquisition**

        265.      On June 22, 2005, Refco announced the acquisition of Cargill Investor Services for $209 million, a significant transaction for the company. This transaction was openly funded using converted and upstreamed RCM customer property. The THL Defendants, in their capacity as Board members, were thoroughly involved in the transaction and either knew, or were reckless in not knowing, that the source of financing was stolen RCM customer property. RGL's Balance Sheet, as reported on its Form 10-Q for the period ending May 31, 2005, showed approximately $405 million in cash and equivalents on hand. It is inconceivable that financiers as shrewd and sophisticated as the THL Defendants would allow a cash acquisition amounting to more than 50% of the company's cash on hand to go forward without a firm understanding of the sources of funds being used to finance the acquisition.

        266.      On June 14, 2005, a Refco employee emailed the Refco board of directors to request a conference call to discuss Project Key, the code name for Refco's acquisition of Cargill Investor Services. In response to the request, Jaeckel sent an internal THL email:

Phil [Bennett] has not called me back. I hope the analysis is sufficiently deep/detailed for a discussion. Since they have never accepted our/Max [Strasburg]'s help I'm not sure who is modeling the deal and pro forma company.

267.    The same day, THL Vice President Taylor sent another internal THL email discussing his concerns with Project Key:

Jake [Jaeckel] and I caught up with Gerry [Sherer] regarding his request for a Board meeting Thursday (now confirmed for 4:00pm) to discuss Project Key (Cargill). Phil and Gerry plan to present the financials for Key and discuss with the Board whether it is an interesting acquisition candidate. When pressed, Gerry did not sound as if he had a presentation prepared that laid out the pros and cons of the deal…As it stands, what will be presented to the Board will be a relatively rudimentary set of financials that are not integrated into Refco's financial results. We offered to help model the combination by sending Max [Strasburg] down to assist in pulling the necessary data together (an offer we've made several times in the past), but did not get much of a response.

268.    On June 15, 2005, Schoen responded to this email with another internal THL email expressing similar concerns:

I had a 30 minute conversation with Phil [Bennett] on the same subject…I gave him a pretty good push on the value we could offer in diligence and modeling, the importance of doing thorough due diligence and building a financial plan in a levered, soon to be public company as compared to their intuitive historical style, and my desire to see them present a 10-20 slide deck to the board that walks through summary financials, pro formas, accretion/dilution, lays out the key executional plan including individual responsibilities, deliverables and measurement metrics, and balances key opportunities and risks. He fully acknowledged the need to engage with us in such a process, and then explained that these were unusual circumstances and basically blew me off. He did it with respect, but nonetheless seemed to just be giving lip service to this approach.

269.    On June 16, 2005, THL analyst Strasburg sent an internal THL email about Refco's strategy for Project Key. He expressed concern over how this acquisition would be funded: "No consideration is given to debt costs and Scott Love [from Refco] thinks they are funding this without borrowing. Not sure how." Jaeckel replied with an internal THL email:

"They r [sic] paying 300mm for this? I wouldn't do that - we have to trade at 10x ebitda for this to be accretive?" Strasburg's reply was: "$215 upfront. Earnout is additional $67 to $192. Love could not explain to me how it works."

      270.    Also on June 16, 2005, a Board of Managers Meeting for Project Key was held. A copy of minutes from that meeting are initialed "MS," presumably for Max Strasburg. Handwritten notes on the minutes state:

> Financing: 500m house cash
>
> 1Q CF: 84m
> ~400m unrestricted cash / unreg. customer $ from deal

      271.    On June 20, 2005, after receiving an email from Refco Chief Financial Officer Sherer regarding yet another potential acquisition, Jaeckel sent Sherer an email recommending a number of due diligence steps that he considered appropriate. These included the use of outside professionals, which had not been part of the Project Key acquisition.

      272.    Jaeckel then forwarded the email he had written to Sherer to Schoen, Taylor, and Strasburg at THL, making clear that he sought to avoid a repeat of Project Key: "Fyi - I didn't want lack of response to be seen as approval of another disorganized effort."

      273.    Schoen responded to this internal THL email:

> A good plan. Let's discuss this morning how we can try to force the same result in process re Cargill, albeit after the fact since we will be signing a binding agreement first! We can at least lay out our specific requirements and give them a sample from [redacted] to show the level of work, planning and information that we require, and that absolutely must be done as a public equity filer.

