- the THL Defendants had multiple representatives on Refco's Board, including representatives that served on key board committees and held key executive positions within relevant Refco companies. These representatives had access to internal financial documents and records that revealed the fraudulent scheme and had an obligation to understand and monitor the fraudulent transactions in question. Jaeckel, for instance, a director of Refco, served as Treasurer of New Refco, Treasurer of Refco Finance Holdings, LLC, and Treasurer of Refco Finance Inc. Just based on fulfilling these roles, Jaeckel must have known of the fraudulent scheme. Schoen, a director of Refco, served as President of New Refco, President of Refco Finance, Inc., and was the sole director of Refco Finance, Inc. As a result of such executive positions within Refco entities, each of Jaeckel, Schoen, Lee and Harkins knew, or were reckless in not knowing, key details of the fraudulent scheme and its importance to the continued funding of Refco's operations;

- the THL Defendants had complete access to relevant RCM and other Refco personnel, including those charged with direct responsibility for carrying out the unauthorized sales, through hypothecations and pursuant to Repos, of RCM customer assets;

- the THL Defendants, through THL Managers V, LLC, an entity controlled by THL and the other THL Defendants, received tens of millions of dollars for providing management services to Refco and its affiliates during the period that they were in control of Refco, and in so doing should have become even more familiar with Refco's operations than the typical controlling stockholder;

- while the THL Defendants were in control of Refco the use of RCM customer securities to finance the operations of other Refco Entities was essential to the continued operation and existence of those other entities; and

- while the THL Defendants were in control of Refco, Refco engaged in at least two extraordinary transactions, being the Cargill and Suffolk transactions discussed above, each of which required hundreds of millions of dollars of funding, which was provided for through the sale, through hypothecations or pursuant to Repos, of RCM customer securities and the subsequent misuse of the proceeds.

305.    The Defendants caused Refco to rely for its life and growth upon the fraudulent conversion of billions of dollars of assets that customers of the Refco subsidiary RCM deposited in RCM for safekeeping. The Defendants' conversion of RCM customers' securities violated applicable state and federal law. The THL Defendants became aware, or were reckless in not becoming aware, of this rampant practice in connection with their control of Refco. Yet,

NY2:#4742866

the THL Defendants did nothing to fulfill their fiduciary obligations, or their obligations under the Management Agreement, or under applicable state and federal securities laws to prevent the Officer Defendants from misusing RCM customers' assets.

306.    As a direct result of the actions of the THL Defendants, this fraudulent scheme continued unabated, and the THL Defendants pushed Refco into an IPO that saddled it with hundreds of millions of dollars in obligations it could not fulfill.

## VIII.    DEFENDANTS REAPED SUBSTANTIAL PROFITS FROM THE SCHEME

307.    In addition to the facts set out above giving rise to a strong inference that each of the Defendants knew and consciously engaged in acts constituting the fraudulent scheme, the Defendants also had both the motive and opportunity to commit fraud.  Indeed, the entire fraudulent scheme was designed to enrich the Defendants at the expense of the Refco entities and their customers.

308.    Unique factors motivated the Defendants to conduct the fraudulent scheme alleged herein.  In particular, the misappropriated RCM customer assets were used to fund Refco's otherwise financially unsustainable operations and thus to project a false appearance of growth and success on the part of Refco that allowed the Defendants to enrich themselves personally.  The false appearance of growth and success created by the unauthorized sale of RCM customer's securities enabled the Officer Defendants successfully to complete Refco's Bond offering in July 2004.  It also enabled the Officer Defendants to complete the THL LBO in August 2004, and enabled the Officer Defendants and the THL Defendants successfully to complete Refco's IPO in August 2005.  The Officer Defendants and the THL Defendants reaped tremendous monetary benefit from each of these transactions.  None of the transactions

would have been possible without the fraudulent scheme alleged herein because without the misappropriated RCM customer assets Refco would not have been able to project the appearance of financial health and prosperity necessary in order for the Defendants to cash out their interests in Refco for more than they were worth.

309.    In the year leading up to the IPO and the subsequent collapse of Refco, the Officer Defendants, the THL Defendants and others stripped in excess of $1 billion from Refco.  As alleged below, they did so through sales of equity interests in the LBO; enormous outright grants of Refco common stock; the "green shoe" oversubscription option on the IPO, the proceeds of which were used to enrich personally certain Officer Defendants; further grants in the form of "Restricted Stock Units" ("RSUs") – awards of large blocks of stock that vest over time on certain conditions – to the Officer Defendants, the lucrative management fees paid to THL Manager V's under the Management Agreement, and several other bonus and compensation plans.

