**Exhibit C**

```
 1                UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF NEW YORK
 2

 3    -------------------------------------X
                                          :
 4    In Re:                              :   Case No. 05-60006
                                          :
 5       REFCO, INC., et al,              :
                                          :   One Bowling Green
 6                                        :   New York, NY
                             Debtors.     :   March 14, 2006
 7    -------------------------------------X
                          :
 8    OFFICIAL COMMITTEE OF UNSECURED      :   05-03331
        CREDITORS,                        :
 9                                        :
                      Plaintiffs,         :
10                                        :
                         v.               :
11                                        :
      JOHN DOE, et al.,                   :
12                                        :
                      Defendants.         :
13    -------------------------------------X

14

15                    TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE ROBERT D. DRAIN
16               UNITED STATES BANKRUPTCY JUDGE

17
      APPEARANCES:
18
      For the Debtor:          ANTHONY W. CLARK, ESQ.
19                             Skadden, Arps, Slate, Meagher
                                  & Flom, LLP
20                             Four Times Square
                               New York, New York   10036
21

22    For Official Committee:  LUC A. DESPINS, ESQ.
                               DENNIS C. O'DONNELL, ESQ.
23                             Milbank, Tweed, Hadley & McCloy
                               One Chase Manhattan Plaza
24                             New York, New York   10005

25
                          (Appearances continued on next page)
```

238

1  settlement issues that --

2        FEMALE VOICE:  We wish to talk among ourselves.

3        THE COURT:  If you want to talk among yourselves,

4  that's fine too.

5        MR. MOLONEY:  Your Honor, I think if we could have a

6  five minute recess --

7        MR. CLARK:  How about ten?

8        MR. MOLONEY:  -- followed by a chambers conference

9  that would be asked.

10        MR. CLARK:  That would be, I think, a very

11  constructive --

12        THE COURT:  All right.

13        I think to be fair I should include the Leuthold

14  people in that as well and Mr. Dash.

15        Although my chambers are pretty small.

16        MR. CLARK:  Could we make that ten minutes, Your

17  Honor?

18        THE COURT:  Yes, that's fine.

19                  (Recess.)

20      (Proceedings resume at 6 p.m.)

21        THE COURT:  Please be seated.

22        We've had -- for Bankruptcy Court-- a lengthy trial

23  with numerous witnesses.  We're up to 5,000 pages of exhibits

24  and deposition testimony and the like on what had appeared to

25  me and continues to appear to me to be an essential issue in

239

1    these Chapter 11 cases; that is, whether Refco Capital

2    Management Ltd., or "RCM," one of the debtors here, is a

3    "stockbroker" under the Bankruptcy Code, and consequently, is

4    ineligible to be a debtor under Chapter 11, and must have its

5    case proceed, if at all, under subchapter 3 of Chapter 7 of the

6    Bankruptcy Code, the stockbroker liquidation provision.

7            It's a gating issue for two reasons, primarily

8    because under the stockbroker liquidation provisions of

9    subchapter 3 of Chapter 7, "customers" have a statutory

10   priority as to "customer property" or property in the "customer

11   fund," which is the fund of properties that may be attributable

12   -- or of securities or cash that may be attributable to those

13   customers' claims, even though, as is the case here, it is

14   commingled and insufficient, potentially, to satisfy the claims

15   in full and not identifiable customer property.

16           Given that priority, there's a potentially large

17   swing in value between or among RCM's creditors, not only from

18   the pockets of potentially FX-related creditors and derivatives

19   or commodities-related creditors of RCM, but also even some

20   customers who at this point may be comfortable with their net

21   equity ratios of recovery *vis-a-vis* the other customers who

22   engaged in securities trading.

23           That's an important issue not only economically but

24   also, importantly, because under Section 1129(a)(7) of the

25   Bankruptcy Code, a Chapter 11 plan cannot be confirmed over the

240

1  objection of a single creditor if that creditor would do better
2  in a Chapter 7 case.  And the potential swing in value here
3  might well give individual creditors veto rights over a Chapter
4  11 plan.

