262

1   securities that were involved in repos as a matter of course

2   and yet the repo participants were found to be "customers"--

3   but, if the distinction is relevant, it appears to me to be

4   clear that the customers here traded through Refco.

5           This is I think also supported by the economic

6   realities that Mr. York testified to, and the documentation or

7   absence thereof, of customers' relationship with RCM.

8           Generally, if one is not a customer under the Second

9   Circuit case law that I referred to earlier, it's engaged in

10  some other relationship as in Baroff, as an investor, an equity

11  investor in the debtor, or as in SIPA v. Executive Securities

12  Corp., as a lender to the debtor; that is, a lender other than

13  in the sort of typical securities repo transaction that Bevill

14  Bressler found to be covered by the customer definition.

15          Here, except in those few instances described by Mr.

16  Clark where there were documented loans, there's no

17  documentation of any loan to RCM, especially as related to

18  RCM's hypothecation of securities that are no open margin or

19  repo-accounts.

20          Obviously, also in addition to not getting any note

21  or any other documentation, the customers didn't get any stock

22  interest in any Refco entity in connection with that activity,

23  which they claim they didn't know about and they weren't paid

24  any interest for Refco's undocumented use of their securities.

25  The testimony was that in Mr. York's view, the interest on such

263

1  a loan would be roughly four and a half percent, and at most,

2  arguably, although the testimony was not particularly specific

3  on this point, the benefits that the customers got from Refco's

4  hypothecating for its own account were limited to perhaps

5  saving half a percent when they actually did engage in

6  financing.  It cannot be reasonably said that this relationship

7  was a debtor/creditor relationship, where the customers were

8  lenders, or one where the customers were investors, in RCM or

9  any other Refco entity.

10         It's also argued that the various times that trades

11  failed may have indicated that you couldn't really trust RCM

12  with your securities.  It appears to me from the record,

13  however, that those customers who had failed trades, and not

14  all did, could not have discerned from the failed trades that

15  the reason for the fail was that Refco was dealing with the

16  securities in a way that would be inconsistent with taking a

17  customer's orders and inconsistent with the customer agreement.

18         The testimony was, first and foremost, that if there

19  ever was a "fail" it would be rectified usually within twenty-

20  four hours but I think almost always, if not always, within

21  forty-eight hours and that Refco never failed ultimately to

22  execute the customer's request.  It's also a fact or at least

23  in the record that there are numerous explanations for failed

24  trades, including the counterparty's failure, human error and

25  the like.  Given the appearance in the customer's statements,

264

1  which they received on a monthly basis at least and sometimes

2  were able to check more frequently on line, that every failed

3  trade went through, I find it hard to see how the existence of

4  failed trades, which occur in the ordinary course of business

5  although they're not in terms of number common, would have

6  alerted customers, to the extent that this concept even applies

7  in this context, that they could not reasonably rely on RCM to

8  take their instructions.

9      It's also argued that Refco's financial statements,

10 its public financial statements, which were certainly available

11 to customers, should have alerted customers or would have

12 alerted customers that RCM was engaged in practices that would

13 have made it clear to them that they could not rely on RCM to

14 undertake their orders and instructions.  Of course, again,

15 this is in the first instance belied by the customer statements

16 which they received on a monthly basis, which showed the

17 customers' orders being fulfilled and showed them being

18 fulfilled in a way that reflected their ownership of the

19 securities.

20     Moreover, based on my review of the financial

21 statement disclosure that's relied upon by the objectors here,

22 I conclude that that disclosure was at best ambiguous and would

23 not have alerted customers to a problem that would rise to the

24 level of leading them reasonably to believe that their orders

25 would not be executed and RCM could not be relied on to return

265

1    their securities.  In particular, the description of

2    intercompany transactions does not suggest the type of

3    receivable that would have caused someone to panic.  Indeed, I

4    think it's acknowledged by all that that customer fund "hole" –

5    – to the extent again it's relevant and I understand the

6    movant's argument that it is not relevant legally, but to the

7    extent that that hole exists-- as Mr. Clark says, the extent of

8    it has not been fully determined and certainly the cause of it

9    has not been fully determined and was, as is evident by the

10   fact it is still a mystery today, unknown I think prior to the

11   bankruptcy.

