Scott A. Edelman (SE 5247)
Sander Bak (SB 2263)
Michael Shepherd (MS 1313)
**MILBANK, TWEED, HADLEY & McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY  10005
(212) 530-5000

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re REFCO CAPITAL MARKETS, LTD. BROKERAGE CUSTOMER SECURITIES LITIGATION | 06 Civ. 643 (GEL) |
| VR GLOBAL PARTNERS, L.P., et al., Plaintiffs,<br><br>- against -<br><br>PHILLIP R. BENNETT, et al., Defendants. | 07 Civ. 8686 (GEL) |
| CAPITAL MANAGEMENT SELECT FUND LTD., et al., Plaintiffs,<br><br>- against -<br><br>PHILLIP R. BENNETT, et al., Defendants. | 07 Civ. 8688 (GEL) |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**MOTIONS TO DISMISS**

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ........................................................................................................... v

PRELIMINARY STATEMENT ..................................................................................................... 1

STATEMENT OF FACTS .............................................................................................................. 9

ARGUMENT ................................................................................................................................. 17

I.      APPLICABLE LEGAL STANDARDS ............................................................................ 17

        1.      Rule 10b-5 ............................................................................................... 17

        2.      Motion to Dismiss Standards .................................................................. 18

II.     THE COMPLAINTS ALLEGE RCM'S DECEPTIVE CONDUCT ............................. 20

        A.      RCM's Conduct was Deceptive in Numerous Respects ....................................... 20

                1.      RCM's Conduct was Deceptive Because it was in Violation of the
                        Customer Agreements ............................................................................. 20

                2.      RCM's Conduct Was Deceptive Because the Account Statements
                        Led Plaintiffs to Believe that their Securities Were Held in their
                        Accounts ................................................................................................... 24

                3.      RCM's Conduct Was Deceptive Because the Trade Confirmations
                        Led Plaintiffs to Believe That Their Securities Were Held in Their
                        Accounts ................................................................................................... 26

                4.      RCM's Conduct was Deceptive Because Customers were not
                        Compensated for the Risks Associated with the Unauthorized Use
                        of their Securities .................................................................................... 28

                5.      RCM's Conduct was Deceptive Because Plaintiffs Were Told That
                        Their Securities Would be Maintained Safely in their Accounts ........... 29

                6.      RCM's Conduct was Deceptive Because it Violated Federal Laws
                        Prohibiting Unauthorized Use of Customers' Securities ........................ 31

        B.      Defendants' Arguments Based On An Analogy to a Bank is Flawed ................. 35

III.    IN ADDITION TO PLEADING AFFIRMATIVE DECEPTION, THE
        COMPLAINTS ALLEGE A SECURITIES FRAUD CLAIM BASED ON
        RCM'S BREACH OF ITS FIDUCIARY DUTY TO ITS CUSTOMERS ..................... 37

IV.     PLAINTIFFS HAVE STANDING TO ASSERT THEIR CLAIMS ............................... 42

        A.      The Purchaser-Seller Rule Is No Bar to Plaintiffs' Claims Where, As
                Here, Their Securities Were Sold Without Their Authorization ......................... 42

        B.      Plaintiffs Have Standing As Their Injury Is Not Derivative Of RCM's
                Injury ................................................................................................................... 47

V.    THE COMPLAINTS ADEQUATELY PLEAD SCIENTER AS TO THE THL
      DEFENDANTS AND THE OFFICER DEFENDANTS ................................................. 49

      A.    Applicable Legal Standards ................................................................... 49

      B.    The Complaints Adequately Allege the THL Defendants' Scienter .................. 51

            1.    The Complaints Plead Strong Circumstantial Evidence of the THL
                  Defendants' Conscious Misbehavior or Recklessness ............................ 51

            2.    The Complaints Adequately Allege the THL Defendants had
                  Motive and Opportunity to Commit Fraud ............................................ 65

      C.    The Complaints Adequately Allege Facts Giving Rise to a Strong
            Inference of Scienter Against Defendants Sexton, Murphy, Silverman, and
            Trosten ................................................................................................. 68

            1.    The Complaints Plead Facts that Constitute Strong Circumstantial
                  Evidence of Conscious Misbehavior or Recklessness on the Part of
                  Sexton, Murphy, Silverman, and Trosten .............................................. 69

            2.    The Complaints Adequately Allege the Officer Defendants had
                  Motive and Opportunity to Commit Fraud ............................................ 74

VI.   THE COMPLAINTS ADEQUATELY PLEAD PRIMARY LIABILITY ON THE
      PART OF THE  OFFICER DEFENDANTS AND THE THL DEFENDANTS ............ 76

      A.    The Officer Defendants Knew About the Fraud and Played a Central Role
            in Its Perpetration ................................................................................. 78

      B.    The THL Defendants Knew About the Fraud and Played a Central Role in
            its Perpetration ...................................................................................... 81

VII.  THE COMPLAINTS  PLEAD ACTIONABLE CONTROL PERSON
      LIABILITY CLAIMS AGAINST THE THL DEFENDANTS AND THE
      OFFICER DEFENDANTS ......................................................................... 86

      A.    Control Person Legal Standards ............................................................. 86

      B.    The Complaints Adequately Plead Claims For Control Person Liability
            Against The THL Defendants .................................................................. 89

      C.    The Complaints Adequately Plead Claims For Control Person Liability
            Against Tone Grant ................................................................................ 90

      D.    The Complaints Adequately Plead Claims For Control Person Liability
            Against Murphy, Sexton, Silverman, and Trosten ..................................... 91

            1.    Control ............................................................................................. 91

            2.    Culpable Participation ........................................................................ 93

VIII. THE COMPLAINTS ADEQUATELY PLEAD A RULE 10B-16 VIOLATION .......... 94

      A.    There is an Implied Private Right of Action under Rule 10b-16 .................... 94

      B.    The Rule 10b-16 Claim is Not Time Barred ............................................. 98

C.     Rule 10b-16 Applies to Individual Defendants As Well As to Broker-Dealers ............................................................................................................ 99

D.     RCM and the Officer Defendants Failed to Provide the Necessary Disclosures Under Rule 10b-16 in the Customer Agreements and Monthly Account Statements .......................................................................................... 100

IX.    THE VR COMPLAINT ADEQUATELY PLEADS A 10B-5 VIOLATION AGAINST GRANT THORNTON ........................................................................ 101

A.     The VR Plaintiffs Claims Against Grant Thornton ........................................... 101

B.     Grant Thornton Made Material False Statements .............................................. 103

C.     The VR Complaint Adequately Alleges Grant Thornton's Scienter ................. 107

       1.     The VR Complaint Pleads Facts that Constitute Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness on the Part of Grant Thornton ......................................... 108

       2.     The VR Complaint Adequately Alleges Grant Thornton had Motive and Opportunity to Commit Fraud ........................................... 115

D.     The VR Complaint Adequately Pleads Loss Causation Against Grant Thornton.............................................................................................................. 117

X.     LEAVE TO REPLEAD SHOULD BE GRANTED IF ANY PLEADINGS ARE FOUND TO BE INSUFFICIENT ............................................................................... 123

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abercrombie v. Andrew College*,
  438 F. Supp. 2d 243 (S.D.N.Y. 2006)...............................................................40

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
  512 F.3d 46 (1st Cir. 2008)...............................................................................50

*Adams v. Amplidyne, Inc.*,
  No. Civ. A. 99-4468 (MLC), 2000 WL 34603180 (D.N.J. Oct. 24, 2000) .........59

*Aiena v. Olsen*,
  69 F. Supp. 2d 521 (S.D.N.Y. 1999)...............................................................118

*Alexander v. Sandoval*,
  532 U.S. 275 (2001)..................................................................................95, 97

*Alvarado v. Morgan Stanley Dean Witter, Inc.*,
  448 F. Supp. 2d 333 (D.P.R. 2006)...................................................................47

*Angelastro v. Prudential-Bache Sec., Inc.*,
  764 F.2d 939 (3d Cir. 1985)..............................................................................94

*Aquino v. Trupin*,
  833 F. Supp. 336 (S.D.N.Y. 1993)...................................................................118

*ATSI Commc'ns, Inc. v. Shaar Fund Ltd.*,
  No. 02 Civ. 8726 (LAK), 2004 WL 616123 (S.D.N.Y. Mar. 30, 2004)...........124

*Azrielli v. Cohen Law Offices*,
  21 F.3d 512 (2d Cir. 1994)...........................................................................77, 81

*Baena v. Woori Bank*,
  515 F. Supp. 2d 414 (S.D.N.Y. 2007)..............................................................125

*Bank of Am. Corp. v. Lemgruber*,
  No. 02 Civ. 1041 (DAB), 2007 WL 4510329 (S.D.N.Y. Dec. 20, 2007)...........40

*Bank of N.Y. Trust, N.A. v. Franklin Advisors, Inc.*,
  522 F. Supp. 2d 632 (S.D.N.Y. 2007)................................................................24

*Bell Atl. v. Twombly*,
  127 S. Ct. 1955 (2007)..............................................................................19, 93

*Bellikoff v. Eaton Vance Corp.*,
  481 F.3d 110 (2d Cir. 2007)..............................................................................97

*Benjamin v. Kim*,
  No. 95 Civ. 9597 (LMM), 1999 WL 249706 (S.D.N.Y. Apr. 28, 1999)...........50

*Birnbaum v. Newport Steel Corp.*,
  193 F.2d 461 (2d Cir. 1952)..............................................................................44

*Bissell v. Merrill Lynch & Co.*,
  937 F. Supp. 237 (S.D.N.Y. 1996),
    *aff'd* 157 F.3d 138 (2d Cir. 1998).....................................................41, 42, 95

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*,
  754 F.2d 57 (2d Cir. 1985).............................................................................122

*Bloor v. Dansker (In re Investor Funding Corp. Sec. Litig.)*,
   566 F. Supp. 193 (S.D.N.Y. 1983)............................................................................... 123

*Blue Chip Stamps v. Manor Drug Stores*,
   421 U.S. 723 (1975)...................................................................................... 42, 43

*Blue Planet Software, Inc. v. Games Int'l, LLC*,
   334 F. Supp. 2d 425 (S.D.N.Y. 2004)......................................................................... 31

*Boles v. Turner (In re Enivid, Inc.)*,
   364 B.R. 139 (Bankr. D. Mass. 2007) ...................................................................... 49

*Brown v. E.F. Hutton Group, Inc.*,
   991 F.2d 1020 (2d Cir. 1993)................................................................................. 30

*Burstyn v. Worldwide Xceed Group, Inc.*,
   No. 01 Civ. 1125 (GEL), 2002 WL 31191741 (S.D.N.Y. Sept. 30, 2002)........................ 121

*Caiola v. Citibank, N.A.*,
   295 F.3d 312 (2d Cir. 2002).......................................................................... passim

*Caremark Inc. v. Coram Healthcare Corp.*,
   113 F.3d 645 (7th Cir. 1997) ............................................................................... 122

*Central Bank, N.A., v. First Interstate Bank, N.A.*,
   511 U.S. 164 (1994)........................................................................................... 76

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002)........................................................................... 18, 26

*Chem. Bank v. Shearson Lehman Bros., Inc.*,
   91 Civ. 4915, 1992 U.S. Dist. LEXIS 10751 (S.D.N.Y. July 21, 1992) ................... 95, 100

*Conway v. Icahn & Co.*,
   16 F.3d 504 (2d Cir. 1994).......................................................................... 37, 39, 42

*Cortec Indus., Inc. v. Sum Holding L.P.*,
   949 F.2d 42 (2d Cir. 1991).................................................................................. 124

*Cosmas v. Hassett*,
   886 F.2d 8 (2d Cir. 1989).................................................................................... 59

*DE Kwiatkowski v. Bear, Stearns & Co.*,
   306 F.3d 1293 (2d Cir. 2002)................................................................................ 39

*Del Cid v. Beloit Corp.*,
   901 F. Supp. 539 (E.D.N.Y. 1995), *aff'd*, 1996 U.S. App. LEXIS 15842 (2d
   Cir. July 24, 1996) ........................................................................................... 118

*Devaney v. Chester*,
   813 F.2d 566 (2d Cir. 1987)................................................................................. 124

*Dietrich v. Bauer*,
   126 F. Supp. 2d 759 (S.D.N.Y. 2001)....................................................................... 89

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)......................................................................................... 117

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
   343 F.3d 189 (2d Cir. 2003)......................................................................... 118, 120

*Epstein v. Itron, Inc.*,
   993 F. Supp. 1314 (E.D. Wash. 1998)...................................................................... 59

*Exxon Co., U.S.A. v. Sofec, Inc.*,
   517 U.S. 830 (1996)...................................................................................... 121

*Facella v. Fed'n of Jewish Philanthropies, Inc.*,
   No. 98 Civ. 3146 (DAB), 2004 WL 1700616 (S.D.N.Y. July 30, 2004) ........................... 39

*Fezzani v. Bear, Stearns & Co.*,
   384 F. Supp. 2d 618 (S.D.N.Y. 2004)................................................................... 44

*Fogarazzo v. Lehman Bros., Inc.*,
   341 F. Supp. 2d 274 (S.D.N.Y. 2004)................................................................... 67

*Foman v. Davis*,
   371 U.S. 178 (1962)...................................................................................... 123

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*,
   376 F. Supp. 2d 385 (S.D.N.Y. 2005)................................................................... 55

*Funke v. Life Fin. Corp.*,
   237 F. Supp. 2d 458 (S.D.N.Y. 2002)................................................................... 67

*Geiger v. Solomon-Page Group, Ltd.*,
   933 F. Supp. 1180 (S.D.N.Y. 1996)...................................................................... 66

*Gilman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   404 N.Y.S.2d 258 (Sup. Ct. 1978)....................................................................... 38

*Glidepath Holding B.V. v. Spherion Corp.*,
   No. 04-CVV-9758, 2007 WL 2176072 (S.D.N.Y. July 26, 2007) ................................... 19

*Grippo v. Perazzo*,
   357 F.3d 1218 (11th Cir. 2004) ........................................................................ 46

*Hayes v. Gross*,
   982 F.2d 104 (3d Cir. 1992)............................................................................. 49

*Henneberry v. Sumitomo Corp. of Am.*,
   No. 04 Civ. 2128 (PKL), 2007 WL 2068346 (S.D.N.Y. July 12, 2007) ........................... 38

*Hollin v. Scholastic Corp.* (*In re Scholastic Corp. Sec. Litig.*),
   252 F.3d 63 (2d Cir. 2001)........................................................................ 19, 55

*Hunt v. Enzo Biochem, Inc.*,
   530 F. Supp. 2d 580 (S.D.N.Y. 2008)................................................................. 125

*In re 36 WorldCom Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003)................................................................... 65

*In re Alstom SA Sec. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005)................................................... 50, 88, 90, 91

*In re Ames Dep't Store Inc. Stock Litig.*,
   991 F.2d 953 (2d Cir. 1993)........................................................................... 119

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
   381 F. Supp. 2d 192 (S.D.N.Y. 2004)..................................................... 89, 110, 114

*In re Asia Pulp & Paper Sec. Litig.*,
   293 F. Supp. 2d 391 (S.D.N.Y. 2003)................................................................... 19

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004)................................................................... 56

*In re BISYS Sec. Litig.*,
   397 F. Supp. 2d 430 (S.D.N.Y. 2005)..................................................................91

*In re Blech Sec. Litig.*,
   No. 94 Civ. 7696 (RWS), 2002 WL 31356498 (S.D.N.Y. Oct. 17, 2002)....................77, 89

*In re Calpine Corp.*,
   377 B.R. 808 (Bankr. S.D.N.Y. 2007) ................................................................26

*In re Cell Pathways Sec. Litig.*,
   No. 99-752, 2000 WL 805221 (E.D. Pa. June 20, 2000)........................................59

*In re Complete Mgmt. Sec. Litig.*,
   153 F. Supp. 2d 314 (S.D.N.Y. 2001)...........................................................49, 117

*In re Converium Holding AG Sec. Litig.*,
   04 Civ. 7897 (DIC), 2007 WL 2684069 (S.D.N.Y. Sept. 14, 2007) ...................................50

*In re Currency Conversion Fee Antitrust Litig.*,
   No. 01 MDL 1409, M-21-95, 2006 WL 3247396 (S.D.N.Y. Nov. 8, 2006)....................125

*In re Donald T. Sheldon,*
   Exchange Act Release No. 31475, No. Admin. Proc. 3-6626, 1992 WL
   353048 (Nov. 18, 1992),
      *aff'd*, 45 F.3d 1515 (11th Cir. 1995)..........................................................32

*In re Executive Telecard, Ltd. Sec. Litig.*,
   913 F. Supp. 280 (S.D.N.Y. 1996)...................................................................86

*In re First Merchs. Acceptance Corp. Sec. Litig.*,
   No. 97 C 2715, 1998 WL 781118 (N.D. Ill. Nov. 4, 1998)....................................114

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   352 F. Supp. 2d 429 (S.D.N.Y. 2005)......................................................86, 89, 125

*In re Global Crossing Ltd. Sec. Litig.*,
   322 F. Supp. 2d 319 (S.D.N.Y. 2004).......................................................passim

*In re Global Crossing, Ltd. Sec. Litig.,*
   No. 02 Civ. 910 (GEL), 2005 WL 2990646 (S.D.N.Y. Nov. 7, 2005)............................86

*In re Global Crossing, Ltd. Sec. Litig.*,
   471 F. Supp. 2d 338 (S.D.N.Y. 2006)..................................................86, 88, 89, 93

*In re Health Mgmt Inc. Sec. Litig.*,
   970 F. Supp. 192 (E.D.N.Y. 1997) ...............................................................85, 114

*In re Homestore.com Inc. Sec. Litig.*,
   252 F. Supp. 2d 1018 (C.D. Cal. 2003), *aff'd*, 452 F.3d 1040 (9th Cir. 2006).................110

*In re Hyperion Sec. Litig.*,
   No. 93 Civ. 7179 (MBM), 1995 WL 422480 (S.D.N.Y. July 14, 1995)
      *aff'd sub nom.* 98 F.3d 2 (2d Cir. 1996) ................................................30

*In re Initial Pub. Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)...............................................................86

*In re Initial Public Offering Sec. Litig.*,
   227 F.R.D. 65 (S.D.N.Y. 2004) ...................................................................122

*In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.*,
   No. 00 Civ. 7804 (LMM), 2004 WL 487222 (S.D.N.Y. Mar. 12, 2004) ...........................99

*In re Jefferson Ins. Co. v. Rouhana (In re Winstar Commc'ns)*,
    Nos. 01 CV 3014 (GDB), 01 CV 11522, 2006 WL 473885
    (S.D.N.Y. Feb. 27, 2006) ................................................................................. 110, 114, 125

*In re Kenneth L. Rubin, CPA & Michael W. Lewis, CPA*,
    Exchange Act Release No. ID-295, Admin. Proc. No. 3-11748, 2005 WL
    2180440 (Sept. 8, 2005) ................................................................................................. 110

*In re Kidder Peabody Sec. Litig.*,
    10 F. Supp. 2d 398 (S.D.N.Y. 1998) .............................................................................. 50

*In re Lernout & Hauspie Sec. Litig.*,
    236 F. Supp. 2d 161 (D. Mass. 2003) ............................................................................ 85

*In re Leslie Fay Cos.*,
    871 F. Supp. 686 (S.D.N.Y. 1995) ............................................................................... 113

*In re Leslie Fay Cos., Inc. Sec. Litig.*,
    918 F. Supp. 749 (S.D.N.Y. 1996) ................................................................... 60, 93, 111

*In re Livent, Inc. Sec. Litig.*,
    148 F. Supp. 2d 331 (S.D.N.Y. 2001) ............................................................. 60, 110, 111

*In re Marsh & McLennan Cos., Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) .......................................................................... 118

*In re MicroStrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ............................................................................ 87

*In re Nortel Networks Corp. Sec. Litig.*,
    238 F. Supp. 2d 613 (S.D.N.Y. 2003) ........................................................................... 55

*In re NYSE Specialists Sec. Litig.*,
    405 F. Supp. 2d 281 (S.D.N.Y. 2005) .......................................................................... 118

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ................................................................... 86, 111, 113

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005) ........................................................................... 86

*In re Parmalat Sec. Litig.*,
    376 F. Supp. 2d 472 (S.D.N.Y. 2005) .................................................................... 85, 121

*In re Parmalat Sec. Litig.*,
    414 F. Supp. 2d 428 (S.D.N.Y. 2006) ........................................................................... 86

*In re Philip Servs. Corp.*,
    383 F. Supp. 2d 463 (S.D.N.Y. 2004) ..................................................................... 18, 59

*In re Qwest Commc'ns Int'l Sec. Litig.*,
    396 F. Supp. 2d 1178 (D. Colo. 2004) ......................................................................... 116

*In re Refco Capital Mkts. Ltd., Brokerage Customer Sec. Litig.*,
    No. 06 Civ. 643 (GEL), 2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007)............. 3, 15, 37, 106

*In re Refco Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) ....................................................................... passim

*In re Registration Requirements for Foreign Broker-Dealers*,
    Exchange Act Release No. 27017, No. 57-11-88, 1989 WL 1097092 (July 11,
    1989) .............................................................................................................................. 34

*In re Retek Inc. Sec. Litig.*,
 Civ. No. 02-4209 (JRT/SRN), 2007 WL 14352 (D. Minn. Jan. 3, 2007)............................ 80

*In re Revlon, Inc. Sec. Litig.*,
 No. 99 Civ. 10192 (SHS), 2001 WL 293820 (S.D.N.Y. Mar. 27, 2001) ............................ 55

*In re Salomon Analyst AT&T Litig.*,
 350 F. Supp. 2d 455 (S.D.N.Y. 2004)........................................................................... 84

*In re Sears, Roebuck & Co. Sec. Litig.*,
 291 F. Supp. 2d 722 (N.D. Ill. 2003) ........................................................................... 59

*In re Sotheby's Holdings, Inc.*,
 No. 00 Civ. 1041 (DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000).......................... 56

*In re Sterling Foster & Co., Sec. Litig.*,
 222 F. Supp. 2d 216 (E.D.N.Y. 2002) ......................................................................... 82

*In re Sunbeam Sec. Litig.*,
 89 F. Supp. 2d 1326 (S.D. Fla. 1999) ........................................................................ 110

*In re Suprema Specialties, Inc., Sec. Litig.*,
 438 F.3d 256 (3d Cir. 2006)...................................................................................... 114

*In re Tel-Save Sec. Litig.*,
 No. 98-CV-3145, 1999 WL 999427 (E.D. Pa. Oct. 19, 1999) ........................................ 59

*In re Tower Auto. Sec. Litig.*,
 05 Civ. 1926 (RWS), 2008 U.S. Dist. LEXIS 16056 (S.D.N.Y. Mar. 3, 2008) ................. 50

*In re Veeco Instruments, Inc. Sec. Litig.*,
 235 F.R.D. 220 (S.D.N.Y. 2006) ............................................................................... 56

*In re Vivendi Universal, S.A. Sec. Litig.*,
 381 F. Supp. 2d 158 (S.D.N.Y. 2003)......................................................................... 80

*In re Williams Sec. Litig.*,
 339 F. Supp. 2d 1242 (N.D. Okla. 2003) ................................................................... 117

*In re WorldCom, Inc. Sec. Litig.*,
 294 F. Supp. 2d 392 (S.D.N.Y. 2003)............................................................. 56, 87, 92

*In re Xethanol Corp. Sec. Litig.*,
 No. 06 Civ. 10234 (HB), 2007 WL 2572088 (S.D.N.Y. Sept. 7, 2007).......................... 118

*Investor Prot. Corp. v. Executive Sec. Corp.*,
 423 F. Supp. 94 (S.D.N.Y. 1976), *aff'd.*, 556 F.2d 98 (2d Cir. 1977) ............................. 28

*Jacobs v. Coopers & Lybrand, L.L.P.*,
 No. 97 Civ. 3374 (RPP), 1999 WL 101772 (S.D.N.Y.  Mar. 1, 1999)............................. 92

*Jaksich v. Thomson McKinnon Sec., Inc.*,
 582 F. Supp. 485 (S.D.N.Y. 1984).............................................................................. 44

*Johnson v. Transp. Agency*,
 480 U.S. 616 (1987)................................................................................................. 97

*Katz v. Image Innovation Holdings, Inc.*,
 ____ F. Supp. 2d ___, 2008 WL 762105 (S.D.N.Y. Mar. 24, 2008)............................... 113

*Komanoff v. Mabon, Nugent & Co.*,
 884 F. Supp. 848 (S.D.N.Y. 1995).......................................................................... 43, 95

*Kramer v. Time Warner, Inc.*,
  937 F.2d 767 (2d Cir. 1991) ........................................................................ 26

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*,
  424 F.3d 195 (2d Cir. 2005) ........................................................................ 23

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005),
  *cert. denied*, 546 U.S. 935 (2005) ........................................................ 118, 119

*Levitin v. PaineWebber, Inc.*,
  159 F.3d 698 (2d Cir. 1998) ........................................................... 35, 36, 41

*Liang v. Dean Witter & Co.*,
  540 F.2d 1107 (D.C. Cir. 1976) .............................................................. 95, 100

*Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*,
  969 F.2d 1384 (2d Cir. 1992) ...................................................................... 82

*Liberty Ridge LLC v. RealTech Sys. Corp.*,
  173 F. Supp. 2d 129 (S.D.N.Y. 2001) ......................................................... 19

*Lincolnshire L.P. v. Essex, LLC*,
  244 F. Supp. 2d 912 (N.D. Ill. 2002) .......................................................... 46

*Lindelow v. Hill*,
  No. 00 C 3727, 2001 WL 830956 (N.D. Ill. July 20, 2001) .......................... 59

*Manning v. Utils. Mut. Ins. Co.*,
  254 F.3d 387 (2d Cir. 2001) ...................................................................... 123

*McLaughlin v. Anderson*,
  962 F.2d 187 (2d Cir. 1992) ...................................................................... 123

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
  456 U.S. 353 (1982) .................................................................................. 96

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
  547 U.S. 71 (2006) ..................................................................................... 45

*Metzner v. D.H. Blair & Co.*,
  689 F. Supp. 262 (S.D.N.Y. 1988) .......................................................... 95, 99

*Miller v. Asensio & Co.*,
  364 F.3d 223 (4th Cir. 2004) .................................................................... 122

*Mississippi Public Employees' Retir. Sys. v. Boston Scientific, Corp.*, No. 07-
  0794, 2008 WL 1735390 (1st Cir. April 16, 2008) .................................... 50

*Montoya v. Mamma. Com Inc.*,
  No. 05 Civ. 2313 (HB), 2006 WL 770573 (S.D.N.Y. Mar. 28, 2006) ........... 93

*N.L.R.B. v. Local 32B-32J Serv. Employees Int'l Union*,
  353 F.3d 197 (2d Cir. 2003) ....................................................................... 31

*Neubauer v. Eva-Health USA, Inc.*,
  158 F.R.D. 281 (S.D.N.Y. 1994) ................................................................. 86

*Nisselson v. Ford Motor Co. (In re Monahan Ford Corp.)*,
  340 B.R. 1 (Bankr. E.D.N.Y. 2006) ............................................................ 40

*No. 84 Employer-Teamster Joint Council Pension Trust Fund*,
  320 F.3d 920 (9th Cir. 2003) ..................................................................... 59

*Nomura Sec. Int'l, Inc. v. E*Trade Sec., Inc.*,
    280 F. Supp. 2d 184 (S.D.N.Y. 2003).................................................................................. 28

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)............................................................................... 50, 66, 67

*Oliver Sch., Inc. v. Foley*,
    930 F.2d 248 (2d Cir. 1991)................................................................................ 123, 124

*Olmsted v. Pruco Life Ins. Co.*,
    283 F.3d 429 (2d Cir. 2002)........................................................................................... 97

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.,*
    *LLC*, 446 F. Supp. 2d 163 (S.D.N.Y. 2006) ................................................................. 38

*Podgoretz v. Evans & Co.*,
    Nos. 86 CV 2681 (SJ), 86 CV 2996 (SJ), 1997 WL 138989 (E.D.N.Y. Mar.
    25, 1997) ........................................................................................................................ 43

*Press v. Chem. Inv. Sec. Corp.*,
    988 F. Supp. 375 (S.D.N.Y. 1997),
    *aff'd*, 166 F.3d 529 (2d Cir. 1999) ..................................................................... 38, 40, 41

*Rehm v. Eagle Fin. Corp.*,
    954 F. Supp. 1246 (N.D. Ill. 1997) .............................................................................. 111

*Reliance Acceptance Group, Inc. v. Levin*
    *(In re Reliance Acceptance Group, Inc.)*,
    235 B.R. 548 (D. Del. 1999)......................................................................................... 48

*Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.)*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001)........................................................................... 93

*Robertson v. Dean Witter Reynolds, Inc.*,
    749 F.2d 530 (9th Cir. 1984) .................................................................................. 94, 96

*Rolf v. Blyth, Eastman Dillon & Co.*,
    570 F.2d 38 (2d Cir. 1978)............................................................................................ 50

*Ronzani v. Sanofi S.A.*,
    899 F.2d 195 (2d Cir. 1990)........................................................................................ 124

*Ross v. A.H. Robins Co.*,
    607 F.2d 545 (2d Cir. 1979)........................................................................................ 124

*Ross v. Bolton*,
    904 F.2d 819 (2d Cir. 1990).......................................................................................... 79

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)............................................................................................ 50

*Schnorr v. Schubert*,
    No. CIV 05-303-M, 2005 WL 2019878 (W.D. Okla. Aug. 18, 2005) ......................... 47

*Scott v. Dime Sav Bank of New York, FSB*,
    886 F. Supp 1073 (S.D.N.Y. 1995),
    *aff'd*, 101 F.3d 107 (2d Cir. 1996) ................................................................................ 40

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Civ. 1996)..................................................................... 63, 77, 78, 81

*SEC v. Hasho*,
    784 F. Supp. 1059 (S.D.N.Y. 1992).............................................................................. 20

*SEC v. Scott, Gorman Muns., Inc.*,
   407 F. Supp. 1383 (S.D.N.Y. 1975)...................................................................... 32

*SEC v. Zandford*,
   535 U.S. 813 (2002) ........................................................................................ passim

*Sec. Investor Prot. Corp. v. Nappy (In re Nappy)*,
   269 B.R. 277 (Bankr. E.D.N.Y. 1999) ............................................................ 38, 39

*Sec. Investor Prot. Corp. v. Vigman*,
   803 F.2d 1513 (9th Cir. 1986) ............................................................................. 44

*Semerenko v. Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000).............................................................................. 122

*Sequa Corp. v. GBJ Corp.*,
   156 F.3d 136 (2d Cir. 1998)................................................................................ 39

*Simpson v. AOL Time Warner Inc.*,
   452 F.3d 1040 (9th Cir. 2006) ............................................................................ 76

*Slomiak v. Bear Stearns & Co.*,
   597 F. Supp. 676 (S.D.N.Y. 1984)...................................................................... 95

*Snyder v. Four Winds Sailboat Centre, Ltd.*,
   701 F.2d 251 (2d Cir. 1983).............................................................................. 118

*Sparling v. Daou (In re Daou Sys., Inc. Sec. Litig.)*,
   411 F.3d 1006 (9th Cir. 2005) .......................................................................... 122

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
   128 S. Ct. 761 (2008)................................................................ 77, 96, 97, 120

*Streit v. Bushnell*,
   424 F. Supp. 2d 633 (S.D.N.Y. 2006).................................................................. 27

*Subaru Distrib. Corp. v. Subaru of Am., Inc.*,
   425 F.3d 119 (2d Cir. 2005)................................................................................ 24

*Suez Equity Investors L.P. v. Toronto-Dominion Bank*,
   250 F.3d 87 (2d Cir. 2001)........................................................................ 87, 118

*Sullivan v. Kodsi*,
   373 F. Supp. 2d 302 (S.D.N.Y. 2005).................................................................. 99

*Swierkiewicz v. Sorema N.A.*,
   534 U.S. 506 (2002)............................................................................................ 87

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   127 S. Ct. 2499 (2007).................................................................... 49, 64, 108

*Tho Dinh Tran v. Alphonse Hotel Corp.*,
   281 F.3d 23  (2d Cir. 2002)................................................................................ 33

*United Dep't Stores, Inc. v. Ernst & Whinney*,
   713 F. Supp. 518 (D.R.I. 1989)........................................................................... 43

*United States  v. Chestman*,
   947 F.2d 551 (2d Cir. 1991)................................................................................ 39

*United States v. Am. Soc'y of Composers*,
   309 F. Supp. 2d 566 (S.D.N.Y. 2004).................................................................. 22

*Vtech Holdings Ltd. v. PriceWaterhouseCoopers LLP*,
    348 F. Supp. 2d 255 (S.D.N.Y. 2004) .................................................................. 18

*Whalen v. Hibernia Foods PLC*,
    No. 04 Civ. 3182, 2005 WL 1799370 (S.D.N.Y. Aug. 1, 2005) ......................... 113

*Wiggins v. Weicker*,
    104 F.3d 351 (Table), 1996 WL 617569 (2d Cir. Oct. 28, 1996) ....................... 124

*Woodling v. Garrett Corp.*,
    813 F.2d 543 (2d Cir. 1987) ................................................................................ 120

*World Wrestling Entm't, Inc. v. Jakks Pacific, Inc.*,
    530 F. Supp. 2d 486 (S.D.N.Y. 2007) ................................................................. 40

## STATUTES

15 U.S.C. § 78j(b) (2006) .................................................................................... passim

15 U.S.C. § 78t(a) (2006) .................................................................................... passim

15 U.S.C. § 78u-4 ...................................................................................................... 19

15 U.S.C. § 78u-4(b)(2) ............................................................................................ 49

28 U.S.C. § 1658(b) .................................................................................................. 98

## OTHER AUTHORITIES

*In re Refco Inc. et al.*, Case No. 05-60006 (RDD) (Docket No. 4088) ...................... 9

*Kirschner v. Bencorp Casa de Bolsa* (*In re Refco, Inc.*), Adv. Proc. No. 06-01745
    (RDD), Judgment Ex. A at 129-30 (Bankr. S.D.N.Y. Dec 29, 2006) ................. 48

Refco Private Actions Trust Agreement ...................................................................... 9

*United States of America v. Phillip R.*
    *Bennett, Robert C. Trosten, Tone N. Grant,* S3 05 Cr. 1192 (NRB) ......... 70, 71, 72

*United States of America v. Phillip R. Bennett, Robert C. Trosten, Tone N. Grant*
    S3 05 Cr. 1192 (NRB) ......................................................................................... 71

*United States v. Phillip Bennett, et al.*,
    No S3 05 Cr. 1192 (NRB) (S.D.N.Y. Jan. 16, 2007) .......................................... 79

## RULES

17 C.F.R. § 240.10b-5(a) ..................................................................................... passim

17 C.F.R. § 240.10b-5(b) ........................................................................................ 18

17 C.F.R. § 240.10b-5(c) ...................................................................................... passim

17 C.F.R. § 240.10b-16 ........................................................................................ passim

17 C.F.R. § 240.12b-2 .............................................................................................. 93

17 C.F.R. § 240.15c3-1 ....................................................................................... 31, 34

17 C.F.R. § 240.15c3-3 ....................................................................................... 31, 34

Fed. R. Civ. P. 8(a)(2) ............................................................................................ 117

Fed. R. Civ. P. 9(b) ........................................................................................... 19, 78

Fed. R. Civ. P. 12(b)(6) ................................................................................... 18, 19, 24

Plaintiffs in *In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation,* 06 Civ. 643 (the "Class Action")[1], *VR Global Partners, et al. v. Phillip R. Bennett, et al.*, No. 07 Civ. 8686 (the "VR Action")[2], and *Capital Management Select Fund Ltd., et al. v. Phillip R. Bennett, et al.*, No. 07 Civ. 8688 (the "Capital Management Action")[3] (together "Plaintiffs") respectfully submit this memorandum of law in opposition to the defendants' motions to dismiss the complaints filed in the aforementioned actions ("the Complaints").[4]  For the reasons that follow, each of the motions should be denied.