      274.    On June 22, 2005, Schoen expressed his disappointment with the level of Refco's disclosure and diligence work in connection with the Cargill transaction to date:

As promised, enclosed is a presentation one of our portfolio companies, [redacted], presented to its Board of Directors prior to obtaining a Board resolution to complete an approximately $400 million acquisition of [redacted]. This is an excellent example of the level of disclosure and diligence work we would normally expect for a substantial acquisition. I recognize that the Cargill process had real limitations we had to live with to be successful. Hopefully, we can now do the work and prepare materials of comparable breadth and depth for our Board meeting. In addition, below are a few diligence and reporting points we would like to address with you in advance of the board meeting, now that we will have greater access to Key management and records… (5.) Analysis of capital benefit from transaction – Refco cash position before and after deal – required and excess.

275.    The June 22, 2005 letter from Schoen indicates an intention to do further analysis regarding the cash position of Refco before and after the deal. Any minimal analysis would have uncovered the massive movement of RCM customer cash used to purchase Cargill. Schoen's letter also confirms that it was THL's ordinary practice to obtain the details of the financing of any significant transaction by a THL portfolio company. In the enclosed presentation from a THL portfolio company, which was presented to Bennett as an "excellent example of the level of disclosure and diligence work we would normally expect for a substantial acquisition," one slide, entitled "Transaction Assumptions" detailed the financing of the acquisition:

**Purchase Price:**

- Aggregate purchase price between €373 and €411 million on a debt and cash free basis.

**Financing:**

- [Portfolio Company Redacted] will finance transaction through a $500 million Term Loan B Add-On as allowed by the "accordian" feature of its credit facility.

- The remaining portion will be funded through [Portfolio Company Redacted's] existing revolver facility.

NY2:#4742866

91

- Assumed LIBOR rate of 3.25%, 3.75% and 4.25% for 2005, 2006 and 2007, respectively

276.    Lee, Harkins, Jaeckel and Schoen all approved a board resolution granting Refco executives the power to finish the Cargill transaction - notwithstanding their strong misgivings about the procedure used for the deal and their knowledge that the acquisition was being rushed. The THL Defendants knew, or were reckless in not knowing, that the source of the funds used to purchase Cargill were RCM customer funds. As the handwritten notes on the June 16, 2005 meeting minutes indicate, the THL Defendants knew exactly where the funds were coming from: Refco's "unregulated" subsidiary RCM.

277.    In approving the resolution authorizing the Refco executives to complete the Cargill acquisition, the THL Defendants authorized and directed a fraud – *i.e.*, the conversion and upstreaming of RCM customer property and the use of this stolen property to purchase a new business for Refco. Their main concern was to avoid doing anything that would interfere with the IPO.

**(b)    The Suffolk Loans**

278.    The Cargill acquisition was not the only major transaction approved by the THL Defendants that was funded with stolen customer property. Another example is a series of transactions with the Suffolk entities.

279.    In March 2005, RGL, through its subsidiary, RCC, issued a series of loans totaling $204 million (the "Suffolk Loans") to Suffolk, LLC, the controlling shareholder of PlusFunds Group, Inc., and related entities. Suffolk, LLC, which has now filed for bankruptcy, was controlled principally by Chris Sugrue, a former Refco employee with close ties to Bennett,

and Sugrue's brother-in-law, Mark Kavanaugh. In his time at Refco, Sugrue developed Refco's

relationship with BAWAG, which was a participant in the fraud.

280. The first loan ("the Phase I Loan"), a line of credit of $154 million, was

issued to Suffolk to be used to purchase the minority shares of PlusFunds. The second series of

loans ("the Phase II Loans"), totaling $50 million, were issued to entities controlled by the

principals of PlusFunds and the proceeds were distributed by Refco to banks in the United States

and to Bank Frick, a small private bank in Liechtenstein in which BAWAG and Refco were

shareholders. The principals of PlusFunds thereafter distributed to themselves or for their benefit

substantially all of the $50 million in proceeds from the Phase II Loans.

281. The Suffolk Loans were nothing more than a sham. In actuality, Bennett

and certain other of the Officer Defendants had intended that Suffolk would default on the

Suffolk Loans and Refco's sole recourse would be to foreclose on and acquire the majority

interest in PlusFunds - at a price far higher than market rate.

282. In the last full year before the loans were issued, PlusFunds' total net

income was less than $2 million according to PlusFunds' certified financial statements.

Nevertheless, the Officer Defendants valued PlusFunds at $250 million, or a multiple of more

than 125 times the reported net income. There was insufficient justification for Refco to make a

$208 million loan against illiquid, privately-held stock of a company that generated minimal

profits.

283. At the time of the Suffolk Loans, the THL Defendants exercised control

over the Refco parent entities. The THL Defendants knew that Refco entered into the Suffolk

Loans. By failing to prevent Refco from issuing a loan of $204 million to a company with little

or no collateral the THL Defendants recklessly caused Refco to incur over $200 million in debt effectively to acquire a company that had been wildly overvalued.