310.    As part of the series of transactions in the LBO, RGL's predecessor in interest, Refco Finance, transferred $825 million to RGHI, the entity then wholly owned and controlled by Bennett.  RGL also transferred to RGHI all of its equity interests in Forstmann-Leff International Associates, LLC ("Forstmann-Leff") (valued at approximately $238 million).

311.    Officer Defendants Murphy, Sexton and Maggio also realized significant financial windfalls from the LBO.  In connection with the THL Defendants' investments, these executives had their interests in a Refco-endorsed profit-sharing agreement liquidated, allowing them to share in substantial payments in August 2004 and September 2005, with Murphy receiving approximately $13.1 million, Sexton receiving approximately $8.1 million, and Maggio receiving approximately $13.5 million.  These payments were in addition to the multi-

million dollar salaries and bonuses received by these executives over the period of 2003 to 2005

and the generous stock option awards they received in advance of the IPO. These large

payments underscore the Defendants' motivation and intent to use the LBO and the IPO to

extract large personal payments, raising a strong inference of scienter.

312.    In the lead-up to the IPO, certain Officer Defendants received substantial

grants of Refco common stock. The benefits of these grants could only be realized through an

IPO, which created a public trading market for the stock and substantially increased its trading

value, thereby greatly increasing these Defendants' personal wealth. These grants of stock

therefore provided these Officer Defendants with further motive both to continue and conceal the

fraudulent scheme by which Refco's otherwise financially unsustainable operations were able to

project a false appearance of growth and success. This false appearance in turn greatly increased

public interest in the IPO from which the Officer Defendants stood to benefit directly and

substantially.

313.    The following chart sets forth Officer Defendants Bennett, Sexton,

Murphy and Maggio's respective Refco stock holdings on the eve of the IPO, and the value

thereof at the offering price, as set forth in the prospectus:

| Defendant | Stock Held at IPO | Value at IPO Price |
|---|---|---|
| Bennett | 48,427,000 shares | $1,065,394,000 |
| Sexton | 596,000 shares | $13,112,000 |
| Murphy | 534,000 shares | $11,748,000 |
| Maggio | 503,000 shares | $11,066,000 |

NY2:#4742866

314.    The substantial pecuniary benefits that these Defendants received, and could only have received, through an IPO raises a strong inference that they acted with scienter. Indeed, defendant Bennett (through RGHI) sold 5.375 million shares in the IPO, netting over $111.2 million in cash while retaining a 33.8% stake in Refco. Significantly, a "lock-up" agreement with the IPO underwriters was the only impediment preventing the other Officer Defendants from similarly cashing in all or a portion of their equity interests in the IPO. That "lock-up" agreement prevented the other Officer Defendants from selling their shares for 180 days after the IPO – a date that was ultimately preceded by Refco's collapse. Nevertheless, at all times, the other Officer Defendants expected to reap large windfalls from their shares. Thus, the Officer Defendants' clear motivation to conduct an IPO and soon thereafter sell registered shares raises a strong inference of scienter.

315.    Certain Officer Defendants also received huge grants of Restricted Stock Units ("RSUs") in advance of the IPO, and were consequently motivated to conduct the fraudulent scheme alleged herein. Under the terms of the Restricted Stock Unit agreements, 50% of a grant would vest ratably over four fiscal years, and the other 50% would vest upon the achievements of undisclosed EBIDTA targets. As set forth in the IPO registration statement, Bennett received 1,203,365 RSUs, and Murphy, Sexton and Maggio each received 701,963 RSUs. These large grants of RSUs motivated these Officer Defendants to conduct the fraudulent scheme alleged herein in order to ensure that the IPO was successful because the RSUs were worthless without a public market for the underlying shares.

316.    By early 2005, the ground work had been laid for the Defendants to sell a huge stake of Refco to the investing public through an IPO. An IPO was extremely attractive to the Defendants because it would allow them to reap huge financial rewards from their ownership

stake in Refco. An IPO had other benefits as well. For example, it would (i) create a public trading market that would allow the Defendants to sell their stock for huge profits or, at a minimum, use their Refco stock as collateral for personal loans; (ii) create a significant capital infusion that would increase the book value of the millions of shares that these Defendants would retain after an IPO; and (iii) result in a huge one-time "special dividend" payment that would be used to line the pockets of the Officer Defendants and other corporate insiders.