5       It's also important because conversion of the case to
6  Chapter 7 would result in the appointment of a trustee for RCM,
7  and it has been the view of not only the customer group but
8  other creditors of RCM that notwithstanding the general policy
9  in this district and in the Second Circuit not to appoint
10 multiple trustees in -- administratively consolidated cases,
11 even where there are substantial intercompany claims, here, for
12 a number of reasons, they have argued it makes sense to have an
13 independent fiduciary for RCM.

14      Having heard all of the testimony and reviewed the
15 exhibits and heard oral argument and read the excellent briefs
16 submitted by all the parties in this contested matter, I'm
17 prepared to rule on it.

18      However, as noted before we broke about an hour ago,
19 I wanted to consider Mr. Despins' suggestion as well as the
20 views of the other parties as to whether given the plain
21 language of Section 1112 of the Code, which does clearly permit
22 me to either defer a ruling or, perhaps less -- less clearly to
23 rule but not actually order conversion for a while, I should in
24 some form defer or delay.

25      We had a chambers conference with the -- I would say

241

1    the parties who have expressed the most interest in the RCM

2    case including, creditors of other entities like Bank of

3    America and the bondholders, as to their views as to whether it

4    would make sense to give a Chapter 11 plan process time, and

5    having heard the parties and considered the issues myself, I

6    think that it is appropriate to, A, give the parties very clear

7    guidance in the form of a preliminary ruling, which I fully

8    expect not to change, regarding my decision on the motion by the

9    moving customer group, but then to give the parties time

10   subject to some conditions, in light of that ruling to see if

11   they can negotiate a more comprehensive agreement or at least a

12   basis for a Chapter 11 plan that might resolve all of the

13   issues.

14        So what I'm going to issue now is, in fact, a

15   preliminary ruling.  I did not intend, except as I will

16   specifically lay out, to issue any orders flowing from this

17   ruling for some time, and I trust that in light of Section 1112

18   and the clearly expressed interests of all the interested

19   parties, that all will recognize that this procedure is

20   intended to give parties time to work together to maximize

21   their collective recoveries in light of what I think the proper

22   priority decision should be.

23        The Bankruptcy Code in Section 109(d) limits the

24   entities that may be a debtor under Chapter 11, and it

25   specifically provides that a stockbroker or a commodity broker

242

1  may not be a Chapter 11 debtor.  See 11 U.S.C. § 109(d) as well

2  as In Re: Bevill, Bressler & Schulman, Inc., 94 BR. 817, 828

3  (Bankr. D. N.J. 1989).

4          Liquidations of stockbrokers regulated by the SEC are

5  subject to the provisions of the Securities Investor Protection

6  Act, or SIPA, found at 15 U.S.C. § 78 et seq., which

7  incorporates certain provisions of the Bankruptcy Code, and

8  generally contemplates the application of the Bankruptcy Code

9  where SIPA itself is silent.

10         However, if a stockbroker is not regulated by the

11  SEC, for example, because it is an intrastate stockbroker, its

12  liquidation is governed by the provisions of subchapter 3 of

13  Chapter 7 of the Bankruptcy Code.  See HR Rep. No. 95-595 at

14  268 (1978), and 6 Collier on Bankruptcy, Paragraph 740.01 at

15  740-1.

16         The definition of "stockbroker" is set forth in

17  Section 101(53A) of the Bankruptcy Code, and on its face it is

18  pretty simple.  It means a person, which includes entities,

19  (A), with respect to which there is a customer as defined in

20  Section 741(2) of the title 11and, (B), that is engaged in the

21  business of effecting transactions and securities either for

22  the account of others or with members of the general public

23  from or for such person's own account.

24         In other words, the first element of the definition

25  requires us to determine whether there is a "customer," and it

243

1   has been frequently stated that even if a court finds there is

2   only one customer that satisfies that aspect of the definition,

3   although clearly I have to find the existence of an actual

4   customer, not a hypothetical one or not one, as some cases have

5   stated, "in the air."  See In Re:  ESM Government Securities,

6   52 B.R. 372, 275 (S.D. Flor. 1985), affirmed 812 F.2d. 1374

7   (11th Cir. 1987), and In Re:  SSIW Corporation, 7 B.R. 735,

8   738, N. 19 (Bankr. S.D.N.Y. 1980).