12        So to the extent that the burden can be shifted to

13   the customers to have to inquire as to whether they reasonably

14   expected their orders in respect of their securities and cash

15   to be honored I don't think they were on any sort of reasonable

16   notice to question that fact.

17        Therefore, it appears to me that, having gone through

18   the arguments raised by the objectors, the customers had every

19   reasonable indication that they did own the securities,

20   although if they were trading on margin RCM would have a

21   collateral security interest in them for the margin loan, and

22   it was reasonable for them to expect that those securities or

23   infungible like property would be returned to them on their

24   instruction.  This applies in my view to ordinary course repo

25   transactions as well as margin loans for the same reasons set

266

1  forth in the Bevill Bressler case at 67 B.R. 598.  See also SEC

2  v. Drysdale Securities Corporation, 785 F.2d 38, 42 (2d Cir.

3  1986) cert denied 476 U.S. 1171 (1986), in which the Court

4  assumed without deciding that repos are securities for purposes

5  of applying the fraud provisions of the federal securities laws

6  because the buyer takes title to the security and a major part

7  of the consideration apart from the sale price is the seller's

8  ability to perform the repurchase.  See also In re:

9  Residential Resource Mortgage Investments Corporation, 98 B.R.

10  2, 21-23 (Bankr. D. of Ariz. 1989).

11        Now, with regard to there being a specific customer,

12  according to the moving customer group's brief and the record

13  set forth in this proceeding, IFS is a British Virgin Islands

14  entity owned by a Mexican bank.  It has approximately 300

15  customers who engage in securities trading through IFS, in

16  particular trading in equity securities, United States treasury

17  securities and emerging market debt instruments.  IFS conducted

18  extensive trading on behalf of these customers until the

19  moratorium issued on October 10, 2005 in a securities account

20  administered with RCM.  IFS and RCM are parties to a number of

21  agreements relating to IFS's securities trading with RCM,

22  including a prime broker agreement and a customer agreement.

23  As I said before, under the customer agreement, which is

24  governed by New York law, IFS granted authority to RCM to

25  purchase, sell, borrow, lend, pledge or otherwise transfer

267

1  financial instruments for IFS's account in accordance with

2  IFS's oral or written instructions.

3          From 2001 through October 2005 the person who dealt

4  with RCM on behalf of IFS was Carlos Moreno, and the person he

5  dealt with on behalf of RCM was his account officer in the

6  Miami office, Mr. Alvarez, who was a director of that office.

7  He started to work there in 1995.  The Miami office was

8  nominally an RSL office, although it had various designations,

9  and all of approximately fifteen employees there were employed

10 by RSL.  Its business consisted almost entirely of facilitating

11 securities trades for others, its customers or, as the debtor

12 now calls them, clients–– that is in providing brokerage

13 services to institutional Latin American clients that were

14 predominantly investors in emerging market debt securities.  It

15 had no RSL customers and the only activity engaged in it on

16 behalf of RSL was facilitating purchase and sales in emerging

17 debt securities for other U.S. registered broker dealers.  It

18 had about 120 RCM securities customers who in the aggregate

19 held approximately $800 million of market value in securities

20 on the bankruptcy petition date.  It was largely independent

21 from the New York office in that it had its own trade sales

22 force who both took customers' orders and traded with Wall

23 Street counterparties on their behalf and a middle office or

24 back office that handled customers and customer securities and

25 funds and generally performed corporate execution functions.

268

1   It didn't engage in any futures trading or foreign exchange
2   activity except in respect of currency transactions to complete
3   or facilitate the completion of securities trades in foreign
4   securities.  It did not provide financing.  That was handled
5   out of the New York office.