## PRELIMINARY STATEMENT

Until Refco Inc. (collectively with its direct and indirect subsidiaries "Refco"[5]) filed for bankruptcy in October 2005, Plaintiffs, former customers of Refco Capital Markets Ltd. ("RCM"), an indirect subsidiary of Refco Inc., used RCM as a broker to execute securities transactions on a non-discretionary basis.  As part of their

---

[1]  Lead Plaintiffs Global Management Worldwide Ltd., Arbat Equity Arbitrage Fund Ltd., and Russian Investors Securities Ltd (the "Class Action Plaintiffs").

[2]  Plaintiffs VR Global Partners, L.P., Paton Holdings Ltd., VR Capital Group Ltd., and VR Argentina Recovery Fund, Ltd. (the "VR Plaintiffs").

[3]  Plaintiffs Capital Management Select Fund Ltd., Investment & Development Finance Corporation, and IDC Financial S.A. (the "Capital Management Plaintiffs").

[4]  The following memoranda have been filed by defendants in support of motions to dismiss: memorandum of law in support of Defendant Tone Grant's motion to dismiss (the "T. Grant Mem."), the joint memorandum of law in support of Defendants Joseph Murphy and William Sexton's motion to dismiss (the "Murphy/Sexton Mem."), the memorandum of law in support of Defendant Philip Silverman's motion to dismiss (the "Silverman Mem."), the memorandum of law in support of Defendant Robert Trosten's motion to dismiss (the "Trosten Mem."), the memorandum of law in support of Defendant Grant Thornton LLP's motion to dismiss (the "GT Mem."), and the memorandum of law in support of the THL Defendants' motion to dismiss (the "THL Mem."). Defendants Phillip Bennett and Santo Maggio have filed answers to the Complaints (the "Maggio Answer" and the "Bennett Answer").  By agreement of the parties, and as so ordered by the Court, Defendant Richard Outridge's time to respond to the Complaints has not yet expired.

[5]  Prior to the formation of Refco Inc., the parent entity was Refco Group Ltd.  The defined term Refco will be used to include both RGL and Refco Inc., as the successor parent-level entity, collectively with their direct and indirect subsidiaries.

broker-customer relationships with RCM, each Plaintiff deposited securities with RCM for safekeeping.

Plaintiffs' claims arise out of a deceptive scheme perpetrated by the defendants named in the Complaints (the "Defendants"[6]) pursuant to which Plaintiffs' securities were stolen from their accounts (the "RCM Securities Fraud"). On a daily basis, Refco senior management, including each of the Refco officer defendants named in the Complaints (the "Officer Defendants"[7]), directed RCM employees to sell, or cause to be sold, securities that Plaintiffs owned and entrusted to RCM. Defendants then used the proceeds of those sales to finance Refco's operations. Those improper securities sales took place without the knowledge or consent of Plaintiffs. And as Judge Drain concluded in the course of Refco's proceedings under the United States Bankruptcy Code in the United States Bankruptcy Court of the Southern District of New York (the "Bankruptcy Cases"), those securities sales were in violation of the customer agreements between RCM and Plaintiffs (the "Customer Agreements").

The deceptive scheme was perpetrated in violation of Section 10(b) of the Securities Exchange Act (the "Exchange Act") by RCM and the Defendants, during a period when all the Defendants (other than Grant Thornton) were control persons of RCM and Refco within the meaning of Section 20(a) of the Exchange Act.

---

[6]    Phillip R. Bennett, William M. Sexton, Santo C. Maggio, Joseph J. Murphy, Philip Silverman, Robert C. Trosten, Richard N. Outridge, Tone Grant, Refco Group Holdings, Inc., Thomas H. Lee Partners, L.P., Thomas H. Lee Advisors LLC., THL Managers V, LLC., THL Equity Advisors V, LLC., Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., Thomas H. Lee Investors Limited Partnership, 1997 Thomas H. Lee Nominee Trust, Thomas H. Lee, David V. Harkins, Scott L. Jaeckel, Scott A. Schoen, and Grant Thornton LLP.

[7]    Defendants Phillip R. Bennett, William M. Sexton, Santo C. Maggio, Joseph J. Murphy, Philip Silverman, Robert C. Trosten, Richard N. Outridge, and Tone Grant.

This Court dismissed an earlier version of the Class Action Complaint, holding that it failed to allege that Plaintiffs had been deceived such that they could state a claim under Sections 10(b) and 20(a) of the Exchange Act.[8]  After the issuance of that opinion, the VR Plaintiffs and the Capital Management Plaintiffs filed their own complaints for the first time.  Cognizant of the Court's ruling with respect to the earlier version of the Class Action, both the VR Complaint and the Capital Management Complaint contain extensive allegations detailing the manner in which Plaintiffs were deceived.  Subsequently, the Class Action Plaintiffs filed the Second Amended Complaint that reflects similar extensive allegations regarding deception.

As a result, unlike the earlier version of the Class Action Complaint, the Complaints cure the deficiency identified by the Court in its decision on the initial motion to dismiss by making the following allegations regarding deception:

First, RCM's use of customer securities was in violation of RCM's Customer Agreements with Plaintiffs.  Plaintiffs' reading of the Customer Agreement is consistent with the reading given by Judge Drain, who interpreted that agreement following a six-day evidentiary hearing in the course of the Bankruptcy Cases.  *See infra* at Section II.A.1.

Second, RCM implicitly and explicitly represented to Plaintiffs and other RCM customers that it was providing custodial services when Plaintiffs deposited their securities with RCM for safekeeping.  Furthermore, as Judge Drain found in the course of the Bankruptcy Cases, RCM reinforced this misimpression on a monthly basis through its

---

[8]  *In re Refco Capital Mkts. Ltd., Brokerage Customer Sec. Litig.*, No. 06 Civ. 643 (GEL), 2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007).

deceptive presentation of customer account statements. Those monthly account statements indicated to the customers that their securities were being held in custody by RCM exclusively for their benefit. The account statements failed to disclose that RCM, in fact, was using those securities for its own financial benefit and was thereby subjecting Plaintiffs and other RCM customers to risks of which they were unaware. *See infra* at Sections II.A.2,3,5.

Third, contrary to universal custom and practice in the securities business, where customers routinely demand and receive compensation from a broker-dealer as a quid pro quo for use of customer securities, Plaintiffs received no compensation for RCM's unauthorized use of their securities. RCM hid the improper use of the securities precisely to avoid paying such compensation. *See infra* at Section II.A.4.

Fourth, RCM's unauthorized sale of Plaintiffs' securities and the subsequent use of the proceeds for Refco's own benefit was flatly prohibited by federal law, making all the more reasonable the expectations and understandings of Plaintiffs and other RCM customers that the securities they had entrusted to RCM were not being sold out from under them. *See infra* at Section II.A.6.

Finally, the Complaints establish that RCM owed Plaintiffs fiduciary duties with respect to the custody of their fully-paid securities. As a result, RCM had an affirmative duty to disclose its misuse of those securities to Plaintiffs. *See infra* at Section III.

Notwithstanding these allegations and that, at the motion to dismiss stage, all well-pleaded allegations must be accepted as true, the THL entities and officers named

as defendants in the Complaints (the "THL Defendants"[9]) devote much of their moving papers to an argument that the Complaints fail to allege a deceptive scheme. The principal argument advanced by the THL Defendants is a strained, incorrect interpretation of the Customer Agreement that has previously been considered and rejected on a factual record by Judge Drain. As set forth below, the factual allegations of deception – many of which the Defendants ignore because they have no answers – are more than adequate to state a claim. Defendants' contractual arguments are wrong and, in any event, should not be adjudicated at this stage of the case without the Court having the benefit of the same type of factual record that Judge Drain had before him in rejecting the very same argument.

Each of the remaining arguments made by the Defendants for dismissal is also without basis:

First, the purchaser-seller rule is not a bar to Plaintiffs' claims. The Second Circuit has expressly held that where, as here, a plaintiff has suffered losses as a result of unauthorized trading in the plaintiff's account, the plaintiff has standing under Section 10(b).[10]

Second, as customers who had their securities stolen from their accounts, Plaintiffs have standing to seek redress for that injury. Grant Thornton's argument to the contrary ignores the facts giving rise to Plaintiffs' claim, which establish their individual injuries.

---

[9]     Thomas H. Lee Partners, L.P., Thomas H. Lee Advisors LLC., THL Managers V, LLC., THL Equity Advisors V, LLC., Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., Thomas H. Lee Investors Limited Partnership, 1997 Thomas H. Lee Nominee Trust, Thomas H. Lee, David V. Harkins, Scott L. Jaeckel, and Scott A. Schoen.

[10]     *See Caiola v. Citibank, N.A.*, 295 F.3d 312 (2d Cir. 2002), discussed *infra* at Section IV.

Third, the Complaints contain more than sufficient facts to create the requisite "strong inference" of scienter against both the THL Defendants and the Officer Defendants, both under a "conscious behavior" or "motive and opportunity" test. This Court has already found a basis for pleading scienter against those same defendants in *In re Refco Inc. Securities Litigation*, 503 F. Supp. 2d 611, 646 (S.D.N.Y. 2007) (the "Stockholder Class Action").[11] Here, the Complaints contain yet additional facts evidencing the knowing or reckless participation of those defendants in the schemes alleged in the Complaints. Likewise, the Complaints contain sufficient allegations to establish those defendants' liability as primary violators.[12]

Fourth, the Complaints contain ample allegations to sustain the "control person" claims against the THL Defendants and the Officer Defendants. The Complaints' scienter allegations as to these defendants are more than sufficient to meet the "knew or should have known standard" for "culpable participation" applicable to "control person" claims.[13]

Fifth, the Complaints adequately plead a claim for a violation of Rule 10b-16. Contrary to Defendants' arguments, there is a long line of authority holding that an implied private right of action exists under that rule. Congress has done nothing to overturn that line of case law, and accordingly, it should continue to be followed. Defendants' statute of limitation argument ignores that the Rule 10b-16 violation was committed at the end of each quarter up until Refco's bankruptcy filing, and that the

---

[11]    *In re Refco Inc. Sec. Litig*., 503 F. Supp. 2d 611, 646, 663 (S.D.N.Y. 2007).

[12]    *See infra* at Sections V-VI.

[13]    *See infra* at  Section VIII.

violation that gave rise to Plaintiffs' damages occurred well within the applicable five-year statute of limitations.[14]

        <u>Finally</u>, the VR Plaintiffs have asserted claims against Grant Thornton based on their reliance on Grant Thornton's audit opinions with respect to financial statements for RCM and Refco.  The VR Plaintiffs reviewed and relied on such financial statements in opening their accounts with RCM and in continuing to entrust their securities to RCM.  As demonstrated in the VR Complaint, Grant Thornton's audit opinions were false and misleading in numerous respects.  There were two massive frauds ongoing at Refco – one involving a huge, undisclosed receivable between Refco and a holding company controlled by Refco's CEO, Phil Bennett, which was temporarily hidden at the end of reporting periods through accounting machinations (the "RGHI Fraud"), and the other involving the theft of customers' securities by RCM (the "RCM Securities Fraud").  The VR Complaint alleges that Grant Thornton was aware of, or reckless in not knowing, of both schemes.  Had the VR Plaintiffs been aware of either of the two schemes they would not have entrusted their securities to RCM, and they would not have had their securities stolen.

        Grant Thornton's various arguments for dismissal of the VR Complaint are without basis:

        <u>First</u>, the VR Complaint more than sufficiently identifies the statements made by Grant Thornton that are misleading, as well as the manner in which those statements are false.  This Court has previously sustained a claim against Grant Thornton

---

[14]   *See infra* at Section VIII.

in the Stockholder Class Action that identified Grant Thornton's false statements in a like manner.[15]

Second, the VR Complaint contains adequate allegations of Grant Thornton's scienter. This Court has previously found scienter adequately pleaded against Grant Thornton in the Stockholder Class Action. Here, the VR Complaint contains additional allegations of fact that were not contained in the Stockholder Class Action Complaint and, in addition, the VR Complaint contains detailed allegations establishing that Grant Thornton was either aware of, or reckless in not knowing about, the RCM Securities Fraud.[16]

Finally, Grant Thornton's loss causation arguments concern factual matters that are not appropriately adjudicated on a motion to dismiss. The VR Complaint alleges that Grant Thornton knew full well that RCM customers would be relying on its audit opinions in making decisions about whether to do business and deposit securities with RCM. Accordingly, it was clearly foreseeable that RCM customers would be harmed by audit opinions that failed to disclose each of the RGHI Fraud and the RCM Securities Fraud. The VR Plaintiffs allege that had they been aware of either of those frauds, they would not have entrusted their securities to RCM and would not have suffered the harms alleged in the VR Complaint. Those allegations are more than sufficient to allege loss causation at the pleading stage.[17]

---

[15]  *See infra* at Section IX.

[16]  *See id.*

[17]  *See id.*

## STATEMENT OF FACTS

### 1.     The Plaintiffs

Court-appointed Lead Plaintiffs in the Class Action, Global Management Worldwide Limited, Arbat Equity Arbitrage Fund Limited, and Russian Investors Securities Limited (the "Class Action Plaintiffs") are commonly controlled investment funds who were securities brokerage customers of RCM and entrusted securities to RCM for safekeeping.[18]  They bring the Class Action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all securities brokerage customers of RCM who:

> i.     at any time from October 17, 2000 to October 17, 2005 (the "Class Period"), placed securities with or held securities at RCM and/or RSL, directly or indirectly, as custodian or broker for safe-keeping, trading or other purposes, and continued to hold positions with RCM on October 17, 2005 or thereafter; and
>
> ii.     who elected to contribute the proceeds of their claims to the Refco Private Action Trust.[19]

---

[18]   Class Action Compl. ¶¶ 3-15, 34.

[19]   The Refco Private Action Trust was established by the Refco Bankruptcy Plan.  Under the Plan, most of Refco's creditors, including RCM customers, assigned their claims (except for securities law claims) against third parties to the Refco Private Actions Trust.  To the extent those creditors, including RCM customers, had securities law claims against third parties, those creditors assigned the proceeds of their individual Refco-related securities causes of action to the Refco Private Actions Trust.  In return for those assignments, participants received beneficial interests in the Refco Private Actions Trust entitling them to a share of the proceeds of any assigned causes of action.  The overwhelming majority of RCM customers -- including Class Action Plaintiffs -- elected to make such a contribution.  *See* Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries, as approved by the United States Bankruptcy Court for the Southern District of New York on December 15, 2006, *In re Refco Inc. et al.*, Case No. 05-60006 (RDD) (Docket No. 4088), at 1, *available at* http://www.refcodocket.com/DocketFiles/4088.pdf.) and Private Actions Trust Agreement (Exhibit G to the Refco Bankruptcy Plan), *available at* http://www.refcodocket.com/DocketFiles/4090g.pdf.

The Capital Management Action is brought by plaintiffs Capital Management Select Fund Ltd., Investment & Development Finance Corporation, and IDC Financial S.A. (the "Capital Management Plaintiffs"). Each of the Capital Management Plaintiffs maintained securities brokerage accounts with RCM and entrusted securities to RCM for safekeeping.[20]

The VR Action is brought by plaintiffs VR Global Partners, L.P., Paton Holdings Ltd., VR Capital Group Ltd., and VR Argentina Recovery Fund, Ltd. (the "VR Plaintiffs"). Each of the VR Plaintiffs maintained securities brokerage accounts with RCM and entrusted securities to RCM for safekeeping.[21]

## 2. RCM's Theft of Plaintiffs' Securities

Plaintiffs opened non-discretionary trading accounts at RCM after RCM represented, and otherwise led Plaintiffs to believe, that their securities would be safeguarded by RCM.[22] Contrary to representations made to Plaintiffs as to the custodial services that RCM was providing, Plaintiffs' securities were stolen from those accounts.[23] On an almost daily basis, Refco and the Officer Defendants sold securities owned by Plaintiffs that had been entrusted to RCM.[24] The proceeds from those stolen securities were then used to fund Refco's operations.[25] The unauthorized sale of customer securities was prohibited by the Customer Agreements between RCM and Plaintiffs,

---

[20]    Capital Management Compl. ¶¶ 3-15, 31-33.

[21]    VR Compl. ¶¶ 4-14, 49, 83.

[22]    Class Action Compl. ¶ 4; Capital Management Compl. ¶ 3; VR Compl. ¶ 4.

[23]    *Id.*

[24]    Class Action Compl. ¶ 5; Capital Management Compl. ¶ 4; VR Compl. ¶ 5.

[25]    Class Action Compl. ¶ 5; Capital Management Compl. ¶ 4; VR Compl. ¶ 5.

under which RCM was obligated to hold customers' securities in safekeeping and could not effect any transaction without customer authorization.[26]

In furtherance of this deception, RCM routinely provided Plaintiffs with account statements identifying the securities purportedly held in custody in their accounts.[27] Contrary to those account statements, however, customer securities were not kept in safekeeping for customers, but instead were regularly sold by RCM.[28]

RCM owed fiduciary duties to Plaintiffs with respect to the custodial services that RCM purported to provide to Plaintiffs by holding securities for safekeeping.[29] Defendants caused RCM to violate this fiduciary duty by failing to disclose the existence of the fraudulent scheme and by otherwise perpetrating it.[30] Instead of complying with the customer account documents, the representations made to customers, and its fiduciary duty, Refco raided the RCM customer accounts and converted Plaintiffs' securities to cash without authorization, and used the proceeds to finance Refco's daily operations, trading losses, and significant acquisitions.[31]

Had Defendants advised Plaintiffs that their securities were being sold for Refco's benefit, Plaintiffs would have entrusted their securities to a secure and faithful custodian rather than to RCM.[32] The Defendants knew that truthful disclosure of RCM's practices would have jeopardized the lucrative payouts that they hoped to obtain as a

---

[26]    Class Action Compl. ¶ 10; Capital Management Compl. ¶ 9; VR Compl. ¶ 10.

[27]    Class Action Compl. ¶ 11; Capital Management Compl. ¶ 10; VR Compl. ¶ 11.

[28]    *Id.*

[29]    Class Action Compl. ¶ 9; Capital Management Compl. ¶ 8; VR Compl. ¶ 9.

[30]    *Id.*

[31]    Class Action Compl. ¶ 5; Capital Management Compl. ¶ 4; VR Compl. ¶ 5.

[32]    Class Action Compl. ¶ 6; Capital Management Compl. ¶ 5; VR Compl. ¶ 6.

result of liquidity events, such as a leveraged buyout of Refco and a successful initial public offering ("IPO").  Accordingly, the Defendants at all times fraudulently concealed RCM's practices.[33]

As a result of the Defendants' fraudulent conversion of Plaintiffs' securities, Plaintiffs held nothing more than an "IOU" from RCM purportedly to repay an amount equal to the value of the customer securities that Plaintiffs had delivered to RCM to be held in custody in their accounts, rather than the securities themselves as had been represented to Plaintiffs.[34]

Plaintiffs were unaware of the Defendants' deception until disclosure of RCM's practices trickled out in the wake of Refco's bankruptcy filing.  Only then, when they sought the return of their securities, Plaintiffs learned for the first time that RCM had sold many of the securities purportedly being held in safekeeping on their behalf.[35] Plaintiffs were left collectively with hundreds of millions of dollars in losses that resulted directly from the fraudulent conversion of their securities that took place prior to Refco's bankruptcy filing.[36]  Plaintiffs' losses would have been avoided had customer securities actually been held in custody at RCM, as was represented to them, rather than having been converted pursuant to the fraudulent scheme.[37]

---

[33]    Class Action Compl. ¶ 14; Capital Management Compl. ¶ 12; VR Compl. ¶ 13.

[34]    Class Action Compl. ¶ 28; Capital Management Compl. ¶ 25; VR Compl. ¶ 28.

[35]    Class Action Compl. ¶ 15; Capital Management Compl. ¶ 13; VR Compl. ¶ 14.

[36]    Class Action Compl. ¶ 28; Capital Management Compl. ¶ 25; VR Compl. ¶ 28.

[37]    Class Action Compl. ¶¶ 28-29; Capital Management Compl. ¶¶ 25-26; VR Compl. ¶¶ 28-29.

### 3.    Defendants' Roles in the Fraud

The fraudulent scheme was so fundamental to the continued operation and financing of Refco and to its ability to proceed with several major corporate transactions during the relevant period that it required the participation of, and had to have been apparent to, all of the Defendants, and anyone who was managing or controlling the Refco entities in a non-reckless manner.

### a.    Role of THL Defendants

After the THL Defendants took control of Refco as a result of their August 2004 leveraged buyout of Refco (the "LBO"), they had access to all material facts concerning the RCM Securities Fraud.  Although the fraudulent practice began prior to the LBO, it substantially increased in size following the LBO, during the period in which the THL Defendants controlled and directed Refco.[38]

Even before their investment in Refco, the THL Defendants learned of Refco's checkered past through numerous examples of the legal and regulatory problems faced by the company.[39]  Any suspicion that the THL Defendants had of irregularities prior to the LBO was confirmed after they took control of Refco.  Upon learning of the RCM Securities Fraud, the THL Defendants, driven by their single-minded pursuit of a substantial payday from a Refco IPO, perpetrated the fraud by continuing Refco's practice of using stolen customer securities to fund operations and acquisitions.  Not only

---

[38]    Class Action Compl. ¶¶ 16-19; Capital Management Compl. ¶¶ 14-16; VR Compl. ¶¶ 15-17.

[39]    Class Action Compl. ¶¶ 181-310; Capital Management Compl. ¶¶ 182-306; VR Compl. ¶¶ 269-414.

did the THL Defendants fail to put an end to the fraudulent practices, they allowed the magnitude of the theft to grow under their control.[40]

The THL Defendants are sued in each of the Complaints under each of Sections 10(b) and 20(a) of the Exchange Act.

### b.    Role of the Officer Defendants

The Officer Defendants directed the fraudulent theft of RCM customer securities on a day-to-day basis.[41]  Each of the Officer Defendants (about whom more detail is provided below, at Sections V.C. and VI.A.), was part of a small group of senior executives responsible for Refco's operations and each played a critical role in its management.[42]  As discussed in detail at Sections V.C., VI.A., and VII.C.-D., based on their respective roles and seniority within Refco, each of the Officer Defendants directed and controlled the specific actions that constituted the RCM Securities Fraud.[43]

The Officer Defendants carried out the fraud in order to provide Refco with low-cost "capital", *i.e.*, cash from "other people's securities," that was used to sustain and grow Refco's operations and to give the illusion that Refco was profitable, financially healthy and highly liquid. [44]  On an almost daily basis, the Officer Defendants, having determined that a further injection of capital was needed to meet Refco's operational and funding needs, would direct Refco employees to sell, or cause to be sold,

---

[40]    *Id.*

[41]    Class Action Compl. ¶¶ 4-17, 23-25, 102-19; Capital Management Compl. ¶¶ 3-15, 20-22, 105-15; VR Compl. ¶¶ 4-14, 21-23, 38, 112-25.

[42]    Class Action Compl. ¶ 169; Capital Management Compl. ¶ 171; VR Compl. ¶ 253.

[43]    Class Action Compl. ¶¶ 169-80; Capital Management Compl. ¶¶ 171-81; VR Compl. ¶¶ 253-68.

[44]    Class Action Compl. ¶¶ 4-17, 23-25, 102-19; Capital Management Compl. ¶¶ 3-15, 20-22, 105-15; VR Compl. ¶¶ 4-14, 21-23, 38, 112-25.

through hypothecation or pursuant to Repos, whatever amount of RCM customer securities was required to raise the required funds.[45]  Because they knew that truthful disclosure of this practice would have jeopardized not only the ability of Refco to operate, but also the lucrative payouts that they hoped to obtain as a result of an IPO, the Officer Defendants deceptively concealed the practice from the customers.[46]

The Officer Defendants named in the Complaints are Phillip R. Bennett, Tone N. Grant, Santo C. Maggio, Joseph J. Murphy, William M. Sexton, Philip Silverman, Robert C. Trosten and Richard N. Outridge.[47]  (Bennett, Maggio and Outridge are not the subject of this motion to dismiss).  The Officer Defendants are sued under each of Sections 10(b) and 20(a) of the Exchange Act.

### c.    Role of Grant Thornton

The VR Complaint (but not the Class Action Complaint or the Capital Management Complaint) names Grant Thornton as a defendant because the VR Plaintiffs relied upon Grant Thornton's audit reports in deciding to place, and to continue to maintain, their securities with RCM.[48]  The VR Complaint alleges the existence of "another related scheme to improve falsely the appearance of Refco's financial condition",[49] namely the RGHI Fraud.  The RGHI Fraud hid certain customer trading

---

[45]  Class Action Compl. ¶ 5, 105; Capital Management Compl. ¶ 4; VR Compl. ¶ 5.

[46]  Class Action Compl. ¶¶ 312-27; Capital Management Compl. ¶¶ 308-22; VR Compl. ¶¶ 489-503.

[47]  The Court dismissed Messrs. Silverman, Sexton and Murphy from the class action with prejudice and therefore they are not named as defendants in the Second Amended Class Action Complaint.  *See In re Refco Capital Mkts. Ltd., Brokerage Customer Sec. Litig.*, No. 06 Civ 643 (GEL), 2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007).  The Court's ruling in the Class Action was prior to class certification and therefore does not prevent individual customers, such as the Capital Management and VR Plaintiffs, from asserting claims against Messrs. Silverman, Sexton, and Murphy.

[48]  VR Compl. ¶¶ 78, 90-94.

[49]  VR Compl. ¶ 30.

15

losses, operating expenses, and other items that negatively affected Refco's financial position by recording them as additions to a debt owed by RGHI to certain Refco entities (collectively, the "RGHI Receivable").  The RGHI Receivable was then temporarily hidden at the end of reporting periods by a series of fraudulent transactions (the "Round Trip Loans").[50]  As a result of Refco's failure to disclose the RGHI Fraud, readers of Refco's financial statements, like the VR Plaintiffs, were left with a completely distorted picture of Refco's financial condition.

Grant Thornton hid the existence of both the RCM Securities Fraud and the RGHI Fraud by making false statements in its unqualified audit reports with respect to Refco's financial statements for fiscal years 2003, 2004, and 2005.[51]  Grant Thornton ignored the minimum acceptable standards of professional conduct including, but not limited to, Generally Accepted Auditing Standards ("GAAS"), and Refco's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP").[52]  Had Grant Thornton properly performed its audit function in accordance with GAAS and had Refco's financial statements been properly prepared in accordance with GAAP, as Grant Thornton falsely represented, Grant Thornton would have revealed, and required disclosure in the "audited" financial statements, of both the fraudulent use of customer securities by RCM and the financial fraud that permeated Refco.[53]  Indeed, after Refco hired a new Controller to oversee RCM's finances on an

---

[50]  *Id*. ¶ 30.

[51]  *Id*. ¶¶ 78, 221, 415-16.

[52]  *Id*. ¶¶ 222-34, 454-85.

[53]  *Id*. ¶¶ 37-39.

interim basis, it took him only a few weeks to discover and reveal the RGHI Fraud.[54]  By

contrast, Grant Thornton had been Refco's auditor since 2002, with full access to Refco's

books and records and a duty to ensure the accuracy of Refco's financial statements.

Over that period, Grant Thornton turned a blind eye to the RGHI Fraud that the new

Controller found with little difficulty.

## ARGUMENT

## I.    APPLICABLE LEGAL STANDARDS

### 1.    Rule 10b-5[55]

All three Complaints plead claims against all of the Defendants, other than

Grant Thornton, under Rule 10b-5(a) and (c) based on deceptive conduct.  Rule 10b-5(a)

and (c) of the Exchange Act make it unlawful for any person, directly or indirectly "(a)

[t]o employ any device, scheme or artifice to defraud," or "(c) [t]o engage in any act,

practice, or course of business which operates or would operate as a fraud or deceit upon

any person, in connection with the purchase or sale of any security." 17 C.F.R. §

240.10b-5(a) & (c).

Although Rule 10b-5(b) provides a cause of action based solely on the

"making of an untrue statement of a material fact and the omission to state a material

fact," subsections (a) and (c) also allow claims against defendants who, with scienter,

participate in "a 'course of business' or a 'device, scheme or artifice' that operated as a

fraud" on sellers or purchasers of stock.  As this Court recognized in *In re Global

Crossing, Ltd. Securities Litigation*, 322 F. Supp. 2d 319, 335 (S.D.N.Y. 2004), "a cause

---

[54]    *Id.* ¶ 36.