284.    As controlling shareholders of, and fiduciaries to, Refco, the THL Defendants had an obligation to understand the transaction with PlusFunds and the source of the over $200 million used to make the loan to PlusFunds. The THL Defendants knew, or were reckless in not knowing, that Refco's ability to fund the loan was dependent on the existence and continuation of the fraudulent conversion of securities belonging to RCM customers.

## 9.    The IPO

285.    After conducting due diligence pre- and post-LBO, the THL Defendants knew of a myriad of problems at Refco: dishonesty by the Officer Defendants, disastrous internal controls and accounting, inadequate external auditing, and financial statements that were in need of restatement. The THL Defendants also knew, or were reckless in not knowing, of the massive fraud involving the conversion of RCM customer securities which enabled Refco to continue to operate. The THL Defendants made a conscious choice to disregard the fraud and to proceed with the singular goal of getting a lucrative payday as quickly as possible.

### (a)    The Reincorporation

286.    In preparation for the impending IPO, Refco underwent a reincorporation (the "Reincorporation"), whereby Refco Inc. became the new holding company through which ownership in RGL was held. As a result, Refco Inc. became the ultimate parent of the Refco entities; New Refco became inoperative except as a subsidiary of Refco Inc. and parent of RGL; and RGL continued to be the main holding company for the Refco businesses.

287.    As part of the Reincorporation, the THL Entities and their affiliates exchanged their 283.24 Class A Common Units of New Refco for 63,122,588 shares of common stock of Refco Inc and thus became majority owner of Refco Inc.

288.    As of August 1, 2005, the following people were directors of Refco Inc.:

- THL Directors: David V. Harkins; Scott L. Jaeckel; Thomas H. Lee;; and Scott A. Schoen;

- Refco Insider: Phillip R. Bennett; and

- Independents: Leo R. Breitman; Nathan Gantcher; Ronald L. O'Kelley.

THL therefore had significant control over the board of Refco Inc.

**(b)    The Prospectus**

289.    Prior to the IPO, Refco Inc., as Refco's new parent company, filed a final prospectus (the "Prospectus") with the SEC.  The Prospectus described the stock sale as follows:

- Common stock offered by [Refco]    12,500,000 shares.

- Common stock offered by the selling stockholders   14,000,000 shares.

- Total offering  26,500,000 shares.

- Common stock to be outstanding after this offering  127,500,000 shares.

290.    The Prospectus also included a "Report of Independent Registered Public Accounting Firm" from Grant Thornton, Refco's outside auditors, as well as the audited financial statements of New Refco, which were audited by Grant Thornton.

291.    As discussed above, the THL Defendants knew that that it would have been prudent to replace Grant Thornton, but in their desire to cash out in the IPO, the THL Defendants caused Refco to consummate the IPO using Grant Thornton's audit opinion,

notwithstanding that THL recognized that there was a real risk that a re-audit by a Big Four firm would have required a restatement of Refco's financial statements.

(c)      **Roadshow**

292.      The THL Defendants embarked on a two week IPO roadshow to market Refco to public investors.  During the roadshow, the THL Defendants touted the financial viability of Refco - despite their knowledge of Refco's true state.  The THL Defendants falsely claimed Refco had an "Exceptional Financial Model" and that its "Disciplined Risk Management" ensured Refco would not suffer sustained losses in the future.  In truth, the THL Defendants knew that Refco had suffered grave losses in the past that had been fraudulently masked and that Refco's financial model was beset with significant problems.

293.      Moreover, THL lent its good name to overcome the public's poor perception of Refco's business practices.  In the presentation, THL maintained that Refco would use the primary proceeds of the IPO to "buyout [the] THL management agreement."  The investors were led to believe that THL's management, pursuant to the Management Agreement, already had fixed many of the problems that plagued Refco.  This too was false.  The THL Defendants never informed the investors of the truth - that THL had failed to remedy Refco's troubled state.

(d)      **Stock Sales in the IPO**

294.      After the roadshow, on August 11, 2005, just one year after the LBO, THL led Refco though an initial public offering of its stock.  At that time, THL and its affiliates sold approximately 8.625 million shares of Refco common stock, with a total sale price of approximately $189.8 million.  After selling this portion of their collective ownership, THL and its affiliates retained approximately 42.7% of ownership of Refco.

295.    Bennett sold 5.375 million shares through his holding vehicles RGHI and Phillip R. Bennett Three Year Annuity Trust, for a total price of approximately $118.3 million.

296.    Refco's proceeds from the IPO totaled approximately $259 million, most of which was used to retire $210 million of the debt taken out to facilitate the LBO, plus a debt prepayment penalty of $18.9 million.