317.    The Defendants also stood to benefit substantially from the use of the green shoe option in case of oversubscription on the IPO. Pursuant to the terms of the IPO, the Refco board granted the Underwriters of Refco's IPO an option to purchase at $20.68 per share, 3,975,000 additional shares beyond their initial allotment. When the Underwriters exercised this option, Refco registered nearly four million additional shares for sale in the IPO in case the 26.5 million shares planned for sale in the IPO were oversubscribed.

318.    As described above, the THL Defendants began focusing on creating and obtaining a sizeable greenshoe dividend at its very first official IPO planning meeting on October 19, 2004, and secured a massive payout for themselves less than one year later. Despite the fact that Refco held in excess of one billion dollars in debt, the Board determined that Refco would have a "sufficient surplus of funds" to permit payment of the dividend to its shareholders. Thus, by conducting, or recklessly disregarding, the fraudulent scheme and thereby creating sufficient demand for Refco stock at the time of the IPO, certain Officer Defendants and the THL Defendants received an extra cash payment in the form of the greenshoe dividend (the "Greenshoe Dividend").

319.    On August 18, 2005, Refco paid the Greenshoe Dividend to its pre-IPO shareholders as follows:

| Defendant | Pre-IPO Interest | Greenshoe Dividend |
|---|---|---|
| Bennett (through RGHI) | 42.1% | $34,616,153 |
| Sexton | 0.52% | $426,052 |
| Murphy | 0.46% | $381,558 |
| Maggio | 0.44% | $359,311 |
| THL Entities & affiliates | 57% | $45,120,576 |

320.     The prospect of these cash payments alone gives rise to a strong inference of motive on the part of the Defendants to conduct and conceal the fraudulent scheme alleged herein.  As a direct result of Refco's fraudulent scheme to misappropriate huge volumes of customer securities to secretly finance the activities of RCM's affiliates, the Defendants were able to drive up demand for Refco shares, resulting in share purchases from which the Defendants would benefit directly.  Thus, the Defendants stood to benefit directly and substantially from the fraudulent scheme.

321.     As noted above, the IPO offered additional financial benefits to the THL Defendants.  They and their affiliates were paid approximately $223.5 million as a result of the IPO, while still maintaining a controlling ownership stake of 42.7% of Refco and having a liquid market in which to sell shares in the future.

322.     A successful IPO would also provide additional benefits to the THL Defendants because they were in the process of marketing a new private equity fund that required them to raise approximately $7.5 billion from institutional investors.  The THL Defendants could "leverage" the publicity provided by a high-profile IPO of Refco by touting the

quick profits they and their affiliates had realized through their involvement with Refco, and thereby market their new fund and raise billions of dollars of additional capital from institutional investors. By demonstrating a quick and significant return on the Refco IPO, the THL Defendants increased their ability to raise the capital to form a new fund in the hyper-competitive leveraged buyout community. The THL Defendants stood to make huge fees and profits from such a new private equity fund.

## IX.    THE OFFICER DEFENDANTS HAD CONTROL OVER REFCO

323.    The Officer Defendants had control of Refco and its relevant subsidiaries, including RCM, RSL, RGL, Refco Global Finance, RCC and Refco LLC, by virtue of their executive positions with Refco, the key roles each played in Refco's management, and their direct involvement in its day-to-day operations, including its finance and accounting functions.

324.    Defendant Bennett controlled Refco by virtue of being one of Refco's largest shareholders. From August 2004, Bennett owned approximately 43% of the equity interests of Refco through RGHI. Following the August 2005 IPO, Bennett owned 33.8% of Refco's outstanding common stock through RGHI and the Bennett Trust.

325.    Refco's SEC filings –Refco's Offering Memorandum for the Bonds, Bond Registration Statement and IPO Registration Statement – were each prepared, approved and signed by one or more of the Officer Defendants. Each of the Officer Defendants held top management positions within Refco and, thereby, individually and collectively controlled Refco including the relevant subsidiaries RCM, RSL, RGL, Refco Global Finance, RCC and Refco LLC.

326.    Refco's SEC filings, including the Offering Memorandum for the Bonds, the Bond Registration Statement, and the IPO Registration Statement, touted the key roles played

by the Officer Defendants in Refco's operations and purported success. For example, the Bond

Registration Statement discussed the potential departure of the Officer Defendants in a risk

disclosure, emphasizing that:

> "Our business operations could be significantly disrupted if
> we lost the members of our management team. Our future
> success depends to a significant degree upon the continued
> contributions of our management team. Our future
> performance will be substantially dependent on our ability
> to retain and motivate them. . . . The loss of the services of
> any member of our management team . . . could adversely
> affect our ability to manage our business effectively or to
> execute our business strategy."