9           Effectively, the rationale for having a separate

10  scheme under subchapter 3 giving a priority to customer claims

11  for customer property is that customers as defined in Section

12  741(2) of the Bankruptcy Code would not be protected under the

13  distribution scheme under Chapter 11 because their interests

14  are substantially different than those creditors normally

15  associated with cases under Chapter 11 and its distribution

16  scheme, in that they -- that is, the securities customers under

17  Section 741(2) effectively entrust their securities with the

18  debtor.  See HR. Rep. No. 95-595 at 319.

19          Focusing first on the definition of "customer," one

20  begins and in all likelihood ends with the plain language of

21  the statute, as the Supreme Court has instructed us to do in

22  Ron Pair, 489 U.S. 235, 242-43 (1989).

23          A customer is defined in Section 741(2) of the

24  Bankruptcy Code as:

25          "An entity with whom a person" -- that is, the debtor

244

1   -- "deals as principal or agent and that has a claim

2   against such person on account of a security

3   received, acquired or held by such person, again by

4   the debtor," in the ordinary course of such person's

5   business as a stockbroker, from or for the securities

6   account or accounts of such entity."

7   And then the definition lists six ways in which such

8   person may hold such securities; i.e., for safekeeping, with a

9   view to a sale, to cover a consummated sale, pursuant to a

10  purchase, as collateral under a security agreement, or finally

11  for the purpose of effecting registration of transfer.

12  And then, secondly, the "customer" definition

13  requires that such entity has a claim against the debtor

14  arising out of either a sale or conversion of a security

15  received, acquired or held as specified in subpart (a), or a

16  deposit of cash, a security or other property with such person

17  for the purpose of purchasing or selling a security as set

18  forth in subpart (b).

19  It should be noted that an entity may be a customer

20  if it satisfies either Subsections (a) or (b) under Section

21  741(2) notwithstanding that these conditions are joined in the

22  conjunctive making it appear that both conditions need to be

23  satisfied.  Again, see ESM Government Securities, Inc., 812

24  F.2d. 1374, 1376 and In Re:  Residential Resources Mortgages --

25  Mortgage Investment Corporation, 98 B.R. 2, 21 (Bankr. D. Ariz.

245

1   1989).

2          The definition of "customer" as it appears in SIPA is

3   basically the same as the definition appearing in the

4   Bankruptcy Code, and, therefore, cases construing SIPA's

5   definition of customer under 15 USC §78(lll)(2) are also

6   applicable to the definition under Section 741(2) of the

7   Bankruptcy Code.  See In Re:  Swink & Company, 142 B.R. 874,

8   876 (Bankr. E.D. Ark. 1992).

9          Although the legislative history states that the

10  definition of the term customer was meant to encompass any

11  person that interacts with the debtor in a capacity that

12  concerns securities, whether such person is a cash or margin

13  client of a broker or a dealer, see H.R. Rep. No. 95-595 at

14  385, and, although the term is not found in Section 741(2) or

15  the analogous definition in SIPA, it has been long and widely

16  held that "entrustment" of property with the broker or dealer

17  or a broker-dealer is dispositive in determining whether a

18  person or entity fits into the Bankruptcy Code's definition of

19  customer.

20         I should, note before going further on the topic of

21  "entrustment," however, that the customer definition very

22  clearly does include parties who have margin accounts and

23  engage in financing activities with their securities with a --

24  with a stockbroker.  This is stated repeatedly by Collier at --

25  for example, Paragraph 741.03[3][a], in which the editors of

246

1    <u>Collier</u> state that customer securities are either fully paid

2    for or are held in a margin account.  Further, it's clear that

3    -- in fact, from the operative provisions of subchapter 3 that

4    such securities may be commingled and that they need not be

5    segregated.  In fact, that's the reason for the priority in

6    customer property. As <u>Collier</u> says in Paragraph 741.03[3][a],

7    again:

8                "Under the Bankruptcy Code, all customers, regardless

9                of the nature of their accounts, are entitled to

10               share in the pool of customer property (which is, in

11               effect, the sum of specifically identical

12               identifiable property in the single and separate

13               fund) to the extent of their respective net equity

14               claims."