6          As generally with RCM, the Miami office engaged in
7   securities transaction activity for the account of its
8   customers.  That is, it did not underwrite, act as a market
9   maker, take proprietary positions or engage in any proprietary
10  transactions for its account.  When it purchased equities for
11  its customers it acted as an agent.  When it purchased debt
12  securities it entered into essentially risk free back to back
13  trades, denominated principal, trades which I've already
14  discussed were in my view were trades for the account of its
15  customers.  It also acted as a settlement agent for customers
16  who "traded away" and that occurred frequently.  At times as
17  part of the "one stop shop" model of RCM it acted as a
18  custodian for the securities accounts of customers to
19  facilitate their trading activity.  As I said before, it also
20  performed corporate services on behalf of customers.  For
21  example, if a Miami office customer needed to vote a security
22  in connection with a tender offer or a restructuring that
23  required corporate action, RCM's Miami office would facilitate
24  that action.

25         IFS had an agreement with RCM that contemplated what

269

1  it referred to as "prime broker" services, in which RCM acted

2  as the settlement agent, but, as noted in oral argument by

3  various parties but for different reasons, I don't believe that

4  such activities are necessary here to find IFS was a

5  "customer," since the general business of RCM was facilitating

6  customer transactions and orders.

7       IFS had every expectation that if IFS chose to sell

8  securities in its account and have the proceeds returned to it,

9  RCM would do so.  In fact, in the ordinary course of its

10 business IFS from time to time made such requests and until

11 October 11, 2005 RCM always would sell securities and return

12 the proceeds to IFS.  See, for example, Exhibit 16 of the

13 moving customer group which is the September account statement

14 for IFS showing such a transaction.  At no time before October

15 10th did RCM ever refuse a request from IFS for the return of

16 its securities, as testified to by Mr. Alvarez.  As Mr. Alvarez

17 testified generally, in his ten-year experience with RCM he

18 never once had any difficulty complying with a client's demand

19 for access to securities in the client's accounts before

20 October 10th, 2005.

21      That changed, of course, on October 10th.  On October

22 11th, 2005, IFS demanded that RCM transfer its securities from

23 RCM to another entity.  Despite acknowledging that request, RCM

24 did not do so.

25      On October 13th IFS wired into its account

270

1  approximately $11.5 million U.S. to fully pay up outstanding

2  margin loans relating to certain securities in its account and

3  to facilitate their delivery.  Even after this payment none of

4  the securities were returned to IFS.

5          In light of the Court's direction in December of 2005

6  to disclose customer account information, RCM delivered to IFS

7  a statement of RCM's client accounts as of November 18, 2005,

8  listing the securities that were then held in the IFS account

9  and a percentage "hole factor" listing the securities or any

10  portion thereof in the IFS account on that date.  Approximately

11  53 different securities are identified as having been held in

12  the IFS account, all or nearly all of which form the basis of

13  the claims of IFS against RCM on account of securities

14  received, acquired or held by RCM in the ordinary course of its

15  business as a stockbroker from or for the account of IFS for

16  one or more of the purposes noted in Section 741, that is, for

17  safekeeping, sale and purchase or as collateral.

18          I conclude based on the foregoing that IFS was a

19  "customer" of RCM for purposes of Section 741(2) of the

20  Bankruptcy Code in that it entrusted its securities to IFS --

21  I'm sorry, to RCM-- for one or more of the purposes outlined in

22  section 741(2) that this was in the ordinary course of RCM's

23  and IFS's business and that IFS has claims of a kind set forth

24  in 741(2)(b).

25          Of course, however, given the circularity in the

271

1   definitions of "stockbroker" and customer, as Mr. Clark pointed

2   out, I can't really find that IFS is a customer until I find

3   that RCM is a stockbroker.  However, I do find that RCM is a

4   "stockbroker."  The definition as I said before in addition to

5   requiring that there be at least one customer as defined in

6   Section 741 requires that the debtor be engaged in the business

7   of effecting transactions and securities, either for the

8   account of others-- essentially the "broker" definition under

9   the securities laws-- or with members of the general public

10  from or for such person's own account-- essentially the

11  "dealer" definition under the securities laws.  11 U.S.C. §

12  101(53A).

13          Much has been made in this litigation of the phrase

14  in Section 101(53A)(B)(ii); that is, "with members of the

15  general public."  I note, however, that it appears only in that

16  section and not in Section (b)(i).  I recognize that the

17  general trend in dealing with this industry is to conflate

18  "brokers/dealers" and treat them as broker dealers recognizing

19  that most parties engaged in brokering services also engage in

20  dealing services, at least in a broad sense.  But I think the

21  fact that the statute here uses the phrase only in the section

22  that has the debtor engaging in effecting transactions and

23  securities from or for such persons own account is meaningful.