[55]    In addition to asserting Rule 10b-5 violations, all three Complaints also include claims for violation of
Rule 10b-16 and Section 20(a).  The legal standards for claims under Rule 10b-16 are discussed *infra*
at Section VIII.  The legal standards for claims under Section 20(a) are discussed *infra* at Section VII.

of action exists under subsections (a) and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant."  *See SEC v. Zandford*, 535 U.S. 813, 821-22 (2002)  ("A non-speaking actor who engages in a 'scheme to defraud' has used or employed a deceptive device within the meaning of Section 10(b).").

The VR Complaint, in addition to asserting claims against the THL Defendants and Officer Defendants based on deceptive acts, also pleads claims against Grant Thornton under Rule 10b-5(b) based on material misrepresentations made by Grant Thornton in the audit reports and financial statements for Refco and RCM.[56]  The VR Plaintiffs relied on those misrepresentations when they decided to place, and to continue to maintain, their securities with RCM.[57]  Rule 10b-5(b) claims against auditors based on false financial statements are well-recognized.[58]

### 2.    Motion to Dismiss Standards

Resolution of a Rule 12(b)(6) motion requires a court to accept all well-pleaded allegations in the complaint as true, and to draw all reasonable inferences in the plaintiff's favor.  *See Chambers v. Time Warner, Inc*., 282 F.3d 147, 152 (2d Cir. 2002).  "The issue is not whether the plaintiff ultimately will prevail but whether the plaintiff is entitled to offer evidence to support its claims."  *Vtech Holdings Ltd. v. PriceWaterhouseCoopers LLP*, 348 F. Supp. 2d 255, 261 (S.D.N.Y. 2004).  Although the

---

[56]    VR Compl. ¶¶ 78, 221, 415-16.

[57]    *Id*. ¶¶ 90-94.

[58]    *See In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d at 335 (under Rule 10b-5(b) an auditor may be held liable for false representations made in financial statements that were relied on by investors); *In re Philip Serv. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 472 n.5 (S.D.N.Y. 2004) (noting an auditor can be held liable under Rule 10b-5(b) for its misrepresentations concerning a company's financial statements).

factual allegations "must be enough to raise a right to relief above the speculative level," "[o]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. v. Twombly*, 127 S. Ct., 1955, 1964-67 (2007).

In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Glidepath Holding B.V. v. Spherion Corp.*, No. 04-CVV-9758, 2007 WL 2176072, at *10 (S.D.N.Y. July 26, 2007).

The general pleading standard and the presumptions in favor of plaintiffs apply equally in suits alleging violations of the federal securities laws. The *Private Securities Litigation Reform Act* of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, altered the pleading requirements for the scienter element only. *See In re Asia Pulp & Paper Sec. Litig.,* 293 F. Supp. 2d 391, 396 n.6 (S.D.N.Y. 2003) (noting that PSLRA applies only where scienter is an essential element and the claim arises under the Exchange Act). Moreover, although Rule 10b-5 complaints must comply with the particularity requirement of Fed. R. Civ. P. 9(b), "courts should not demand a level of specificity in fraud pleadings that can only be achieved through discovery." *Liberty Ridge LLC v. RealTech Sys. Corp.*, 173 F. Supp. 2d 129, 137 (S.D.N.Y. 2001). "Even with the heightened pleading standard under Rule 9(b) and the [PSLRA] we do not require the pleading of detailed evidentiary matter in securities litigation." *Hollin v. Scholastic Corp.* (*In re Scholastic Corp. Sec. Litig.*), 252 F.3d 63 (2d Cir. 2001).

## II.    THE COMPLAINTS ALLEGE RCM'S DECEPTIVE CONDUCT

### A.    RCM's Conduct was Deceptive in Numerous Respects

The Complaints are premised on a fraudulent scheme through which Plaintiffs were induced to deposit securities with RCM for safekeeping, and then, contrary to Plaintiffs' expectations, RCM and its sister company, Refco Securities, LLC ("RSL"), deceptively used those securities for their own benefit and the benefit of Refco's affiliates.[59]  The Complaints expressly allege deception: each of the Plaintiffs alleges that it was unaware of, and expressly deceived about, the manner in which RCM and RSL were converting their fully-paid securities.[60]

Claims based on unauthorized transactions have long been recognized to be within the ambit of Section 10(b).  *See, e.g.*, *SEC v. Hasho*, 784 F. Supp. 1059, 1110 (S.D.N.Y. 1992) ("A pattern of unauthorized transactions occurred in accounts serviced by the defendants. . . . Since these unauthorized trades were the result of, and were accompanied by, material 'deception, misrepresentation or non-disclosure' they violated the anti-fraud provisions of the securities laws."); and cases cited *infra* at Section IV.

### 1.    RCM's Conduct was Deceptive Because it was in Violation of the Customer Agreements

The THL Defendants' argument for lack of deception is premised on an erroneous interpretation of the Customer Agreements.  As found by Judge Drain after a six-day trial in which he reviewed the Customer Agreements in connection with the Refco Bankruptcy Cases, those agreements provided that RCM and RSL could not effect transactions in customers' securities without customer authorization, and that RCM and

---

[59]    Class Action Compl. ¶¶ 3-4; Capital Management Compl. ¶¶ 2-3; VR Compl. ¶¶ 3-4.

[60]    Class Action Compl. ¶ 6; Capital Management Compl. ¶ 5; VR Compl. ¶ 6.

RSL had no legal right to use customer securities for the benefit of RCM, RSL, or other Refco affiliates.[61]

   The first paragraph of the Customer Agreements[62] -- which the Defendants fail even to address in their moving papers, notwithstanding that paragraph's pivotal place in Judge Drain's analysis of the Customer Agreements -- is entitled "Authorization". That paragraph provides, in pertinent part, that Plaintiffs and RCM's other customers "authorize[d] Refco to purchase, sell, borrow, lend, pledge or otherwise transfer Financial Instruments (including any interest therein) for [customer accounts] in accordance with your oral or written instructions."[63] Thus, the Customer Agreements required (and created a reasonable expectation on the part of the Plaintiffs), in the absence of "oral or written instructions" from the customer, that securities would be held in safekeeping for Plaintiffs' benefit and would not be sold or hypothecated by RCM to finance its own business activities or the business activities of other Refco affiliates.

   Section B, entitled "Margin," states that "[t]his Margin section applies in the event Refco finances any of your Transactions from time-to-time in Financial Instruments." Section B.1 provides that RCM could require customers to maintain collateral in their accounts to secure performance in the event the customer engages in margin trading. Section B.2, entitled "Rights and Use of Margin," states that RCM could use customers' securities "until settlement in full of all Transactions entered into pursuant

---

[61] *In re Refco, Inc., et al.*, Case No. 05-60006 (RDD), Transcript of Hearing Before The Honorable Robert D. Drain, March 14, 2006 (the "Judge Drain Order") at 252:20 – 253:11; *see also* Class Action Compl. ¶¶ 10, 95-101, 124; Capital Management Compl. ¶¶ 9, 100-04, 120; VR Compl. ¶¶ 10, 106-10, 153.

[62] *See* Exhibit B of Declaration of Richard Rosen in Support of THL Mem. at 2.

[63] Class Action Compl. ¶ 96; Capital Management Compl. ¶ 101; VR Compl. ¶ 107.

to this Agreement."   Those sections dealing with margin make clear that where, as was the case for each of the Plaintiffs at the time of the bankruptcy filing, customers had no loans outstanding, RCM could not use those customers' securities.[64]  To the same effect, Section B.2 later provides that Refco could use customers' securities "as may be deemed necessary for margin or to satisfy or reduce any deficit or debit balance in any such account," again making clear that in the absence of such a debit balance, RCM was not permitted to use the securities.  *See United States v. Am. Soc'y of Composers*, 309 F. Supp. 2d 566, 573 (S.D.N.Y. 2004) (noting the "elementary principle of contract construction" that the language of one clause in a contract must be read in conjunction with the immediately preceding clause).

Thus, when Sections A and B are read together, the only reasonable interpretation of the Customer Agreements is that RCM could use customers' securities only as collateral against a loan balance when the customer engaged in margin or other financing.  As the Complaints allege,[65] however, RCM used customers' securities even when the securities were fully paid, *i.e.*, there was no margin or deficit balance in the customer's account.  As a result, at the time of the bankruptcy, Plaintiffs' fully paid

---

[64]  The THL Defendants point out that the Capital Management Plaintiffs and VR Plaintiffs allege they did at times execute margin transactions.  (THL Mem. at 20.)  But the THL Defendants fail to note that the Plaintiffs in all three Complaints allege that RCM was improperly using their securities even when there was no margin balance and, critically, when Plaintiffs sought the return of their securities in October 2005 and were told that they were not held in their accounts, those securities were fully paid and unencumbered by any lien in favor of RCM.  Class Action Compl. ¶ 104; Capital Management Compl. ¶ 69; VR Compl. ¶ 110.

[65]  Class Action Compl. ¶¶ 99, 104, 151, 159; Capital Management Compl. ¶¶ 69, 80, 93, 162; VR Compl. ¶¶ 106, 179, 243.

securities were not in their accounts as they should have been when Plaintiffs demanded their return.[66]

In the context of a detailed factual record in the Bankruptcy Case, Judge Drain rejected the interpretation of the Customer Agreements advanced in this case by the THL Defendants.  Defendants selectively cite in their motion papers to a portion of Judge Drain's ruling.  (THL Mem. at 20, n.5.)  Defendants fail, however, even to address Judge Drain's express rejection of the very argument that they now espouse.  Thus, Judge Drain held:

> "[t]he objectors to the motion point to the customer agreement, and in particular, Paragraph B of that agreement where they had a margin, to suggest that the customers of RCM normally took the risk that RCM could do whatever it pleased with the securities and other property that they left with RCM in their customer accounts notwithstanding Section A of the customer agreement, quoted above, and therefore, that there was no real entrustment.
>
> Having read the two paragraphs in Section B of the customer agreement, I don't accept that argument.  It appears clear to me from the language of that agreement and those provisions that those provisions apply in the situation where customers have engaged in margin or financing transactions with RCM or its affiliates and that what the customers have given to RCM in those

---

[66] Defendants misrepresent the language of the Customer Agreement when they suggest that it defines the term "collateral" as "all of your cash, securities and other property . . . and the proceeds thereof" in the possession of any Refco entity.  (THL Mem. at 19.)  Defendants' citation comes from the middle of Section B.1, but they fail to note that the term "collateral" appears also in the first sentence of Section B.1.  That sentence states that "Refco reserves the right to require the deposit or maintenance of collateral (consisting of cash, United States government obligations or such other marketable securities or other property which may be acceptable to Refco) *to secure performance of your obligations to Refco*."  The last words in that sentence make clear that the Customer Agreement allowed RCM to use customers' securities only with a value equal to a customers' margin balance.  It does not mean, as Defendants argue, that RCM could use all the property in a customer's account as collateral against a loan balance.  The fact that Defendants' interpretation is mistaken is also confirmed by the reference in the Customer Agreements to situations in which Refco could demand "additional collateral."  If RCM could treat all of the customers' securities as collateral, the references to "additional collateral" would be meaningless.  *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("An interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'") (internal citations omitted).

> paragraphs is a security interest in their property until those transactions are paid off and the debt satisfied…
>
> … So I do not see anything in these two paragraphs that will take the moving customer group members out of the notion that they entrusted their securities [   ] or cash to purchase securities, with RCM."

Judge Drain Order at 252:20 – 254:11.

Plaintiffs respectfully submit that Judge Drain got it right:  the Customer Agreements cannot be interpreted to permit RCM to use customer securities except to the extent that customers had a margin balance.

Plaintiffs submit that, consistent with Judge Drain's ruling, the Customer Agreement is unambiguous on this point.  On this motion, however, Plaintiffs need not establish a lack of ambiguity.  Were such an ambiguity to exist (and Plaintiffs believe it does not) it would, at most, raise factual issues that would require a full factual record for resolution.  *See Subaru Distrib. Corp. v. Subaru of Am., Inc*., 425 F.3d 119, 122 (2d Cir. 2005) (on a motion to dismiss any contract ambiguities are to be resolved in plaintiff's favor); *Bank of N.Y. Trust, N.A. v. Franklin Advisors, Inc*., 522 F. Supp. 2d 632, 637 (S.D.N.Y. 2007) ("The Court's role on a 12(b)(6) motion to dismiss is not to resolve contract ambiguities").

### 2.    RCM's Conduct Was Deceptive Because the Account Statements Led Plaintiffs to Believe that their Securities Were Held in their Accounts

Plaintiffs were further deceived as to what RCM and RSL were doing with customer securities by the monthly account statements disseminated by RCM and RSL.[67] As the Complaints allege, every month Plaintiffs and other RCM customers received an

---

[67]    Class Action Compl. ¶¶ 129-32; Capital Management Compl. ¶¶ 125-28; VR Compl. ¶¶ 157-60.

account statement bearing the legend "SECURITY POSITIONS IN YOUR ACCOUNT," under which there was a list of securities. Based on these statements, Plaintiffs and other RCM customers reasonably believed that their securities were being held in custody.[68]

The deception was furthered by the manner in which account statements reported the treatment of securities in connection with customers' margin financing. When an RCM customer borrowed on margin against securities, the number of securities reported in "SECURITY POSITIONS IN YOUR ACCOUNT" was reduced by the number of securities posted as collateral.[69] As a customer paid off the margin loan, the statement showed a corresponding increase in the number of securities in "SECURITY POSITIONS IN YOUR ACCOUNT."[70] This presentation understandably led customers to believe that once they paid off a margin loan their securities were maintained safely in their RCM accounts. In fact, however, RCM used all of its customers' securities for its own purposes, whether or not the customer was trading on margin. If proven, these allegations would plainly establish that Plaintiffs were deceived about RCM's use of customer securities. Tellingly, Defendants do not argue otherwise.[71]

---

[68]   Class Action Compl. ¶¶ 3-15; Capital Management Compl. ¶¶ 3-13; VR Compl. ¶¶ 3-14.

[69]   Class Action Compl. ¶ 130; Capital Management Compl. ¶ 126; VR Compl. ¶ 158.

[70]   *Id.*

[71]   Defendants argue that the account statements, like an account statement a customer might receive from a bank, were meant to reflect the ultimate value a customer was entitled to receive, not the amount of securities that were in RCM's custody (THL Mem. at 23-24.) As discussed *infra* at Section II.B., Defendants' attempt to explain away the fraudulent behavior by analogizing RCM to a bank is without basis.

3.      **RCM's Conduct Was Deceptive Because the Trade Confirmations Led Plaintiffs to Believe That Their Securities Were Held in Their Accounts**

Aside from being without merit as a factual or legal matter, Defendants' arguments regarding the trade confirmations (THL Mem. at 18) are not appropriately considered on this motion. The trade confirmations cited by Defendants are not discussed or referenced in the Complaints. Furthermore, there is no allegation or evidence that such trade confirmations were provided to any of the Plaintiffs; to the contrary, during the hearing before Judge Drain, there was evidence from some customers that they had not received such confirmations. This motion is not the appropriate vehicle for Defendants to seek factual determinations based on this unpleaded and unproven aspect of the relationship between RCM and its customers.[72]

Regardless, Defendants' argument is based on a misreading of the trade confirmations, which were deceptive in several respects. The third paragraph of those confirmations states that Refco could use its customers' securities "as may be deemed necessary for margin or to satisfy or reduce any deficit or debit balance."[73] The only reasonable interpretation of that language is that RCM could use the securities as collateral against a loan balance when a customer borrowed on margin, but that the securities would not be used by RCM when the margin loan was paid off.

The fourth paragraph of the trade confirmations refers several times to RCM as maintaining "custodian" accounts, thereby reinforcing customers' beliefs that

---

[72]    *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) (in considering a Rule 12(b)(6) motion a court must limit itself to facts alleged in the complaint); *In re Calpine Corp.*, 377 B.R. 808, 815 (Bankr. S.D.N.Y. 2007) ("documents referred to by [Defendant] are neither identified [nor] referred to in the operative allegations of the Complaint and may not be considered on a motion to dismiss.") (quoting *Chambers v. Time Warner Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

[73]    *See* Exhibit A of Declaration of Richard Rosen in Support of THL Mem. at p. 3 ¶ 3.

their securities were being held in custody.[74]  Furthermore, Section 6 informed the

customers that all transactions with RCM were subject to "all applicable laws, rules,

practices and customs and to the terms of the applicable customer agreements,"

reinforcing customers' beliefs that RCM was complying with U.S. regulations.[75]

Defendants' arguments regarding the trade confirmations were explicitly

rejected by Judge Drain, who held that it "would be a real stretch" to conclude that

Paragraph 1 of the trade confirmation voids Section A of the Customer Agreement, which

requires that customer securities only be dealt with pursuant to express customer

instructions.[76]  Judge Drain concluded that the trade confirmation should be read in

combination with the Customer Agreement, and the two documents did not provide RCM

with the right to use customers' securities other than as collateral for margin trading.[77]

Even if Defendants dispute Judge Drain's conclusion and argue that the trade

confirmations are ambiguous, that issue is not appropriate for resolution on a motion to

dismiss.[78]

---

[74]  *Id*. ¶ 4.

[75]  This belief was even further reinforced by the reference in the trade confirmations to "applicable customer agreements" because the Customer Agreement is expressly governed by New York law. And given Section 6's statement that all transactions were subject to the applicable customer agreements, even if the trade confirmations could be read to permit RCM to use customer securities (a reading that the trade confirmations do not support), any such reading would be overridden by the Customer Agreement, which, as discussed above, does not permit RCM to sell customer securities except with customer permission.

[76]  Judge Drain Order at 255:15–23.

[77]  *Id*. at 256:2-15.

[78]  *See Streit v. Bushnell*, 424 F. Supp. 2d 633, 641-42 (S.D.N.Y. 2006) (conflicting interpretations of a document "raise genuine disputes as to material facts that require discovery to resolve by motion for summary judgment or at trial, and that thus cannot properly be decided" on a motion to dismiss).

**4.    RCM's Conduct was Deceptive Because Customers were not Compensated for the Risks Associated with the Unauthorized Use of their Securities**

Plaintiffs' allegations of deceptive conduct find further support in the Complaints' discussion of industry practice in the securities industry, which again corroborates Plaintiffs' allegations that they were unaware that their securities were being sold.  Had Plaintiffs known the truth about the manner in which RCM was using their securities, they would have taken their securities out of RCM.[79]  No rational customer, aware of the risk to which RCM was exposing its securities, would have entrusted fully-paid securities to RCM when such customer received absolutely no benefit for doing so. Such a customer could easily have entrusted its securities instead to other financial institutions that segregate customer securities, thereby avoiding the risks that ultimately resulted in Plaintiffs' losses.[80]  Indeed, it is the custom and practice in the securities business that lenders of securities routinely receive collateral as protection for the risks associated with the use of their securities.[81]

Thus, not only do the Complaints allege that Plaintiffs were deceived, they include factual allegations that establish that no rational customer, knowing that RCM was converting customers' securities to cash and using the proceeds for its own purposes, would have left its securities with RCM without being compensated for this risk.

---

[79]    Class Action Compl. ¶¶ 6, 13; Capital Management Compl. ¶¶ 5, 11; VR Compl. ¶¶ 6, 12.

[80]    *Id.*

[81]    *Id.  See also Nomura Sec. Int'l, Inc. v. E*Trade Sec., Inc.*, 280 F. Supp. 2d 184, 190 (S.D.N.Y. 2003) (standard agreements in the securities industry provide for a lender of securities to receive a pledge of collateral); *Sec. Investor Prot. Corp. v. Executive Sec. Corp.*, 423 F. Supp. 94, 95 (S.D.N.Y. 1976), *aff'd*, 556 F.2d 98 (2d Cir. 1977) (finding that it is common for a lender of securities to receive cash collateral in return).

5.     **RCM's Conduct was Deceptive Because Plaintiffs Were Told That Their Securities Would be Maintained Safely in their Accounts**

The Complaints' allegations of deception are further buttressed by specific oral misrepresentations that were made to representatives of the Plaintiffs. For example, the Class Action Complaint alleges that after opening accounts with RCM in July 2004 and May 2005, Serge Pushinsky, a Refco representative located in Chicago who handled the RCM accounts of Global Management, Arbat, and Russian Investors, misrepresented that RCM held as custodian the property entrusted to it by Plaintiffs.[82] Pushinsky deceptively failed to disclose that RCM was using customer securities in violation of the Customer Agreements between Plaintiffs and RCM.[83]

Similarly, the Capital Management Complaint alleges that in May 2004 a representative of Capital Management met with Refco representatives Stafford Bucknall and Executive Vice President Thomas Yorke in New York, and they failed to disclose that RCM used customer securities without authorization.[84] Email communications between Refco and RCM following the meeting confirm that RCM's representatives understood and discussed that Capital Management was seeking a "dependable" "custodian" for its securities.[85] The Capital Management Complaint also alleges that in meetings in Guatemala and Miami in October 1996, Refco representatives Rodrigo

---

[82]   Class Action Compl. ¶¶ 74-94.

[83]   *Id.*

[84]   Capital Management Compl. ¶¶ 64-75.

[85]   Capital Management Compl. ¶ 66. The THL Defendants seek to downplay this email based on the fact that it is not a communication directly to the Capital Management Plaintiffs. (THL Mem. at 22.) The THL Defendants would ignore, however, that the email memorializes that RCM was fully aware that representatives of Capital Management were seeking a "dependable" "custodian" for their securities. The email captures what was discussed at the meeting between representatives of Refco and RCM because it was a candid internal business record made by Refco Management immediately following Refco's meeting with the representative of Capital Management.

Alvarez, Victor Enriquez, Sixto Campano and Carlos Alvarez misrepresented to Plaintiffs

IDF and IDC that RCM would act as custodian for securities deposited with it.[86]

Likewise, the VR Complaint contains specific allegations concerning

misrepresentations relating to RCM's improper use of customers' assets.  Beginning in

September 2001, Refco representative Adam Weiss represented to VR's principal,

Richard Deitz, that Refco simply executed, cleared, and financed customer trades.[87]

Weiss also represented that Refco's business was "purely a matched-book," imposed

"conservative haircuts," and "did not conduct any proprietary trading."[88]  And in 2003,

Weiss successfully retained VR's full prime brokerage business by providing

supplemental guarantees from Refco Group Limited ("RGL").[89]  Dietz understood from

those statements that, consistent with the Customer Agreement, the account statements,

and standard business practices in the securities business, RCM was authorized to handle

VR's securities only as directed by VR.

In short, there is no merit to Defendants' argument (THL Mem. at 21) that

the oral representations alleged in the Complaints are too vague and general to plead a

fraud claim.[90]  *See Blue Planet Software, Inc. v. Games Int'l, LLC*, 334 F. Supp. 2d 425,

---

[86]    Capital Management Compl. ¶¶ 76-99.

[87]    VR Compl. ¶¶ 85, 92, 96.

[88]    VR Compl. ¶¶ 86-88.

[89]    VR Compl. ¶¶ 97-98.

[90]    Furthermore, the THL Defendants' argument (THL Mem. at 22-23) that Plaintiffs must view any oral representations in light of any written materials provided to them only *strengthens* Plaintiffs' arguments.  *See In re Hyperion Sec. Litig.*, No. 93 Civ. 7179 (MBM), 1995 WL 422480, at *8 (S.D.N.Y. July 14, 1995) *aff'd sub nom.* 98 F.3d 2 (2d Cir. 1996) (an investor should check an agent's oral representations against the written materials); *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1033 (2d Cir. 1993) (same).  Plaintiffs were all the more deceived by Defendants' oral misrepresentations and omissions because, as discussed *supra* Sections II.A.1-3,  the customer account documents received by Plaintiffs stated that customer securities would be purchased and sold only in accordance with their express instructions and would otherwise be held by RCM as custodian.

439 (S.D.N.Y. 2004) (whether a defendant made a misrepresentation is a question of fact).

> **6.     RCM's Conduct was Deceptive Because it Violated Federal Laws Prohibiting Unauthorized Use of Customers' Securities**

The Complaints further establish deception based on Plaintiffs' allegations that RCM's course of dealing was expressly precluded by federal law.  Plaintiffs' fully-paid securities belonged to Plaintiffs and federal law prevented RCM and the Defendants from using those securities for their own benefit.  Not only is Plaintiffs' interpretation of the Customer Agreement wrong as a matter of contract interpretation, it is prohibited by federal law.  Thus, even if the Court concludes that the Customer Agreement is ambiguous, it should be interpreted as prohibiting RCM from using the securities so as to avoid a contract interpretation that would render the agreement at odds with federal regulations.  *See N.L.R.B. v. Local 32B-32J Serv. Employees Int'l Union*, 353 F.3d 197, 202 (2d Cir. 2003) ("The law is well settled that 'ambiguously worded contracts should not be interpreted to render them illegal and unenforceable where the wording lends itself to a logically acceptable construction that renders them legal and enforceable.'").

RCM was required under federal law to comply with net capital and segregation rules that did not permit the unauthorized use of customers' securities.[91] Foremost among these requirements are Rule 15c3-1 (17 C.F.R. § 240.15c3-1), which requires broker-dealers to maintain sufficient capital to operate safely, and Rule 15c3-3 (17 C.F.R. § 240.15c3-3), which requires broker-dealers to protect and segregate certain

---

[91]    Class Action Compl. ¶¶ 24, 98, 136-41; Capital Management Compl. ¶¶ 21, 139-44; VR Compl. ¶¶ 22, 164-69.

customer funds and securities.  *See SEC v. Scott, Gorman Muns., Inc.*, 407 F. Supp. 1383, 1387 (S.D.N.Y. 1975) (noting that "[t]o use customers' fully paid for securities as the firm's collateral for loans without the customers' knowledge and authorization is a deceptive course of business."); *In re Donald T. Sheldon,* Exchange Act Release No. 31475, No. Admin. Proc. 3-6626, 1992 WL 353048, at *19 n.10 (Nov. 18, 1992) (it is a fraud, deceit, and violation of trade custom "for a broker-dealer to hypothecate or otherwise convert to his own use customers' funds or fully-paid for securities of customers held by the broker-dealer for safe-keeping."), *aff'd*, 45 F.3d 1515 (11th Cir. 1995).  RCM and Defendants deceived Plaintiffs by not disclosing that RCM was violating these U.S. broker-dealer rules and not properly protecting RCM customer assets.[92]  Defendants would have the Court ignore these violations of federal law based on their argument that RCM was representing itself to be unregulated.  (THL Mem. at 17.)  This argument fails for several reasons.

        <u>First</u>, each of the Complaints is clear that none of the Plaintiffs understood at any time that RCM was unregulated.[93]  These allegations must be accepted as true on this pleadings motion.  Moreover, the allegations are entirely reasonable given that RCM had years before shut down its offshore operations and had been dealing with Plaintiffs

---

[92]   Class Action Compl. ¶¶ 141, 151; Capital Management Compl. ¶¶ 144, 154; VR Compl. ¶¶ 169, 179.

[93]   Although RCM was based offshore, almost all of its operations were handled through its sister company, RSL, which was based in the U.S.  Class Action Compl. ¶¶ 142-46; Capital Management Compl. ¶¶ 145-49; VR Compl. ¶¶ 170-74.  RCM operations were generally conducted from Refco's offices in New York, New Jersey, and Miami, by employees who acted jointly for RCM and RSL.  Class Action Compl. ¶¶ 23, 70, 142-46; Capital Management Compl. ¶¶ 20, 60, 145-49; VR Compl. ¶¶ 21, 79, 170-74.  Plaintiffs were thus unaware whether they were dealing with RSL, a regulated entity, or with RCM, and thus reasonably believed that their securities were being properly safeguarded in accordance with applicable U.S. regulatory requirements.  Class Action Compl. ¶¶ 22, 75, 82, 89, 142-46; Capital Management Compl. ¶¶ 19, 145-49; VR Compl. ¶¶ 20, 170-74.  This belief was reinforced by the fact that none of the Plaintiffs was ever informed by a representative of Refco that RCM was not complying with Rule 15c3-3 and 15c3-1.

for some time from within the United States.[94]  Furthermore, the Customer Agreement is

expressly governed by New York law, a jurisdiction obviously subject to U.S. federal

regulations prohibiting a broker's unauthorized use of customers' securities.  Given these

circumstances, it is hardly surprising that none of the Plaintiffs would have expected that

RCM would somehow not be subject to federal regulation.[95]

RCM was in fact required to comply with the federal rules and regulations

as it was effectively operating out of the United States.  Under federal law, all broker-

dealers physically operating within the United States that effect, induce, or attempt to

induce any securities transactions, even if these activities are directed only to foreign

investors outside the United States, are required to comply with U.S. regulations.[96]  The

Complaints allege that RCM conducted its business from within the United States,

thereby triggering the requirements of compliance with U.S. law.  As Judge Drain found:

> "RCM itself conducted almost all of its business from the United States.  It
> employed United States management and employees and its business until
> it collapsed was to the benefit of the U.S. economy and the U.S. markets,
> and I don't see a basis, particularly in the absence of any such basis in the
> statute, for distinguishing such a business from intrastate brokers and
> excluding RCM's customers to the extent they're entitled to protection
> from the statute on that basis."

---

[94]  Class Action Compl. ¶¶ 44, 142, 147; Capital Management Compl. ¶¶ 39, 145, 150; VR Compl. ¶¶ 55, 170, 175.

[95]  Defendants refer to an allegation in the First Amended Class Action Complaint that Refco publicly described RCM as an offshore broker, and they suggest based on that allegation that the customers knew that RCM was not complying with U.S. regulatory requirements.  (THL Mem. at 17.)  But the fact that RCM was described as an offshore broker does not mean that customers recognized that RCM was not complying with U.S. rules and regulations.  In any event, allegations in the First Amended Complaint that have been amended in the Second Amended Complaint are not binding on the Plaintiffs.  *See Tho Dinh Tran v. Alphonse Hotel Corp.,* 281 F.3d 23, 32 (2d Cir. 2002) ("A statement in a withdrawn complaint that is superseded by an amended complaint without the statement is no longer a conclusive judicial admission.").

[96]  This includes the requirement of complying with Rule 15c3-1 (17 CFR 240.15c3-1), which requires broker-dealers to maintain sufficient capital to operate safely, and Rule 15c3-3 (17 CFR § 240.15c3-3), which requires broker-dealers to protect and segregate certain customer funds and securities.

(Judge Drain Order at 252.)[97]

Second, even if RCM had described itself as an unregulated broker-dealer, RCM still would have been subject to the federal law requirements regarding segregation of customer securities. The Securities and Exchange Commission (the "SEC") has made clear that the segregation requirements apply equally to unregulated and regulated broker-dealers. *In re Registration Requirements for Foreign Broker-Dealers*, Exchange Act Release No. 27017, No. 57-11-88, 1989 WL 1097092, at *31 n.22, (July 11, 1989) (stating "[m]any of the statutory and regulatory provisions cited below as applicable to registered broker-dealers actually are applicable by their terms to other unregistered broker-dealers. *E.g.*, …Rules 15c3-1, 15c3-3").

Finally, even if Plaintiffs had been advised that RCM was unregulated (which each Plaintiff affirmatively alleges was not the case), such advice would not insulate Defendants from liability. The Complaints plainly allege that customers were deceived about RCM's misuse of customer securities. Thus, whether Plaintiffs were told that RCM was regulated or unregulated, without specific disclosure about what RCM was doing with customer securities, Plaintiffs would not have known how their securities were being used by RCM and its affiliates.

In the absence of some express statement from RCM, RSL or the Defendants to Plaintiffs that RCM was violating federal law, Plaintiffs had every reason to believe that their securities were being held in safekeeping as federal law required.

---

[97] Refco's outside counsel expressed this same view in a draft memorandum, noting that "RCM would be deemed to be engaging in 'significant' conduct in the U.S. and could not properly claim to be exempt from the regulatory requirements of U.S. law." Class Action Compl. ¶ 147; Capital Management Compl. ¶ 150; VR Compl. ¶ 175.

And as discussed in Section VIII, the Defendants also violated federal law by failing to make the disclosures required by Rule 10b-16. Thus, the Complaints' allegations that RCM was acting in blatant violation of federal law provide further basis for Plaintiffs' allegations that they were deceived.