297.    The Defendants agreed among themselves to structure the IPO with the principal goal of allowing themselves to cash out, as opposed to raising funds for Refco to reduce the enormous debt with which the Defendants had saddled Refco in connection with the LBO.  Again, the THL Defendants put their own interests ahead of Refco's.

298.    When the fraud at Refco was disclosed, Refco was saddled with hundreds of millions of dollars in liabilities to all of the purchasers of Refco stock in the IPO who had claims against Refco based on its false and misleading registration statement and prospectus, notwithstanding that the majority of the proceeds of the public offering had been reaped by the Defendants (as opposed to Refco itself) through the sale of their stock in Refco.  Thus, the sale of stock by the Defendants resulted in Refco taking on liabilities to pay back investors who had purchased stock based on unreliable financial statements.  These liabilities would not have been incurred had the THL Defendants fulfilled their duties to RCM customers.

    (e)    **The Greenshoe**

299.    A greenshoe dividend results from the exercise by IPO underwriters of an option to purchase shares beyond their initial allotment.  The proceeds from such a sale are paid out in the form of a dividend to certain investors of the company.

300.    The THL Defendants began focusing on creating and obtaining a sizeable greenshoe dividend at its very first official IPO planning meeting on October 19, 2004. The planning culminated in a massive payout to THL less than one year later. On August 10, 2005, the Refco Board agreed to pay a dividend to pre-IPO shareholders, including THL. The Board self-servingly determined that after the IPO and the exercise of the Underwriters' Option to purchase additional shares, Refco would have a "sufficient surplus" of funds to permit payment of the dividend to its shareholders - despite the fact that Refco still held debt exceeding one billion dollars incurred in the LBO.

301.    One day later, on August 11, 2005, the Underwriters agreed to exercise their over-allotment option and to purchase 3,975,000 shares of Refco common stock. Accordingly, it was determined that "an aggregate dividend equal to the net proceeds of the $82,203,000 received from the exercise of the Underwriters' Option...be paid."

302.    On August 18, 2005, Refco paid the THL Entities and their affiliates $45.1 million as a result of the greenshoe dividend.

**(f)    Fraud At Refco**

303.    As noted, by the time of the IPO, the THL Defendants knew, among other things, the following about Refco:

- Refco's internal accounting function was in disrepair;

- Refco's outside auditor was inadequate for a company of Refco's size, giving rise to a "restatement risk" were an appropriate auditor brought in;

- Refco, at the direction of the Officer Defendants, merely had taken "stop gap measures" to deal with the auditing shortcoming;

- The Officer Defendants and Refco's outside auditor had deliberately failed to bring to the THL Defendants' attention the "horrendous" Management Letter;

- Refco played "fast and loose [with] compliance issues," and incurred multiple regulatory sanctions involving the improper handling of customer funds;

- The Officer Defendants had affirmatively lied to the THL Defendants;

- Refco, at the direction of the Officer Defendants, engaged in multi-hundred-million-dollar transactions that the THL Defendants knew or should have know were funded with looted customer property.

304.     Following the LBO, upon taking control of Refco, the THL Defendants learned that the improprieties within Refco were not limited to the list above. In fact, following the LBO, the THL Defendants discovered, or were reckless in not discovering, that the same Officer Defendants that the THL Defendants knew to be dishonest had carried out a massive and long-running fraudulent scheme. After assuming control of Refco, the THL Defendants knew, or were reckless in not knowing, of the fraudulent scheme for reasons including:

- the THL Defendants had unfettered access to, and were made aware of, material information concerning RCM and the intercompany transfers of RCM customer assets. For example, the THL Defendants, through Jaeckel, received presentations on the results of Grant Thornton's audit of Refco's 2005 financial statements. In addition, documents produced by THL Partners in connection with the Bankruptcy Cases demonstrate that the THL Defendants were aware of RCM's practice of selling, through hypothecations and pursuant to Repos, customer securities that were supposed to be held in custody by RCM and that the THL Defendants knew that RCM customer securities were being sold to sustain Refco's business operations and acquisitions;

- the THL Defendants are highly sophisticated about financial matters. With specific skills in corporate finance, the THL Defendants are, and were at all relevant times, in the business of closely examining companies and using large amounts of financing to acquire interests in companies with potential for growth in order to actively manage and prepare those companies to go public;

- the operations of RCM were a substantial element of Refco's overall business model;

- the regular, substantial lending of billions of dollars by RCM to its "upstream" affiliates and corporate parents constituted highly irregular related-party transactions lacking any proper business purpose. This would have been plainly apparent to anyone with access to the level of information that was available to the THL Defendants;