327.    The Offering Memorandum for the Bonds and the IPO Registration

Statement each contained substantially similar descriptions of the Officer Defendants'

importance to Refco's affairs. In connection with the risk disclosure, the registration statement

for the Bonds further assured investors that Officer Defendants Bennett, Murphy, Sexton, and

Maggio were all subject to non-compete agreements with Refco in the event of their departure.

328.    The Executive Employment and Non-Competition Agreements pursuant

to which Officer Defendants Bennett, Maggio, Sexton, and Murphy were employed gave each of

those Defendants substantial authority over the day-to-day management and operation of Refco.

Each of their agreements explicitly stated that they were employed "in a key capacity with the

Company," and that they had access to "confidential information regarding the organization,

business and finances of the Company." Each of their employment agreements also placed non-

competition, non-solicitation and no-hire restrictions on these defendants.

329.    As a result of the foregoing, each of the Officer Defendants, both

individually and collectively, controlled Refco and its relevant subsidiaries including RCM,

RSL, RGL, Refco Global Finance, RCC and Refco LLC.

## X.    THE THL DEFENDANTS HAD CONTROL OVER REFCO

330.    At all relevant times after the LBO, the THL Defendants were the controlling stockholder of Refco.  As a result of the 2004 LBO, the THL Defendants and their affiliates owned a 57% equity stake in Refco.  That stake remained at 42.7% following Refco's IPO in August 2005, pursuant to which the THL Defendants and their affiliates received approximately $223.5 million as selling stock holders and otherwise.  At all times after the LBO, the THL Defendants owed contractual and fiduciary duties to one another requiring them to act in concert and share all material information with each other with respect to their investment in Refco.

331.    The THL Defendants can hardly dispute their control of Refco and its affiliates.  The Offering Memorandum for Refco's Bonds that was issued concurrently with the LBO acknowledged that, upon consummation of the LBO, the THL Defendants would "have the ability to control all aspects of [Refco's] business."  Similarly, Refco's IPO Prospectus, filed with the SEC on August 10, 2005, disclosed to potential investors that upon completion of the offering, the THL Defendants and Bennett would control Refco.

332.    Refco has also characterized itself as a "controlled company" within the meaning of NYSE rules by virtue of the THL Entities' and Bennett's collective post-August 2005 IPO position in Refco stock, which consisted of an approximate 42.7% interest of the THL Entities and their affiliates and Bennett's 33.8% interest (held through RGHI and the Bennett Trust) in Refco's outstanding shares.

333.    Under the terms of the Securityholders Agreement of August 5, 2004, between Refco and various members of the THL Defendants and their affiliates (the "Securityholders Agreement"), the THL Defendants were entitled to designate four of the eight

members of the board of managers of New Refco. In addition, the THL Defendants were entitled to designate a fifth member jointly with RGHI. Pursuant to these provisions, the THL Defendants designated Defendants Lee, Schoen, Harkins and Jaeckel to serve on the board. The THL Defendants' substantial board presence continued after the August 2005 IPO. Under an Amended and Restated Stockholders Agreement of August 10, 2005 (the "Amended Stockholders Agreement"), the THL Defendants were entitled to designate three of eight members of Refco Inc's board of directors, with an additional fourth member to be designated jointly with RGHI.

334.    The Securityholders Agreement also entitled the THL Defendants to "reasonable representation" on the board's key committees, including the audit committee, nominating and governance committee and compensation committee. Pursuant to this provision, the THL Defendants designated Schoen to serve on the compensation committee and Harkins and Schoen to serve on the nominating and governance committee. The THL Defendants also designated Jaeckel to attend meetings of the audit committee.

335.    The compensation committee oversaw Refco's compensation and employee benefit plans and practices and produced a report on executive compensation as required by SEC rules. On information and belief, the compensation committee including Schoen thus reviewed and approved the incentive compensation structure that was designed to incentivize the theft of RCM customer assets alleged herein. As noted above, the RSL employees responsible for carrying out the sales and transfer transactions in question, including Yorke, earned hundreds of thousands of dollars in bonuses that were determined in part based on the interest imputedly earned by RCM from the intercompany receivables generated once the customer securities were "monetized", "upstreamed" and "side-streamed" to other Refco entities.