15   Again, at Paragraph 741.03[3][a], the editors say:

16               "Under the Bankruptcy Code and SIPA, both margin and

17               cash customers share ratably in the fund of customer

18               property to the extent of their respective net equity

19               claims.  As the fund of the customer property is

20               comprised of *fungible* property, all customers have an

21               equal claim to that pool."

22   Indeed, under Paragraph 741.04[2], the editors of <u>Colliers</u> go

23   so far as to say:

24               "Under the Bankruptcy Code, fungibility is carried to

25               its greatest degree in permitting all customers to

247

1          share ratably in the cash proceeds of customer

2          property irrespective if particular customer

3          securities were, in fact, available (i.e., present)

4          to be liquidated.  Thus, a customer whose securities

5          have been lost, stolen, improperly hypothecated or

6          otherwise unavailable to the trustee will still share

7          in customer property based upon the customer's net

8          equity claim."

9  See Collier, ¶ 741.05[3].

10         Again, "entrustment" of customer property is a

11 dispositive element of Section 742(2) as well as under SIPA.

12 See In Re:  Hanover Square Securities, 55 B.R. 235, 238 (Bankr.

13 S.D. NY 1985), citing a number of cases from the Second Circuit

14 and others, which hold in each case that the purported customer

15 was really engaged in a different type of relationship with the

16 debtor such as that of a lender, citing SIPA v. Executive

17 Securities Corporation, 556 F.2d. 98-99 (2nd Cir. 1977), in

18 what the purported customer was really a lender to the debtor,

19 SEC v. F.O. Baroff, Inc., 497 F.2d. 280, 284 (2nd. Cir. 1974),

20 in which the purported customer was rally an investor in the

21 debtor.

22         That is, entrustment of one's securities with another

23 is said to distinguish a true customer relationship from

24 various other dealings with broker-dealers that might be shoe-

25 horned into the definition but do not, in fact, satisfy the

248

1  statute.  See also In Re:  Baker & Getty Financial Services,

2  Inc., 106 F.3d. 1255, 1260 (6th Cir. 1997).

3       Entrustment in this context essentially means that

4  the transaction must be related to the purported customer's

5  investment, trading or participation in the securities market.

6  Again, see In Re:  Hanover Square Securities, Inc., 55 B.R. at

7  238.  And in that context it is often said without much

8  analysis the transaction must have created a fiduciary

9  relationship.  See In Re:  Stalvy & Associates, Inc.

10  (phonetic), 740 F.2d. 464, 471 (5th Cir. 1985).  A fiduciary

11  relationship exists when one person is under a duty to act for

12  or to give advice for the benefit of another upon matters

13  within the scope of the relationship.  Flickinger v. Harold C.

14  Brown & Company, 947 F.2d. 595, 599 (2nd. Cir. 1991).

15       It has been held that generally a broker does not owe

16  fiduciary duties to a purchaser of securities, its customer.

17  A. Ronald Sirna, Jr., P.C. Profit Sharing Plan v. Prudential

18  Securities, Inc., 964 F. Supp. 147, 152 (S.D.N.Y. 1997).

19  However, fiduciary duties may exist between a broker and

20  customer when the broker has discretion over the customer's

21  property or has been, again, given direction to act and has

22  accepted a responsibility to act on a customer's behalf.  See

23  Press v. Chemical Investment Securities Corp., 988 F. Supp.

24  375, 386 (S.D.N.Y. 1997), which was later affirmed by the

25  Second Circuit in a case I'll discuss in a moment.  See also

249

1  Lowenbran v. L.F. Rothschild (phonetic), 685 F.Supp. 336, 334

2  (S.D.N.Y. 1998).