24  That is, if I find that RCM was engaged in the business of

25  effecting transactions and securities for the account of

272

1    others, I don't need to inquire what Congress meant by the

2    phrase "with members of the general public."

3        That distinguishes this case from In re: SSIW, 7 B.R.

4    735, in which this Court focused only on (b)(ii), the parties

5    having previously stipulated that, if anything, the debtor in

6    that case was a "dealer."  As I think was clear from my

7    discussion of Refco's -- I'm sorry, of RCM's business in the

8    context of whether there is a "customer," I believe that RCM

9    was in fact a broker engaged in the business of effecting

10   transactions and securities for the account of others and, in

11   fact, that that was its bread and butter business.  It engaged

12   in other business; for example, it engaged in a derivatives or

13   futures business  and engaged in an FX business, but it

14   received substantial revenue from, and in fact, arguably, the

15   most profitable aspect of its business was, its securities

16   business, it securities brokerage business.  Again, in my view

17   that business was one where it took its customers orders in

18   effectuating transactions for the customers' account.

19       Again, being a licensed dealer or broker is not a

20   necessary condition for effecting such transactions, as set

21   forth in Baker & Getty at 106 F.3d at 1261.  See also In re:

22   McMillen Wrap & Company, 30 F. Supp 40, 41, (D. Pa. 1941).  It

23   is very clear to me here that again these were not single,

24   maverick transactions but a large element of RCM's business.

25       In this case, although I think it's unnecessary, I

273

1  also think that the "prime" brokerage or "trading away" aspect

2  of the business was a significant part of the business-- not

3  insofar as a source of money specifically attributable to such

4  activity but, rather, in the role that this business had in

5  helping RCM obtain customers and keep customers. But, again,

6  that's not the primary focus of my opinion here.

7          Given that analysis, it's not necessary for me, I

8  think, to parse through In re: SSIW Corporation's

9  interpretation of the phrase "with members of the general

10 public." I recognize the danger in doing so, in that it would

11 be an alternative holding. Frankly, one of my reasons for

12 disagreeing with that alternative holding -- I'm sorry. One of

13 my reasons for disagreeing with SSIW's interpretation of the

14 phrase "with members of the general public" is that it was an

15 alternative holding in that case. The Court in that case made

16 it clear that because no securities were actually delivered to

17 or entrusted with the debtor there was no customer and,

18 therefore, subchapter 3 wouldn't apply. But it went on

19 nevertheless to consider whether Section 101(53A)(b)(ii) would

20 apply even if for some reason there was a customer, and, as the

21 parties all know reached the conclusion that the phrase "with

22 members of the general public" for purposes of the Bankruptcy

23 Code provision was meant to encompass only those who were, as

24 stated in one version of the SSIW opinion, "passive, relatively

25 uninformed investors" or in another section of the opinion "in

274

1    expert, passive, relatively uninformed investors who trade with
2    members of regulated stock exchanges."
3         There may well be a limit to the scope of the phrase
4    "members of the general public," but I do not believe that it
5    is so narrowly limited as SSIW concluded.  I believe that it
6    reached that conclusion for two reasons that at least today
7    shouldn't apply.  The first is the Court took note of various
8    opinions rendered in the context of applying the anti-fraud
9    provisions of the U.S. securities laws which may have validly
10   distinguished in that context between sophisticated investors
11   and unsophisticated investors.  As far as whether one who
12   entrusts securities to a broker is concerned, although it may
13   make sense to determine whether that customer entrusted
14   securities willfully shutting its eyes to obvious practices by
15   the broker or dealer that would lead one to believe he never
16   should have entrusted the securities to the dealer or broker, I
17   don't believe that the policy behind subchapter 3 is informed
18   by the same policies as the anti-fraud provisions of the
19   securities laws with respect to distinguishing between
20   sophisticated and unsophisticated customers.  Again, Subchapter
21   3 has to do with the different priority that Congress believed
22   should be accorded to those who gave over their securities or
23   their cash to entities for the purpose of effectuating
24   securities transactions.  I don't think that should be limited
25   to unsophisticated parties.