> **B.      Defendants' Arguments Based On An Analogy to a Bank is Flawed**

Relying on a comment in *Levitin v. PaineWebber, Inc.*, 159 F.3d 698 (2d Cir. 1998), Defendants argue that RCM's practice of selling customer securities without authorization is analogous to a bank's practice of using customer deposits to make money. (THL Mem. at 24.) Thus, according to Defendants, Plaintiffs should not have been surprised that their securities were being taken from their accounts on a daily basis because that is the way that a bank works. Defendants' arguments based on *Levitin* are without basis.

First, as *Levitin* notes, a bank often pays interest as an inducement to the customer to leave the funds in the bank. *Levitin*, 159 F.3d at 703. In contrast, here, Plaintiffs received no such compensation for the use of their securities.[98] In these circumstances, the only logical reason that Plaintiffs or other RCM customers would have left their securities at RCM without receiving any compensation is because they were deceived into believing that their securities were being held in custody.[99]

Second, it is perfectly legal, and expected, for banks to use customer deposits of cash to make money by making loans. In contrast, it is plainly illegal for a broker-dealer to use fully paid customer securities (or other assets held in custody) to

---

[98]   Class Action Compl. ¶¶ 6, 13 ; Capital Management Compl. ¶¶ 5, 11 ; VR Compl. ¶¶ 6, 12.

[99]   *Id.*

make money by loaning those securities.[100]  In depositing cash at a bank, the depositor

becomes a mere unsecured creditor of the bank.  By comparison, the securities that

Plaintiffs entrusted to RCM remained Plaintiffs' property,[101] and they continued to

exercise property rights in the securities they entrusted to RCM (for instance by voting

their securities).[102]

Third, the plaintiff in *Levitin* did not allege that the bank was placing her

assets at risk.  Her claim, instead, was that she was entitled to the interest generated on

her assets as they sat in the banks.  The Court properly rejected that argument, noting that

there is nothing "in industry practice that might cause [plaintiff] to expect a return of the

time value of her collateral."  *Id.* at 703.  Here, Plaintiffs allege that industry practice is

directly contrary to what RCM was doing.[103]  Plaintiffs' securities were not simply sitting

in their accounts earning interest; to the contrary, RCM was hypothecating and selling

those securities, often in risky transactions.[104]  The Plaintiffs are not alleging a deception

in the fact that RCM did not pay them interest; rather, the deception lies in the fact that

they were led to believe their securities were being held in custody when in fact they

were being placed at risk.

Finally, *Levitin* is inapposite because the customer agreement in that case

informed the customers that "interest will not be paid on the proceeds of short sales."  *Id.*

at 703 n.5.  Here, by contrast, the Customer Agreement was deceptive in leading

---

[100]  Class Action Compl. ¶¶ 24, 99, 137-51; Capital Management Compl. ¶¶ 21, 102, 140-54 ; VR Compl.
¶¶ 22, 108, 165-79.

[101]  VR Compl. ¶¶ 3-14, 106-10.

[102]  VR Compl. ¶ 103.

[103]  Class Action Compl. ¶ 99; Capital Management Compl. ¶ 102; VR Compl. ¶ 108.

[104]  Class Action Compl. ¶¶ 4-6; Capital Management Compl. ¶¶ 3-5 ; VR Compl. ¶¶ 4-6.

Plaintiffs to believe that their securities were being held in custody.  *See supra* Section

II.A.1.

III.    IN ADDITION TO PLEADING AFFIRMATIVE DECEPTION, THE
        COMPLAINTS ALLEGE A SECURITIES FRAUD CLAIM BASED
        ON RCM'S BREACH OF ITS FIDUCIARY DUTY TO ITS
        CUSTOMERS

        As demonstrated in Section II, the Complaints allege affirmative deception

sufficient to state a claim under the federal securities laws.  If the allegations of

affirmative deception are found to state a claim, the question of whether there was a

fiduciary relationship between Refco and its customers does not even need to be

considered.  *See In re Refco Capital Mkts.* No. 06 Civ. 643 (GEL), 2007 WL 2694469, at

*7 (S.D.N.Y. Sept. 13, 2007) ("A fiduciary duty is not a required element of a deceptive

conduct claim in cases where there is some conduct or representation that gives the

victim the relevant false impression.")  On the other hand, even in the absence of

allegations of affirmative deception, the Complaints should survive the motion to dismiss

because the Complaints plead the existence of a fiduciary relationship.  Where a fiduciary

relationship exists, a failure on the fiduciary's part to disclose a material fact, even

without an affirmative misrepresentation, gives rise to a Section 10(b) violation.  *See id.*

("Another kind of securities fraud claim is based on conduct that is deceptive because it

is inconsistent with a fiduciary duty.").

        The case law establishes that a broker owes a fiduciary duty to customers

with respect to securities that the customer entrusts to the broker in between transactions.

*See Conway v. Icahn & Co.*, 16 F.3d 504, 510 (2d Cir. 1994) (finding that in non-

discretionary accounts "[t]he relationship between a stockbroker and its customer is that

of principal and agent and is fiduciary in nature . . . A broker, as agent, has a duty to use

37

reasonable efforts to give its principal information relevant to the affairs that have been entrusted to it"); *Press v. Chem. Inv. Sec. Corp.*, 988 F. Supp. 375, 386 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 529, 536 (2d Cir. 1999) (finding that a fiduciary obligation arises between a broker and a customer in respect of matters relevant to affairs entrusted to the broker); *Sec. Investor Prot. Corp. v. Nappy (In re Nappy)*, 269 B.R. 277, 297-98 (Bankr. E.D.N.Y. 1999) (holding that even for non-discretionary accounts, "[t]he broker, once he has received his customer's funds, is a fiduciary with respect to those funds" and "[t]hat fiduciary duty is breached when the broker misappropriates those funds for his own personal benefit and the benefit of others."); *Gilman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 404 N.Y.S.2d 258, 262 (Sup. Ct. 1978) ("The broker, once he has received his customer's funds, is a fiduciary with respect to those funds.").

Those cases accord with general principles of law on fiduciary relationships, under which a fiduciary relationship is found to exist where one party reposes trust and confidence in another party. *See Henneberry v. Sumitomo Corp. of Am.*, No. 04 Civ. 2128 (PKL), 2007 WL 2068346, at *26 (S.D.N.Y. July 12, 2007) (describing a fiduciary relationship as one that is "founded upon trust or confidence reposed by one person in the integrity and fidelity of another ... in which influence has been acquired and abused, in which confidence has been reposed and betrayed.") (internal quotations omitted); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 195-96 (S.D.N.Y. 2006) (a fiduciary relationship is created where trust and confidence has been reposed and betrayed).

Here, the Complaints allege such a relationship in which Plaintiffs reposed their trust and confidence in RCM by leaving their securities with RCM in between

38

transactions.[105]  That trust was betrayed, and a fiduciary duty violated, when RCM

appropriated the property entrusted to it for its own use.  *See United States  v.*

*Chestman*, 947 F.2d 551, 569 (2d Cir. 1991) (holding that when a fiduciary is entrusted

with custody over property it "becomes duty-bound not to appropriate the property for his

own use"); *Facella v. Fed'n of Jewish Philanthropies, Inc.*, No. 98 Civ. 3146 (DAB),

2004 WL 1700616, at *6 (S.D.N.Y. July 30, 2004) (same).

Defendants' citation to *DE Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d

1293, 1304 (2d Cir. 2002) (THL Mem. at 33) only undermines their position.

*Kwiatkowski* states that a fiduciary duty is owed to nondiscretionary[106] accounts when the

broker engages in "unauthorized measures concerning the customer's account (*i.e.*, the

account became discretionary-in-fact because the broker effectively assumed control of

it)."  *Kwiatkowski*, 306 F.3d at 1306.  That is precisely the conduct in which RCM

engaged.  Thus, *Kwiatkowski* demonstrates that when RCM misappropriated its

customers' securities, RCM breached a fiduciary duty.

Furthermore, RCM had an affirmative obligation to inform its customers

of material facts relating to the securities entrusted to RCM by its customers, including

the sale of customer securities and up-streaming of the proceeds to Refco entities that did

not have the intent or financial wherewithal to repay those funds.[107]  *See Sequa Corp. v.*

*GBJ Corp.*, 156 F.3d 136, 145 (2d Cir. 1998) (finding a fiduciary has a duty to disclose

---

[105]  Class Action Compl. ¶¶ 9, 124-26; Capital Management Compl. ¶¶ 8, 120-22; VR Compl. ¶¶ 9, 153-54.

[106]  Although nondiscretionary accounts may not always give rise to a general fiduciary duty, where, as here, customer securities are entrusted to a broker for safekeeping, a fiduciary duty arises in relation to that entrustment.  This is the conclusion reached by *Nappy*, *Conway* and Judge Drain.

[107]  Class Action Compl. ¶ 125; Capital Management Compl. ¶ 121; VR Compl. ¶ 154.

"all material information concerning transactions for which [defendant] served as a broker"); *Bank of Am. Corp. v. Lemgruber*, No. 02 Civ. 1041 (DAB), 2007 WL 4510329, at *5 (S.D.N.Y. Dec. 20, 2007) (a "fiduciary duty includes duty to disclose all material information concerning transactions"); *Press*, 166 F.3d at 536 ("[A]ppellees had the "duty to use reasonable efforts to give … information relevant to the affairs that [had] been entrusted").

   In any event, the question of whether RCM owed a fiduciary duty to its customers is a fact-based inquiry not properly determined on a motion to dismiss:

> ➢ *See Abercrombie v. Andrew College*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006) (noting that "[t]he existence of a fiduciary duty normally depends on the facts of a particular relationship, therefore a claim alleging the existence of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6)");

> ➢ *World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*, 530 F. Supp. 2d 486, 504 (S.D.N.Y. 2007) (same);

> ➢ *Scott v. Dime Savings Bank of New York, FSB*, 886 F. Supp. 1073, 1078 (S.D.N.Y. 1995) ("The existence of a fiduciary relationship cannot be determined by recourse to rigid formulas;" rather, "New York courts typically focus on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first.") *aff'd*, 101 F.3d 107 (2d Cir. 1996);

> ➢ *Nisselson v. Ford Motor Co. (In re Monahan Ford Corp.)*, 340 B.R. 1, 41 (Bankr. E.D.N.Y. 2006) (finding that whether "fiduciary duties actually arose between the parties is a question of fact not properly addressed on [a motion to dismiss].").

   In the Bankruptcy Cases, after hearing extensive testimony about RCM's relationship with its customers, Judge Drain held that a fiduciary duty existed. Acknowledging the rule that as a general matter a broker does not owe fiduciary duties to a purchaser of securities, Judge Drain stated that "fiduciary duties may exist between a broker and customer when the broker has discretion over the customer's property or has been, again, given direction to act on a customer's behalf." Judge Drain Order at 248 (citing *Press v. Chem. Inv. Sec. Corp.*, 988 F. Supp. 375, 386 (S.D.N.Y. 1997), *aff'd*, 166

F.3d 529, 536 (2d Cir. 1999).  Judge Drain proceeded to find that "in the context" where a customer "entrusts its securities with the broker to effectuate a transaction," the "broker becomes a fiduciary."  *Id.* at 249 (citing *Press*).  Judge Drain then considered the factual record before him, including the Customer Agreements, the account statements, the testimony of key RCM employees, and the testimony of certain customers, in concluding that RCM's customers had so entrusted their securities to RCM, thereby triggering a fiduciary relationship.  *Id.*

Relying on *Press*, a case that Judge Drain considered in finding the existence of a fiduciary relationship, Defendants argue that no such fiduciary duty exists, without even so much as mentioning Judge Drain's ruling to the contrary (THL Mem. at 33.)  Defendants do nothing more than cite cases that stand for the proposition that a broker, in the context of a basic broker-client relationship, does not owe a general fiduciary duty to the purchaser of the security.  (*Id.* at 32-33.)  However, as Judge Drain held, even in the absence of a general fiduciary duty, fiduciary obligations nonetheless exist with respect to matters relevant to affairs entrusted to the broker.  Judge Drain Order at 248-49.

Defendants also cite *Levitin* and *Bissell v. Merrill Lynch & Co.,* 937 F. Supp. 237, 246 (S.D.N.Y. 1996), *aff'd* 157 F.3d 138 (2d Cir. 1998) for the proposition that the relationship between RCM and Plaintiffs was a creditor-debtor relationship, not a fiduciary one (THL Mem. at 32.)  As discussed above, Defendants' citation to *Levitin* is inapposite because the depositor-bank relationship is very different from the relationship of a securites broker and its customers with respect to, among other things, the manner in which customer securties are held.  And as noted in *Bissell*, a broker often occupies roles

41

as both a fiduciary and a creditor to a customer.  *Id.* at 247.  Defendants' argument

ignores that, although the relationship between a broker and a customer is not fiduciary in

every respect, fiduciary obligations do arise with respect to matters relevant to affairs

entrusted to the broker.  *See, e.g., Press*, 166 F.3d at 536; *Conway*, 16 F.3d at 510.

## IV.    PLAINTIFFS HAVE STANDING TO ASSERT THEIR CLAIMS

### A.    The Purchaser-Seller Rule Is No Bar to Plaintiffs' Claims Where, As Here, Their Securities Were Sold Without Their Authorization

Defendants argue that Plaintiffs do not have standing to assert their claims,

relying on *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 738 (1975), which set

forth the principle that Section 10(b) standing is restricted to a "purchaser or seller" of

securities. (GT Mem. at 8-10; THL Mem. at 49-52.)

Plaintiffs' argument ignores a long line of authority, including the Second

Circuit's decision in *Caiola v. Citibank, N.A.*, 295 F.3d 312 (2d Cir. 2002), holding that

where a broker purchases or sells a client's securities without authorization -- as Plaintiffs

allege that RCM did -- the customer has standing to bring a Section 10(b) claim to redress

that wrong.

In *Caiola*, an equity investor agreed to enter into "synthetic" transactions

with Citibank to hedge his risk and to avoid leaving a "footprint" on the market

indicating his trading strategies.  *Id*. at 315-16.  Without authorization, Citibank executed

physical trades that mirrored the investor's synthetic trades, exposing him to the very

risks the synthetic trades were designed to avoid.  *Id*. at 318-19.  The district court

dismissed the investor's Rule 10b-5 complaint on the ground that he was not himself a

purchaser or seller of the securities that Citibank was trading.  *Id*. at 320.  The Second

Circuit reversed the district court's decision, holding that the purchaser-seller rule does

not require that the customer voluntarily purchase or sell securities in reliance on a fraud.

Rather, as noted by the Second Circuit in *Caiola*, "it is well-settled that claims under

Rule 10b-5 arise when brokers purchase or sell securities on their clients' behalf without

specific authorization." *Id*. at 323.

Here, Plaintiffs allege that securities they entrusted to RCM were sold

without their authorization or knowledge as part of a fraudulent scheme. *Caiola* makes

express that such a scheme falls squarely within Rule 10b-5 and is one that Plaintiffs

have standing to pursue. Indeed, it would be an illogical result if an investor could assert

a Section 10(b) claim when it purchased or sold securities but could not assert a Section

10(b) claim when its securities were purchased or sold by its broker without

authorization.

Even prior to *Caiola*,[108] the Second Circuit recognized that Section 10(b)

is implicated where a broker makes improper use of a customer's securities. As the court

noted in *Caiola*, its ruling is consistent with the fact that "churning claims, which depend

on a broker's liability for excessive trading, also have been recognized under Rule 10b-

5." *Id*. at 324. *See Komanoff v. Mabon, Nugent & Co.*, 884 F. Supp. 848 (S.D.N.Y.

1995) (recognizing 10b-5 claim for churning); *Podgoretz v. Evans & Co.*, Nos. 86 CV

2681 (SJ), 86 CV 2996 (SJ), 1997 WL 138989, at *7 (E.D.N.Y. Mar. 25, 1997) ("As a

deceptive and manipulative device, churning is prohibited by Section 10(b) of the

---

[108]    In addition to satisfying the purchaser/seller standing requirement, Plaintiffs' claims also are consistent
with the policy considerations of *Blue Chip Stamps*. *See United Dep't Stores, Inc. v. Ernst & Whinney*,
713 F. Supp. 518, 522 (D.R.I. 1989) (noting that purchaser/seller requirement is to avoid "conjectural
and speculative recovery in which the number of shares involved will depend on the plaintiff's
subjective hypothesis") (citation omitted). There is nothing "conjectural" or "speculative" about
Plaintiffs' losses. Nor are Plaintiffs' claims based on "recollection" or "hypothetical testimony."
Rather, the claims are supportable by documentary proofs of the amount of securities that each
customer entrusted to RCM and that were stolen from its account.

Securities and Exchange Act of 1934").  *See also Jaksich v. Thomson McKinnon Sec., Inc.*, 582 F. Supp. 485, 492-95 (S.D.N.Y. 1984) (Section 10(b) violation adequately pleaded where defendant broker purchased and sold securities without customer's authorization); *Sec. Investor Prot. Corp. v. Vigman*, 803 F.2d 1513, 1519 (9th Cir. 1986) ("We hold that when a broker makes an unauthorized purchase or sale of securities with his customer's assets, that purchase or sale may be attributed to the customer for purposes of satisfying the *Birnbaum* rule.").[109]

Following the Second Circuit's holding in *Caiola*, in *Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618, 625 (S.D.N.Y. 2004), customers brought a Rule 10b-5 action against a broker-dealer who made unauthorized purchases on their behalf. The Court rejected defendant's argument that the customers did not have standing under Rule 10b-5, holding that "claims under Rule 10b-5 arise when brokers purchase or sell securities on their clients' behalf without specific authorization".  *Id*. at 638, quoting *Caiola*, 295 F.3d at 638.

After concluding that customers have standing to assert Section 10(b) actions against a broker who trades in their securities without authorization, *Fezzani* noted that "[t]his result is also dictated by the Supreme Court's decision in *SEC v. Zandford*," 384 F. Supp. 2d at 638.  In *Zandford*, a securities broker was alleged to have liquidated the securities in his client's brokerage account without the client's authorization, and then to have used the proceeds for his personal benefit.  *Id*. at 813.

---

[109]  The "*Birnbaum* rule" refers to *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952), where the Second Circuit held that Section 10(b) is "directed solely at that type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities." *Id*. at 464.  Grant Thornton and THL both cite *Birnbaum*, but that case is inapposite because Plaintiffs' claims fall within the unauthorized seller exception set forth in *Caiola*.

The defendant argued that the scheme was not "in connection with the purchase or sale of securities" because it involved the theft of money and not market manipulation or misrepresentations that inflated the price of particular securities. *Id*. at 817-18. The Supreme Court unanimously rejected that argument, holding that the scheme constituted fraud "in connection with" the purchase or sale of securities because the securities sale by the broker coincided with the overall scheme to defraud. *Id*. at 825. Explaining that Section 10(b) should be "construed not technically and restrictively, but flexibly to effectuate its remedial purposes," the Court noted that "the SEC has consistently adopted a broad reading of the phrase 'in connection with the purchase or sale of any security.'" *Id*. at 819. The Court agreed with the SEC's view that "a broker who accepts payment for securities that he never intends to deliver, or who sells customer securities with intent to misappropriate the proceeds, violates Section 10(b) and Rule 10b-5." *Id*.[110]

Here, as in *Zandford*, the fraudulent conduct involved a broker's liquidation of customer securities and theft of the proceeds. The Complaints allege that Plaintiffs were brokerage customers of RCM who trusted their securities to RCM for custody and safekeeping.[111] The Complaints further allege that those securities were sold without Plaintiffs' authorization and that the sale proceeds were converted for Refco's own use.[112] Under *Zandford*, RCM's unauthorized use of Plaintiffs' securities constituted fraud "in connection with" the purchase or sale of securities.

---

[110] In *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 71 (2006), the Supreme Court reiterated that the phrase "'in connection with the purchase or sale' of securities" was to be broadly construed. Citing *Zandford*, the Court stated that "it is enough that the fraud alleged 'coincide' with a securities transaction – whether by the plaintiff or someone else." *Id*. at 85.

[111] Class Action Compl. ¶ 159; Capital Management Compl. ¶ 162; VR Compl. ¶ 243.

[112] Class Action Compl. ¶ 5; Capital Management Compl. ¶ 4; VR Compl. ¶ 5.

Defendants argue that *Zandford* is distinguishable because the Court was interpreting the "in connection with" language of Section 10(b), not the purchaser or seller requirement (THL Mem. at 52.)  Thus, Defendants argue, whether or not the alleged fraud in the Complaints would support an SEC enforcement action, it does not permit a private action because the alleged sales of securities were done without the Plaintiffs' involvement.

As discussed above, *Caiola*, which was decided after *Zandford*, makes clear that Defendants' argument cannot be persuasive in the Second Circuit.  Moreover, Defendants' argument runs directly contrary to the position that the SEC took on this issue before the Supreme Court in the *Zandford* case.  At oral argument in *Zandford*, the SEC stated that "[i]n the situation where there's a sale by the broker of the customer's securities, the purchaser-seller requirement will be met" and "the customer could have brought a private action against the broker."  Oral Argument before the Supreme Court in *SEC v. Zandford*, No. 01-147, 2002 WL 485040, at *8-9 (U.S. Mar. 18, 2002).

Defendants' argument that the *Zandford*  analysis does not apply to private actions has been implicitly rejected by numerous courts.  *See Grippo v. Perazzo*, 357 F.3d 1218 (11th Cir. 2004) (private investor stated 10b-5 claim consistent with *Zandford* where he alleged theft of money that had been deposited in payment for securities); *Lincolnshire L.P. v. Essex*, LLC, 244 F. Supp. 2d 912 (N.D. Ill. 2002) (citing *Zandford* and concluding that private investor satisfactorily pleaded 10b-5 claim where he deposited funds with broker who misrepresented that those funds would be used to purchase shares in a future public offering that never occurred; allegations had sufficient nexus to a purchase of securities); *Schnorr v. Schubert*, No. CIV 05-303-M, 2005 WL

46

2019878 (W.D. Okla. Aug. 18, 2005) (citing *Zandford* and holding that private victim's

claim that funds deposited with broker for securities purchases were stolen falls within

Section 10(b)); *Alvarado v. Morgan Stanley Dean Witter, Inc.*, 448 F. Supp. 2d 333

(D.P.R. 2006) (under *Zandford* an investor could sue brokerage firm whose

representative sold plaintiff's securities and misappropriated the invested funds). Those

authorities are fully consistent with *Caiola* and the SEC's position at oral argument in

*Zandford*. There should be no different result in this case.

    **B.**    **Plaintiffs Have Standing As Their Injury Is Not Derivative Of**
             **RCM's Injury**

           Grant Thornton argues that the VR Plaintiffs lack standing because their

injury is derivative of RCM's own injury (GT Mem. at 10-13.) That argument is based

on a false characterization of the Complaints, which make clear that each of the Plaintiffs

suffered injuries in their own right. The securities that RCM took from the accounts of

the VR Plaintiffs and other customers belonged to the customers. When RCM used those

securities for various purposes and the securities could not be returned to the customers'

accounts, those customers plainly were injured.

           Each RCM customer will have suffered its own unique injury depending

on the amount of securities that it held on deposit with RCM. These are not claims that

are held by all RCM creditors; the injuries alleged in the Complaints are claims that are

uniquely held by RCM creditors who were securities customers. In contrast, many other

RCM creditors, including RCM foreign exchange customers, will not possess such

securities claims. Thus, this is not a case where all of RCM's creditors have suffered the

same injury as one another.  Accordingly, the Complaints' allegations are sufficient to establish that Plaintiffs have standing to bring these securities fraud claims.[113]

Whether or not RCM sustained its own injuries as a result of the Defendants' actions is irrelevant for purposes of determining whether Plaintiffs' claims may proceed.  The Refco Estates have claims against numerous fiduciaries and professional firms that owed and breached duties of care and loyalty to the Refco Estates.  Those claims will require proof of, among other things, injury suffered by the Estates that are plaintiffs in their actions.

Contrary to Grant Thornton's argument (GT Mem. at 10-13), there is no bar against RCM's customers pursuing claims for their injuries against Grant Thornton at the same time that RCM and other Refco Estates pursue claims for their own injuries against Grant Thornton.  Numerous cases establish that such claims may proceed in parallel.  *See Reliance Acceptance Group, Inc. v. Levin (In re Reliance Acceptance Group, Inc.)*, 235 B.R. 548, 555 (D. Del. 1999) (allowing shareholders to pursue securities claims against the same defendants and based on similar facts as the debtors' lawsuits, where shareholders pursued different claims, for breaches of different duties,

---

[113]  Grant Thornton refers to the decision of Judge Drain in *Kirschner v. Bencorp Casa de Bolsa (In re Refco, Inc.)*, Adv. Proc. No. 06-01745 (RDD, Judgment Ex. A at 129-30 (Bankr. S.D.N.Y. Dec 29, 2006)) (GT Mem. at 12) for the proposition that RCM did not hold customer securities on constructive trust.  But this proposition is irrelevant to the question of Plaintiffs' standing to bring these claims.  First, the Complaints clearly allege that Plaintiffs held *legal* not equitable title to the securities they entrusted to RCM.  At all times, the securities Plaintiffs entrusted to RCM remained Plaintiffs' property.  *E.g.,* VR Compl. ¶¶ 3-14, 106-10.  This was also Judge Drain's conclusion after reviewing the Customer Agreements in connection with the Bankruptcy Cases. VR Compl. ¶ 109.  These allegations render moot any consideration of what additional equitable rights Plaintiffs may have had in connection with the entrustment of their property to RCM.  Second, Judge Drain's decision in *Kirschner* did not consider the position of RCM's securities customers who entrusted securities to RCM under the Customer Agreements.  As Judge Drain stated "the creditors that I am referring to are the other general unsecured creditors of RCM, *not securities customers who provided identifiable securities or entrusted identifiable securities to RCM*" *Id.,* Judgment Ex. A at 129. (emphasis added).  Accordingly, the *Kirschner* decision is irrelevant to any question before this Court.

alleging different injuries); *Boles v. Turner (In re Enivid, Inc.)*, 364 B.R. 139, 157

(Bankr. D. Mass. 2007) (allowing shareholders' securities lawsuits to proceed where the

"claims of the Shareholder Plaintiffs are not derivative of the claims of creditors or the

former bankruptcy estates and do not belong to the Plan Trustees"); *Hayes v. Gross*, 982

F.2d 104, 108-109 (3d Cir. 1992) (no conflict between plaintiff's claims and those of

creditors and other stockholders where plaintiff sues officers and directors based on a

injury distinct from that of the corporation and stockholders generally).

## V.    THE COMPLAINTS ADEQUATELY PLEAD SCIENTER AS TO THE THL DEFENDANTS AND THE OFFICER DEFENDANTS

### A.    Applicable Legal Standards

To allege scienter under Section 10(b), a plaintiff must "state with

particularity facts giving rise to a strong inference that the defendant acted with the

required state of mind." 15 U.S.C. § 78u-4(b)(2).  In *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 127 S. Ct. 2499 (2007), the Supreme Court described the relevant scienter

inquiry on a motion to dismiss in the following terms: "[w]hen the allegations are

accepted as true and taken collectively, would a reasonable person deem the inference of

scienter at least as strong as any opposing inference?"  *Id*. at 2511.  The requisite

inference of scienter need not be "the most plausible of competing inferences," nor does

it need to be "irrefutable, *i.e.,* of the 'smoking-gun' genre" *Id*. at 2510 (internal citations

omitted).[114]  Under *Tellabs*, a complaint should not be dismissed at the pleadings stage if

equally strong inferences exist for and against scienter.[115]

_____

[114]  Nor should the allegations be considered in isolation; "[t]he inquiry [   ]is whether all of the facts
alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual
allegation, scrutinized in isolation, meets that standard." *Tellabs*, 127 S. Ct. at 2509; *see also In re*
*Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 333 (S.D.N.Y. 2001) (court must read the complaint
"in toto and most favorably to plaintiff" in determining whether it alleges facts giving rise to a strong

To establish scienter in the Second Circuit, "a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000).

Conscious misbehavior or recklessness may be inferred where the complaint sufficiently alleges that defendants: (1) "benefitted in a concrete and personal way from the purported fraud"; (2) "engaged in deliberately illegal behavior"; (3) "knew facts or had access to information suggesting that their public statements were not accurate"; or (4) "failed to check information they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000). "Recklessness" has been held to include conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care.'" *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir. 1978). "Such conduct, at a minimum, encompasses willful blindness."[116]

Scienter is an issue that rarely can be resolved on the pleadings. *See In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 344 (S.D.N.Y. 2004) ("scienter

---

inference of scienter); *In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187, 196, 208 (S.D.N.Y. 2006) (noting that at the motion to dismiss stage the court must accept as true all factual allegations in the complaint, and finding a strong inference of scienter based on "the totality of the facts').

[115]   *See, e.g.*, *In re Converium Holding AG Sec. Litig.*, 04 Civ. 7897 (DIC), 2007 WL 2684069, at 2 (S.D.N.Y. Sept. 14, 2007) (denying motion to dismiss because the inference of scienter raised by plaintiffs was "at least as compelling" as any opposing inference one could draw from the facts alleged); *In re Tower Auto. Sec. Litig.*, 05 Civ. 1926 (RWS), 2008 U.S. Dist. LEXIS 16056 (S.D.N.Y. Mar. 3, 2008) (denying motion to dismiss because "an inference of fraudulent intent at least as compelling as any opposing non-fraudulent inference" was established); *see also ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008) (noting that "where there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff"); *Mississippi Public Employees' Retir. Sys. v. Boston Scientific, Corp.*, No. 07-0794, 2008 WL 1735390 (1st Cir. April 16, 2008) (applying *Tellabs* and reversing district court's dismissal of complaint because "plaintiff's inferences are at least equally strong").

[116]   *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 415 (S.D.N.Y. 1998); *see also Benjamin v. Kim*, No. 95 Civ. 9597 (LMM), 1999 WL 249706, at *8 (S.D.N.Y. Apr. 28, 1999) (noting that the recklessness standard includes willful blindness).

remains an issue of fact to be decided at a later stage of the litigation").  As the Second

Circuit observed, courts have been "lenient in allowing scienter issues" to withstand even

summary judgment.  *Press*, 166 F.3d at 538.  In *Press*, the Second Circuit held that even

with "the barest" acceptable allegations of motive and opportunity, "we cannot take this

issue of fact from the finder of fact." *Id*.  To require more "would make virtually

impossible a plaintiff's ability to plead scienter in a financial transaction involving a

corporation, institution, bank or the like that did not involve specifically greedy

comments from an authorized corporate individual." *Id*.

**B.**    **The Complaints Adequately Allege the THL Defendants'**
         **Scienter**

As discussed above, in the Second Circuit, Plaintiffs may plead scienter

either by alleging facts to show "evidence of conscious misbehavior or recklessness" or

"motive and opportunity."  Although compliance with either of these tests is sufficient,

the Complaints satisfy both tests.

**1.**    **The Complaints Plead Strong Circumstantial Evidence**
         **of the THL Defendants' Conscious Misbehavior or**
         **Recklessness**

The Complaints contain detailed allegations establishing four things that,

in combination, create more than a strong inference that the THL Defendants were

conscious of, or reckless in not knowing about, the RCM Securities Fraud.

Notably, the THL Defendants never dispute in their moving papers that

they knew that RCM took its customers' fully paid securities from their accounts, sold

the securities, and used the proceeds for various purposes within the Refco entities.

Instead, the THL Defendants focus their defense on a claim that they were unaware that

RCM's practice of using customer securities in this manner was fraudulent.  *See e.g.*,

51

THL Mem. at 37 ("Plaintiffs have not alleged that the THL Defendants . . . knew that RCM could not sell, loan, hypothecate, or otherwise use customer securities"); *id*. at 39 ("the THL Defendants had no reason to conclude that RCM's use of customer securities was fraudulent"); *id*. ("the THL Defendants had no reason to believe that RCM's use of customer funds in this way was inappropriate".).