336.     The THL Defendants' positions on the nominating and governance committee, filled by Harkins and Schoen, also gave them significant power and control. That committee's role was to identify and to recommend to the board individuals qualified to serve as directors of Refco and on committees of the board, advise the board with respect to the board composition, procedures and committees, develop and recommend to the board a set of corporate governance principles and guidelines, and oversee the evaluation of the board and Refco management.

337.     The THL Defendants designated Jaeckel to attend meetings of the audit committee. The audit committee selected an independent auditor, determined the auditor's functions, developed and implemented an independent reporting system, reviewed audits, and regularly reported to Refco's Board of Managers. Jaeckel attended audit committee meetings and reviewed and approved audited financial statements.

338.     The THL Defendants' control over Refco is also demonstrated by its insistence that Trosten be removed as CFO of RGL upon the completion of the LBO. During the course of their pre-LBO due diligence into Refco, the THL Defendants determined that Trosten would not be an effective CFO of a public company and would be replaced following the LBO. Following the THL Entities' acquisition of their controlling interest in Refco, Trosten was made aware of the THL Defendants' view and promptly resigned.

339.     The THL Defendants also exercised control over Refco through the hiring of a new chief financial officer, controller and tax director for Refco after the LBO, each of whom the THL Defendants designated and controlled. At all times, the THL Defendants had access to these newly hired executives, as well as other Refco employees, who had knowledge

about the manner in which securities held in RCM customer accounts were being used to finance the business operations and acquisitions of RCM's affiliate companies.

340.    Furthermore, pursuant to a Management Agreement, dated August 5, 2004, between Refco and various of the THL Defendants (the "Management Agreement"), defendant THL Managers V was specifically obligated to know and understand the Refco business in order to provide it with advice. Under the Management Agreement, THL Managers V was, upon the request of New Refco or RGL (each of which, as stated above, was controlled by the THL Defendants, thereby putting the THL Defendants in the position of having to make requests of themselves), to provide management and advisory services to Refco in connection with Refco's business operations and the execution of its "strategic plan." As alleged herein, that "strategic plan" depended on the improper theft of RCM customer assets. THL Managers V received a fee of $30 million in addition to annual payments amounting to the greater of $2.5 million per year or 1% of EBITDA for the provision of these advisory services. As a result of their control of New Refco and RGL, therefore, the THL Defendants were themselves able to control both the requests for advice and the advice subsequently given pursuant to the Management Agreement.

341.    The Management Agreement stated that the reason for the retention of THL Managers V was that the THL Defendants were "specifically skilled in corporate finance, strategic corporate planning, and other management skills and advisory services." The Management Agreement also stated that THL Managers V was retained to advise Refco "in connection with the negotiation and consummation of agreements, contracts, documents and instruments related to [Refco's] or any of its subsidiaries finances or relationships with banks or other financial institutions," and "with respect to the development and implementation of

strategies for improving the operating, marketing and financial performance of [Refco] and other senior management matters related to the business, administration and policies of [Refco] and its subsidiaries."

342.    Thus, THL Managers V, an entity controlled by THL and the other THL Defendants, was both obligated and authorized by the Management Agreement to become deeply involved in the day-to-day management of Refco and its subsidiaries, including RCM. Similarly, pursuant to the Management Agreement, Defendants Lee, Harkins, Jaeckel and Schoen were obligated to provide management services to Refco and thus to become individually involved in the day-to-day affairs of Refco and its subsidiaries, including RCM.

343.    The Securityholders Agreement also provided the THL Defendants with a number of additional mechanisms by which they exerted control over Refco. The Securityholders Agreement effectively conferred on the THL Defendants veto power over a wide range of corporate activities including the right to merge or sell any of Refco's assets or to effect a public offering. In particular, the Securityholders Agreement required the approval of 65% of the outstanding shares (57% of which were owned by the THL Defendants) to take any of the following actions:

I.    "enter into, or agree to enter into, or permit Old Refco to enter into or agree to enter into, any merger or consolidation with any Person";

II.    "offer for sale or sell, or permit Old Refco to offer for sale or sell, directly or indirectly, all or substantially all of the assets of the Company";

III.    "effectuate the first Public Offering of the Company or any successor entity";

IV.    "pass a resolution of managers commencing the voluntary dissolution or liquidation of the Company or any Subsidiary or voluntarily commence any proceeding or file any petition seeking relief under Title 11 of the United States Code as now constituted or hereafter amended, or any

other federal, state or foreign bankruptcy, reorganization, insolvency or similar law with respect to the Company or any Subsidiary";