3          More specifically, the Second Circuit held in the

4  Press v. Chemical Investment Sec. Corp., 166 F.3d. 529, 536

5  (2nd. Cir. 1999) that the fiduciary obligation that arises

6  between a broker and a customer as a matter of New York common

7  law is limited to matters relevant to affairs entrusted to the

8  broker.  The scope of the entrusted affairs generally is thus

9  limited to the completion of the security transaction.  Id.

10          In some respects then, or in large measure, the

11  requirement, to the extent there is one under Section 741(2),

12  that the debtor be a fiduciary to its customer to qualify the

13  customer as a "customer" is largely redundant or overlaps with

14  the notion that the customer entrusts its securities with the

15  broker to effectuate a transaction, because, again, in the

16  words of Press, it's in that context that a broker becomes a

17  fiduciary; that is, in completing the securities transaction

18  that the customer has asked.

19          It appears clear to me in reading the customer

20  agreements that the moving customer group members signed with

21  RCM that this was the nature of the relationship between them

22  and RCM.  As Paragraph A1 of the customer agreement says, you

23  hereby -- I'm sorry.  Authority to act:

24          "You hereby authorize Refco to purchase, sell,

25  borrow, lend, pledge, or otherwise transfer financial

250

1  instruments, including any interest therein for your account in
2  accordance with your oral or written instructions.
3        "The authority hereby conferred shall remain in full
4  force until written notice of its revocation is received by
5  Refco."
6        The testimony of Mr. York and others was also to the
7  same effect, that his -- his business was not proprietary but
8  was in taking customer instructions in effectuating
9  transactions in securities.
10       The objectants to the motion nevertheless contend that
11 there was no entrustment here for a number of reasons. In
12 essence, all of them boil down to an argument that the movants
13 knew or should have known that they ran the risk of RCM not
14 being able to return their securities, not only as an economic
15 matter but as a legal matter.
16       The first such argument is that it was clear that RCM
17 was an unregulated -- I'm sorry, was unregulated under the U.S.
18 securities laws, and that is, that it was not a broker-dealer
19 like its affiliate, RSL, and, therefore, that the customers
20 would not be protected under SIPA, for example, or in respect
21 of various requirements of the U.S. securities laws that
22 pertain to margin trading and the like that a broker-dealer
23 engages in if it is regulated by the U.S. securities laws.
24       It is clear, however, that subchapter 3 of Chapter 7
25 applies to unregulated -- I'm sorry, to entities who are

251

1   unregulated under the U.S. securities laws.  The legislative

2   history I referred to earlier clearly makes that point in

3   respect of intrastate stockbrokers.  It's also implicit and

4   explicit in the holding of the <u>Baker & Getty</u> case, which

5   applied to an unregulated U.S. entity whose affiliate was

6   regulated.  See 106 F.3d. 1255.

7            I'd also note a quote from -- on this point from <u>SEC</u>

8   <u>v. Ambassador Church Finance/Development Group, Inc.</u>, 679 F.2d

9   608, 614 (6th Cir.) that Judge Brozman excerpted in her <u>Hanover</u>

10  <u>Square Securities</u> case at 55 BR 240.  There, the Sixth Circuit

11  said:

12            "The appellants make much of the fact that [the

13            broker-dealer] did not maintain a customer account in

14            the name of the church and did not charge a

15            commission for selling the incentive bonds.  It is

16            not likely that Congress, in seeking to protect the

17            assets of small transaction customers of broker-

18            dealers, intended to make eligibility for protection

19            depend on whether the broker complied with rules of

20            the SEC or practices of the trade.  These are matters

21            over which the broker has complete control.  The

22            trusting customer is not to be penalized for choosing

23            a careless, unethical or dishonest broker."