275

1          Indeed, even in the SSIW case, the Court makes a leap

2    from references in other authorities to the securities laws

3    protecting the general investing public to concluding that the

4    "general public" means only relatively uninformed investors.

5    As noted in a number of the cases, including the Hanover Square

6    case, 55 B.R. at 235, which cites numerous Second Circuit and

7    Southern District opinions, the first element of the customer

8    definition in SIPA, which again is analogous to and can be

9    applied to the customer definition in subchapter 3, is that the

10   claimant entrusts cash and securities to the broker for some

11   purpose connected with participation in the securities market.

12   The claimant must be a "trading" or "public customer" who

13   tenders his securities for the purpose of having them traded

14   for his account by the broker "in the market."

15          It seems to me that that's the focus of -- the proper

16   focus for interpreting the phrase "with members of general

17   public" to the extent that RCM could be said to be a dealer.

18   That is, it applies to those generally in the public trading

19   with the debtor in the marketplace.  And there is clear

20   testimony here that RCM gave its customers access to the market

21   and in fact was a leader in the emerging market securities

22   market or the market for emerging market securities.

23          In addition, the SSIW case relies on what I think is

24   a mistaken reading of SIPA, which is that SIPA itself,

25   according to SSIW, was intended to protect, again,  "inexpert,

276

1   passive relatively, uninformed investors." That is not my
2   understanding of SIPA. Indeed SIPA is intended to protect them
3   but also protects sophisticated entities who engage in customer
4   trading with brokers or dealers regulated under SIPA. What
5   SIPA is in fact I think intended to protect and what I believe
6   in a lesser measure subchapter 3 was intended to protect is the
7   reasonable expectations of those who engage in such trading in
8   the marketplace with brokers or dealers that if they are not
9   able to get their securities back or their fungible equivalent
10  back they will at least participate with a priority with all
11  other securities customers in the customer property fund, thus
12  giving a measure of reasonable assurance to those engaged in
13  the market in the U.S.-- with in the case of SIPA-- registered
14  broker dealers and in the case of Subchapter 3-- all other
15  broker dealers.

16          In that regard, I should note as a footnote that the
17  fact that various customers received affiliate guarantees in
18  respect of their assets at RCM only goes so far. Obviously
19  it's not clear today even under the priority granted to them by
20  subchapter 3 that RCM's customers will be made whole -- that
21  is, subchapter 3 is not a guarantee of full payment. It only
22  provides for a priority of what's - a priority in respect of
23  what's there in the customer fund. Indeed, customers in SIPA
24  cases are not always paid in full. So the existence of the
25  affiliate guarantee can provide some evidence that customers

277

1    didn't fully trust RCM but it also is potentially no more than

2    evidence that it trusted RCM to at least live up to in the

3    bankruptcy case the distribution scheme of Article 3 under

4    Subchapter 3 which may or may not result in payment in full.

5    So I conclude again that either under section 101(53A)(b)(i) or

6    (b)(ii) was a "stockbroker."

7            Finally, it is argued that even though RCM is a

8    stockbroker it's case should not be converted to one under

9    subchapter 3 under Section 1112(b) of the Bankruptcy Code as

10   amended by BAPCPA because of the unusual and extraordinary

11   circumstances of this case.  I think it's important to parse

12   through the arguments made in that regard.  I accept--  and

13   it's the underlying premise for this being a preliminary or

14   tentative ruling as opposed to a final ruling that I will

15   ultimately issue-- that there is some basis under Section

16   1112(b) for a court not to convert or dismiss a case even

17   where, as here, on its face Bankruptcy Code section 109

18   provides that the debtor is not eligible for relief under

19   Chapter 11.  That is because this is not an initial

20   determination upon a filing but a motion to convert or dismiss

21   under section 1112(b).