   The THL Defendants' argument -- that they did not know that customers were deceived as to the misuse of their securities -- does not withstand scrutiny.  The Complaints contain detailed allegations, which are accepted as true on this motion, establishing each of the following:

   1. The THL Defendants had extensive involvement in, and responsibility for, Refco's operations, which gave them unfettered access to relevant information about Refco's business practices;

   2. The transactions underlying the RCM Securities Fraud were so significant in magnitude and scope, so regular, and so material to Refco's operations and ability to survive financially, that the THL Defendants must have become familiar, or been reckless in not becoming familiar, with the facts and circumstances relating to those transactions;

   3. The THL Defendants had seen numerous red flags relating to Refco's management and business operations that gave them reason to question all aspects of Refco's business operations, including the legality of RCM's business practices; and

   4. The THL Defendants had every reason to know that RCM's customers were being deceived and were unaware of the RCM Securities Fraud, which

was contrary to RCM's Customer Agreements, its presentation of the customer relationship in account statements, federal law, and inconsistent with industry standards.

### a. The THL Defendants' Involvement in and Control over Refco's Internal Operations Gives Rise to a Strong Inference of Scienter

The Complaints establish that the THL Defendants were firmly in control of Refco, which provided them with access to all material information regarding the fraud.[117] The THL Defendants had multiple representatives on Refco's Board, including representatives who served on key board committees and held key executive positions within relevant Refco companies.[118] Following the LBO, the THL Entities became Refco's majority owners; they assumed direct oversight, management and control of Refco, and had unfettered access to all information regarding Refco's internal functioning.[119]

The Complaints also establish that the THL Defendants had the ability to control Refco's operations. The Offering Memorandum for Refco's Bonds issued concurrently with the LBO represented that, upon consummation of the LBO, the THL Defendants would "have the ability to control all aspects of [Refco's] business."[120] Similarly, Refco's IPO Prospectus, filed with the SEC on August 10, 2005, disclosed to potential investors that upon completion of the offering, the THL Defendants and Bennett would control Refco.[121] The THL Defendants stated in several SEC filings that,

---

[117]   Class Action Compl. ¶¶ 17, 231-35; Capital Management Compl. ¶¶ 15, 224-28; VR Compl. ¶¶ 16, 328-33.

[118]   Class Action Compl. ¶ 308; Capital Management Compl. ¶ 304; VR Compl. ¶ 411.

[119]   Class Action Compl. ¶ 236; Capital Management Compl. ¶ 229; VR Compl. ¶ 334.

[120]   Class Action Compl. ¶ 341; Capital Management Compl. ¶ 331; VR Compl. ¶ 517.

[121]   *Id.*

following the LBO, they became familiar with, and had the ability to control, "all aspects of the financial affairs of Refco and its subsidiaries."[122]  Furthermore, "[a]s a direct result of their seniority within Refco, each of [Lee, Harkins, Jaeckel and Schoen] individually and as a group had the power and opportunity to control or influence each of the specific actions of the various Refco entities that constituted the fraudulent schemes alleged herein."[123]  For example, during the period they controlled Refco, all incentive compensation arrangements (including those that provided incentive for the unauthorized use of RCM customer assets), all business acquisitions (including the purchase of Cargill and the loan to Suffolk with the proceeds of misappropriated RCM customer assets), and all annual budgeting (including the amount of misappropriated RCM customer assets that each subsidiary was entitled to spend) were subject to the express consent of the THL Defendants.[124]

Pursuant to a Management Agreement, dated August 5, 2004, between Refco and various of the THL Defendants, defendant THL Managers V was specifically obligated to know and understand the Refco business in order to provide it with advice.[125] The Management Agreement "obligated and authorized" defendants Lee, Harkins, Jaeckel and Schoen to become "individually involved in the day-to-day affairs of Refco and its subsidiaries, including RCM."[126]  The Management Agreement also stated that THL Managers V was retained to advise Refco "in connection with the negotiation and

---

[122]  Class Action Compl. ¶¶ 62, 341; Capital Management Compl. ¶¶ 59, 331; VR Compl. ¶¶ 77, 517.

[123]  Class Action Compl. ¶ 358; Capital Management Compl. ¶ 347; VR Compl. ¶ 533.

[124]  Class Action Compl. ¶ 363; Capital Management Compl. ¶ 352; VR Compl. ¶ 538.

[125]  Class Action Compl. ¶ 351; Capital Management Compl. ¶ 340; VR Compl. ¶ 526.

[126]  Class Action Compl. ¶ 353; Capital Management Compl. ¶ 342; VR Compl. ¶ 528.

consummation of agreements, contracts, documents and instruments related to [Refco's]

or any of its subsidiaries finances or relationships with banks or other financial

institutions," and "with respect to the development and implementation of strategies for

improving the operating, marketing and financial performance of [Refco] and other

senior management matters related to the business, administration and policies of [Refco]

and its subsidiaries."[127]

   The Complaints also allege that, in their various roles, the THL

Defendants received "regular reports . . . showing the amount of customer assets that

could be fraudulently converted and used to sustain Refco's business operations and

acquisitions."[128]  Given the widespread fraud at RCM, these allegations on their own

establish scienter.  Numerous cases have found scienter adequately pleaded where

defendants received or had access to reports that could have disclosed the fraud.  *See,*

*e.g.*, *Hollin v. Scholastic Corp. (In re Scholastic Corp. Sec. Litig.)*, 252 F.3d 63, 73 (2d

Cir. 2001) (plaintiffs pleaded scienter by alleging that officers received internal company

reports analyzing and commenting on sales data); *Fraternity Fund Ltd. v. Beacon Hill*

*Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 404 (S.D.N.Y. 2005) (scienter adequately

pleaded against a chief financial officer alleged to have had access to the pricing sheets at

issue and have had ample opportunity to become familiar with the employees who

performed the pricing analyses).[129]

---

[127] Class Action Compl. ¶ 352; Capital Management Compl. ¶ 341; VR Compl. ¶ 527.

[128] Class Action Compl. ¶¶ 164-65; Capital Management Compl. ¶¶ 166-67; VR Compl. ¶¶ 248-49.

[129] *See also In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 631-32 (S.D.N.Y. 2003)
(scienter pleading sufficient where plaintiffs identified budgets received by defendants with the
relevant information); *In re Revlon, Inc. Sec. Litig*., No. 99 Civ. 10192 (SHS), 2001 WL 293820, at *7
(S.D.N.Y. Mar. 27, 2001) (inference of fraudulent intent where complaint alleged weekly reports to
defendants detailing deteriorating inventory situation).

Likewise, other cases have found scienter adequately pleaded based on allegations that defendants were involved, as the THL Defendants were here, in the day-to-day operations of a business entity engaged in fraud. *See In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 233 (S.D.N.Y. 2006) (scienter properly "may be imputed to the company's officers and directors who are involved in the day-to-day operations of the company." ); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 497 (S.D.N.Y. 2004) (reasonable to impute knowledge to a signatory of SEC filings who is directly involved in the day-to-day operations of the company); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 416 (S.D.N.Y. 2003) (Ebbers' "hands-on management style," among other things, "create a strong inference that Ebbers knew that his [positive] public statements…were not just reckless, but false").

Here, the Complaints' allegations establish that the THL Defendants were able, and required to, inform themselves of all elements of the deceptive and fraudulent conversion of RCM customer securities. On their own, these allegations create a strong inference of the THL Defendants' conscious misbehavior.[130]

### b.    The Magnitude, Scope, and Financial Significance of the Scheme Give Rise to the Requisite Strong Inference

The inference of scienter in this case is particularly strong because of the Complaints' allegations regarding the magnitude, scope and financial significance of the scheme to Refco. As the Complaints allege, "[t]he fraudulent scheme was so

---

[130]   *In re Sotheby's* and the additional cases cited by the THL Defendants (THL Mem. at 42) are inapposite because, in contrast to those cases, here the Complaints' detailed allegations regarding the control and management responsibility of the THL Defendants go far beyond "boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions." *In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041 (DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000).

fundamental to the operation and financing of Refco and its ability to proceed with a number of major corporate transactions during the Class Period that it required the participation of, and had to have been apparent to, all of the Defendants."[131]  The Complaints allege that the unauthorized sale of customer securities and transfer of the proceeds to other Refco entities "was accepted as a regular business practice within Refco" and was "approved and executed by senior management of Refco, and was known to the THL Defendants and each of the Officer Defendants or, at a minimum, was recklessly disregarded by them."[132]

Thomas Yorke, one of the executives responsible for moving customers' securities out of RCM accounts on a daily basis, has testified that employees involved in the transfer of capital made no effort to hide the practice within Refco.  To the contrary, the practice was discussed openly among relevant members of Refco management.[133]

The proceeds of securities improperly taken from customer accounts were used for a wide variety of funding purposes within Refco, all such purposes unrelated to RCM.[134]  The diversion of RCM customer assets was so critical to Refco's operations that management implemented a bonus incentive compensation structure designed to encourage the diversion of those assets.[135]  This compensation structure was overseen and

---

[131]  Class Action Compl. ¶ 16; Capital Management Compl. ¶ 14; VR Compl. ¶ 15.

[132]  Class Action Compl. ¶ 119; Capital Management Compl. ¶ 115; VR Compl. ¶ 124.

[133]  *Id.*

[134]  Class Action Compl. ¶ 107; Capital Management Compl. ¶ 110; VR Compl. ¶ 119.

[135]  Class Action Compl. ¶ 166; Capital Management Compl. ¶ 168; VR Compl. ¶ 250.

approved by Refco senior management, including the THL Defendants who had a

representative, defendant Scott Schoen, on the compensation committee.[136]

The scheme involved transfers of up to "hundreds of millions of dollars

each day," such that "the amounts stolen in RCM customer assets substantially outsized

Refco's total capital."[137]   As alleged in the Information the Government filed against

Maggio, "Bennett, Maggio, and others caused Refco systematically to fail to meet

settlement on its customer transactions, often on a daily basis, on amounts that exceeded,

at times, approximately $100 million a day."[138]   When Refco filed for bankruptcy, the net

uncollectible transfers exceeded $2 billion, while RGL claimed, respectively, at each

fiscal year end, only $515 million in capital in 2002, $566 million in 2003, $616 million

in 2004, and only $153 million in 2005.[139]   Although the scheme was conceived prior to

the LBO, following the LBO "during the period in which the THL Defendants controlled

and directed Refco and its affairs, the fraudulent scheme was not only allowed to

continue, but it substantially increased in size."[140]

The fact that the fraudulent scheme involved a core component of Refco's

business supports a strong inference that the THL Defendants, who were directors,

managers and controlling shareholders of Refco, knew or were reckless in not knowing

about the fraud.  Where matters are so important that they go to the very "core" of a

---

[136]  Class Action Compl. ¶ 167; Capital Management Compl. ¶ 169; VR Compl. ¶ 251.

[137]  Class Action Compl. ¶ 162; Capital Management Compl. ¶ 165; VR Compl. ¶ 247.

[138]  Class Action Compl. ¶ 163.  *See also* Information filed by the United States Attorney against Santo C. Maggio, dated December 19, 2007, pp. 8-9, attached as Exhibit A to the Declaration of Sander Bak, Esq., in Support of Plaintiffs' Opposition to Motions to Dismiss (the "Bak Decl.").

[139]  Class Action Compl. ¶ 162; Capital Management Compl. ¶ 165; VR Compl. ¶ 247.

[140]  Class Action Compl. ¶ 19; Capital Management Compl. ¶ 16; VR Compl. ¶ 17.

company's business, it is particularly appropriate to infer that the company's top officers, directors, and large shareholders were or should have been aware of them. *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (directors are imputed with knowledge of the removal of a "potentially significant source of income for the company"); *No. 84 Employer-Teamster Joint Council Pension Trust Fund*, 320 F.3d 920, 943 (9th Cir. 2003) (company's largest corporate investor deemed to have knowledge of company's maintenance problems and communications with the government because their officers "served as members of America West's Board of Directors").[141]

Likewise, the "sheer magnitude" of the scheme creates a strong inference that the THL Defendants knew, or were reckless in not knowing about the scheme. *See In re Philip Servs. Corp.*, 383 F. Supp. 2d 463, 475 (S.D.N.Y. 2004) ("The enormity of the fraud attributed to Philip makes this finding [of scienter] particularly appropriate."); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 347 (S.D.N.Y. 2004) ("the scope of the fraud alleged may appropriately be considered in determining whether scienter has been adequately pled."); *In re Livent, Inc. Sec. Litig.*, 148 F. Supp. 2d 331,

---

[141] *See also In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (officers of a company can be assumed to know of facts "critical to a business's core operations or to an important transaction that would affect a company's performance.") (quotations omitted); *Lindelow v. Hill*, No. 00 C 3727, 2001 WL 830956, at *8 (N.D. Ill. July 20, 2001) (where misrepresentations "concern matters fundamental" to the company, there is a strong inference that "every officer or director" knew of falsity or acted with reckless disregard); *In re Cell Pathways Sec. Litig.*, No. 99-752, 2000 WL 805221, at *7 (E.D. Pa. June 20, 2000) ("[W]here the alleged fraud relates to the core business of the company, knowledge of the fraud may be imputed to the individual defendants."); *Adams v. Amplidyne, Inc.*, No. Civ. A. 99-4468 (MLC), 2000 WL 34603180, at *7 (D.N.J. Oct. 24, 2000) (strong inference that officers and directors have knowledge of "core business" matters); *Epstein v. Itron, Inc.*, 993 F. Supp. 1314, 1326 (E.D. Wash. 1998) ("[F]acts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers."); *In re Tel-Save Sec. Litig.*, No. 98-CV-3145, 1999 WL 999427, at *5 (E.D. Pa. Oct. 19, 1999) ("Knowledge concerning a company's key businesses or transactions may be attributable to the company, its officers and directors.").

367 (S.D.N.Y. 2001) ("[T]he magnitude of the alleged fraud is properly considered in weighing whether a complaint meets the pleading standard for scienter.").[142]

**c.    The THL Defendants' Pattern of Ignoring Red Flags Constitutes Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness**

Making the inference of scienter even stronger is the fact that the THL Defendants had ample reason to be concerned about the legalities of Refco's business practices.  The Complaints identify numerous "red flags" that alerted the THL Defendants -- even before they made their investment -- that Refco was not being run as it should have been.[143]  The THL Defendants knew that Refco had a long history of regulatory violations, including playing "fast and loose [with] compliance issues".[144]  The THL Defendants knew that their due diligence professionals had been stonewalled by Refco's executives who refused to answer many of their questions.[145]

The THL Defendants knew that Refco's outside auditor, Grant Thornton, was inadequate for a company of Refco's size, and that Refco had taken merely "stop gap measures" to deal with the auditing shortcoming.  Internal THL correspondence evidences that the THL Defendants chose to retain Grant Thornton as Refco's outside auditor because of their concern that replacing Grant Thornton would require a

---

[142]  *See also In re Leslie Fay Cos. Sec. Litig.*, 871 F. Supp. 686 (S.D.N.Y. 1995) (defendants purported failure to discover inventory fraud of over $50 million indicates, at a minimum, a degree of recklessness from which intent may be inferred).

[143]  Class Action Compl. ¶¶ 190-88; Capital Management Compl. ¶¶ 190-84; VR Compl. ¶¶ 277-89.

[144]  Class Action Compl. ¶¶ 190-98; Capital Management Compl. ¶¶ 190-98; VR Compl. ¶¶ 277-85.

[145]  Class Action Compl. ¶¶ 190-205.; Capital Management Compl. ¶¶ 190-206; VR Compl. ¶¶ 277-93.

restatement of Refco's financial statements and delay the IPO that the THL Defendants so fervently desired.[146]

Even prior to the LBO, the THL Defendants also heard about shady practices at Refco from a senior banker at a major investment firm, including allegations from an inside source referred to as "Deep Throat" that Refco was "sloughing off trading losses into a Refco subsidiary" in the 1990s.[147]  KPMG compiled for the THL Defendants a list of diligence items to investigate the report, but the THL Defendants recklessly failed to follow up on KPMG's recommendations even when they took control of Refco and had responsibility for its affairs.[148]

Following the LBO, the THL Defendants learned that Refco's management had been dishonest.  In March 2005, the THL Defendants learned that Refco executives had lied to them about the existence of a letter to Refco's management from Refco's outside auditors, Grant Thornton (the "Management Letter"), that discussed significant internal accounting deficiencies at Refco.[149]  The Management Letter had been prepared by Grant Thornton but it was not provided to THL.[150]  It listed nine broad and important "Internal Control Deficiencies" at Refco, which put the THL Defendants on further notice of significant financial irregularities within Refco.[151]  Of  critical importance in light of the fraudulent conversion of RCM customer securities is Grant Thornton's comment in the Management Letter regarding a "Refco Capital Markets Ltd.

---

[146]   Class Action Compl. ¶¶ 255-56; Capital Management Compl. ¶¶ 251-52; VR Compl. ¶¶ 356-57.

[147]   Class Action Compl. ¶ 206; VR Compl. ¶ 302.

[148]   Class Action Compl. ¶ 207; VR Compl. ¶ 303.

[149]   Class Action Compl. ¶ 240; Capital Management Compl. ¶ 233; VR Compl. ¶ 338.

[150]   *Id.*

[151]   Class Action Compl. ¶ 245-46; Capital Management Compl. ¶ 238-39; VR Compl. ¶ 343-44.

Custody Reconciliations" deficiency which read: "The Company could not produce any custody reconciliations at or around year end for EQ."[152]  To the extent the THL Defendants asked for RCM's custody reconciliations  -- which were essential to understanding how Refco functioned -- they would have seen that Refco's business model, as directed by the Officer Defendants, was rooted in fraud and unsustainable.[153]  To the extent that the THL Defendants did not ask for them, either they already knew about the fraudulent misappropriation of RCM customer securities or they recklessly disregard those practices.[154]

The THL Defendants also learned that Refco executives had lied to them regarding an important and lucrative compensation scheme.[155]  Faced with blatant evidence that certain of the Officer Defendants engaged in fraudulent conduct by failing to disclose the existence of profit participation arrangements, the THL Defendants chose to ignore the issue.

In sum, this is not a case where the THL Defendants can credibly assert that they had no reason to know that RCM might be deceiving its customers.  Rather, there were ample "red flags" and hard evidence that Refco was routinely cutting corners and that key members of Refco's management were perfectly willing to lie and deceive when it suited their purposes.  Those allegations provide a further basis for the THL Defendants' scienter in this action.

---

[152]  *Id.*

[153]  Class Action Compl. ¶ 247; Capital Management Compl. ¶ 240; VR Compl. ¶ 345.

[154]  *Id.*

[155]  Class Action Compl. ¶¶ 260-68; Capital Management Compl. ¶¶ 256-64; VR Compl. ¶¶ 361-69.

       **d.**      **The Complaints Establish A Strong Inference**
                   **that the THL Defendants Were Aware of the**
                   **Fraudulent Nature of the RCM Securities Fraud**

As discussed above, the THL Defendants nowhere dispute in their motion to dismiss that they were aware that RCM was using fully paid customer securities to fund its operations.  Rather, they ground their defense on the argument that the Complaints fail to allege that the THL Defendants knew that RCM's customers were being deceived.  The THL Defendants' argument on this point rises and falls almost entirely on their faulty interpretation of the Customer Agreements.  As discussed above at Section II.A.1., the Customer Agreements did not permit RCM to use customer securities for RCM's own purposes.

Thus, just by reviewing the Customer Agreements and familiarizing themselves with industry practice and federal law, the THL Defendants must have become aware that RCM was defrauding its customers.  At a bare minimum, whether the language of the Customer Agreements should have alerted the THL Defendants to the fact that RCM's use of customers' securities was unauthorized is a question of fact that cannot be resolved at this stage of the litigation.  *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996) ("Whether or not a given intent existed, is, of course, a question of fact.").

The THL Defendants' scienter argument would require the Court to accept that they were unaware that RCM was required under federal law to comply with net capital and segregation rules that did not permit the unauthorized use of customers' securities.

Moreover, acceptance of the THL Defendants' argument on scienter would imply that the THL Defendants believed that RCM's customers were knowingly

entrusting fully paid securities to RCM, and exposing those securities to risk, when the

customers received absolutely no benefit for doing so.  The THL Defendants' argument

makes no sense.  Had RCM customers been informed of what RCM was doing, those

customers could easily have entrusted those securities to other financial institutions that

segregated customer securities without exposing them to any risk.  In short, the Court

would have to adopt several illogical inferences to accept the THL Defendants' claim that

they believed RCM's practice of using its customers' securities was not deceptive.

Surely, at a minimum, the THL Defendants were reckless to the extent that they formed

that view.  For that reason, the Complaints adequately allege THL Defendants' scienter

because "[w]hen the allegations are accepted as true and taken collectively [] a

reasonable person [would] deem the inference of scienter at least as strong as any

opposing inference".  *Tellabs*, 127 S. Ct. at 2511.

> **e.    The Defendants' Fact Based Arguments Against
> a Finding of Scienter Provide No Basis For
> Dismissal of the Complaints**

The THL Defendants place great emphasis on the allegation that following

the LBO they hired a new CFO, controller and Tax Director; and they argue that these

hires evidence the THL Defendants' unawareness of the fraud at Refco (THL Mem. at

45-46.)  Plaintiffs respectfully submit that the THL Defendants' reliance on these new

hires (which were the minimum required to get them their coveted IPO payday) will

ultimately be seen as a bad jury argument, and one that cannot come close to providing a

basis for dismissal of this action at the pleadings stage.  In making their argument, the

THL Defendants have to ignore the numerous allegations in the Complaints that evidence

their failure to follow up on rampant problems at Refco, including their failures:

- to follow up after receiving a warning from "Deep Throat"(Class Action Compl. ¶¶ 206-07; VR Compl. ¶ 302-03);

- to press the issue after Bennett refused their request for a due diligence meeting with Ernst & Young (Class Action Compl. ¶ 209; VR Compl. ¶ 305);

- to replace Grant Thornton even after they acknowledged that Grant Thornton was doing an inadequate job (Class Action Compl. ¶ 237; CM Compl. ¶ 230; VR Compl. ¶ 335); and

- to insist on RCM's custody reconciliations even after learning in the course of reading a Grant Thornton Management Letter that such reconciliations were not being made available (Class Action Compl. ¶ 247; CM Compl. ¶ 240; VR Compl. ¶ 345).

Defendants' cherry picking of allegations from the Complaints to test the inference of scienter is not appropriate on this motion. *See In re Refco Inc. Sec. Litig.*, 503 F. Supp. 2d at 658 ("the red flags must be viewed in the aggregate; defendants cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder") (internal citation omitted); *In re 36 WorldCom Sec. Litig.*, 294 F. Supp. 2d 392, 417 (S.D.N.Y. 2003) ("The allegations in the [c]omplaint are entitled to be taken together to determine if the facts 'give rise to a strong inference of fraudulent intent.'").

### 2.    The Complaints Adequately Allege the THL Defendants had Motive and Opportunity to Commit Fraud

The Complaints contain additional allegations to establish scienter based on "motive and opportunity". In the Stockholder Class Action, this Court held that motive as to the THL Defendants was sufficiently pleaded, given that "the THL Defendants, like the officer defendants … were shareholders of record before the IPO, and therefore stood to profit personally and directly from any oversubscription of shares pursuant to the so-called 'green shoe' option." *In re Refco Inc. Sec. Litig.*, 503 F. Supp. 2d at 663.

That logic applies equally to the THL Defendants in these actions. The Complaints allege that the THL Defendants received more than $45 million in the form of a greenshoe dividend.  This allegation is sufficient to allege the THL Defendants' motive.[156]

The THL Defendants argue incorrectly that Plaintiffs "have not demonstrated how ignoring RCM's allegedly fraudulent use of customer securities would enable the THL Defendants to profit from the IPO of RCM's corporate parent."  (THL Mem. at 46.)  But the Complaints allege a direct connection between the THL Defendants' fraud and the IPO because the THL Defendants knew that truthful disclosure of RCM's practices would have made a successful IPO impossible and left the THL Defendants unable to unload over  $220 million of their investment.[157]  The Complaints allege that the IPO would not have been possible without the fraudulent scheme because without the misappropriated RCM customer assets Refco would not have been able to project the necessary appearance of financial health and prosperity.[158]

The THL Defendants also argue that the Complaints do not adequately plead motive because they allege a mere "nonspecific interest in a successful IPO."  THL Mem. at 47, citing *Geiger v. Solomon-Page Group, Ltd.*, 933 F. Supp. 1180, 1189 (S.D.N.Y. 1996).  The Complaints, however, do not allege a mere "nonspecific interest" but rather that the THL Defendants were motivated to achieve a benefit for themselves in a "concrete and personal way," *Novak*, 216 F.3d at 307; specifically, to profit by selling

---

[156]  Class Action Compl. ¶¶ 321-27; Capital Management Compl. ¶¶ 316-22; VR Compl. ¶¶ 497- 503.

[157]  Class Action Compl. ¶ 14; Capital Management Compl. ¶ 12; VR Compl. ¶ 13; *see also* Class Action Compl. ¶ 312; Capital Management Compl. ¶ 308; VR Compl. ¶ 489

[158]  Class Action Compl. ¶ 14; Capital Management Compl. ¶ 12; VR Compl. ¶ 13; *see also* Class Action Compl. ¶ 312; Capital Management Compl. ¶ 308; VR Compl. ¶ 489

their own inflated shares to the public as selling shareholders in Refco's IPO.[159]  The law

is clear that motive is properly alleged where a defendant "'misrepresented . . . material

facts . . . in order to keep the stock price artificially high while they sold their own shares

at a profit.'"  *Fogarazzo v. Lehman Bros., Inc*., 341 F. Supp. 2d 274, 296 (S.D.N.Y.

2004) (quoting *Novak*, 216 F.3d at 308); *Funke v. Life Fin. Corp*., 237 F. Supp. 2d 458,

467 (S.D.N.Y. 2002) ("allegations that defendants wanted the corporation to appear

profitable or sought to keep stock prices high to increase officer compensation are

insufficient, whereas an allegation that the defendants sought to inflate the market price

while they sold their own shares would suffice.") (internal citations omitted).

       The Complaints go further with respect to motive and opportunity.  At the

time of the IPO, the THL Defendants were seeking to raise approximately $7.5 billion in

new money from institutional investors.[160]  The THL Defendants wanted to "leverage"

the publicity provided by a high-profile IPO of Refco by touting the quick profits they

and their affiliates had realized through their involvement with Refco.  Thus, by failing to

address the RCM Securities Fraud, the THL Defendants increased their ability to raise the

capital to form a new fund in the hyper-competitive leveraged buyout community, from

which they stood to make huge fees and profits.[161]

       There is no merit to the THL Defendants' claim that the inference of

scienter is refuted by the fact that they maintained a large stake in Refco even following

---

[159]  Class Action Compl. ¶ 319; Capital Management Compl. ¶ 314; VR Compl. ¶ 495 (alleging that the
THL Defendants (not including their passive affiliates) collectively sold 7.72 million shares in the IPO,
receiving cash proceeds of approximately $170 million).

[160]  Class Action Compl. ¶ 27; Capital Management Compl. ¶ 24; VR Compl. ¶ 25.

[161]  Class Action Compl. ¶¶ 26-27 ; Capital Management Compl. ¶¶ 23-24 ; VR Compl. ¶¶ 24-25.

the IPO.[162]  This Court rejected a nearly identical argument in *In re Refco Inc. Sec. Litig.*,

where several defendants argued that their purchase of stock in the IPO was inconsistent

with the motive to commit fraud because "one does not buy seats on a sinking ship".  503

F. Supp. 2d at 647.  As this Court explained:

> "[T]he facts alleged in the complaint do not make clear that the defendants
> knew the ship was sinking.  The defendants might have believed that the
> uncollectible receivables held by RGHI could be hidden indefinitely or at
> some point permanently disposed of . . .  and that Refco's stock would
> accordingly continue to rise."

*Id*.  The same is true here.  The THL Defendants may have been gambling that the RCM

Securities Fraud could be hidden indefinitely and that Refco's stock would therefore

continue to rise.  The THL Defendants' argument on this point rings particularly hollow

in light of the fact that they opted not to replace auditors because they feared that to do so

would result in the need to do a restatement of Refco's financial statements.  And, as the

Court previously held, although Defendants are free to argue that their actions were

inconsistent with an intent to commit fraud, "this is, after all, a motion to dismiss, and

arguments such as these are inappropriate at this stage."  *Id*.[163]

### C.    The Complaints Adequately Allege Facts Giving Rise to a Strong Inference of Scienter Against Defendants Sexton, Murphy, Silverman, and Trosten

The Complaints contain detailed and particularized allegations regarding

each Officer Defendants' (1) conscious misbehavior and recklessness and (2) motive and

opportunity to commit fraud.  Accordingly, under both tests (only one of which must be

---

[162]  THL Mem. at 35.

[163]  The THL Defendants do not challenge the element of "opportunity".

met for the Complaints to be sustained), the Complaints adequately allege facts giving rise to a strong inference of scienter against these defendants.[164]

> **1.**     **The Complaints Plead Facts that Constitute Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness on the Part of Sexton, Murphy, Silverman, and Trosten**

The Complaints allege that the Officer Defendants were among a small group of senior executives who conducted and oversaw the day-to-day management and operations of Refco.[165]  Through their knowledge and control of Refco's internal operations, each of the Officer Defendants perpetrated the fraudulent and deceptive conversion of RCM customer securities and had access to information demonstrating that Refco's public statements were false and misleading.  By virtue of their positions and responsibilities, each of the Officer Defendants was able to influence the various Refco entities involved in the fraudulent scheme described in the Complaints.

On an almost daily basis, Sexton, Murphy, Silverman and Trosten directed Refco employees to sell securities that Plaintiffs and other RCM customers had entrusted to RCM.[166]  Aware of RCM's obligations to hold Plaintiffs' and other customers' securities in safekeeping, Sexton, Murphy, Silverman and Trosten, along with the other Officer Defendants, nevertheless directed the fraudulent raid on the RCM customer accounts and the subsequent use of the proceeds to finance Refco's operations.[167]

---

[164] Defendant Grant does not challenge the adequacy of the scienter allegations made against him.

[165] Class Action Compl. ¶¶ 48, 169-70; Capital Management Compl. ¶¶ 43, 171-72; VR Compl. ¶¶ 60, 253-54.

[166] Class Action Compl. ¶¶ 4-5, 23-25, 102-19; Capital Management Compl. ¶¶ 3-4, 20-22, 105-15; VR Compl. ¶¶ 4-5, 21-23, 38, 114-25.

[167] *Id.*

### a.    Defendant Sexton

Sexton's position as Executive Vice President and COO of RGL and Executive Vice President and COO of Refco LLC provided him overall responsibility for accounting and finance at Refco and its subsidiaries, which included oversight of subsidiaries that were in direct receipt of illegally converted customer assets.[168]  Sexton was acutely aware of the capital required to sustain Refco's business operations and acquisitions and directed the fraudulent conversion of Plaintiffs' securities and the transmission of the proceeds to Refco LLC and other Refco entities.[169]  Despite his central role in executing the RCM Securities Fraud, Sexton refused to come clean about the fraudulent conversion of customer securities even after Refco's entry into Bankruptcy.  In his October 27, 2005 letter to RCM customers informing them that a timetable for returning funds to customers would be determined by the Bankruptcy Court, Sexton failed to inform RCM customers that their securities had, in many cases, already been sold by RCM.[170]  Sexton has been identified by the Government as an unindicted coconspirator of Bennett, Trosten and Grant in regard to the criminal charges brought against them resulting from the fraud at Refco.[171]

---

[168]  Capital Management Compl. ¶ 174; VR Compl. ¶ 256.

[169]  Class Action Compl. ¶¶ 107, 119; Capital Management Compl. ¶¶ 110, 115; VR Compl. ¶¶ 119, 124.

[170]  Class Action Compl. ¶ 155; Capital Management Compl. ¶ 158; VR Compl. ¶ 239.

[171]  *See* Government's List of Coconspirators, dated February 7, 2008, filed in *United States of America v. Phillip R. Bennett, Robert C. Trosten, Tone N. Grant,* S3 05 Cr. 1192 (NRB), attached as Ex. B. to the Bak Decl.