V.  "make an election to be taxed as other than a partnership for U.S. federal income tax purposes, except in connection with a Public Offering of the Company or any successor entity";

VI.  "permit Old Refco to elect to terminate Bennett's employment under the Bennett Employment Agreement or elect not to renew such agreement, except in a case where 'Cause' (as defined in the Bennett Employment Agreement) exists for the termination of employment under such agreement";

VII.  "amend the LLC Agreement or the Certificate of Formation of the Company, except in connection with a Public Offering of the Company or any successor entity";

VIII.  "amend the Management Agreement, except in connection with a Public Offering of the Company or any successor entity or otherwise in a manner not adverse to the Company or Old Refco"; or

IX.  "grant any Persons the right to request the Company to register any equity securities of the Company, or any securities convertible or exchangeable into or exercisable for such securities; provided, that the Company may grant rights to other Persons to participate in Incidental Registrations so long as such rights are subordinate to the rights of the holders of Registrable Securities with respect to such Incidental Registrations".

344.    By virtue of this wide-ranging provision, the THL Defendants were assured control over Refco.

345.    The Securityholders Agreement also enumerated a wide range of corporate activities that required board approval, *i.e.*, the approval of the THL Defendants' designees. These included the "Acquisitions of assets or stock of another business", "Dispositions of assets of the Company or any subsidiary (outside the ordinary course of business)", "Annual budgets (including any investment and capital expenditures budgets)", "Distributions on equity of the Company", "Setting of performance targets for incentive plans", "Incurrence of any debt in excess of $5,000,000 outside of the ordinary course of business", "Hiring, firing and compensation of key executives", "Issuance of units, options, SARs, warrants

or other equity or debt securities", "Approval of any new incentive plan", "Selection of auditors", "Entry into joint venture or partnership agreements", "Change in lines of business: decision to enter/quit a line of business", "Actions to settle or resolve litigation or regulatory matters involving $50,000 or more or that would reasonably be expected to materially impact the Company's and its subsidiaries' operations or regulatory relationships", "Contracts requiring annual expenditures over $500,000 that are not included in the annual budget", "Any action requiring a supermajority approval pursuant to Section 2.2(b) of the Securityholders Agreement", and "Any action relating to Taxes or actions reserved for the Board pursuant to the LLC Agreement".

346.    The THL Defendants exercised day-to-day control over Refco through its Board control over the foregoing key corporate issues, especially budgetary control and control over hiring and firing employees.  The THL Defendants' control over Refco is also demonstrated by the fact that its members both had and exercised the authority on behalf of Refco to sign material documents and SEC filings.  By virtue of exercising such authority, the THL Defendants indicated that they were aware of the terms and conditions of and the financial conditions underlying the statements made in such documents.  Thus, Jaeckel executed the trust indenture dated August 5, 2004 and the registration rights agreements in connection with the Bond offering as treasurer of Refco Finance Inc.  Jaeckel also participated in the road show conducted by Refco to market the Bonds to institutional investors.  Defendants Lee, Harkins, Jaeckel and Schoen also executed Refco's August 10, 2005, IPO Registration Statement filed with the SEC and each approved of the Offering Memorandum for the Bonds and the Bond Registration Statement.

347.     As a result of the above, THL Defendants Lee, Harkin, Jaeckel and Schoen each also individually and collectively controlled Refco through their high level executive positions within Thomas H. Lee Partners, their board membership of Refco, the services they provided pursuant to the Management Agreement and their extensive involvement in the day-to day management of Refco.  Defendants Lee, Harkin, Jaeckel and Schoen were members of a narrowly defined group, which included Defendants Bennett, Maggio, Sexton, Silverman, Trosten, Murphy and Outridge who were charged with the day-to-day operations of Refco.  As a direct result of their seniority within Refco, each of them individually and as a group had the power and opportunity to control or influence each of the specific actions of the various Refco entities that constituted the fraudulent scheme alleged herein.

348.     From the time of the LBO, Defendant Lee was a member of Refco's Board of Directors.  Lee was the Chairman, CEO, and founder of Thomas H. Lee Partners, which itself controlled Refco.  Lee also provided services to Refco pursuant to the Management Agreement.  As a result, Lee was deeply involved in the day-to-day management of Refco.  Lee was deemed to beneficially own the THL Partner Defendants' controlling interest in Refco shares.