24            Now, obviously, that quote referred to

25  unsophisticated customers, but I think the point is that, as

252

1  <u>Baker & Getty</u> made it clear, the very purpose of subchapter 3

2  was to fill in the gap wherever it existed with SIPA, so long

3  as SIPA remained in place, and in other instances where

4  customers engaged in securities transactions through their

5  brokers or broker-dealers.

6          To the extent there's a suggestion in the record that

7  this view be limited to U.S. intrastate brokers and not to

8  brokers that are like RCM, foreign companies or at least

9  foreign incorporated companies, I don't accept that view.  The

10  statute makes no distinction between U.S. or domestic

11  corporations on the one hand and foreign corporations on the

12  other.  Moreover, RCM itself conducted almost all of its

13  business from the United States.  It employed United States

14  management and employees and its business until it collapsed

15  was to the benefit of the U.S. economy and to U.S. markets, and

16  I don't see a basis, particularly in the absence of any such

17  basis in the statute, for distinguishing such a business from

18  intrastate brokers and excluding RCM's customers to the extent

19  they're entitled to protection from the statute on that basis.

20          Secondly, the objectors to the motion point to the

21  customer agreement, and in particular, Paragraph B of that

22  agreement where they had a margin, to suggest that the

23  customers of RCM normally took the risk that RCM could do

24  whatever it pleased with the securities and other property that

25  they left with RCM in their customer accounts notwithstanding

253

1  Section A of the customer agreement, quoted above, and

2  therefore, that there was no real entrustment.

3      Having read the two paragraphs in Section B of the

4  customer agreement, I don't accept that argument.  It appears

5  clear to me from the language of that agreement and those

6  provisions that those provisions apply in the situation where

7  customers have engaged in margin or financing transactions with

8  RCM or its affiliates and that what the customers have given to

9  RCM in those paragraphs is a security interest in their

10 property until those transactions are paid off and the debt

11 satisfied.

12     As Paragraph B2 states:

13     "Refco's sole obligation shall be to return to you

14 such cash, like amounts of similar cash, securities and other

15 property where the cash value thereof in the event of any

16 liquidation of collateral to the extent they're not deemed to

17 be collateral to secure transactions entered into pursuant to

18 this agreement with any Refco entities or have not been applied

19 against obligations owing by you to Refco entities whether as a

20 result of liquidation of positions in any transactions entered

21 into pursuant to this agreement or otherwise."

22     Although there are distinctions between this language

23 and language in RSL's customer agreements and Mr. Litt's Schwab

24 agreement, the essential point is the same, which is that these

25 are provisions common in the industry, common to margin

254

1   accounts where the customers granted Refco a security interest

2   in their property and expected its return once the margin loan

3   or financing was satisfied.

4           As I stated earlier in quoting from Collier,

5   subchapter 3 clearly contemplates that "customers" includes

6   those who engaged in margin trading and provides for the

7   netting out of short margin positions before access to the

8   customer fund.  So I do not see anything in these two

9   paragraphs that will take the moving customer group members out

10  of the notion that they entrusted their securities with -- or

11  cash to purchase securities with RCM.

12          In addition, the objectants point to the boilerplate

13  on the second page of RCM's standard form of confirmation of

14  trades the customers received, as well as to Paragraph D2 of

15  the customer agreement, which provides that:

16          "This agreement and insofar as such terms are

17  recorded in a confirmation, each such confirmation and all

18  amendments to any of such terms which together form the

19  agreement between the parties shall together constitute a

20  single agreement between the parties.

21          "The parties acknowledge that all transactions

22  governed by the agreement are entered into in reliance upon the

23  fact that all terms constitute a single agreement between the

24  parties."