22           I note that no one is really asking me to dismiss the

23   case except perhaps rhetorically.  I think that recognizes the

24   realities of this situation, which is that fundamentally this

25   was a U.S. -based company and that in all likelihood if I

278

1  dismiss this case under Section 1112(b) it would be back in

2  bankruptcy under Chapter 7 very soon thereafter, basically as

3  soon as it took for three customers to sign a petition for

4  involuntary relief.

5         It is clear to me that unusual circumstances here

6  require the case to be converted or remain in Chapter 11 as

7  opposed to being dismissed, in that more than ninety days have

8  run and, therefore, significant rights that the parties relied

9  upon in that period in respect of potentially voidable

10  transfers could be lost.

11        It is also argued that in addition to not dismissing

12  the case I should keep it in Chapter 11 and it's said so for

13  various reasons.  The first is that there would really be no

14  harm or precedential value in doing so because this case is

15  unique or close to it.  I can't make that leap even though this

16  is I suppose sui generous.  There are other businesses like

17  RCM's that engage in emerging market securities and other

18  securities and knowing human nature, there will be bankruptcy

19  cases involving them in the future to which this ruling will be

20  a precedent.

21        It is also argued with some force and cogency that it

22  is inequitable and unfair to convert this case because very

23  clearly RCM had other customers who entrusted assets with RCM,

24  for example, the FX customers' cash, but that arguably do not

25  have the benefit of the priority accorded under subchapter 3 of

279

1  Chapter 7 to the securities customers.  Unfortunately, I think
2  this argument only goes so far.  After all, Congress enacted
3  that priority and it would be I think a remarkable step for me
4  (although not under 105 clearly because there is some language
5  supporting it in Section 1112(b)(1), that is the "unusual
6  circumstances" language), to override a congressional priority
7  because I felt that it was unfair.
8          Congress has more than once over the last several
9  years recognized the rapid changes in the securities industry
10  by expanding the provisions of the Bankruptcy Code to deal with
11  repos, commodities trades and the like, most recently in BAPCPA
12  by expanding the provisions of Section 362 that deal with
13  various financial instruments.  Given that, although I also
14  recognize that it's quite possible that Section 741 et seq. is
15  a bit of a legislative backwater, I can't assume that Congress
16  somehow royally screwed up and that it should therefore
17  override the priority scheme that it imposed in subchapter 3.
18          Now, I want to be clear that I am not, except in
19  respect of IFS, determining that anyone is a "customer."  It's
20  conceivable to me, I suppose, that other customers of RCM may
21  argue a broad definition of "securities" or what is a
22  "security" and that's an issue for another day.  But I don't
23  believe that I can use 1112(b) to override the statutory
24  priority that would apply ultimately to those who fit within
25  the definition.

280

1    Finally, as I noted at the start of this ruling, I do

2  believe however that there is a reason (a) to defer this ruling

3  as a final ruling to give the parties time to pursue a

4  potential global Chapter 11 plan for RCM and one or more other

5  Refco entities and (b) to do so ultimately with the purpose of

6  reducing costs in augmenting the estate.  Mr. Goldin testified

7  as to various ways that could, and perhaps should, be done.

8  For example, having issued this ruling, although of course it's

9  just that, a ruling by a bankruptcy court, it's always subject

10  to appeal-- the parties have a good idea of at least one

11  judge's view of the priority issue.  On the other hand, knowing

12  that fact, they should be better able to negotiate a plan that

13  deals with intercompany claim issues, substantive consolidation

14  issues and the like, as well as better able to deal with RCM's

15  assets, a large portion of which Mr. Goldin testified (he

16  believed roughly $600 million worth of which) are illiquid

17  securities that require active, intelligent hands-on management

18  and very well should not be -- very well likely should not be

19  subjected to the pressures of a requirement that they be

20  promptly liquidated.  I recognize that Section 748 of the Code

21  has a "commercially reasonable" gloss on the requirement to

22  liquidate, but under a Chapter 11 plan clearly the parties

23  would have more flexibility in dealing with those assets.

24    So, for all of those reasons, it does seem to me that

25  those latter circumstances are the "unusual circumstances" that

281

1  Congress may well have had in mind when it amended Section

2  1112(b) last year and that these parties, all of whom are

3  sophisticated and well represented, should be given the chance

4  to work out their own agreements before they're imposed on them

5  by a court.