### b.    Defendant Murphy

Murphy played a key role in Refco's day-to-day operations, including its finance and accounting functions.[172]  Murphy was Executive Vice President of RGL and President of Refco LLC and Refco Global Futures LLC and other Refco subsidiaries, which made him responsible for the oversight and management of up-streaming Refco subsidiaries that were direct beneficiaries of the proceeds of the RCM Securities Fraud.[173] As part of the small group of senior executives who conducted and oversaw the daily management and operation of Refco, Murphy directed the fraudulent sale of RCM customer assets.[174]  Murphy has been identified by the Government as an unindicted coconspirator of Bennett, Trosten and Grant in regard to the criminal charges brought against them resulting from the fraud at Refco.[175]

### c.    Defendant Silverman

As Secretary and Controller of RGL,[176] RGHI and other Refco subsidiaries, Silverman "was directly responsible for overseeing intercompany and related-party transactions (including transactions between RCM and RCC and RCM and Refco Global Finance), the closing of Refco's books and its internal audits, implementation and maintenance of adequate internal financial controls, as well as the

---

[172]   Capital Management Compl. ¶¶ 43, 46, 176, 327; VR Compl. ¶¶ 60, 64, 258, 508.

[173]   Capital Management Compl. ¶ 176; VR Compl. ¶ 258.

[174]   Capital Management Compl. ¶¶ 3-4, 20-22, 105-15; VR Compl. ¶¶ 4-5, 21-23, 38, 114-25.

[175]   *See* Government's List of Coconspirators, dated February 7, 2008, filed in *United States of America v. Phillip R. Bennett, Robert C. Trosten, Tone N. Grant* S3 05 Cr. 1192 (NRB), attached as Ex. B. to the Bak Decl.

[176]   Defendant Silverman's assertion that, contrary to the allegations in the Complaints, he was not the Controller of Refco Group (Silverman Mem. at 8), is plainly a factual argument that is not appropriate for adjudication on a motion to dismiss.

adoption and implementation of appropriate accounting policies for Refco."[177]
Silverman, a certified public accountant, was also Controller of RGHI and Secretary of
numerous Refco subsidiaries, a close confidant of Bennett, and Bennett's personal
accountant.[178]  Silverman's job responsibilities included monitoring and assessing
outstanding intercompany receivables like the $2.4 billion one that resulted from the
fraudulent conversion of entrusted customer securities.[179]  In supervising Refco's
finances, Silverman directed and oversaw the fraudulent sale of customer securities.[180]
Silverman has been identified by the Government as an unindicted coconspirator of
Bennett, Trosten and Grant in regard to the criminal charges brought against them
resulting from the fraud at Refco.[181]

### d.    Defendant Trosten

As CFO of Refco through October 2004, Trosten was ultimately
responsible for Refco's finances and played a critical role in its management.  Trosten's
financial responsibilities placed him in a unique position to access inside information
concerning the fraudulent schemes.[182]  Trosten was obligated to monitor Refco's
financial status, and was responsible for global accounting and budgeting, regulatory
reporting, establishment of accounting policies, and the development of key strategic

---

[177]  Capital Management Compl. ¶ 177; VR Compl. ¶ 259.

[178]  *Id.*

[179]  Capital Management Compl. ¶¶ 115, 177; VR Compl. ¶¶ 124, 259.

[180]  Capital Management Compl. ¶¶ 3-4, 20-22, 105-15; VR Compl. ¶¶ 4-5, 21-23, 38, 114-25.

[181]  Government's List of Coconspirators, February 7, 2008, *United States of America v. Phillip R. Bennett, Robert C. Trosten, Tone N. Grant* S3 05 Cr. 1192 (NRB).

[182]  Class Action Compl. ¶¶ 177-79; Capital Management Compl. ¶¶ 178-80; VR Compl. ¶¶ 260-62.

initiatives.[183]  Trosten directed, orchestrated and supervised both the RCM Securities

Fraud and the RGHI Fraud.[184]  As Trosten recently admitted, in pleading guilty to

charges including, *inter alia*, securities fraud, wire fraud, bank fraud, money laundering,

and conspiracy to make false filings with the SEC, "I agreed with other Refco executives

to hide the true nature of Refco's finances."[185]  Given the size of the transfers from RCM

to the other Refco entities, and the extent to which those transfers were essential to those

entities' continued operation, it is inconceivable that Refco's CFO could have been

unaware of the manner in which RCM was raising such funds.

*      *      *

In short, it defies common sense for Murphy, Sexton, Silverman and

Trosten to argue that they were unaware of RCM's fraudulent conversion of securities.

All were high-level officers of an entity that controlled RCM, as well as of entities that

were receiving the proceeds of the fraud on RCM's securities customers.  And, as alleged

in the Complaints, the misuse of customer securities was an open secret within Refco,

and common knowledge among Refco's employees such as Thomas Yorke, with

securities being sold and upstreamed to various Refco entities on a daily basis.[186]

Strengthening the inference of scienter for each of the Officer Defendants

are the Complaints' allegations that each of them took steps to conceal information about

Refco in the period leading up to the LBO and IPO.  The Complaints allege that the

Officer Defendants refused to deal with auditing shortcomings, deliberately failed to

---

[183]  Class Action Compl. ¶ 177; Capital Management Compl. ¶ 178; VR Compl. ¶ 260.

[184]  Class Action Compl. ¶¶ 4-5, 23-25, 102-19, 177-79; Capital Management Compl. ¶¶ 3-4, 20-22, 105-15, 178-80; VR Compl. ¶¶ 4-5, 21-23, 38, 114-25, 260-62.

[185]  Plea Hearing before Judge Buchwald, February 20, 2008.

[186]  Class Action Compl. ¶ 119; Capital Management Compl. ¶ 115; VR Compl. ¶ 124.

bring to the THL Defendants' attention the "horrendous" Management Letter,

affirmatively lied to the THL Defendants, and approved and engaged in major

transactions that they knew, or were reckless in not knowing, were funded with looted

customer property.[187]

Finally, for the reasons discussed in Section V.B., the magnitude, scope

and materiality of the allegations of the fraud at Refco gives rise to a strong inference of

scienter against each of the Officer Defendants.

### 2.    The Complaints Adequately Allege the Officer Defendants had Motive and Opportunity to Commit Fraud

This Court held in the Stockholder Class Action that a strong inference of

scienter was established as to a number of the Officer Defendants based on their

participation in the "greenshoe" dividend.  *In re Refco Inc. Securities Litigation*, 503

F. Supp. 2d at 646 (standing alone, the defendants' receipt of a green shoe dividend is a

concrete benefit directly flowing from the fraud to the defendants sufficient to give rise to

a strong inference of scienter).  The greenshoe dividend alleged in the Complaints as to

the Officer Defendants (other than Silverman) is identical to that alleged by the

Stockholder Class Action plaintiffs.[188]  Consequently, the Court's prior holding in the

Stockholder Class Action compels the conclusion that the Complaints here adequately

plead scienter against the Officer Defendants (other than Silverman who did not receive a

greenshoe dividend).

---

[187]  Class Action Compl. ¶ 307; Capital Management Compl. ¶ 303; VR Compl. ¶ 409.

[188]  Class Action Compl. ¶ 324; Capital Management Compl. ¶ 319; VR Compl. ¶ 500.

Aside from the greenshoe dividend, this Court also noted the possibility, but did not decide, that the Officer Defendants' receipt of financial benefits from a profit-sharing agreement and unusually large grants of common stock and RSUs in the aggregate constituted sufficient motive to commit fraud. *Id.* at 645-46. Here, the Complaints allege that the Officer Defendants stripped in excess of $1 billion from Refco through sales of equity interests in the LBO, enormous outright grants of Refco common stock, the greenshoe oversubscription option on the IPO, RSUs, and bonus and compensation plans.[189] Even on its own, the stock grants raise a strong inference of scienter because the benefits of the grants could only be realized by concealing the fraudulent scheme long enough to create a public trading market for the stock.[190] Similarly, the Officer Defendants' receipt of RSUs raises a strong inference of scienter because it motivated them to ensure a successful IPO to create a public market on which they could unload their shares.[191] Murphy, Trosten, and Sexton's participation in a profit sharing agreement with RGL also gave them a direct and personal stake in the financial health of RGL and its subsidiaries, which ultimately resulted in payments to each of them ranging from $2 to $25 million.[192] Viewed individually, each of these financial benefits gives rise to an inference that each of the Officer Defendants had motive to commit

---

[189] Class Action Compl. ¶ 313; Capital Management Compl. ¶ 309; VR Compl. ¶ 490.

[190] Class Action Compl. ¶ 316; Capital Management Compl. ¶ 312; VR Compl. ¶ 493.

[191] Class Action Compl. ¶ 320; Capital Management Compl. ¶ 315; VR Compl. ¶ 496.

[192] Class Action Compl. ¶¶ 261-68, 315; Capital Management Compl. ¶¶ 257-64, 311; VR Compl. ¶¶ 362-69, 492.

fraud.[193]  And when viewed in the aggregate, they show an unmistakable benefit that depended on, among other things, the continued success of the RCM Securities Fraud.

## VI.  THE COMPLAINTS ADEQUATELY PLEAD PRIMARY LIABILITY ON THE PART OF THE  OFFICER DEFENDANTS AND THE THL DEFENDANTS

Rule 10b-5(a) and (c) make it unlawful for any person, directly or indirectly "(a) [t]o employ any device, scheme or artifice to defraud," or "(c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(a) & (c).  A plaintiff does not need to allege a misleading statement or omission to state a claim based on deceptive practices in violation of Rule 10b-5(a) or (c).  *See Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1047 (9th Cir. 2006) ("A non-speaking actor who engages in a 'scheme to defraud' has used or employed a deceptive device within the meaning of Section 10(b).") (citing *Zandford*, 535 U.S. at 821-22).

In *Central Bank, N.A., v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994), the Supreme Court held that, in a private action, secondary actors cannot be held liable for aiding and abetting a securities fraud under Section 10(b).  The Court stated, however, that:

---

[193]  The argument of Defendants Murphy and Sexton that they had insufficient opportunity to commit the RCM Securities Fraud (Murphy/Sexton Mem. at 26-27) should be given short thrift.  As discussed in detail at Sections V.C.1, VI.A., and VII.D, the Complaints allege that Murphy and Sexton were part of a small group of senior executives responsible for Refco's operations and that each played a critical role in its management.  The Complaints clearly allege not only that both of these Officer Defendants had the power to direct and control all relevant aspects of the RCM Securities Fraud but that they used their authority on a day-to-day basis to direct the fraudulent theft of RCM customer securities (Class Action Compl. ¶¶ 4-17, 23-25, 102-19; Capital Management Compl. ¶¶ 3-15, 20-22, 105-15; VR Compl. ¶¶ 4-14, 21-23, 38, 112-25).

> "The absence of Section 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity . . . *who employs a manipulative device* or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming *all* of the requirements for primary liability are met."

*Id.* at 191 (first emphasis added).

In cases alleging a fraudulent scheme, Section 10(b) liability attaches to persons "who had knowledge of the fraud and assisted in its perpetration." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1471 (2d Cir. 1996), quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir. 1994) (affirming a judgment that the CEO of a broker-dealer violated Rule 10b-5 by orchestrating a securities fraud scheme even though the officer had not personally made misrepresentations or omissions); *see also In re Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS), 2002 WL 31356498, at *4 (S.D.N.Y. Oct. 17, 2002) (primary liability adequately alleged where defendant "directed" or "contrived" allegedly fraudulent trades).

The THL and Officer Defendants cite the Supreme Court's recent decision in *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008). However, the issue in *Stoneridge* was whether, in a classic Section 10(b) action involving misrepresentations, the investor plaintiffs can use a scheme liability theory to impose liability on defendants who are not alleged to have made misrepresentations. *Id*. at 766 The Supreme Court held that liability could not be placed on the suppliers because "[n]o member of the investing public had knowledge, either actual or presumed, of respondents' deceptive acts during the relevant times," and, therefore, the suppliers' acts were "remote to the injury". *Id*. at 769, 770. That reasoning has no bearing on the

present actions where the claims (except against Grant Thornton) are for violations of

Rule 10b-5(a) and (c) and the deceptive acts of the THL and Officer Defendants were not

at all remote from the injury suffered by the Plaintiffs.  To the contrary, the deceptive acts

that these defendants are alleged to have committed – knowing about the theft of

customer securities and perpetrating that fraud – are the very acts that caused Plaintiffs'

losses.

        As demonstrated below, the Officer Defendants and the THL Defendants

have primary liability, as well as control person liability (*see infra* at Section VII) for

such deceptive acts.

> **A.    The Officer Defendants Knew About the Fraud and Played a Central Role in Its Perpetration**

        The Complaints plead that each of the Officer Defendants "had knowledge

of the fraud" and "assisted in its perpetration," as is required under *First Jersey* to plead

primary liability as to a scheme under Section 10(b).  101 F.3d at 1471.  The Complaints

allege that on an almost daily basis, the Officer Defendants "direct[ed] Refco employees

to sell, or cause to be sold – through hypothecations or subject to agreements to

repurchase ("Repos") – securities owned by Plaintiffs and other RCM customers that had

been entrusted to RCM."[194]  The Officer Defendants then directed the upstreaming,

sidestreaming, and downstreaming of the proceeds of these sales to other Refco

entities.[195]

        Several of the Officer Defendants argue that the Complaints fail to allege

their role in the fraud with the particularity required by Rule 9(b).  (Murphy/Sexton Mem.

---

[194]  Capital Management Compl. ¶¶ 3-4, 20-22, 105-15; VR Compl. ¶¶ 4-5, 21-23, 38, 114-25.

[195]  Class Action Compl. ¶ 110; Capital Management Compl. ¶ 113; VR Compl. ¶ 122.

at 13-14; Silverman Mem. at 6-7.)  However, "[t]he primary purpose of Rule 9(b) is to afford a defendant fair notice of the plaintiff's claim and the factual ground upon which it is based."  *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990).  The Complaints comply with Rule 9(b) as they contain more than sufficient detail to provide each of the Officer Defendants with fair notice of Plaintiffs' claims against him and the grounds upon which those claims rest.  The specific allegations as to defendants Sexton, Murphy, Silverman, and Trosten are discussed *supra* at Sections V.B.-C. and VI.A.

The Complaints also contain sufficient allegations regarding defendant Grant's role in the scheme.  From 1997 through 1998, Grant (who did not challenge the sufficiency of the Complaint's allegations of scienter against him) was President and CEO of RGL.  During his tenure as President and CEO of RGL the fraudulent RGHI Fraud was first devised by Bennett as a method to cover up Refco's dire financial situation.[196]  According to the Grand Jury's Indictment of Grant and others,[197] Grant was a direct participant in the RGHI Fraud and was fully briefed on the various frauds at Refco.[198]  Grant deliberately misled the marketplace in the wake of the Asian crisis by publicly issuing a statement denying that there were any serious customer losses and insisting that "there is no problem at Refco."  Grant's public statements were false and intended to mislead.[199]  On April 17, 2008, Grant was convicted, after a jury trial, of all counts on which he had been indicted, including conspiracy, securities fraud, wire fraud, bank fraud and money laundering.

---

[196]  Class Action Compl. ¶ 173; VR Compl. ¶ 264.

[197]  Third Superseding Indictment in *United States v. Phillip Bennett, et al.*, No S3 05 Cr. 1192 (NRB) (S.D.N.Y. Jan. 16, 2007).

[198]  Class Action Compl. ¶ 176; VR Compl. ¶ 267.

[199]  Class Action Compl. ¶¶ 173-75; VR Compl. ¶¶ 264-66.

Grant also perpetrated the RCM Securities Fraud, directing the unauthorized sale of customer securities and the use of the proceeds to fund Refco's continuing operation and various acquisitions. From 1999 to 2004, Grant maintained his indirect interest in Refco (through RGHI) and regularly discussed with defendant Maggio the continued financial problems at Refco, including continued "rolling fails," where Refco, because it was using customer money to cover its financial losses, purposefully failed to cover its daily cash obligations to its creditors.[200]

The Complaints thus allege that each of the Officer Defendants held high-level positions within Refco, knew about the fraudulent scheme involving customers' securities, and actively assisted the perpetration of that scheme or, at a minimum, failed to put an end to the scheme. Those pleadings are more than sufficient to support a Rule 10b-5 violation. *See In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 191 (S.D.N.Y. 2003) ("a member of the upper level management, such as the CEO or CFO, who had knowledge of the fraud, and assisted in its perpetration by failing to disclose or correct the fraud when he had a duty to do so, may be held liable under Section 10(b) and Rule 10b-5"); *In re Retek Inc. Sec. Litig.*, Civ. No. 02-4209 (JRT/SRN), 2007 WL 14352, at *7 (D. Minn. Jan. 3, 2007) (sustaining Rule 10b-5 claims against several corporate officers because "Plaintiffs' allegations place these executive officers at the center of the alleged scheme to defraud, which if proven true could show the officers assisted in the perpetration of fraud").

---

[200]    Class Action Compl. ¶¶ 173-76; VR Compl. ¶ 264-67.

**B.    The THL Defendants Knew About the Fraud and Played a
Central Role in its Perpetration**

In addition to pleading the THL Defendants' liability as control persons

(discussed *infra* at Section VII), the Complaints adequately allege that the THL

Defendants are liable as primary violators because they actively participated in and

played a central role in the fraudulent scheme involving customers' securities.

The THL Defendants argue that they cannot be primary violators because

the Complaints acknowledge that the fraudulent use of customers' securities began at

Refco even before THL's 2004 investment. (THL Mem. 28). But nothing in the case

law says that a defendant must contrive a scheme or be there at the outset in order to be a

primary violator of Rule 10b-5.[201]  Surely, a broker, manager or owner of a fraudulent,

boiler room stock sale operation would be liable for securities law violations whether or

not that person was involved in the inception of the fraud or joined the fraud thereafter.

Likewise, there is no requirement that the THL Defendants had to have been involved in

the RCM Securities Fraud at its inception. What is important, and is alleged in the

Complaints, is that the THL Defendants learned of the fraudulent scheme after making

their investment at which time they furthered the scheme and benefited from the cash that

it generated for Refco's other businesses. *See* Sections V.B. and VI.B.

As the THL Defendants acknowledge to this Court in connection with

their lawsuit against Refco's outside counsel, a plaintiff may plead a violation of Rule

10b-5(a) and (c) even without alleging that the defendant was the "mastermind" of the

---

[201]    On the contrary, a finding of primary liability for a fraudulent scheme requires only that a person "had
knowledge of the fraud and assisted in its perpetration." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450,
1471 (2d Cir. 1996), quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir. 1994) (affirming
a judgment that the CEO of a broker-dealer violated Rule 10b-5 by orchestrating a securities fraud
scheme even though the officer had not personally made misrepresentations or omissions).

scheme, so long as there are particularized allegations that the defendant "materially assisted in" and "participated in and furthered" the scheme.[202]

The Complaints allege specifics about how the THL Defendants participated in and materially assisted the fraudulent scheme. For example, to support RCM's fraudulent practices, the THL Defendants and Refco senior management implemented a compensation structure that encouraged the conversion of RCM customer assets.[203] Thomas Yorke and other employees working on behalf of RCM and RSL received bonuses that were determined, in part, based on the amount of customer funds they could sell and transfer out of RCM to other parts of Refco.[204] As Yorke testified at a hearing in the Bankruptcy Cases "we were paid for raising money for the firm. That was our job."[205] In light of detailed pleadings showing that the compensation of RCM and RSL employees was determined by the THL Defendants and others based on the amount of securities these employees could steal from RCM customer accounts, there is no merit to the THL Defendants' argument (THL Mem. at 29) that the bonuses are not alleged to have been unusual.

The THL Defendants further participated in the fraud by approving the resolution authorizing Refco to acquire Cargill Investor Services for $209 million funded

---

[202] *See* THL's Memorandum of Law in Opposition to Defendant's Motions to Dismiss, filed in *Thomas H. Lee Equity Fund V, L.P. et al. v. Mayer, Brown, Rowe & Maw L.L.P.*, 07 Civ. 06767 (GEL), on Nov. 9, 2007, at 22-23. The Court may take notice of this filing by the THL Defendants in a related litigation before this Court. *See In re Sterling Foster & Co., Sec. Litig.*, 222 F. Supp. 2d 216, 254 (E.D.N.Y. 2002) (a court may take judicial notice of documents filed in related actions "to establish the fact of the filing and fact that the allegations contained in the [filing] were made.") (citing *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992)).

[203] Class Action Compl. ¶¶ 166-67; Capital Management Compl. ¶¶ 168-69; VR Compl. ¶¶ 250-51.

[204] *Id.*

[205] *Id.*

with proceeds from the sales of stolen RCM customer securities.[206]  The Complaints include specific details showing that the THL Defendants knew that customer funds were the primary source for the purchase price, including handwritten notes of Max Strasburg, a THL analyst, that refer to the deal being financed with "500m house cash" and "unreg. Customer $ from deal".[207]  The Complaints also describe the series of loans to Suffolk totaling $204 million that were funded from the proceeds of securities stolen from RCM customers.[208]  The THL Defendants controlled Refco at the time those loans were extended and they knew the source of the funds.[209]  By approving the Cargill acquisition and by allowing the Suffolk loans to be extended, the THL Defendants perpetrated the fraud by ensuring a continuation of Refco's fraudulent business model that relied on stealing RCM customer securities to fund the company's operations and acquisitions and keeping that theft hidden from the customers.

   Indeed, as the Complaints allege, the practice of selling customers' securities and using the proceeds was a critical part of Refco's business model.[210]  The THL Defendants had access to internal reports that were regularly generated showing the amount of customer assets that could be fraudulently converted and used to sustain Refco's business operations.[211]  The way that Refco funded its operations, acquired other

---

[206]  Class Action Compl. ¶¶ 269; 280-81; Capital Management Compl. ¶¶ 268, 276-77; VR Compl. ¶¶ 373, 381-82.

[207]  Class Action Compl. ¶ 274; Capital Management Compl. ¶ 270; VR Compl. ¶ 375.

[208]  Class Action Compl. ¶¶ 282-88; Capital Management Compl. ¶¶ 278-84; VR Compl. ¶¶ 383-89.

[209]  Class Action Compl. ¶¶ 287-88; Capital Management Compl. ¶¶ 283-84; VR Compl. ¶¶ 388-89.

[210]  Class Action Compl. ¶¶ 9-13, 17-19, 102-07, 119, 280, 342; Capital Management Compl. ¶¶ 10-15, 20-22, 105-10, 123, 284, 353; VR Compl. ¶¶ 11-16, 21-23, 114-19, 155, 389, 539.

[211]  Class Action Compl. ¶¶ 168-69, 304; Capital Management Compl. ¶¶ 166-67, 308; VR Compl. ¶¶ 248-49, 411.

companies, made loans, and worked towards an IPO was, in part, by relying on hundreds of millions of dollars generated from the sales of securities that did not belong to Refco but belonged to the Plaintiffs and other customers of RCM.[212]

Furthermore, the Complaints allege in detail the level of control that the THL Defendants exercised over Refco as the majority shareholders.  As noted in the Offering Memorandum for Refco's Bonds issued concurrently with the LBO, following the LBO the THL Defendants would "have the ability to control all aspects of [Refco's] business."[213]  Refco's IPO prospectus made the same point regarding the THL Defendants' control.[214]  Thus, for fourteen months following the LBO until Refco's collapse, the THL Defendants controlled a company that relied on hundreds of millions of dollars of stolen customer property to fund its operations on a daily basis.

As corporate insiders with control over the Company while the massive fraud regarding customer securities was being perpetrated, the THL Defendants are precisely the type of insiders against whom primary liability claims may properly be asserted.  As the court explained in *In re Salomon Analyst AT&T Litigation*, following *Central Bank* courts in this Circuit have adopted a pattern of "typically dismissing claims brought against outside professionals such as lawyers or accountants . . . and permitting claims against insiders that allege substantial knowing participation or orchestration." 350 F. Supp. 2d 455, 473 (S.D.N.Y. 2004).

---

[212]  Class Action Compl. ¶¶ 9-13, 17-19, 102-07, 119, 280, 342; Capital Management Compl. ¶¶ 10-15, 20-22, 105-10, 123, 284, 353; VR Compl. ¶¶ 11-16, 21-23, 114-19, 155, 389, 539.

[213]  Class Action Compl. ¶ 326; Capital Management Compl. ¶ 331; VR Compl. ¶ 517.

[214]  *Id.*

That the THL Defendants were not the ones who physically took the securities from the customers' accounts and sold them without authorization, does not mean that they cannot be held liable as primary violators. *Cf. In re Parmalat Sec. Litig*., 376 F. Supp. 2d 472, 502 (S.D.N.Y. 2005) (a defendant may be liable as a primary violator of Section 10(b) and Rule 10b-5 when the defendant "substantially participate[d] in a manipulative or deceptive scheme . . . even if a material misstatement by another person creates the nexus between the scheme and the securities market.") (citing *In re Lernout & Hauspie Sec. Litig*., 236 F. Supp. 2d 161, 173 (D. Mass. 2003)). In *Global Crossing*, plaintiffs claimed that Arthur Andersen violated Rule 10b-5(a) and (c) by playing a central role in a scheme involving the creation of interrelated transactions that had no economic substance. 322 F. Supp. 2d at 327. This Court rejected Arthur Andersen's argument that the scheme allegation was "a thinly disguised . . . aiding and abetting claim". *Id*. at 335. Instead, the Court held, plaintiffs' allegations that Arthur Andersen "actively participated," "was intimately involved in," and played a "central role" in the scheme easily pled a "manipulative or deceptive act" in violation of Rule 10b-5(a) and (c). *Id*. at 327, 336. The same is true here about the THL Defendants and, in fact, as corporate insiders, they played an even more central role in the scheme at Refco than outside third parties like Arthur Andersen in *Global Crossing*. The Complaints adequately plead that the THL Defendants "actively participated" in, were "intimately involved in," and played a "central role" in the fraudulent theft and misuse of RCM customer securities. For that reason, the Complaints adequately plead their role as primary violators of Rule 10b-5(a) and (c).

## VII.   THE COMPLAINTS PLEAD ACTIONABLE CONTROL PERSON LIABILITY CLAIMS AGAINST THE THL DEFENDANTS AND THE OFFICER DEFENDANTS

### A.   Control Person Legal Standards

To assert a claim under Section 20(a) a plaintiff must plead:  (1) a primary violation of the federal securities laws on the part of one or more persons – in this case, RCM and/or RSL, and (2) control by the defendant over the primary violator.  *See In re Parmalat Sec. Litig*., 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005).  Actual control is not required; control "requires only the ability to direct the actions of the controlled person, and not the active exercise thereof."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458 (S.D.N.Y. 2005).  Allegations of control need only be pleaded in accordance with Rule 8(a)'s notice-pleading standard.  *In re Global Crossing*, *Ltd. Sec. Litig.*, 471 F. Supp. 2d 338, 352 (S.D.N.Y. 2006) ("the relaxed notice-pleading standard of Rule 8(a) applies to allegations of control.").[215]  Thus, even "'naked allegations of control ... will typically suffice.'"  *In re Global Crossing, Ltd. Sec. Litig.,* No. 02 Civ. 910 (GEL), 2005 WL 2990646, at *8 n.8 (S.D.N.Y. Nov. 7, 2005) (quoting *In re Initial Pub. Offering Sec. Litig*., 241 F. Supp. 2d 281 (S.D.N.Y. 2003)).

The question of control "is necessarily fact intensive".  *In re Executive Telecard, Ltd. Sec. Litig*., 913 F. Supp. 280, 286 (S.D.N.Y. 1996); *see also In re Oxford Health Plans, Inc. Sec. Litig*., 187 F.R.D. 133, 143 (S.D.N.Y. 1999) (control is a "fact intensive" question for a jury).  Accordingly, the issue of control "is not ordinarily subject to resolution on a motion to dismiss" and "dismissal is appropriate only when 'a

---

[215]   *See also In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 440-41 (S.D.N.Y. 2006) ("Allegations of control are not averments of fraud and therefore need not be pleaded with particularity."); *Neubauer v. Eva-Health USA, Inc*., 158 F.R.D. 281, 284-85 (S.D.N.Y. 1994) ("the allegation of control is not an averment of fraud and therefore need not be made with particularity").

plaintiff does not plead any facts from which it can reasonably be inferred the defendant

was a control person.'" *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 661

(E.D. Va. 2000); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512-14 (2002)

(dismissal of a control person claim is improper as long as the complaint furnishes

adequate notice of the basis of plaintiff's claim and "relief could be granted under

[some] set of facts that could be proved consistent with the allegations"); *Global

Crossing*, 471 F. Supp. 2d 338, 352 ("[E]ven if the facts alleged do not, by themselves,

permit an inference of control, dismissal is improper as long as it is at least plausible that

plaintiff could develop some set of facts that would pass muster.'").

      A number of courts in this Circuit have held that an additional aspect of a

Section 20(a) claim is "culpable participation by the defendant in the perpetration of the

fraud". *Suez Equity Investors L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir.

2001). However, there is significant disagreement as to whether culpable participation is

a pleading requirement, or simply an element that requires proof at trial. Several courts

in this Circuit have concluded that culpable participation does not have to be pleaded and

that there is no scienter requirement for Section 20(a) claims. For example, in *In re

Worldcom Inc. Securities Litigation,* 294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003), the

court analyzed that issue at length and determined that "there is no required state of mind

for a defendant's culpable participation in a Section 20(a) offense." Rather, the court

concluded, "it appears that a plaintiff must plead only the existence of a primary violation

by a controlled person and the direct or indirect control of the primary violator by the

defendant in order to state a claim under Section 20(a)." *Id*. Another decision that

reached that same conclusion is *In re Initial Public Offering Securities Litigation*, 241 F.

Supp. 2d 281, 392-97 (S.D.N.Y. 2003). There, Judge Scheindlin noted that six courts of appeals have held that there is no scienter requirement for Section 20(a) claims, two have held that there is a scienter requirement, and the Second Circuit has not yet definitively answered this question. *Id.* at 393 n.179. After analyzing extensively the case law from the district courts, Judge Scheindlin concluded that "scienter is not an essential element of a Section 20(a) claim". *Id.* at 396. *But see In re Global Crossing Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 349 n.24 (S.D.N.Y. 2004) (noting disagreement among courts and concluding that culpable participation must be alleged).

Plaintiffs respectfully submit that Judge Scheindlin's holding should be followed and that a plaintiff should not be required to plead facts establishing culpable participation. However, whether or not culpable participation must be pleaded, the Complaints more than satisfy that requirement. Although the Second Circuit has yet to determine what is required to establish this element, it appears that it requires something less than scienter. This Court held in *In re Refco Inc. Securities Litigation*, 503 F. Supp. 2d 611, 661 (S.D.N.Y. 2007) that to satisfy the culpable participation requirement plaintiffs must "plead with particularity facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct" (quoting *In re Global Crossing, Ltd. Securities Litigtion,* 471 F. Supp. 2d 338, 351 and noting, with reference to *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 490 (S.D.N.Y. 2005), that "[d]isagreement exists within the Second Circuit . . . as to precisely what conduct, beyond negligence, [culpable participation] entails."). Other courts in the Circuit have followed the "knew or should have known" standard for control person liability. *See In re Blech Sec. Litig.*,

2002 WL 31356498, at *21-22 (S.D.N.Y 2002) (finding that "the controlling person 'knew or should have known' that the controlled person 'was engaging in fraudulent conduct.'); *Dietrich v. Bauer*, 126 F. Supp. 2d 759, 765 (S.D.N.Y. 2001) (noting the "blindness standard" that liability may be found where the control person "knew or should have known that [the] primary violator, over whom the person had control, was engaged in fraudulent conduct, but ... did not take steps to prevent the primary violation." (internal quotation marks omitted)).

Whatever that lesser standard may be, it is certainly true that "[a]llegations of scienter necessarily satisfy the requirement." *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 235 (S.D.N.Y. 2004). Allegations of recklessness also suffice. *See Global Crossing*, 471 F. Supp. 2d at 351. In addition, allegations of motive and opportunity, which satisfy the scienter standard, clearly satisfy the lower culpable participation standard. *See In re Flag Telecom Holdings, Ltd. Sec.*, 308 F. Supp. 2d 249, 273 (S.D.N.Y. 2004) ("if a plaintiff pleads facts establishing that the control person had motive and opportunity to commit fraud, plaintiff has pled 'culpable participation.'").

### B.    The Complaints Adequately Plead Claims For Control Person Liability Against The THL Defendants

The THL Defendants do not contest the allegations of their control. Rather, they challenge the adequacy of the Section 20(a) claims on the grounds that the Complaints fail to allege (1) a primary violation by a controlled person and (2) that THL Defendants culpably participated in the fraud (THL Mem. at 52-54.) Neither argument has merit.