349.     From the time of the LBO, Defendant Harkins was a member of Refco's Board of Directors.  Harkins was the Vice Chairman and Managing Director of Thomas H. Lee Partners, which itself controlled Refco.  Harkins provided services to Refco pursuant to the Management Agreement, and was deeply involved in the day-to-day management of Refco.  Harkins was deemed to beneficially own the THL Partner Defendants' controlling interest in Refco shares.

350.    From the time of the LBO, Defendant Jaeckel was a member of Refco's Board of Directors and Treasurer of New Refco. Jaeckel also served as Treasurer of Refco Finance Holdings, LLC., and Treasurer of Refco Finance Inc., a co-offeror in Refco's Bond Offering of August 2004. Jaeckel was a Managing Director of Thomas H. Lee Partners, which itself controlled Refco. Jaeckel provided services to Refco pursuant to the Management Agreement and was deeply involved in the day-to-day management of Refco. Jaeckel was deemed to beneficially own the THL Partner Defendants' controlling interest in Refco shares.

351.    From the time of the LBO, Defendant Schoen was a member of Refco's Board of Directors and President of New Refco. Schoen also served as President of Refco Finance, Inc., a co-offeror in Refco's Bond Offering of August 2004, and sole director of Refco Finance, Inc. Schoen was a Co-President of Thomas H. Lee Partners, which itself controlled Refco. Schoen provided services to Refco pursuant to the Management Agreement and was deeply involved in the day-to-day management of Refco. Schoen was deemed to beneficially own the THL Partner Defendants' controlling interest in Refco shares.

352.    As a result of the foregoing, the THL Defendants were able to exercise control over the affairs of Refco and all material aspects of Refco's operations including those related to the fraudulent scheme alleged. All incentive compensation arrangements (including those that provided incentive for theft of RCM customer assets described above), all business acquisitions (including the purchase of Cargill and the loan to Suffolk with the proceeds of misappropriated RCM customer assets as described above) and all annual budgeting (presumably including the amount of misappropriated RCM customer assets that each subsidiary was entitled to spend) during the relevant period were subject to the express consent of the THL Defendants.

353.    The THL Defendants also had access to all material facts concerning the fraudulent scheme alleged herein.  Given this level of access, the sheer size and number of the transfers made in furtherance of the fraudulent scheme, and the importance of the misappropriated funds both to the ongoing viability of Refco and its ability to complete a number of significant acquisitions, it is inconceivable that the THL Defendants would not have known about the use of the RCM customer funds over the course of the sixteen months they controlled Refco prior to the bankruptcy.  As a result, at all times after the LBO, the THL Defendants knew, or were reckless in not knowing, that RCM was engaging in fraudulent conduct.

## COUNT I - VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 (AGAINST ALL DEFENDANTS)

354.    Plaintiffs repeat each and every allegation contained above.

355.    Defendants together with RCM and Refco carried out a plan, scheme and course of conduct that was intended to and did: (i)  fraudulently sell securities held by RCM on behalf of Plaintiffs without the Plaintiffs' knowledge, authorization or consent; (ii) misappropriate the proceeds of such unauthorized securities sales as alleged herein; and (iii) deceptively cause Plaintiffs to place and hold securities for safe-keeping with RCM.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants together with RCM and Refco as a group and individually, took the actions set forth herein.  As a result, Plaintiffs suffered damage in connection with the undisclosed and unauthorized sale of its securities and the misappropriation of the proceeds thereof, as alleged above.

356.    Defendants together with RCM and Refco (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts,

practices, and a course of business that operated as a fraud and deceit upon Plaintiffs, who placed

and held securities with RCM, in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

357.    Defendants together with RCM and Refco individually and in concert,

directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of

the mails, engaged and participated in this continuous course of conduct, in connection with the

purchase and sale of securities, to misappropriate funds that constituted the proceeds of sales of

securities (or the securities themselves) held by RCM as custodian and broker for Plaintiffs.

358.    As part of and in furtherance of this conduct, Defendants together with

RCM and Refco engaged in an ongoing fraudulent scheme to sell RCM customer securities and

misappropriate funds that constituted the proceeds of the sales, as alleged above.