25          The confirm back-page boilerplate arguably goes

255

1  beyond the interpretation of the two paragraphs of the customer
2  agreement dealing with margin loans that I discussed a moment
3  ago, but not a whole lot.  If one were to rely on the
4  integration argument made by the objectors, however, it does
5  say that RCM does not segregate any collateral or other
6  property deposited with it.  But that's really not a surprise
7  since, again, from the language I quoted in <u>Collier</u> and the
8  statute itself, Section -- I'm sorry, subchapter 3 of Chapter 7
9  doesn't require segregation, and in fact deals with situations
10 where customer securities were not segregated, and there was
11 plenty of testimony that it's more often than not industry
12 practice not to segregate into specific accounts collateral but
13 to permit hypothecation of securities and cash and other
14 property at least when a customer is trading in margin.
15          There is in addition an ambiguity in Paragraph 1 of
16 the confirmation slip boiler-plate, which arguably refers not
17 only to RCM's right to sell, pledge, hypothecate, assign,
18 invest or use such collateral, but also says or property
19 deposited with it, but I agree with the customer group that to
20 read out customer status based on Paragraph A1 of the customer
21 agreement on that ambiguous language would be a real stretch,
22 given that it appears on the back of a confirm and deposited
23 could be read as referring again to collateral.  Particularly,
24 I conclude this because of the language referring to the two -
25 -the customer agreement and the confirm-- as being integrated

256

1   agreements.   What again Section D2 says is:

2        "This agreement and insofar as such terms are

3   recorded in a confirmation...they're integrated agreements. And

4   I believe that refers back to D1 of the customer agreement,

5   which says that transactions governed by the customer agreement

6   shall be promptly confirmed in writing by the parties, defined

7   term confirmations.   The confirms that the parties received

8   were just that, then, confirmations of the individual

9   transactions, and it's logical to assume, and in fact, there's

10  testimony in the deposition of Mr. Paglia (phonetic) that this

11  was the assumption, that that memorialization of the individual

12  transactions, as opposed to the boilerplate dealing generally

13  with the use of margin collateral and other property, was what

14  was meant to be covered by the integration provision in D2 of

15  the customer agreement.

16       It's also argued that the customer agreements as well

17  as other documents that the parties were aware of referred to

18  RCM trading with the customers "as principal" or in a

19  "principal" capacity.   At least this was if not always RCM's

20  practice, it was almost always RCM's practice.

21       It's therefore argued both in terms of applying the --

22  -- or construing whether the moving customer group members were

23  "customers" that again they didn't entrust their securities

24  with RCM because RCM was acting with them as a "principal."

25  The same point is also made in connection with the stockbroker

257

1  definition itself, which I'll address in a moment.

2      But let me say now that while the language clearly

3  says what it says and the testimony of Mr. York and Ms. Kraker

4  was very clear as well as other testimony by RCM officers and

5  employees that RCM traded as a "principal" and that was part of

6  its business model, it is also crystal clear to me that it did

7  so only to effectuate transactions as instructed and directed

8  by its customers.

9      That is, RCM did not compete with its customers

10 either in the marketplace in the sense of proprietary trading

11 nor in terms of trying to strike the best bargain in a

12 securities purchase or sale that it could as a true principal

13 would in dealing with a customer.

14      Rather, it took the customer's order, went out to the

15 market and filled that order, in each case, acting as the party

16 to the transaction with the customer on the one hand and with

17 the market party on the other.

18      As Mr. York testified, he would in this process

19 always try to get the customer the best deal he could within

20 the price range quoted to him.  He was not and RCM was not

21 compensated on the basis of the profit that it made at the

22 customer's expense in selling to or buying from a customer a

23 security for either the highest price in the case of a sale or

24 the lowest price in case of a purchase as a true principal

25 would, but, rather, on the agreed spread or markup between the

258

1   range of buy or sell-order prices that the customer would give

2   it and what it could get from a counterparty in the

3   marketplace.

4        As far as 741(2)(A) is concerned, my interpretation

5   fo RCM's relationship with its customers is buttressed by the

6   plain meaning of the statute, or the plain language of the

7   statute which says that the debtor may deal with the customer

8   "as principal or agent."

9        I also think that it's generally supported by the

10  definition of a "broker" elsewhere in the Code -- I'm sorry,

11  elsewhere outside of the Code, either in SEC no action letters

12  are in the UCC.