6         Now, having said that, I don't intend to defer the

7  changing of this tentative ruling into a final ruling

8  indefinitely.  I believe based on Mr. Goldin's testimony as

9  well as additional information, including my sense of the work

10 that's been done to date and the work that can be done now that

11 this ruling has been issued, that the necessary steps in terms

12 of marshalling information regarding claims and assets,

13 including intercompany claims and assets, can be done with the

14 proper diligence over the next month to two months, with my

15 hope being that it would be within the next month.

16        I think, since deadlines do keep all parties focused

17 on the task at hand, I should set a relatively short deadline

18 before we come back here to see if that process continues to be

19 one where unusual circumstances warrant my withholding issuing

20 a final ruling.  So I'll defer that ruling now for forty-five

21 days.  Clearly, in my mind that's not enough time to negotiate

22 a Chapter 11 plan, but it is enough time to confirm that the

23 steps are being taken that are necessary to do that, and that's

24 what I'll essentially look to forty-five days or so from now.

25        MR. DESPINS:  Your Honor, I'm so very sorry for

282

1  interrupting.  I just want to point out that in the statute at

2  one point they use the word unusual circumstances, but in terms

3  of deferring your ruling the statute used the word compelling

4  circumstance.  I want to make sure that --

5          THE COURT:  They're compelling.  It's compelling in

6  this sense:  the dollars at stake here are so high.  The cost

7  of unnecessary litigation are so high, the dollars that can be

8  saved are so high that although in terms of the -- perhaps the

9  percentage of the total amount of the estate they're not

10 overwhelming, I think they would be overwhelming to not only

11 the average person but also the sophisticated person.

12         The second requirement that I'm going to impose deals

13 with the other issue that I said I thought was really driving

14 this proceeding and making it necessary to have in the first

15 place, that is, the trial that we've gone through for the last

16 six days and this ruling.  That is, that I think that at this

17 time recognizing that ultimately there is a right to conversion

18 here if the parties can't negotiate a plan the parties, or more

19 properly the RCM estate-- not just the moving parties but the

20 RCM estate-- is entitled to a trustee.  It would be entitled to

21 a trustee under 1104(a)(2).  That is not because of fraud,

22 mismanagement and the like which is -- which are the factors

23 enumerated in 1104(a)(1) but rather that it is in the interests

24 of creditors and the estate to appoint a trustee for RCM.  I

25 say that because I think there will be a need to focus the

283

1   negotiations and a need to insure that RCM's creditors, all of

2   them, are confident that an independent party is representing

3   their interests as would be the case in a Chapter 7 case, that

4   is, their interests as a group.

5        Having said that (and I will direct that, and as you

6   may remember in my ruling with respect to the appointment of a

7   trustee last month I adjourned the portion dealing with RCM

8   recognizing that issues in respect of an RCM trustee would be

9   further developed as part of this process and that's clearly

10  been the case), therefore, this aspect of my ruling is a final

11  ruling and not part of a tentative ruling.  I'm resolving that

12  adjourned portion of the trustee hearing and directing that a

13  trustee for RCM be appointed by the U.S. Trustee after

14  consultation with all of the appropriate parties in the RCM

15  case-- that is, not only with the moving customer group but

16  with the representatives of other customers on the FX side, the

17  derivative side and the like.

18       Having said that, recognizing that there already are

19  several very capable professionals who might genuinely think

20  they are acting in the interests of all of the creditors in

21  these estates, including Mr. Goldin and the Official Creditors

22  Committee, I want to be very clear that the RCM trustee should

23  rely primarily on his or her own business and legal judgment.

24  I would hope that the U.S. Trustee would appoint a lawyer or at

25  least someone very familiar, if it is a business person, with

284

1   the legal aspects of large Chapter 11 cases such as this with

2   intercompany claims and similar issues.  I'm not looking for

3   this person to hire a large number of professionals to give him

4   or her cover for his or her investigations and analysis.  In

5   fact, I don't believe that those types of people would end up

6   being paid in this case if they were retained.  The RCM's

7   trustee's job here is to come up to speed quickly to perform

8   his or her due diligence primarily based on review of the

9   processes and procedures that the debtors and the committee and

10  other parties have already gone through, not to reinvent the

11  wheel, to confer properly with all of the parties in the RCM

12  case and to focus on the key issues pertaining to a plan.