First, as addressed in Sections I - VI, the Complaints adequately plead primary violations on the part of Refco, including RCM and RSL.

Second, the Complaints allege that the THL Defendants culpably participated in the fraud. By adequately pleading scienter against the THL Defendants as demonstrated in Section V.B., the Complaints more than satisfy this Court's less onerous burden of alleging culpable participation "in some meaningful sense" by the THL Defendants. *In re Global Crossing*, 322 F. Supp. 2d at 349 & n.24. Plaintiffs will not repeat the numerous allegations that, as discussed above, establish that the THL Defendants acted with scienter, except to note that those same allegations necessarily meet the lesser burden of establishing the strong inference that the THL Defendants "knew or should have known that the primary violator was engaging in fraudulent conduct," "failed to review or check information that [they] … had a duty or monitor," or "ignored obvious signs of fraud."[216]

### C. The Complaints Adequately Plead Claims For Control Person Liability Against Tone Grant

Tone Grant argues that the control person claim against him fails because Plaintiffs have not alleged a primary violation (T. Grant Mem. at 15.) As addressed in Sections I - VI, the Complaints adequately plead primary violations on the part of Refco, RCM, and RSL. Grant does not challenge either the sufficiency of the allegations of control against him or the sufficiency of the allegations of his culpable participation. *Id.*

---

[216] *See In re Alstom SA Sec. Litig.,* 406 F. Supp. 2d 433, 491-92 (S.D.N.Y. 2005) (allegations of culpable participation sufficient where plaintiff pleaded that the controlling person "knew or should have known that the primary violator was engaging in fraudulent conduct," or that the controlling person "failed to review or check information that he or she had a duty or monitor," or that the controlling person "ignored obvious signs of fraud.").

### D.    The Complaints Adequately Plead Claims For Control Person Liability Against Murphy, Sexton, Silverman, and Trosten

Defendants Murphy, Sexton, Silverman, and Trosten challenge the adequacy of the Section 20(a) claims on the grounds that the Complaints fail to allege (1) their status as controlling persons or (2) that they culpably participated in the fraud (Murphy/Sexton Mem. at 32; Silverman Mem. at 26; Trosten Mem. at 9.)  Both arguments are without merit with respect to each of these defendants.

### 1.    Control

Each of the Officer Defendants had the power to control Refco and its subsidiaries, including RCM, by virtue of their executive positions with Refco, the key roles each played in Refco's management, and their direct involvement in its day-to-day operations, including its finance and accounting functions.  *See* above at Sections V.C. and VI.A. (outlining facts relating to the role of each of the Officer Defendants).  These allegations are sufficient to plead control as to each of these defendants.  *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 488 n.51 (S.D.N.Y. 2005) ("Corporate officers are usually presumed to possess the requisite power to control the actions of their employees and are often held accountable as controlling persons.").

\*          \*          \*

The Complaints do not rest solely on the allegations that the Officer Defendants held executive positions.[217]  For example, the Complaints also allege that the Executive Employment and Non-Competition Agreements pursuant to which Murphy

---

[217]  Plaintiffs note that some courts have indicated that allegations regarding defendants' executive positions are by themselves sufficient pleadings of control.  *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 451 (S.D.N.Y. 2005) (defendants' positions as either president, CEO, COO or CFO "almost certainly afforded them control over the Company").

and Sexton were employed gave them substantial authority over the day-to-day management and operation of Refco.[218]  In the Stockholder class action, this Court concluded that those allegations were sufficient to allege control against several of the Officer Defendants.  *See In re Refco Sec. Litig.*, 503 F. Supp. 2d at 637-40 (finding sufficient allegations that Bennett, Sexton, Murphy and Silverman exercised control over Refco where it was alleged that they were "directly involved in [Refco's] day-to-day operations, including financial reporting and accounting" or "deeply involved with Refco's day-to-day activities").  Those same allegations of control also suffice here.

The Complaints also allege that the Officer Defendants exercised control by preparing, approving, and signing Refco's SEC filings, including Refco's Offering Memorandum for the Bonds, Bond Registration Statement, and IPO Registration Statement.[219]  *See In re Refco Sec. Litig.*, 503 F. Supp. 2d at 638-39 (finding that a signature on an SEC filing, a Bond Registration Statement or the preparing and approving an IPO Registration Statement is suggestive of control); *Jacobs v. Coopers & Lybrand, L.L.P.*, No. 97 Civ. 3374 (RPP), 1999 WL 101772, at *18 (S.D.N.Y.  Mar. 1, 1999) (it "comport[s] with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report."); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 420 (S.D.N.Y. 2003) (noting that "[t]he very fact that a director is required to sign these critical documents charges the director with power over the documents and represents to the corporation, its shareholders, and the public that the

---

[218]  Class Action Compl. ¶ 333; Capital Management Compl. ¶ 328; VR Compl. ¶ 509.

[219]  Class Action Compl. ¶¶ 330-32; Capital Management Compl. ¶¶  325-27; VR Compl. ¶¶ 506-08.

corporation's director has performed her role with sufficient diligence that she is willing and able to stand behind the information contained in those documents.").[220]

In the aggregate, the allegations in the Complaints are sufficient to plead that Murphy, Sexton, Silverman, and Trosten occupied control positions within Refco and RCM. *See In re Leslie Fay Cos., Sec. Litig.*, 918 F. Supp. 749, 763 (S.D.N.Y. 1996) ("Odyssey attempts to isolate various indicia of control and argue that each, by itself, does not establish control person liability. Of course, we must consider the total effect of the various indicia of control in combination.").  At a minimum, because the control allegations are governed by Rule 8(a)'s lenient pleadings standard, dismissal is improper because "it is at least plausible that plaintiff could develop some set of facts that would pass muster." *In re Global Crossing, Ltd. Sec. Litig.*, 471 F. Supp. 2d at 352, quoting *Bell Atl. Corp. v. Twombly.*

### 2.      Culpable Participation

The same allegations, discussed in Section V.C., that raise a strong inference of scienter on the part of the Officer Defendants necessarily give rise to a strong inference that the Officer Defendants were culpable participants in the fraud.  *See Montoya v. Mamma. Com Inc.*, No. 05 Civ. 2313 (HB), 2006 WL 770573, at *9 (S.D.N.Y. Mar. 28, 2006) ("[S]ince I have already determined that plaintiffs adequately alleged that [defendants] acted with scienter, the 'culpable participation' requirement is met").

---

[220] *See also Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.)*, 151 F. Supp. 2d 371, 437 (S.D.N.Y. 2001) ("An outside director and audit committee member who is in a position to approve a corporation's financial statements can be presumed to have 'the power to direct or cause the direction of the management and policies of' the corporation, at least insofar as the 'management and policies' referred to relate to ensuring a measure of accuracy in the contents of company reports and SEC registrations that they actually sign.") (quoting 17 C.F.R. § 240.12b-2).

## VIII.   THE COMPLAINTS ADEQUATELY PLEAD A RULE 10B-16 VIOLATION

SEC Rule 10b-16 required RCM to notify its customers regarding the nature of any interest or lien that RCM retained in any securities held as collateral.[221] RCM and the Officer Defendants violated Rule 10b-16 by failing to provide Plaintiffs with (1) a written statement disclosing the nature of any interest or lien retained by RCM in the security held as collateral or (2) quarterly statements describing each debit and credit entered during such period.[222]   Defendants' arguments to dismiss the Rule 10b-16 claims are without merit.

### A.      There is an Implied Private Right of Action under Rule 10b-16

Although the Second Circuit has not ruled on the issue, every court of appeals that has addressed the issue has recognized an implied private right of action for a violation of Rule 10b-16.  *See Angelastro v. Prudential-Bache Sec., Inc.*, 764 F.2d 939, 949 (3d Cir. 1985) (finding an implied private right of action under Rule 10b-16, noting that doing so "will advance the statutory goals of promoting full disclosure of material information and of protecting investors from fraudulent practices."); *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530 (9th Cir. 1984) (recognizing an implied private right

---

[221] Specifically, Rule 10b-16 provides:

It shall be unlawful for any broker or dealer to extend credit, directly or indirectly, to any customer in connection with any securities transaction unless such broker or dealer has established procedures to assure that each customer:

(1) Is given or sent at the time of opening the account, a written statement or statements disclosing … (vii) the nature of any interest or lien retained by the broker or dealer in the security or other property held as collateral and the conditions under which additional collateral can be required; and

(2) Is given or sent a written statement, or statements, at least quarterly, for each account in which credit was extended, disclosing (i) the balance at the beginning of the period; the date, amount and a brief description of each debit and credit entered during such period; the closing balance; and, if interest is charged for a period different from the period covered by the statement, the balance as of the last day of the interest period.  17 C.F.R. § 240.10b-16.

[222] Class Compl. ¶¶ 134-35; Capital Management Compl. ¶¶ 137-38; VR Compl. ¶¶ 162-63.

of action for Rule 10b-16 violations); *Liang v. Dean Witter & Co.*, 540 F.2d 1107 (D.C. Cir. 1976) (same).

   In addition, the majority of courts in the Circuit that have addressed the issue have concluded that there is an implied private right of action under Rule 10b-16. *See Slomiak v. Bear Stearns & Co.*, 597 F. Supp. 676, 677-81 (S.D.N.Y. 1984) (finding an implied private right of action even though "the Supreme Court has pursued an increasingly restrictive approach to implying private remedies."); *Metzner v. D.H. Blair & Co.*, 689 F. Supp. 262, 267 (S.D.N.Y. 1988); *Chem. Bank v. Shearson Lehman Bros., Inc.*, 91 Civ. 4915, 1992  U.S. Dist. LEXIS 10751, at *5 (S.D.N.Y. July 21, 1992).  Even *Komanoff* and *Bissell*, upon which Defendants rely, support the existence of an implied private right of action.  *Komanoff v. Mabon, Nugent & Co.*, 884 F. Supp. 848, 858 (S.D.N.Y. 1995) (noting that "the only federal appellate courts to consider whether customers have an implied right of action under Rule 10b-16 have determined that they do."); *Bissell*, 937 F. Supp. at 244-45 (assuming without deciding that an implied private right of action exists under Rule 10b-16).

   To determine whether an implied private right of action exists, a court must interpret the underlying statute passed by Congress "to determine whether it displays an intent to create not just a private right but also a private remedy."  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  The court must look not at the intent behind the regulation at issue, but at the intent of the underlying enabling statute.  *Id.* at 291.  "Both Congress and the SEC recognized that agency authority to promulgate [Rule 10b-16] would come from the Exchange Act"; therefore the underlying statute from which a

95

private right of action for Rule 10b-16 must be implied is Section 10(b).  *Robertson*, 749

F.2d at 535.[223]

In *Stoneridge*, the Supreme Court cautioned that the judicially constructed

implied private right of action under Section 10(b) should not be extended "beyond the

scope congressionally intended."  *Stoneridge*, 128 S. Ct. at 773.  The Court found that in

enacting the PSLRA, Congress comprehensively reexamined all private actions under the

Exchange Act, and chose to ratify judicially constructed implied private rights of action

derived from Section 10(b).  *Id.* at 773.  Congress thus "accepted the Section 10(b)

private cause of action as then defined but chose to extend it no further."  *Id.*  Consistent

with *Stoneridge*, to determine whether Section 10(b)'s private right of action is implied

into Rule 10b-16, the Court must look to the state of the law at the time the PSLRA was

enacted.

Congress' ratification of implied private rights of action derived from

Section 10(b) included a decades-long judicial legacy granting implied private rights of

action under Rule 10b-16, including unanimous agreement among the Circuit Courts of

Appeal that had addressed the issue.  And "the fact that a comprehensive reexamination

and significant amendment of the [Exchange Act] left intact the statutory provisions

under which the federal courts had implied a cause of action is itself evidence that

Congress affirmatively intended to preserve that remedy."  *Merrill Lynch, Pierce, Fenner*

*& Smith, Inc. v. Curran*, 456 U.S. 353, 381-82 (1982).  *See also id.* at 382 n.66

---

[223]   When enacting the Truth in Lending Act, Congress exempted transactions involving securities or
commodities accounts from disclosure.  Congress explicitly premised this exemption on the
understanding that the SEC would, pursuant to existing statutory authority under Section 10(b) of the
Exchange Act, promulgate similar disclosure rules in the securities field.  *See Robertson*, 749 F.2d at
535 (citing S. Rep. No. 392, 90th Cong., 1st Sess. 9 (1967)).  The SEC exercised this authority and
fulfilled its congressional directive when it promulgated Rule 10b-16.

("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."); *Johnson v. Transp. Agency*, 480 U.S. 616, 629 (1987) (finding that when Congress has not amended a statute to reject its judicial construction, courts may assume their interpretation is correct).

Defendants' reliance on *Sandoval* and *Stoneridge* is misplaced. (Silverman Mem. at 18-19). *Stoneridge* and *Sandoval* do not say anything about taking away existing private rights of action implied under Section 10(b); they say only that congressional enactment of the PSLRA has prevented the judiciary from creating new ones. Similarly, *Olmsted* and *Bellikoff* do not aid Defendants' arguments. Both cases declined to find the existence of an implied private right of action where none had ever existed.[224] Consistent with *Stoneridge*, these cases did not take away implied rights that courts had previously recognized, as is the case with Rule 10b-16. *See Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429, 433 n.3 (2d Cir. 2002) (finding there is no congressional intent "to overrule previous decisions recognizing implied rights of action…The instant case is distinguishable because no court of which we are aware has recognized a private right of action to enforce [the statutory provision at issue]."); *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110 (2d Cir. 2007) (refusing to find an implied private right of action in statutory provisions where no court had ever found one before).

Finally, given that courts recognize that Section 10(b) provides for a private right action when, for example, a company makes public misrepresentations or for

---

[224] Furthermore, both cases deal with implied private rights of action under the Investment Company Act, not Section 10(b).

a fraud on the market, it would be illogical if there were no private right of action for a

violation of Rule 10b-16, which is expressly directed to the private relationship between a

broker and its customer.

###### B.    The Rule 10b-16 Claim is Not Time Barred

There is also no merit to Defendants' argument that the Rule 10b-16 claim

is time-barred.  (Silverman Mem. at 25-26; THL Mem. at 25, n.8.)  Section 804 of the

Sarbanes-Oxley Act of 2002 extended the statute of limitations for federal securities

fraud to the earlier of (1) two years after the discovery of the facts constituting the

violation or (2) five years after such violation.  28 U.S.C. § 1658(b).  Here, Defendants'

breach of the disclosures requirements of Rule 10b-16 was a continuing breach that

recurred throughout the course of Plaintiffs' relationship with RCM.  Rule 10b-16

requires that each customer "[i]s given or sent a written statement, or statements, *at least*

*quarterly*, for each account in which credit was extended" disclosing each debit and

credit entered during such period.  SEC Rule 10b-16(2) (emphasis added).  RCM and the

Officer Defendants breached this requirement at the end of every quarter, when they

repeatedly failed to comply with this disclosure requirement.[225]  Because the final breach,

which gave rise to the claims asserted in this action, occurred in the fiscal quarter

immediately preceding the Bankruptcy, Plaintiffs' claims are timely as they brought suit

within five years of the last violation and within two years of Plaintiffs' discovery of the

violation.

The very earliest Plaintiffs could have been placed on notice of

Defendants' breach of Rule 10b-16 was some time after October 10, 2005, when Refco

---

[225]    Class Action Compl. ¶¶ 134-35 ; Capital Management Compl. ¶¶ 137-38; VR Compl. ¶¶ 162-63.

announced that the company discovered an undisclosed affiliate transaction and that the

company's financial statements could no longer be relied upon.  Consequently, the statute

of limitations had not expired on October 9, 2007, when the Complaints were filed.

Furthermore, the question of when Plaintiffs first learned of the Rule 10b-

16 violation is a factual matter not ripe for determination on a motion to dismiss.  *See In

re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.* No. 00 Civ. 7804 (LMM), 2004

WL 487222, at *5 (S.D.N.Y. Mar. 12, 2004) (when "questions of fact exist as to whether

Plaintiffs should have discovered the facts alleged in their complaint prior to the

expiration of the statute of limitations period, such determination is inappropriate on a

motion to dismiss."); *Sullivan v. Kodsi*, 373 F. Supp. 2d 302, 309 (S.D.N.Y. 2005)

(finding that for statute of limitations purposes the earliest date a plaintiff could have

discovered facts constituting a violation is a fact question, the resolution of which must

await discovery).

### C.    Rule 10b-16 Applies to Individual Defendants As Well As to Broker-Dealers

Several defendants argue mistakenly that Rule 10b-16 does not apply to

individuals.  (Silverman Mem. at 23-25; T. Grant Mem. at 13; Murphy/Sexton Mem. at

31; Trosten Mem. at 9.)  Case law discussing the implied private right of action under

Rule 10b-16 makes clear that the rule's disclosure requirements apply to individuals as

well as to broker-dealers.  Courts have permitted private claims under Rule 10b-16

against a variety of individual defendants, including account executives, a company

president, and a Chief Operating Officer.  *See Metzner v. D.H. Blair & Co.*, 689 F. Supp.

262, 267 (S.D.N.Y. 1988).  Other courts have allowed private Rule 10b-16 claims to

proceed against both a broker and its customer representatives.  *See Liang v. Dean Witter*

& Co., 540 F.2d 1107 (D.C. Cir. 1976); *Chem. Bank v. Shearson Lehman Bros., Inc.*, 91

Civ. 4915, 1992  U.S. Dist. LEXIS 10751 (S.D.N.Y. July 21, 1992).  Defendants do not

cite to a single case stating that Rule 10b-16 applies only to registered broker-dealers and

there is no basis for imposing such a limitation.

Furthermore, to the extent the Court finds that Rule 10b-16 does not apply

to individuals, the Officer Defendants and THL Defendants are nevertheless liable for

violations of Rule 10b-16 as controlling persons of RCM and Refco under Section 20(a)

of the Exchange Act.[226]

### D.    RCM and the Officer Defendants Failed to Provide the Necessary Disclosures Under Rule 10b-16 in the Customer Agreements and Monthly Account Statements

The THL Defendants point to the Customer Agreements and argue

erroneously that RCM disclosed the nature of the liens it asserted over customer

collateral (THL Mem. at 26.)  As discussed *supra* Section II.A.1, the Customer

Agreements made no such disclosures.  The THL Defendants also argue that the monthly

account statements accurately reflected credits and debits in customer accounts (THL

Mem. at 26-27.)  As stated *supra* Section II.A.2, this argument is without merit because

the monthly account statements disseminated by RCM and RSL deceptively presented to

customers that securities were held in their accounts when RCM was, in fact, taking

securities from customer accounts and selling them and then using the proceeds.

---

[226]  Class Compl. ¶ 382; Capital Management Compl. ¶ 371; VR Compl. ¶ 559.

## IX.  THE VR COMPLAINT ADEQUATELY PLEADS A 10B-5 VIOLATION AGAINST GRANT THORNTON

### A.  The VR Plaintiffs Claims Against Grant Thornton

Among the RCM customers pursuing federal securities law claims in this Court, only the VR Plaintiffs at present assert claims against Grant Thornton.  That is because, unlike the other plaintiffs, the VR Plaintiffs reviewed and relied upon the financial statements of Refco and RCM before initiating their relationship with, and entrusting their securities to, RCM [227]  Likewise, the VR Plaintiffs continued to receive, review, and rely upon, those financial statements throughout the period that they entrusted their securities to RCM.[228]  Grant Thornton knew that RCM financial statements would be disseminated to, and relied upon by, RCM customers who were entrusting their securities to RCM;  it was "typical practice" in the industry for brokers to provide their customers with such financial statements.[229]

In addition to the RCM Securities Fraud, the VR Complaint also alleges the existence of the RGHI Fraud.  The RGHI Fraud, perpetrated by Bennett, Grant, Maggio and Trosten, among others, hid certain customer trading losses, operating expenses, and other items that negatively affected Refco's financial position by recording them as additions to a debt owed by RGHI to certain Refco entities (collectively, the RGHI Receivable).[230]  The RGHI Receivable was then temporarily hidden at the end of reporting periods by a series of fraudulent round trip loans to third parties that served no

---

[227]  VR Compl. ¶ 89.

[228]  *Id*. ¶ 90.

[229]  VR Compl. ¶ 89.

[230]  *Id*. ¶ 30.

legitimate business purpose.[231]  As a result of Refco's failure to disclose the RGHI Fraud,

readers of Refco's financial statements, like the VR Plaintiffs, were left with a distorted

picture of Refco's financial condition.[232]

The VR Complaint alleges that the financial statements, which were

purportedly audited by Grant Thornton, were material to the VR Plaintiffs' decision to

place and maintain their securities with Refco because they (1) misled the VR Plaintiffs

about the financial condition of RCM and Refco, and (2) failed to disclose RCM's

improper use of RCM customers' fully-paid securities as RCM's own.[233]

The VR Complaint alleges that had Grant Thornton conducted a proper

audit and caused RCM's and Refco's financial statements to contain proper disclosures,

the VR Plaintiffs would not have entrusted their securities to RCM for safekeeping and

the securities would not have been converted pursuant to Defendants' scheme.[234]

Moreover, the VR Complaint alleges that had Grant Thornton conducted a

proper audit, it would have determined the existence of both the RCM Securities Fraud

and the RGHI Fraud, the discovery of which, in both cases, would have made apparent

the falsity of the Refco and RCM financial statements.[235]  Likewise, the VR Complaint

alleges that (1) had RCM and Refco been creditworthy, or (2) RCM had not been

---

[231]  *Id.* ¶ 31.

[232]  VR Compl. ¶¶ 31-35.

[233]  *Id.* ¶ 32-35.

[234]  *Id.* ¶¶ 37-44, 89-105, 222-34, 454-85.

[235]  Grant Thornton states incorrectly (GT Mem. at 16) that the VR Plaintiffs allege that their losses resulted only from the RCM Securities Fraud.  As described herein, the VR Complaint alleges that the VR Plaintiffs losses resulted from both the RCM Securities Fraud and the RGHI Receivables Scheme. Had Grant Thornton conducted a proper audit and disclosed either of those two fraudulent practices, the VR Plaintiffs would not have left their securities with RCM and therefore would not have suffered losses.

misusing customer securities, the VR Plaintiffs would not have suffered the injury for which they seek recompense in this action.[236]

The non-disclosure of the RGHI Fraud was material to the VR Plaintiffs because in placing and leaving their fully-paid securities with RCM, in addition to relying on the fact that their securities would be held in custody, the VR Plaintiffs were also relying on the fact that RCM and Refco would stand behind RCM's obligations.[237]  Had RCM been creditworthy, even in the face of its misuse of customer securities, RCM would have been able to make good on its obligations to its customers.[238]  And to induce the VR Plaintiffs to increase their relationship with RCM, RGL had provided a supplemental guarantee to the VR Plaintiffs in the amount of $200 million to provide an additional backstop for RCM's obligations, thereby making Refco's own financial condition highly material to the VR Plaintiffs as well.[239]

### B.     Grant Thornton Made Material False Statements

The VR Plaintiffs' case against Grant Thornton is based on Grant Thornton's own misstatements in the purportedly audited financial statements for Refco and RCM.  The VR Complaint explains that "Grant Thornton's unqualified audit opinions contained false and misleading statements in that they represented that they conducted an audit in accordance with GAAS, when Grant Thornton knew that it had not done so, and … represented that the financial statements were presented fairly in

---

[236]  *Id*. ¶¶ 37-44, 89-105, 222-34, 454-85.

[237]  *Id.*

[238]  *Id.*

[239]  *Id*. ¶¶ 97-98.

accordance with GAAP when Grant Thornton knew they were not."[240]  The VR

Complaint specifically identifies numerous ways in which (1) Grant Thornton failed to

comply with the provisions of GAAS and (2) Refco's financial statements were not

prepared in accordance with GAAP.  The violations of GAAS and GAAP pleaded in the

VR Complaint include:

- failure to audit related party transactions in accordance with GAAS;[241]

- failure to adequately assess internal controls in accordance with GAAS;[242]

- failure to identify risks in accordance with GAAS;[243]

- failure to comply with GAAS General Standards, including by failing to maintain, as auditor, "an independence in mental attitude" and failing to exercise "due professional care is to be exercised in the performance of the audit and preparation of the report";[244]

- failure to comply with GAAS Report Standards;[245]

- failure to disclose significant related party transactions in accordance with GAAP, Statements of Financial Accounting Statements ("SFAS") No. 57;[246]

- failure to take a charge for the uncollectible customer receivables in accordance with SFAS No. 5;[247]

- failure to comply with the general principles of GAAP, including Financial Accounting Standards Board Concept Statements No. 1, 2 and 6 and others requiring that financial statements contain a thorough and complete report of relevant information;[248]

---

[240]  *Id.* ¶¶ 38-39.

[241]  *Id.* ¶¶ 459-71.

[242]  *Id.* ¶¶ 472-74.

[243]  *Id.* ¶¶ 475-80.

[244]  *Id.* ¶¶ 457-58.

[245]  *Id.* ¶¶ 481-85.

[246]  *Id.* ¶¶ 225-27.

[247]  *Id.* ¶ 228.

[248]  *Id.* ¶ 232.

- failure to detect the RCM Securities Fraud;[249] and
- failure to detect the RGHI Fraud.[250]

The VR Complaint, in addressing each of these violations, alleges in detail how Grant Thornton failed to comply with GAAS and how Refco's financial statements were not prepared in accordance with GAAP, and, consequently, how those failures rendered Grant Thornton's audit reports false.[251]

Despite these detailed allegations, Grant Thornton argues (GT Mem. at 13) that the VR Complaint fails "to provide adequate notice about the nature of its fraud claims." As shown above, the VR Complaint is quite specific about Grant Thornton's particular failures and the resulting misrepresentations in its audit opinions. In the Refco Shareholders class action, this Court concluded that nearly identical allegations[252] were "sufficiently particular to survive the motion to dismiss, because they give… ample notice of the ways in which its unqualified audit reports allegedly misrepresented the propriety of its auditing practices and Refco's accounting practices." *In re Refco Inc. Sec. Litig.*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007). So too, here, Grant Thornton's

---

[249] *Id.* ¶¶ 37-44.

[250] *Id.* ¶¶ 37-44.

[251] Even if Grant Thornton seeks to challenge the specific allegations that Refco's financial statements did not comply with GAAP, that issue is not susceptible to resolution at the pleadings stage. As this Court noted, "[a]lthough the question of whether GAAP has been violated might appear to be a legal determination, the element of what is 'generally accepted' makes this difficult to decide as a matter of law," so that "at the current procedural phase, the plaintiffs' assertion that [the accounting practices] were not generally accepted must be taken as true". *In re Global Crossing*, 322 F. Supp. 2d at 339.

[252] The allegations of Grant Thornton's accounting failures common both to this action and to the Refco Stockholder Class Action include, with respect to GAAS, Grant Thornton's failure to detect massive fraud, to remain properly independent, or to confirm large loan transactions. As to the non-compliance with GAAP, the common allegations are that the financial statements did not disclose significant related party transactions or that Refco was a guarantor of those transactions, and that the statements violated general principles requiring that financial statements contain a thorough and complete report of relevant information. *See In re Refco Inc. Sec. Litig.*, 503 F. Supp. 2d at 656.

suggestion that the VR Complaint puts the auditing firm "in the impossible position of trying to divine VR Global's allegations" (GT Mem. at 17) is unfounded.

Grant Thornton tries to inject a red herring by focusing on allegations in the VR Complaint as to the uncollectibility of the "loans" made by RCM to various affiliates from the proceeds of the fraudulent sale of customer securities (GT Mem. at 13-16).  The sufficiency of such allegations *was* relevant to this Court's consideration, in its September 13, 2007 order dismissing the First Amended Class Action Complaint, of what conduct was alleged to be deceptive ("the complaint does not explain what aspect of any specific action was deceptive.  Was it the unauthorized sale of plaintiffs' assets that was fraudulent, or the decision to use the resulting funds for self-interested and unprofitable ends?"  *In re Refco Capital Mkts. Ltd., Brokerage Customer Sec. Litig.*, 06 Civ 643, 2007 WL 2694469, at *10).  The Complaints cure that deficiency and address the Court's query by making clear that the fraud lies in the unauthorized sale of Plaintiffs' assets.  The Complaints allege that RCM was not authorized to use customer securities, that customers had non-discretionary accounts, that the relevant Customer Agreements prohibited RCM's use of customer securities, and that RCM's customers, like the VR Plaintiffs, were thereby deceived about the unauthorized sale of their securities.  *See* above at Section II.  Thus, while the Complaints do allege that the purported loans that RCM made to its affiliates with the proceeds of the misappropriated securities were uncollectible, that uncollectibility is not a necessary element of the pleaded fraud, much less a requirement to establish that Grant Thornton's audit opinions were false or its audits insufficient.

C.    **The VR Complaint Adequately Alleges Grant Thornton's Scienter**

The VR Complaint contains sufficient allegations to support Grant Thornton's scienter -- that Grant Thornton's false statements were made knowingly, or at least recklessly -- under both the "conscious misbehavior or recklessness" test and the "motive and opportunity" test.

This Court does not approach consideration of Grant Thornton's scienter on a blank slate. Review of the evidence relating to the RGHI Fraud led the Examiner appointed by the Bankruptcy Court to conclude: "circumstantial evidence suggests that [Grant Thornton] may have had actual knowledge of the fraud."[253] Moreover, based on allegations similar to those contained in the VR Complaint, this Court has already concluded that there is a strong inference of scienter on Grant Thornton's part regarding the RGHI Fraud:

> "Given the size of the transactions, the fact that at least some of Refco's officers were allegedly involved in orchestrating it, and the volume of documentation allegedly created, however, this allegation - together with the others - contributes to a strong inference of scienter on Grant Thornton's part. Accordingly, Grant Thornton's argument that the plaintiffs have failed to allege scienter is without merit . . . ."

*In re Refco Inc. Sec. Litig.*, 503 F. Supp. 2d at 659.

Thus, Grant Thornton concedes on this motion that the VR Complaint's allegations are sufficient with respect to its scienter as to its false statements relating to the RGHI Fraud.[254] Grant Thornton is left to argue that, while there is a basis for the VR Plaintiffs to allege Grant Thornton's conscious or reckless involvement in giving false

---

[253]  *Id.*  ¶ 78.

[254]  VR Compl. ¶¶ 415-42; GT Mem. at 20.

audit statements relating to the RGHI Fraud, there is no basis to draw the same inference of scienter with respect to the false audit statements as they relate to the RCM Securities Fraud.[255]  Grant Thornton's argument makes no sense.  And as demonstrated below, the VR Complaint's allegations are more than sufficient to create a sufficient inference that Grant Thornton's scienter extended to both schemes.[256]

1.    **The VR Complaint Pleads Facts that Constitute Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness on the Part of Grant Thornton**

The VR Complaint alleges that, as auditor of the stand-alone financial statements of RCM and RSL as well as the other Refco entities, Grant Thornton knew that customer securities at Refco entities were required to be maintained in segregated accounts and were subject to minimum capital requirements and other regulations.[257] The VR Complaint further alleges that the RCM Financial Statements were false in omitting to disclose that RCM routinely converted customer securities to generate cash for use by other Refco affiliates and by deliberately mischaracterizing the fraudulent sales of customer securities and the subsequent up-streaming of the proceeds.[258]

Grant Thornton not only had access to, but actually audited and reviewed material information concerning RCM and the various loans it was making to upstream

---

[255]  GT Mem. at 18.

[256]  Grant Thornton argues that "the inference that Grant Thornton did not know about the fraud is at least as plausible – if not more so – than the inference that it did." GT Mem. at 18.  Even if Grant Thornton were correct that the inference that it did not know of the fraud is as plausible as the inference that it did, scienter would be sufficiently pleaded, as per the Second Circuit case law applying *Tellabs*.  *See supra* n. 115.

[257]  VR Compl. ¶ 449.