359.    As a direct and proximate result of the deceptive and fraudulent scheme,

and the dissemination of the materially false and misleading information as set forth above,

Plaintiffs suffered injury in that, among other things: (1) the securities that they placed and held

with RCM and RSL for safe-keeping as custodian and broker were sold and misappropriated

without the Plaintiffs' knowledge, authorization or consent, (2) the securities of other customers

that had been placed with and held by RCM and RSL for safe-keeping as custodian and broker

were sold and misappropriated without such customers' knowledge, authorization or consent, (3)

the proceeds of such sold and misappropriated RCM customer securities were upstreamed to

other Refco entities, (4) when Refco (including RCM) filed for bankruptcy protection and

RCM's chapter 11 case was converted into a chapter 7, subchapter three stockbroker liquidation,

which provides for a pro rata distribution of customer property among securities customers, there

was a shortfall in customer property approaching $2 billion, (5) Plaintiffs have suffered a

concomitant shortfall in their pro rata recovery from the Refco estates and (6) during the

pendency of the Bankruptcy Cases and the claims distribution process, which is now going on

nearly two years, Plaintiffs have lost the use of tens of millions of dollars of capital, which they

would have invested and grown substantially.

360.    Had Plaintiffs known the truth regarding the undisclosed, deceptive and

fraudulent scheme and materially false statements alleged above, Plaintiffs would not have

placed and held securities with RCM or have continued to do so.

361.    By virtue of the foregoing, Defendants together with RCM and Refco

have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and

Plaintiffs have thereby been damaged.

## COUNT II - VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-16 (AGAINST THE OFFICER DEFENDANTS)

362.    Plaintiffs repeat each and every allegation contained above.

363.    The Officer Defendants together with RCM and Refco extended credit,

directly or indirectly, to Plaintiffs, in connection with securities transactions without having

established procedures to assure that Plaintiffs were given, or sent at the time of opening their

accounts, written statements disclosing the nature of any interest or lien retained by RCM in the

security or other property held as collateral and the conditions under which additional collateral

could be required.

364.    The non-disclosure by the Officer Defendants together with RCM and

Refco of the matters listed in paragraph 363 (above) was done knowingly and with an intention

to deceive Plaintiffs as to RCM's intentions with respect to customer property entrusted to it.

365. Had the Officer Defendants together with RCM and Refco made the disclosures required by Rule 10b-16, it would have been disclosed to Plaintiffs that RCM routinely converted customer securities to its own use and those of its corporate affiliates. Had such truthful disclosure been made, Plaintiffs would not have held their securities at RCM and would have obtained credit, to the extent that they did so, from other available sources.

366. As a direct and proximate result of the wrongful conduct of the Officer Defendants together with RCM and Refco, Plaintiffs suffered damage in connection with the undisclosed and unauthorized sale of their securities and the misappropriation of the proceeds thereof, as alleged above.

367. By virtue of the foregoing, the Officer Defendants together with RCM and Refco have violated Section 10(b) of the Exchange Act, and Rule 10b-16 promulgated thereunder, and Plaintiffs have thereby been damaged.

## COUNT III – VIOLATION OF SECTION 20(A) OF EXCHANGE ACT (AGAINST ALL DEFENDANTS)

368. Plaintiffs repeat each and every allegation contained above.

369. Defendants acted as controlling persons of RCM and Refco within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of Refco's operations and/or intimate knowledge of the deceptive and manipulative conduct alleged herein, the Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of RCM and Refco, including the manipulative and deceptive conduct alleged herein.

NY2:#4742866

370.    Defendants were provided with, and had unlimited access to, information concerning the operations of RCM and Refco including the undisclosed and unauthorized securities sales by RCM and the improper and undisclosed intercompany transactions alleged herein, and had the ability to prevent the scheme alleged herein from occurring.

371.    As set forth above, RCM and Refco violated Section 10(b) of the Exchange Act and Rules 10b-5 and 10b-16 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damage in connection with the undisclosed and unauthorized sale of their securities and the misappropriation of the proceeds thereof, as alleged above.

## IX.    **PRAYER FOR RELIEF**

372.    Accordingly, Plaintiffs pray for relief and judgment, as follows:

(a) Awarding compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damage sustained as a result of Defendants' wrongdoing, in an aggregate amount to be proven at trial being not less than tens of millions of dollars;

(b) Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(c) Such other and further relief as the Court may deem just and proper.

X.    **JURY DEMAND**

373.    Plaintiffs demand a trial by jury on all issues triable by a jury.

Dated: New York, NY
October 9, 2007

MILBANK, TWEED, HADLEY & McCLOY LLP

Luc A. Despins (LD 5141)
Scott A. Edelman (SE 5247)
Sander Bak (SB 2263)
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000