13       For example, Official Comment 14 to UCC Section 8-

14  102, which distinguishes the term "broker" from the term

15  "securities intermediary," states:

16       "The terms 'securities intermediary' and 'broker'

17  have different meanings.  Broker means a person engaged in the

18  business of buying and selling securities as agent for others

19  or as principal."

20       Similarly, the SEC no action letter that I referred

21  to in oral argument earlier with Mr. Henkin that appears at

22  2000 West Law 1742088 dated October 11, 2000 states that

23  Section 384 of the Securities Exchange Act of 1934 defines a

24  broker as any person that is "engaged in the business of

25  effecting transactions and securities for the account of

259

1  others."

2        It then goes on in that context to say:

3        "A person effectuates transactions if he or she

4  participates in securities transactions at key points in the

5  chain of distribution.  Such participation includes among other

6  activities, selecting the market to which a securities

7  transaction will be sent, assisting an issuer to structure

8  prospective securities transactions, helping an issuer to

9  identify potential purchasers of securities, soliciting

10 securities transactions including advertising and participating

11 in the order-taking or order-routing process; for example, by

12 taking transaction orders from customers.

13        "Factors indicating that a person is engaged in the

14 business include, among others, receiving transaction-related

15 compensation, holding one's self out as a broker, as executing

16 trades or as assisting others in completing securities

17 transactions and participating in the securities business with

18 some degree of regularity."

19        In addition, too, according to this no-action letter,

20 indicating that a person is effecting transactions, soliciting

21 securities transactions is also evidence of being engaged in

22 the business.

23        In the light of that, I think Mr. York's testimony on

24 a number of accounts is quite telling.  He made it very clear

25 that he was a salesman.  He said he never turned away a

260

1    customer-- that the credit department might have, but he never

2    did.  He wasn't actually aware of whether the credit department

3    had turned away a customer, but he never did.

4         He also made it clear that he was taking the

5    customers' instructions at all times; in effect, effectuating

6    their orders for their account.  He stated that he would not

7    reveal the counterparty to a transaction because he believed

8    that, if he did that, his customers would then go to that

9    counterparty because he would no longer be necessary.  In

10   essence, he was in the middle of the market.

11        He also made it clear that his compensation or RCM's

12   compensation, rather, was for effectuating the transactions on

13   the customer's behalf either in the form of commission, or in

14   the fixed income area, in the form of a spread or markup that

15   had previously been negotiated with the customer.

16        Finally, he testified that the phrase in Section A1

17   of the customer agreement that Refco will act for your account

18   was not a term of art, and that it simply meant what it says.

19        He was not the only witness on this point, of course.

20   There's deposition testimony to the effect that Refco's

21   business was the execution of transactions for others.  See not

22   only Mr. York's deposition at 65, 235, but also Mr. Weiss'

23   deposition at 53, and also Mr. Weiss' deposition at 57 and 58,

24   where he stated that RCM's business, including, the securities

25   area, was essentially to "fill 'em"; that is, to fill orders

261

1   and "bill 'em"; that is, bill the customer for filling those

2   orders.

3           Mr. York also made it clear more than once that he

4   always got customers back their property when they asked for

5   it, up until the date of RCM's collapse.  In addition, it's

6   quite clear that one of the functions RCM performed was to

7   execute corporate actions on the customer's behalf, including

8   in connection with corporate restructurings or refinancings or

9   tender offers, sending letters to the issuer of securities

10  confirming the customer's beneficial ownership of those

11  securities.

12          All of these facts and all this evidence to me

13  indicates clearly that while in a limited sense RCM acted as a

14  principal in taking some execution risk away from the client,

15  RCM effectuated transactions for the account of the client and

16  not for its own account except in the sense that it expected to

17  make money for what it was doing, because after all it was in

18  business, but that money was in the form of a commission or

19  payment for effectuating the transaction directed by the

20  client.

21          The Bevill Bressler case at 67 B.R. 557 contends that

22  it's irrelevant for purposes of whether someone is a customer,

23  whether the customer traded "with" or "through" the broker--

24  and as an aside it's clear from the recitation of facts that in

25  Bevill Bressler the debtor there hypothecated and commingled