13          In light of that fact, I believe that, as I said the

14  other day, the examiner's role in respect of RCM should be

15  extremely limited, if there is any at all at this point, since

16  I view that there would be essentially an overlap with the

17  trustee and a trustee here, since he or she will have more

18  power, should not only take the lead but should supersede the

19  examiner's duties insofar as they would otherwise apply to RCM.

20

21          So that order will be signed promptly.  I'd ask the

22  U.S. Trustee to submit it and I think it's basically a plain

23  vanilla order.  I have great confidence that the U.S. Trustee

24  will fulfill her duties in consulting with all the parties and

25  that she will appoint someone who will benefit not only the RCM

285

1    estate but, indirectly, all of the estates.

2            MR. CLARK:  Your Honor, one point, a procedural

3    point.  In view of the Court's preliminary ruling and perhaps

4    like Judge Gerber I may succeed in persuading Your Honor to

5    change at some point but --

6            THE COURT:  I don't think so.  I'm sorry but that's

7    something you ultimately will have to take upstairs.  I'm

8    serious.  This is -- the term "preliminary ruling" has various

9    meanings around the country.  In the Ninth Circuit they're

10   issued before the hearing.  This obviously was not issued

11   before the hearing.  Except for the compelling circumstances

12   here this would be a final ruling.

13           MR. CLARK:  I do understand that, Your Honor.  The

14   point I was going to make is that as the Court may recall and

15   in view of what the parties ought to be focusing on for the

16   next forty-five days, in light of that you may recall that

17   there is a stay in place for various litigations.  That stay on

18   its terms, on its face stays in place until the hearing on the

19   Chapter 7 conversion motion that has been concluded and in

20   light of that I would ask that the hearing simply be continued

21   to the later date.

22           THE COURT:  Well, I think that's what the statute

23   says.  That's the formulation of 1112.

24           MR. CLARK:  Very good, Your Honor.  Thank you.

25           THE COURT:  So I will continue that hearing to a date

286

1  roughly forty-five days from today.

2          Now, as per that order -- I don't want to get into

3  this now.  I don't want people to start standing up on this

4  point.  Various parties are free to come in to me and say well,

5  things have changed and I want my litigation accelerated, but I

6  would hope that the parties here -- and they are all very well

7  represented and they're all sophisticated and they can I think

8  appreciate the value in making a good faith bona fide effort to

9  resolve the case promptly on a consensual basis and they can

10 also appreciate I think also that I'm not very sympathetic to

11 litigation tactics-- that they should have a very good reason

12 to do anything over the next forty-five days other than engage

13 in good faith negotiations.

14         MR. CLARK:  Very good.  Thank you, Your Honor.

15         THE COURT:  Okay.

16         MR. DESPINS:  Your Honor, just two points of

17 clarification.  I understand what you said exactly but the fact

18 that it's a preliminary ruling, but you don't intend to change

19 your decision but from the point of view of the ten-day

20 clock --

21         THE COURT:  That's not running.  That's not running.

22         MR. DESPINS:  The second point, Your Honor, is given

23 the trustee issue came up literally an hour ago, we have not

24 had a chance to consult with the committee and --

25         THE COURT:  I'm sure the U.S. Trustee will consult

287

1    appropriately with everyone and balance the need for speed with

2    the need to get everyone's views.

3          MR. DESPINS:  Well, what I meant, Your Honor, is that

4    the committee reserves whatever rights we may have regarding

5    that decision.  That's all.

6          THE COURT:  Okay.

7          MR. DESPINS:  I don't want my silence to be read

8    as --

9          THE COURT:  Agreeing to it.  That's fine.

10         Thank you.

11                         *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

288

1                              * * * * *

2        I certify that the foregoing is a court transcript from an

3  electronic sound recording of the proceedings in the above-

4  entitled matter.

5

6                        _____

7                                  Kathleen Price

8  Dated: 3/16/06

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25