[258]  VR Compl. ¶¶ 449-51.

entities as a result of the sale of customer securities.[259]  Nevertheless, Grant Thornton knowingly failed to take the required audit steps to ensure that the RCM Securities Fraud was revealed and recklessly disregarded any resulting audit evidence it did receive.[260]

The VR Complaint alleges that auditors have an obligation to know and understand the general operations and practices of any business that they are auditing.[261] For that purpose, auditors are required to engage in discussions with key personnel, make visits to principal locations, and review internal material.[262]  In addition, auditors are expected to confirm account positions and balances, through sampling techniques or otherwise.  As the VR Complaint explains:

> "Grant Thornton's audit procedures did not ensure that RCM customers' fully-paid securities were being held for customers as was required under the Customer Agreements.  Had Grant Thornton taken the rudimentary steps of evaluating or analyzing RCM's standard Customer Agreement and comparing the securities that RCM had on hand against the securities that its customer accounts statements and other information identified as being held in custody for its customers, the fraudulent conversion scheme would have been apparent.  Having failed to take such steps, Grant Thornton gave clean audit opinions on RCM's Financial Statements notwithstanding that those financial statements failed to disclose to Plaintiffs and other RCM customers that RCM was improperly using RCM customers' fully-paid securities in violation of its Customer Agreements and its representations to those customers."[263]

The magnitude and materiality of the RCM Securities Fraud constitutes strong circumstantial evidence of conscious misbehavior or recklessness on the part of Grant Thornton.  RCM and Refco's misappropriation of customer securities was not an

---

[259]  *Id.* ¶¶ 450-53.

[260]  *Id.*

[261]  *Id.* ¶¶ 445-48.

[262]  *Id.* ¶ 446.

[263]  *Id.* ¶ 448.

isolated incident.  Rather it was an absolutely essential part of Refco's business model

and involved billions of dollars, which involved multiple transactions on a daily basis.

"The volume and size of the transfers involved, on many occasions hundreds of millions

of dollars each day, ensured that the amounts stolen in RCM customer assets substantially

outsized Refco's total capital."[264]  The VR Complaint alleges that the scheme was so

pervasive that it left RCM with in excess of $2 billion in missing assets.[265]  Courts

recognize that the frequent recurrence of major transactions is a significant red flag of

fraud to an auditor.[266]

Likewise, "the magnitude of the alleged fraud is properly considered in

weighing whether the complaint meets the pleading standard for scienter."  *In re Livent,*

*Inc. Sec. Litig.*, 148 F. Supp. 2d 331, 367-368 (S.D.N.Y. 2001); *see In re Sunbeam Sec.*

*Litig.*, 89 F. Supp. 2d 1326, 1345 (S.D. Fla. 1999) ("The sheer magnitude of the

restatements of [the company's] financial statements suggests [the auditor] should have

known or was severely reckless not to know that its Unqualified Audit Opinion was

misleading.").[267]  The VR Complaint alleges that "without continued, fresh infusions of

---

[264]  *Id.*

[265]  *Id.* ¶ 444; *Id.* ¶ 15 ("the amounts stolen from RCM customer accounts dwarfed Refco's total capital.")

[266]  *See In re Homestore.com Inc. Sec. Litig.*, 252 F. Supp. 2d 1018, 1044 (C.D. Cal. 2003) (finding that one of the most significant red flags is that, on numerous occasions, major transactions took place within the last few days of the quarter), *aff'd*, 452 F.3d 1040 (9th Cir. 2006); *In re Jefferson Insurance Co. v. Rouhana (In re Winstar Commc'ns.),* Nos. 01 CV 3014 (GDB), 01 CV 011522, 2006 WL 473885, at 37 (S.D.N.Y. Feb. 27, 2006) (same); *In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004) (same); *In re Kenneth L. Rubin, CPA & Michael W. Lewis, CPA*, Exchange Act Release No. ID-295, Admin. Proc. No. 3-11748, 2005 WL 2180440, at *15 (Sept. 8, 2005) (noting that for auditors, "GAAS recognize certain factors arouse suspicion and require a more focused investigation.  For example, large and unusual transactions require testing and special scrutiny under AU 316.20.") (internal citations omitted).

[267]  The magnitude of the fraud is especially relevant in assessing scienter, because "'common sense suggests that, all other things being equal, more opportunities should exist to discover a larger fraud than a smaller fraud, especially where, as here, the magnitude of the fraud was not accomplished by one fraudulent transaction of enormous monetary significance, but by countless small adjustments to

RCM customer assets, Refco would not have had sufficient liquidity to continue functioning, and would have collapsed long before it did."[268]  The VR Complaint also alleges that when the flow of RCM customer funds finally stopped, Refco did collapse, thus demonstrating the importance of these stolen securities to Refco's daily operations.[269]

        Importantly, Grant Thornton cannot blame its failure to detect the RCM Securities Fraud on the fact that the multi-billion dollars in daily transactions were shrouded in secrecy within the company; there was "no effort to hide the practice within Refco.   Instead the practice was discussed openly among relevant members of Refco management."[270]  Significantly, the RCM fraud was also evidenced in numerous documents maintained at Refco,[271] all of which were "readily available to Grant Thornton." [272]  These allegations raise a strong inference that Grant Thornton knew, or was reckless in not knowing, of all relevant aspects of the fraud.  *See In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999) (plaintiffs sufficiently

---

the accounting entries.'" *In re Livent*, 148 F. Supp. 2d at 367-68 (citation omitted).  As one court put it, "[t]he more serious the error, the less believable are defendants' protests that they were completely unaware of [the company's] true financial status and the stronger is the inference that defendants must have known about the discrepancy."  *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997).  *See also In re Leslie Fay Cos. Sec. Litig*., 835 F. Supp. 167, 175 (S.D.N.Y. 1993) ("In cases where small accounting errors only ripple through the corporate books, a court may conclude...that an accountant's failure to discover his client's fraud was not sufficiently reckless to sustain a 10b-5 claim. On the other hand, when tidal waves of accounting fraud are alleged, it may be determined that the accountant's failure to discover his client's fraud raises an inference of scienter on the face of the pleading.").

[268]  VR Compl. ¶ 247.

[269]  *Id*. ¶ 80.

[270]  *Id*. ¶ 124.

[271]  *Id*. ¶¶ 248-49, 411, 539.

[272]  *Id*. ¶ 41.

alleged auditor's scienter by pleading "'in your face facts,' … that cry out 'how could KPMG not have known that the financial statements were false.'").

Moreover, there is additional, circumstantial evidence demonstrating that Grant Thornton was looking the other way when it came to its audits of Refco and RCM. The VR Complaints allege that Grant Thornton knew at least the following:

1.      the transfers or "loans" from RCM to other Refco entities were substantial and recurring in nature, exceeding $2 billion in total;[273]

2.      the transfers lacked an obvious business purpose and benefited only the affiliates;[274]

3.      the transfers were made to other Refco entities who provided no assurances of their ability, intent, or obligation to repay the funds on demand or otherwise, who provided no security for the funds and lacked the financial wherewithal to repay the funds on demand or otherwise;[275]

4.      Bennett (as early as May 1998), Maggio, and others had confessed a desire to Grant Thornton to maintain Refco's value for a personally enriching sale of the company in the near future;[276]

5.      Refco's internal accounting controls were deficient, and, still worse, those already deficient controls were readily capable of being overridden by members of Refco's management;[277] and,

---

[273] VR Compl. ¶¶ 15, 53, 247, 444.

[274] *Id*. ¶ 452.

[275] *Id*. ¶¶ 21, 33-34.

[276] *Id*. ¶¶ 42, 425.

[277] *Id*. ¶¶ 42, 425.

6.    Refco's history of legal violations, including allegations of false trading reports, securities fraud and, significantly, shuffling funds between client accounts to hide losses.[278]

Indeed, the red flags were so many and significant at Refco that Grant Thornton internally categorized Refco as a "high risk" client.[279]  Given that this Court has already held that there are allegations to support a strong inference that Grant Thornton was reckless as to the RGHI Fraud, the magnitude, frequency and materiality of the RCM Securities Fraud, and the allegations establishing that Grant Thornton should have uncovered the scheme as part of its basic review of RCM's business, the VR Complaint clearly meets the requisite standard for pleading Grant Thornton's "conscious misbehavior or recklessness."  Numerous cases are on point, such as:

> *Katz v. Image Innovation Holdings, Inc.*, _____ F. Supp. 2d _____, 2008 WL 762105, at *5 (S.D.N.Y. Mar. 24, 2008) (denying motion to dismiss 10(b) claims against auditor because "[t]he allegations in the complaint go well beyond simply alleging violations of accounting principles, but instead point to red flags that alerted or should have alerted GGK, absent recklessness, to the fictitious sales");

> *In re Leslie Fay Cos.*, 871 F. Supp. 686, 699 (S.D.N.Y. 1995) (that "BDO ignored multiple 'red flags' could reasonably support an inference that BDO acted with intent");

> *Whalen v. Hibernia Foods PLC*, No. 04 Civ. 3182, 2005 WL 1799370, at *3 (S.D.N.Y. Aug. 1, 2005) (PwC ignored red flags that should have put it on notice that fraud was afoot);

> *In re Global Crossing Ltd. Securities Litigation*, 322 F. Supp. 2d at 347 (Andersen ignored numerous red flags);

> *In re Oxford Health Plans Inc. Securities Litigation*, 51 F. Supp. 2d at 295 (numerous red flags show that "KPMG must have been aware of [a fraud], if it were conducting any kind of audit");

---

[278]  *Id.* ¶¶ 279-93.

[279]  VR Compl. ¶ 426.

> ➢ *In re Jefferson Ins. Co. v. Rouhana (In re Winstar Communications)*, Nos. 01 CV 3014 (GDB) 01 CV 11522, 2006, WL 473885, at *11 (S.D.N.Y. Feb. 27, 2006) (finding scienter against auditor based upon its disregard of red flags and failure to inquire further);

> ➢ *In re Health Management Inc. Securities Litigation,* 970 F. Supp. 192, 203 (E.D.N.Y. 1997) (allegations that BDO violated auditing principles combined with its ignorance of numerous red flags, adequate to infer BDO turned a "blind eye" to fraudulent activities).

The inference of scienter finds further support in Grant Thornton's failure to discharge its responsibilities in accordance with GAAS and GAAP. The VR Plaintiffs allege that had Grant Thornton properly performed its audit function in accordance with GAAS and were Refco's financial statements properly prepared in accordance with GAAP, as Grant Thornton represented to Plaintiffs was the case, Grant Thornton would have easily uncovered the RCM Securities Fraud.[280] Those allegations provide additional basis for a finding that the VR Complaint adequately pleads scienter. *See In re Jefferson Ins. Co. v. Rouhana (In re Winstar Commc'ns)*, Nos. 01cv3014 (GDB), 01cv11522, 2006 WL 473885, at *11 (S.D.N.Y. Feb. 27, 2006) ("An auditor's reckless disregard of red flags, coupled with allegations of GAAP and GAAS violations, is sufficient to support a strong inference of scienter."); *In re AOL Time Warner Sec. & "ERISA" Litig*., 381 F. Supp. 2d 192, 238 (S.D.N.Y. 2004) (plaintiffs pleaded Section 10(b) claim against auditor with particularity where they alleged numerous specific 'red flags' in addition to numerous GAAP and GAAS violations that were ignored by E&Y).[281]

---

[280] VR Compl. ¶¶ 37-39.

[281] *See also In re Suprema Specialties, Inc., Sec. Litig*., 438 F.3d 256, 279-81 (3d Cir. 2006) ("At the pleading stage, courts have recognized that allegations of GAAS violations, coupled with allegations that significant "'red flags'" were ignored, can suffice to withstand a motion to dismiss."); *In re First Merchs. Acceptance Corp. Sec. Litig.*, No. 97 C 2715, 1998 WL 781118, at *10 (N.D. Ill. Nov. 4, 1998) ("'Other circumstances suggesting fraudulent intent' can include the presence of 'red flags' or warning signs that the financial reports are fraudulent, as well as the magnitude of the fraud alleged.").

Finally, the VR Complaint makes clear that Grant Thornton was not acting like an ordinary auditor with respect to Refco. Grant Thornton had abandoned the purported independence with which an auditor is supposed to discharge its responsibilities. Grant Thornton's lead partner on the account, Mark Ramler, who had been auditing Refco since 1992 -- first at Arthur Andersen and then bringing the account to Grant Thornton[282] -- bragged that his relationship with Refco was "so close" that Refco did not engage in any transactions without consulting him and that he was in contact with Refco on a daily basis to discuss transactions and business issues.[283] Given that relationship, it strains credulity to believe that Ramler and Grant Thornton could have been unaware that RCM was using hundreds of millions of dollars of customer securities on a daily basis in order to sustain the rest of Refco's businesses.

### 2. The VR Complaint Adequately Alleges Grant Thornton had Motive and Opportunity to Commit Fraud

Alternatively, the VR Complaint's scienter allegations are sufficient because they establish that Grant Thornton had motive and opportunity to commit fraud. Specifically, the VR Complaint alleges:

> "Grant Thornton's complete audit failure, including its decision to rely on unverified representations of management and to ignore innumerable red flags that would have triggered a high degree of skepticism and should have caused it to conduct a rigorous examination of Refco's books and records, indicates that Grant Thornton and Grant Thornton's lead engagement partner, Mark Ramler, compromised their independence and made the conscious decision to conceal the massive ongoing fraud in order to keep their marquee client happy.

> The motivation for Grant Thornton (and Ramler in particular) to do so was obvious – Refco was an extremely valuable account (resulting in approximately $10 million in fees for Grant Thornton from 2002 through

---

[282] VR Compl. ¶ 36.

[283] *Id*, ¶ 423.

2005) that Ramler himself managed.  Keeping the account through a successful IPO would constitute a coup both for Grant Thornton and for Ramler.  In a conscious attempt to maintain the illusion that Refco was financially solid so as to allow the Officer Defendants to cash out, Grant Thornton regularly issued unqualified audit opinions, having utilized audit procedures that amounted to no audit at all."[284]

Moreover, as discussed above, the VR Complaints allege that the Refco account was hugely important personally to Mark Ramler, the Grant Thornton partner with responsibility for the engagement.  The facts alleged in the VR Complaint create a strong inference that, motivated not only by the substantial fees he was collecting from the Refco accounts, but by the additional financial and reputational benefits he would secure from working on a public company client, Ramler caused Grant Thornton to compromise its independence.  *See In re Global Crossing Ltd. Sec. Litig.*, 322 F. Supp. 2d at 346 (holding that complaint adequately pleaded Arthur Andersen's motive through allegations that it turned a blind eye to the red flags in order to continue to generate significant fees); *In re Qwest Commc'ns Int'l Sec. Litig.*, 396 F. Supp. 2d 1178, 1208 (D. Colo. 2004) ("[a] desire to retain the business of a client who paid fees [of nearly $8 million] could motivate an auditor to disregard a client's accounting machinations," and finding scienter adequately pleaded based on allegations of auditor's motive, knowledge of accounting improprieties, and magnitude of improprieties).

Finally, the VR Complaint also alleges dual receipt of fees by Grant Thornton.  Plaintiffs allege that Grant Thornton received fees not only from auditing the financial statements of RCM, but also from auditing the financial statements of RGL and the other Refco Entities. VR Compl. ¶¶ 180, 417-18.  Courts "have been especially ready

---

[284]    VR Compl. ¶¶ 26-27.

to find motive pleading adequate to survive 12(b)(6) motions in cases where the auditing company plays a dual role with respect to the client." *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d at 345 (auditor's receipt of consulting fees in addition to audit fees supports inference of scienter); *see also In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314 (S.D.N.Y. 2001) (denying auditor's motion to dismiss on scienter grounds where "[t]he complaint alleges that during the class period [the auditor] was paid over $1 million for consulting work" in addition to audit work). And where, as here, allegations of fees received in dual capacities are coupled with GAAP and GAAS violations and red flags, the allegation of a strong profit motive become even more significant. *See, e.g.*, *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242, 1265 (N.D. Okla. 2003) (holding that high fees, coupled with specific allegations of GAAP and GAAS violations and allegations that Ernst & Young disregarded numerous "red flags," was enough to plead scienter).

### D.   The VR Complaint Adequately Pleads Loss Causation Against Grant Thornton

Under Supreme Court precedent, all that is required to plead loss causation are allegations that "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). The *Dura* Court reaffirmed that a complaint adequately pleads loss causation by complying with Rule 8(a)(2), which requires a "short and plain statement" only to "provide the defendant with 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Id* at 346.

Courts in this circuit have stated repeatedly that whether or not the chain of causation has been established "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Capital Inv. Mgmt., LLC v. Stonepath*

*Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).[285]  Likewise, courts have long held that

the foreseeability determination required to assess loss causation is a factual question to

be resolved by the finder of fact.  *See Snyder v. Four Winds Sailboat Centre, Ltd.*, 701

F.2d 251, 253 (2d Cir. 1983) (the matter of foreseeability is peculiarly a question of fact,

appropriately left to the fact finder); *Del Cid v. Beloit Corp.*, 901 F. Supp. 539, 549

(E.D.N.Y. 1995) ("proximate cause, negligence and foreseeability normally are questions

of fact, and are rarely suitable for determination as a matter of law") *aff'd*, 1996 U.S.

App. LEXIS 15842 (2d Cir. July 24, 1996).

 At a trial, the loss causation inquiry will focus on whether the "damages

suffered by plaintiff [are] a foreseeable consequence of any misrepresentation or material

omission." *Emergent*, 343 F.3d at 197.  *See also Suez Equity Inv. L.P. v. Toronto-

Dominion Bank*, 250 F.3d 87, 96 (2d Cir. 2001) ("The loss causation inquiry typically

examines how directly the subject of the fraudulent statement caused the loss, and

whether the resulting loss was a foreseeable outcome of the fraudulent statement.").

 The VR Complaint plainly alleges the requisite facts.  The VR Complaint

alleges that it was "typical practice" in the industry for securities brokers to disseminate

their financial statements to customers and that Grant Thornton was fully aware of that

---

[285]  S*ee also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) ("Loss causation is a
fact-based inquiry"); *In re Xethanol Corp. Sec. Litig.*, No. 06 Civ. 10234 (HB), 2007 WL 2572088, at
*2 n.2 (S.D.N.Y. Sept. 7, 2007) (loss causation is generally a fact-based inquiry inappropriate for
resolution on motion to dismiss); *Aiena v. Olsen*, 69 F. Supp. 2d 521, 535 (S.D.N.Y. 1999) (rejecting
argument that plaintiffs had not alleged that disclosure of concealed facts caused their loss because
"[D]efendants ask too much on a Rule 12 motion"); s*ee also In re Marsh & McLennan Cos., Sec.
Litig.*, 501 F. Supp. 2d 452, 490 (S.D.N.Y. 2006) (plaintiffs need only satisfy liberal Rule 8 notice
pleading requirements for loss causation); *In re NYSE Specialists Sec. Litig.*, 405 F. Supp. 2d 281, 315
(S.D.N.Y. 2005) (same); *Aquino v. Trupin*, 833 F. Supp. 336, 342 (S.D.N.Y. 1993) ("it is not necessary
to plead causation in any great detail").

practice.[286]  Surely it was foreseeable that a potential customer of RCM would review

and rely upon the company's financial statements in deciding whether to entrust its

securities to RCM.  *Cf. In re Ames Dep't Store Inc. Stock Litig.*, 991 F.2d 953, 967 (2d

Cir. 1993) ("[I]t is reasonable to assume that investors may very well rely on the material

contained in false corporate financial statements which have been disseminated in the

market place, and in so relying may subsequently purchase securities of the

corporation.").

That is exactly what the VR Plaintiffs allege that they did here; and, based

on the "clean" financial statements, the VR Plaintiffs (1) concluded that RCM and Refco

were secure, financially healthy companies, that presented minimal risk,[287] and (2) were

deceived as to RCM's practice of misusing RCM customer securities without those

customers' knowledge or consent.  Thus, a foreseeable consequence of Grant Thornton's

failure to perform its audit function in accordance with GAAS and GAAP was that

customers, such as the VR Plaintiffs, who reviewed Refco's and RCM's financial

statements, suffered losses when their understandings – based on their review of the

Grant Thornton-audited financial statements – turned out to be incorrect.

In *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005), *cert.

denied*, 546 U.S. 935 (2005), the Second Circuit explained that "a misstatement or

omission is the 'proximate cause' of an investment loss if the risk that caused the loss

was within the zone of risk concealed by the misrepresentations and omissions alleged by

a disappointed investor".  The VR Plaintiffs easily satisfy this standard.  The VR

---

[286]  VR Compl. ¶ 89.

[287]  VR Compl. ¶¶ 89-94.

Plaintiffs were damaged by reason of the RCM Securities Fraud, which should have been disclosed in the financial statements, together with the lack of creditworthiness of RCM and Refco, which also should have been disclosed in the financial statements, and resulted in those entities being unable to compensate the VR Plaintiffs for their losses. Had either the RCM Securities Fraud or the RGHI Fraud been disclosed in the financial statements, the VR Plaintiffs would not have entrusted their securities to RCM for safekeeping and they would not have suffered the injuries at issue in this action.[288] Plainly, the VR Plaintiffs' losses fall within the "zone of risk concealed" by the misrepresentations in the financial statements that are alleged in the VR Complaint.[289]

Grant Thornton also argues that the VR Plaintiffs' pleading of loss causation fails because those losses "were caused by a supervening event" (GT Mem. at 23). This argument fails for at least three reasons.

First, the supervening event argument is not one appropriately made on a motion to dismiss. *See Emergent*, 343 F.3d at 197 (whether an intervening event prevents the chain of causation from being established "is a matter of proof at trial"); *Woodling v. Garrett Corp*., 813 F.2d 543, 555 (2d Cir. 1987) (determination of proximate cause in situations where "circumstances permit varying inferences as to the foreseeability of the intervening act" is a factual determination); *In re Initial Public*

---

[288]  VR Compl. ¶¶ 38-39.

[289]  Grant Thornton cites several times to the discussion in *Stoneridge* regarding when the activities of a party accused of deceptive conduct are too remote from the plaintiff's injury to serve as a basis for liability. (GT Mem. at 21, 24). But *Stoneridge* is inapposite because the starting point for the Supreme Court's analysis in that case was that the defendants at issue, the suppliers, made no representations that could have been relied upon by the plaintiffs and "had no role in preparing or disseminating Charter's financial statements". 128 S. Ct. at 767. Here, by contrast, as discussed at length in the VR Complaint (*see infra* Section IX.B.), Grant Thornton made numerous misrepresentations and was responsible for auditing Refco's and RCM's financial statements that were relied upon by the VR Plaintiffs and caused their losses.

*Offering Sec. Litig.*, 241 F. Supp. 2d 281, 374 (S.D.N.Y. 2003) ("It is typically

inappropriate, however, to look to supervening causes when examining whether a

complaint has adequately pled loss causation."); *Burstyn v. Worldwide Xceed Group,*

*Inc.*, No. 01 Civ. 1125 (GEL), 2002 WL 31191741, at *6 (S.D.N.Y. Sept. 30, 2002)

("While a trier of fact might blame market forces rather than accounting violations for

that [share price] decline, the allegations in the complaint are sufficient to carry plaintiffs'

claims through this motion to dismiss."); *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830,

840-41 (1996) ("The issues of proximate causation and superseding cause involve

application of law to fact, which is left to the factfinder, subject to limited review.").

Second, Grant Thornton's argument misrepresents the VR Complaint's

allegations.  RCM's theft of customer securities relates directly to Grant Thornton's

alleged auditing failures.  As alleged by the VR Plaintiffs, RCM's misuse of customer

securities should have been disclosed in RCM's financial statements because it was a key

aspect of Refco's business model.[290]  And the VR Plaintiffs' losses arose directly out of

the misuse of securities that was not disclosed in those financial statements.  Thus, Grant

Thornton is simply wrong to characterize the misuse of customer securities as a

supervening event.

Finally, contrary to Grant Thornton's supervening event argument, the law

does not require a proximate cause to be the only cause.  A plaintiff can plead more than

one cause for its loss.  *See In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 509 (S.D.N.Y.

2005) ("plaintiff is not required to prove that the defendant's act was the sole and

exclusive cause of his injury; he need only show that it was substantial, *i.e.*, a significant

---

[290]  VR Compl. ¶¶ 443-53.

contributing cause."); *In re Initial Public Offering Sec. Litig.*, 227 F.R.D. 65, 115 n.378

(S.D.N.Y. 2004) (to prove loss causation, plaintiffs need not show that the alleged

scheme was the sole cause of loss).[291]

        Grant Thornton's reliance on *Bloor v. Carro, Spanbock, Londin, Rodman*

*& Fass*, 754 F.2d 57 (2d Cir. 1985) (GT Mem. at 23) is misplaced. *Bloor* involved a

bankruptcy trustee seeking, on behalf of a bankrupt corporation, to pursue federal

securities claims against a law firm that had effected a fraudulent offering of securities on

behalf of the now bankrupt corporation. *Id*. at 59. The Second Circuit held that, in

contrast to purchasers of the corporation's securities, who potentially could assert claims

against the law firm, the bankrupt corporation itself had actually benefited from the

fraudulent sale of its securities and accordingly could not assert a Section 10(b) claim.

*Id*. at 62. The trustee sought to base his securities law claim on the fact that the

corporation's proceeds from the fraudulent securities sales were subsequently stolen by

various corporate officers. *Id*. The Second Circuit affirmed the conclusion of the district

court that, "[w]hile it was arguably foreseeable that, as a result of appraisals overstating

the value of assets of the corporation, securities issued and sold by IFC would command

a higher price than their true value," "it was not reasonably foreseeable that inside

management of IFC would embezzle the funds so received for their personal use." *Bloor*

---

[291] Numerous Courts of Appeals have reached the same conclusion. *See Sparling v. Daou (In re Daou Sys., Inc. Sec. Litig.)*, 411 F.3d 1006, 1025 (9th Cir. 2005) (so long as the misrepresentation is "one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement"); *Miller v. Asensio & Co.*, 364 F.3d 223, 232 (4th Cir. 2004) (to establish loss causation plaintiff is not required "to prove that the defendant's fraud was the sole cause of the plaintiff's loss"); *Semerenko v. Cendant Corp.*, 223 F.3d 165, 186-87 (3d Cir. 2000) ("[s]o long as the alleged misrepresentations were a substantial cause of the inflation in the price of a security and its subsequent decline in value, other contributing forces will not bar recovery"); *Caremark Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997) ("[I]t is possible for more than one cause to affect the price of a security and, should the case survive to that point, a trier of fact can determine the damages attributable to the fraudulent conduct").

*v. Dansker (In re Investor Funding Corp. Sec. Litig.)*, 566 F. Supp. 193, 200 (S.D.N.Y. 1983).

      *Bloor* is inapposite. Here, it was entirely foreseeable that if customer securities were misappropriated by RCM, customers like the VR Plaintiffs would be exposed to risk of loss. Likewise, it was entirely foreseeable that if RCM and Refco turned out to be uncreditworthy, their customers who relied on inaccurate financial statements could well find themselves without a source of recovery in the event that their securities were somehow stolen or otherwise missing from their accounts. Thus, in this case, the VR Plaintiffs, like the purchasers of the corporation's stock in *Bloor*, are proper plaintiffs and nothing in *Bloor* supports Grant Thornton's argument that the VR Plaintiffs' allegations of loss causation are deficient. Indeed, if anything, *Bloor* supports the VR Plaintiffs' argument. *Bloor*, 754 F.2d at 63 ("The only harm that could have been prevented by [the law firm's] faithful exercise of its fiduciary duty would have been harm to the purchasers of the securities. But they are not parties to this action.").

## X.    LEAVE TO REPLEAD SHOULD BE GRANTED IF ANY PLEADINGS ARE FOUND TO BE INSUFFICIENT

      Plaintiffs respectfully request leave to replead in the event that any of the claims should be found to be deficient as pleaded.[292] It is familiar law that leave to replead should be "freely given." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387, 402 (2d Cir. 2001) (reversing dismissal of claim and

---

[292] Seeking leave to replead by means of a request in a brief in opposition to a motion to dismiss is appropriate. *See McLaughlin v. Anderson*, 962 F.2d 187, 195 (2d Cir. 1992) ("lack of a formal motion is not [a] sufficient ground for a district court's dismissal without leave to amend, so long as the plaintiff has made its willingness to amend clear"); *Oliver Sch., Inc. v. Foley*, 930 F.2d 248, 252-53 (2d Cir. 1991) (noting that leave to amend should be granted even without an explicit motion where the adverse party had knowledge of desire to amend).

granting plaintiff opportunity to replead on remand).  Indeed, recognizing that the federal

rules favor resolving cases on their merits, courts in this Circuit have long been reluctant

"to preclude the prosecution of a possibly meritorious claim because of defects in the

pleadings."  *Ross v. A.H. Robins Co.*, 607 F.2d 545, 547 (2d Cir. 1979) (reversing

dismissal with prejudice of Plaintiffs' securities fraud complaint).  Accordingly, "[i]t is

the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec*

*Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (citing *Ronzani v. Sanofi*

*S.A.*, 899 F.2d 195, 198 (2d Cir. 1990)); *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir.

1987).

        Plaintiffs in the VR and Capital Management Actions have not previously

sought leave to amend and therefore should be granted this opportunity in the event that

their claims are dismissed.  "[T]he court should normally give the Plaintiff at least one

opportunity to amend the complaint." *Oliver Sch., Inc*., 930 F.2d at 253; *see Wiggins v.*

*Weicker*, 104 F.3d 351 (Table), 1996 WL 617569, at *1 (2d Cir. Oct. 28, 1996); *Devaney*,

813 F.2d at 569 (reversing dismissal where plaintiff had no opportunity to address

deficiencies identified in complaint); *ATSI Commc'ns, Inc. v. Shaar Fund Ltd.*, No. 02

Civ. 8726 (LAK), 2004 WL 616123, at *4 (S.D.N.Y. Mar. 30, 2004) (granting leave to

replead after dismissal of amended complaint for deficiencies under PSLRA and Fed. R.

Civ. P. 9(b)).

        This Court previously dismissed the First Amended Class Action

Complaint for failure to plead deception adequately without considering any other

substantive arguments for dismissal raised by the Defendants.  Thus, to the extent the

class action is dismissed based on anything other than whether deception has been

adequately pleaded, Class Plaintiffs should be granted leave to amend.  Moreover, should

the allegations of deception be found to be insufficient as pleaded yet capable of being

cured with repleading, the Class Plaintiffs respectfully request the opportunity to cure

such deficiencies.[293]

## **CONCLUSION**

For the reasons discussed herein, the Defendants' motions to dismiss

should be denied and the Plaintiffs in the Class Action, Capital Management and VR

Complaints should be permitted to proceed to discovery on their claims.

Dated: New York, NY
          April 28, 2008

MILBANK, TWEED, HADLEY & McCLOY LLP

/s/ Scott A. Edelman

Scott A. Edelman (SE 5247)
Sander Bak (SB 2263)
Michael Shepherd (MS 1313)
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000
sbak@milbank.com
*Counsel for the Capital Management and VR
Plaintiffs*; *Proposed Co-Lead Counsel for Lead
Plaintiffs and the Putative Class*

---

[293] Courts in this District have allowed the filing of amended pleadings in securities class actions even after dismissing second or third amended complaints. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02 Civ. 3400 (WCC), 2005 WL 81704, at *35 (S.D.N.Y. Jan. 12, 2005) (granting leave to file fourth amended complaint); *Baena v. Woori Bank*, 515 F. Supp. 2d 414, 426 (S.D.N.Y. 2007) (fourth amended complaint); *Hunt v. Enzo Biochem, Inc.*, 530 F. Supp. 2d 580, 601 (S.D.N.Y. 2008) (granting leave to file a third amended complaint)*; In re Currency Conversion Fee Antitrust Litig.*, No. 01 MDL 1409, M-21-95, 2006 WL 3247396, at *4 (S.D.N.Y. Nov. 8, 2006) (third amended complaint)*; In re Winstar Commc'ns*, No. 01 CV 3014 (GBD) 2006 WL 473885, at *1 (S.D.N.Y. Feb. 27, 2006) (third amended complaint).

KIRBY McINERNEY & SQUIRE, LLP

/s/ Mark A. Strauss

Richard L. Stone (RS 5324)
Mark A. Strauss (MS 2288)
830 Third Avenue
New York, NY  10022
Tel.: (212) 371-6600
Fax:  (212) 751-2540
mstrauss@kmllp.com
*Co-Lead Counsel for Lead Plaintiffs and the
Putative Class*