UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re REFCO CAPITAL MARKETS, LTD. BROKERAGE CUSTOMER SECURITIES LITIGATION | 06 Civ. 643 (GEL) |
| VR GLOBAL PARTNERS, L.P., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>PHILIP R. BENNETT, et al.,<br><br>Defendants. | 07 Civ. 8686 (GEL) |
| CAPITAL MANAGEMENT SELECT FUND, LTD., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>PHILIP R. BENNETT, et al.,<br><br>Defendants. | 07 Civ. 8688 (GEL) |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE THL DEFENDANTS' MOTION TO DISMISS

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

Attorneys for Defendants Thomas H. Lee Partners, L.P., Thomas H. Lee Advisors LLC, THL Managers V, LLC, THL Equity Advisors V, LLP, Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., Thomas H. Lee Investors Limited Partnership, 1997 Thomas H. Lee Nominee Trust, Thomas H. Lee, David V. Harkins, Scott L. Jaeckel, and Scott A. Schoen

## Table of Contents

**Page**

Preliminary Statement ................................................................................................... 1

Argument ....................................................................................................................... 2

I.   PLAINTIFFS HAVE FAILED TO PLEAD WITH
     PARTICULARITY FACTS DEMONSTRATING THAT THE
     CUSTOMER AGREEMENT CONTAINED ANY
     MISREPRESENTATION OR OMISSION OR CONSTITUTED
     ACTIONABLE DECEPTIVE CONDUCT ................................................ 2

     A.   Plaintiffs Concede that RCM Could Use Customer
          Securities to the Extent of Customers' Margin Balances ................ 2

     B.   Under the Customer Agreement, RCM Could Use All
          Securities in the Account of a Customer who Obtained a
          Margin Loan .................................................................................... 3

     C.   The Margin Agreement Confirms RCM's Contractual
          Authority to Use All Securities in the Account of a
          Customer who Obtained a Margin Loan ......................................... 4

     D.   The Customer Agreement Contains No Representation that
          RCM Would Not Use Securities in Customer Accounts .................. 6

     E.   RCM's Standard-Form Trade Confirmation Further
          Demonstrates that Plaintiffs Have Alleged No
          Misrepresentation or Deceptive Conduct Respecting
          RCM's Use of Plaintiffs' Securities ................................................ 11

     F.   In Any Event, Plaintiffs May Not Base a Claim for Fraud
          Merely on an Alleged Breach of Contract by RCM ......................... 14

II.  PLAINTIFFS HAVE ALSO FAILED TO PLEAD WITH
     PARTICULARITY FACTS DEMONSTRATING ANY
     MISREPRESENTATION, OMISSION, OR DECEPTIVE
     CONDUCT APART FROM THE CUSTOMER AGREEMENT .............. 15

     A.   RCM's Customer Account Statements Were Not Deceptive .......... 15

     B.   Plaintiffs Fail to Plead Any Oral Misrepresentation ...................... 17

     C.   Plaintiffs Do Not Plead with Particularity Any
          Representation that RCM Was Subject to U.S. Regulatory
          Law ................................................................................................ 18

i

III.   NEITHER RCM NOR THE THL DEFENDANTS BREACHED
       ANY FIDUCIARY DUTY TO PLAINTIFFS ............................................ 23

IV.    PLAINTIFFS FAIL TO PLEAD PRIMARY LIABILITY AS TO
       THE THL DEFENDANTS ........................................................................ 24

V.     PLAINTIFFS DO NOT PLEAD FACTS ESTABLISHING A
       "STRONG INFERENCE" OF SCIENTER AS TO THE THL
       DEFENDANTS ......................................................................................... 26

       A.    Plaintiffs Fail to Allege Facts Showing that THL
             Defendants Had Both Motive and Opportunity to Commit
             the Alleged Fraud .......................................................................... 27

       B.    Plaintiffs Fail to Allege Facts Constituting Strong
             Circumstantial Evidence of Conscious Misbehavior or
             Recklessness ................................................................................. 29

VI.    PLAINTIFFS LACK STANDING TO BRING A 10b-5 CLAIM .............. 33

VII.   PLAINTIFFS FAIL TO PLEAD A VIOLATION OF RULE 10b-
       16 ............................................................................................................. 34

Conclusion ....................................................................................................... 35

<h1 style="text-align:center">Table of Authorities</h1>

**Page(s)**

**FEDERAL CASES**

*Acito v. IMCERA Group, Inc.*,
   47 F.3d 47 (2d Cir. 1995) .................................................................28

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ........................................................20, 29

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) .....................................................................21

*In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*,
   67 B.R. 557 (D.N.J. 1986) .................................................................8

*Bissell v. Merrill Lynch & Co., Inc.*,
   937 F. Supp. 237 (S.D.N.Y. 1996), *aff'd*, 157 F.3d 138 (2d Cir. 1998) ...............24

*Caiola v. Citibank, N.A.*,
   295 F.3d 312 (2d Cir. 2002) ...............................................................33

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1994) .....................................................................26

*Cosmas v. Hassett*,
   886 F.2d 8 (2d Cir. 1989) ................................................................32

*De Kwiatkowski v. Bear, Stearns & Co., Inc.*,
   306 F.3d 1293 (2d Cir. 2002) ...............................................................7

*Elliott Assocs., L.P. v. Hayes*,
   141 F. Supp. 2d 344 (S.D.N.Y. 2000) ....................................................15

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
   343 F.3d 189 (2d Cir. 2003) ...............................................................20

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*,
   376 F. Supp. 2d 385, 404 (S.D.N.Y. 2005) ..............................................31

*Geiger v. Solomon-Page Group, Ltd.*,
   933 F. Supp. 1180 (S.D.N.Y. 1996) ....................................................27

*In re GeoPharma, Inc. Sec. Litig.*,
   411 F. Supp. 2d 434 (S.D.N.Y. 2006) ....................................................27

iii

*In re Global Crossing, Ltd. Sec. Litig.*,
  322 F. Supp. 2d 319 (S.D.N.Y. 2004)................................................................26

*Hevesi v. Citigroup, Inc.*,
  366 F.3d 70 (2d Cir. 2004) ..............................................................................21

*High View Fund, LP v. Hall*,
  27 F. Supp. 2d 420 (S.D.N.Y. 1998)................................................................28

*Honeyman v. Hoyt (In re Carter-Wallace, Inc. Sec. Litig.)*,
  220 F.3d 36 (2d Cir. 2000) ..............................................................................30

*In re Initial Public Offering Sec. Litig.*,
  544 F. Supp. 2d 277 (S.D.N.Y. 2008)..............................................................21

*Jaksich v. Thomson McKinnon Sec., Inc.*,
  582 F. Supp. 485 (S.D.N.Y. 1984)...................................................................33

*Kalnit v. Eichler*,
  264 F.3d 131,139 (2d Cir. 2001).......................................................................27

*Katara v. D.E. Jones Commodities, Inc.*,
  835 F.2d 966 (2d Cir. 1987) ..............................................................................4

*Kavowras v. N.Y. Times Co.*,
  328 F.3d 50 (2d Cir. 2003) ................................................................................5

*Keady v. J.P. Morgan Chase & Co.*,
  No. 07 Civ. 9896 (JSR), 2008 WL 638444 (S.D.N.Y. Mar. 3, 2008)....................5

*Kirschner v. Bencorp Casa de Bolsa,*
  *C.A.*, No. 05-60006 (Bankr. S.D.N.Y. Dec. 29, 2006)........................................23

*Komanoff v. Mabon, Nugent & Co.*,
  884 F. Supp. 848 (S.D.N.Y. 1995)...................................................................33

*Lentell v. Merrill Lynch & Co., Inc.*,
  396 F.3d 161 (2d Cir. 2005) ............................................................................26

*In re Merrill Lynch & Co., Inc.*,
  273 F. Supp. 2d 351 (S.D.N.Y. 2003)..............................................................11

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*, Nos. 02 MDL 1484, 07
  CIV 6677 (JFK), 2008 WL 2019680 (S.D.N.Y. May 8, 2008)...........................21

*Mills v. Polar Molecular Corp.*,
  12 F.3d 1170 (2d Cir. 1993) ............................................................................14

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ............................................................................29

*In re Parmalat Sec. Litig.*,
   383 F. Supp. 2d 616 (S.D.N.Y. 2005) ...............................................................25

*In re Philip Services Corp. Sec. Litig.*,
   383 F. Supp. 2d 463, 475 (S.D.N.Y. 2004) .......................................................33

*Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999)...........................................23

*Puckett v. Rufenacht, Bromagen & Hertz, Inc.*,
   903 F.2d 1014 (5th Cir. 1990) ............................................................................7

*In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*,
   ("*RCM I*"), No. 06 Civ. 643 (GEL), 2007 WL 2694469 (S.D.N.Y. Sept. 13,
   2007)..............................................................................................................passim

*In re Refco, Inc.*,
   No. 05-60006 (Bankr. S.D.N.Y. Mar. 14, 2006) ...........................................8, 20

*In re Refco Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007) ...............................................................28

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000) ...............................................................................28

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ...............................................................................30

*SEC v. Zandford*,
   535 U.S. 813 (2002)............................................................................................7

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994) ..............................................................................27

*Stevelman v. Alias Research Inc.*,
   174 F.3d 79 (2d Cir. 1999) ...............................................................................28

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
   128 S.Ct. 761 (2008) .............................................................................20, 24, 25

*TCS Capital Mgmt., LLC v. Apax Partners, L.P.*,
   No. 06-CV-13447 (CM), 2008 WL 650385 (S.D.N.Y. 2008)..............................26

*Teamsters Local 445 Freight Div. Pension Fund v. Bombadier, Inc.*,
   No. 05 Civ. 1898 (SAS), 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006)................21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  127 S. Ct. 2499 (2007) ............................................................................... 28, 29

*In re Veeco Instruments, Inc. Sec. Litig.*,
  235 F.R.D. 220, 231-233 (S.D.N.Y. 2006) ................................................. 31, 32


## FEDERAL STATUTES

11 U.S.C. § 101(53A) (2007) ....................................................................................... 8

11 U.S.C. § 741(2) (2007) ...................................................................................... 8, 13

11 U.S.C. §§ 741-53 (2007) ...................................................................................... 18

Securities Exchange Act of 1934 § 10(b),15 U.S.C. § 78j (2007) ........................... 20, 24, 25, 33

Securities Exchange Act of 1934 § 20(a), 15 U.S.C. § 78t (2007) ............................................. 34


## RULES

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (2008) ................................................. *passim*

SEC Rule 10b-16, 17 C.F.R. § 240.10b-16 (2008) .................................................. 34

Fed. R. Civ. P. 12(b)(6) .......................................................................................... 11

Fed. R. Civ. P. 23 ............................................................................................... 20, 21

New York Stock Exchange Rule 431 ....................................................................... 22


## OTHER AUTHORITIES

Andrew R. Sorkin, *When Private Equity Stays the Course*, N.Y. Times, at C6 .......................... 28

Charles F. Rechlin, *Securities Credit Regulation* (2d ed. 2007) ................................. 22

Financial Services Authority, Discussion Paper, *Hedge funds: A discussion of risk and regulatory engagement* (June 2005) ............................................................... 4

International Settlements, *Triennial Bank Survey, Foreign Exchange and Derivatives Market Activity in 2004* 15 (March 2005) .......................................... 21

Letter from Richard Metcalfe, Senior Policy Director, International Swaps and
    Derivatives Association, Inc., to Andrew Shrimpton et al., Asset Management
    Sector Team, Financial Services Authority, *Response to FSA* (2005).....................5

*Repeal of the Ten Commandments: The Impact on the Offshore Hedge Fund
    Administration Industry*,
    http://www.hedgefundnews.com/news ................................................................22

Richard A. Lord, *Williston on Contracts* ("*Williston on Contracts*") (4th ed. 2003)...................14

Thomas P. Lemke, et al., *Securities Laws Handbook Series* ........................................................4

Victor Fleischer, *The Missing Preferred Return*, 21 Iowa J. Corp. L. 77, 83 (2005)...................28

## Preliminary Statement

Plaintiffs' central grievance is that RCM used[1] securities in their accounts, and failed to segregate those securities or otherwise keep them "safe." ***Plaintiffs' opposition brief concedes that under the Customer Agreement governing the relationship between RCM and each of its customers, RCM could use securities in the account of each customer with margin loans, up to the amount of the outstanding loans to customers.*** The complaints allege that each individual plaintiff and each of the putative representative plaintiffs obtained margin loans from RCM. Plaintiffs do not plead with particularity facts demonstrating that RCM's use of securities in their accounts exceeded the use permitted by plaintiffs' own reading of the Customer Agreements.

Furthermore, RCM's right to use customer securities was much more extensive than plaintiffs' concession implies. The plain text of the Customer Agreement allowed RCM to use *all* customer securities held in the account of a customer with margin loans, regardless of whether the value of the securities used by RCM exceeded the amount of the customer's then-outstanding margin loans. RCM's rights in this regard are also spelled out clearly in the Margin Agreement signed by customers who wanted to take advantage of the financing available through RCM. The Margin Agreement states that RCM may use "*all* securities and other property deposited by you [the customer] with [RCM] . . . separately or in common with other securities or any other property . . . for the sum due to [RCM] thereon or for a *greater sum*." (Margin Agreement ¶ 4, Rosen Reply Decl., Ex. A (emphasis added).)

---

[1] When this brief refers to RCM's "use" of securities, the term "use" means RCM's loan, pledge, sale, hypothecation, or other use of or disposal of customer securities as part of RCM's business and financing activities. For this purpose, RCM's "use" of securities does not include any transaction involving customer securities undertaken by RCM on behalf of a customer or for the customer's account.

Even if plaintiffs had pleaded that RCM used customer securities in a manner or to an extent not permitted by the Customer Agreement or the Margin Agreement, plaintiffs would have pleaded only a breach of contract by RCM. Plaintiffs must plead more: to the extent they purport to rely affirmatively on the Customer Agreement, plaintiffs must plead facts demonstrating that the Customer Agreement or Margin Agreement contained misrepresentations or was otherwise fraudulent. They have failed to do so.

In short, plaintiffs have not pleaded any facts identifying any mirepresentation, omission, or deceptive conduct for which the THL Defendants can be held liable. The Court dismissed the prior complaint on this basis and should do so here.

## Argument

### I.  PLAINTIFFS HAVE FAILED TO PLEAD WITH PARTICULARITY FACTS DEMONSTRATING THAT THE CUSTOMER AGREEMENT CONTAINED ANY MISREPRESENTATION OR OMISSION OR CONSTITUTED ACTIONABLE DECEPTIVE CONDUCT

In its opinion dismissing the Class plaintiffs' First Amended Complaint, this Court stated that "[t]he complaint must be dismissed because it fails sufficiently to allege deceptive conduct." *In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.* ("*RCM I*"), No. 06 Civ. 643 (GEL), 2007 WL 2694469, at *5 (S.D.N.Y. Sept. 13, 2007). That is true of plaintiffs' current complaints as well.

### A.  Plaintiffs Concede that RCM Could Use Customer Securities to the Extent of Customers' Margin Balances

Plaintiffs concede that the margin provisions of the Customer Agreement "permit RCM to use customer securities . . . to the extent that customers had a margin balance." (Opp'n at 24.) That is, when an RCM customer had an outstanding margin loan from RCM, RCM could use the customer's securities up to "a value equal to [the] customers' [sic] margin balance." (*Id.* at 23 n.66.) That concession—and indeed a broader view of

RCM's authority to use securities than plaintiffs acknowledge—is dictated by the plain text of the Customer Agreement.

Each individual plaintiff, and each of the putative class representatives, alleges that it obtained margin loans from RCM. (*See VR* Compl. ¶ 96; *Capital* Compl. ¶¶ 68, 80, 93; Class Compl. ¶ 130.) RCM was therefore entitled to use plaintiffs' securities in the way just described. *See also infra* pp. 10-11.

**B.    Under the Customer Agreement, RCM Could Use All Securities in the Account of a Customer who Obtained a Margin Loan**

The margin provisions of the Customer Agreement actually allow for much more extensive use of customer assets than plaintiffs admit. These provisions allowed RCM to use *any and all* property in a customer's account while that customer had an outstanding margin loan. Section B.1 of the Customer Agreement granted RCM a security interest, for each customer with any financing provided by RCM, in "*all* of your cash, securities and other property . . . in the possession or under the control of such Refco Entities, whether or not such cash, securities and other property were deposited with such Refco Entities." (Customer Agreement, Rosen Decl., Ex. B at 1 (emphasis added).) Section B.2 of the Customer Agreement allowed RCM to use "*such* cash, securities and other property." (Customer Agreement at 1 (emphasis added).) The word "such" in this phrase refers to the broadly inclusive list just quoted from Section B.1.

Plaintiffs' attempts to narrow the margin provisions founder. Plaintiffs claim that the use of the term "collateral" somehow shows that RCM could only use customer property up to the value of outstanding margin loans. (*See* Opp'n at 23 n.66.) But collateral can, and often does, exceed the value of the loan that it secures. Overcollateralization is especially common, and especially appropriate, where the collateral consists of securities,

whose value can fluctuate. If overcollateralization were not permitted, even a slight decline in the price of securities deposited as collateral would leave a loan undersecured.[2]

Plaintiffs also argue that RCM's right under the Customer Agreement to demand "additional collateral" would be meaningless if RCM could use all of the securities in plaintiffs' Refco accounts. (Opp'n at 23 n.66.) This right to demand additional collateral is simply the right to make a margin call. By making a margin call, RCM would ask a customer to *add*, as collateral, assets from outside sources to their accounts. *See, e.g., Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 968 (2d Cir. 1987) ("The process of notifying the customer to make [a] required additional deposit is a 'margin call.'").

### C. The Margin Agreement Confirms RCM's Contractual Authority to Use All Securities in the Account of a Customer who Obtained a Margin Loan

RCM's broad authority to use customer securities under the Customer Agreement is confirmed by the Margin Agreement and a separate Tri-Party Agreement entered into by RCM customers who wished to obtain margin loans on securities in their accounts.[3] These documents confirm the broad security interest, and broad ability to use customer securities, granted to RCM:

---

[2]   The *VR* Complaint explains VR's awareness that RCM routinely used securities deposited with it by margin customers, and that for each margin customer, the value of the securities used could exceed the amount of the customer's margin loans. According to VR, a Refco representative informed VR, before VR commenced doing business with RCM, that Refco "would lend money to one party in exchange for securities as collateral *and then simultaneously conduct an equal and opposite transaction with a third party*." (*VR* Compl. ¶ 86 (emphasis added).) In other words, RCM would routinely use the securities deposited with it as collateral for a margin loan. (*Id.*) VR further explained that a risk of doing business in this way is "that the value of the collateral security may in rare instances erode very quickly . . . with the result that a portion of the loan amount becomes unsecured. To compensate for this risk, a broker will typically impose a 'haircut' in lending money, meaning that *the broker will lend the borrower less than full market value of the collateral* . . . ." (*Id.* (emphasis added).)

[3]   *See* Thomas P. Lemke, et al., *Hedge Funds and Other Private Funds: Regulation and Compliance* 10 (Eric Smalley ed., Thomson/West 2007) ("Prime brokers typically retain the authority to rehypothecate [] hedge fund's assets as a means financing the prime broker's operations . . . ."); Financial Services Authority, Discussion Paper, *Hedge funds: A discussion of risk and regulatory engagement* 34 (June 2005) ("Re-

> To secure your obligations under Transactions entered into pursuant to this Agreement, you hereby grant to [RCM] a security interest in all of your securities and other property . . . in the possession or under the control of [RCM]. [RCM] shall have the right to pledge, hypothecate or otherwise use or dispose of such securities and other property until settlement in full of all Transactions . . . .

(*See* Margin Agreement ¶ 2, Rosen Reply Decl., Ex. A; Tri-Party Agreement ¶ 2, Rosen

Reply Decl., Ex. B.)

Each of these documents also contained the following additional language:

> *Consent to Loan or Pledge of Securities.* To the extent permitted by applicable law and governmental regulations, all securities and other property deposited by you with [RCM] may be loaned, pledged, repledged, hypothecated or re-hypothecated by [RCM] separately or in common with other securities or any other property, for the sum due to [RCM] thereon *or for a greater sum* and without retaining in [RCM]'s possession and control for delivery a like amount of a similar securities [*sic*] or other property.

(Margin Agreement ¶ 4 (emphasis added); *see* Tri-Party Agreement ¶ 5 (same).)[4]

---

hypothecation is a key generator of prime brokerage revenue and is often linked to the terms on which other prime brokerage services are offered to the hedge funds."); Letter from Richard Metcalfe, Senior Policy Director, International Swaps and Derivatives Association, Inc., to Andrew Shrimpton et al., Asset Management Sector Team, Financial Services Authority, *Response to FSA*, 5 (2005) ("Generally speaking rehypothecation–or, strictly speaking, re-use–is a standard feature of collateral arrangements and allows dealer firms to maximise the cost-effectiveness of their collateral process. Any undue constraint on this efficiency could only have a negative effect on the price at which services were offered to customers of the firms. . . . We certainly see no general policy problem, however, in 'rehypothecation'–quite the contrary, in fact.").

[4]    The Court may consider these contracts because they are documents that were either exhibits in the trial before Judge Drain that plaintiffs rely on in their complaints and their brief or documents that one of the *Capital* Plaintiffs publicly filed in the bankruptcy proceedings concerning Refco.  *See Kavowras v. N.Y. Times Co.*, 328 F.3d 50, 57 (2d Cir. 2003) (holding that "[j]udicial notice may be taken of public filings" and that courts can therefore consider such filings on a motion to dismiss); *Keady v. J.P. Morgan Chase & Co.*, No. 07 Civ. 9896 (JSR), 2008 WL 638444, at *2 (S.D.N.Y. Mar. 3, 2008) (noting that, as to a "publicly filed document of which the Court may take judicial notice," the court could "consider [the] document[] in adjudicating the motion to dismiss").

**D.    The Customer Agreement Contains No Representation that RCM Would Not Use Securities in Customer Accounts**

1.    *The Customer Agreement*

Plaintiffs do not identify any representation in the Customer Agreement that RCM would not use customer assets as it allegedly did.  Plaintiffs point to Section A of the Agreement, entitled "<u>AUTHORIZATION</u>."  (Opp'n at 21.)  Section A.1, entitled "Authority to Act," authorizes RCM to transact "*for your [the customer's] account* in accordance with [the customer's] oral or written instructions."  (Customer Agreement, Rosen Decl., Ex. B, at 1 (emphasis added).)  Section A.1 of the Customer Agreement thus pertains only to trading *for the customers' account.*  Section A.1 further states:

> Except to the extent you [the customer] have expressly authorized someone else to buy, sell and otherwise effect Transactions *on your behalf and for your account*, all Transactions . . . entered into pursuant to this Agreement shall be initiated orally or in writing by you.

(*Id.* (emphasis added).)  As the "except" clause indicates, this sentence also addresses only trading that occurs "on your behalf and for your account."  By its terms, Section A.1 has no application to RCM's use of customer securities, where that use was not on behalf of, and for the account of, the customer, but was instead part of RCM's own business and financing activities.

Section A.2 confirms this conclusion.  Section A.2, entitled "Additional Authority," confers on RCM authority to enter into certain transactions on the customer's behalf.  Section A.2 expressly notes that the customer "will be responsible for any loss," on those transactions, and discusses the date by which any such transaction will "appear[ ] in your account."  (*Id.*)

The language plaintiffs cite thus demonstrates only that plaintiffs' accounts were non-discretionary accounts, that is, accounts in which a broker may ordinarily trade on

a customer's behalf only in accordance with that customer's specific instruction. *See, e.g.,
De Kwiatkowski v. Bear, Stearns & Co., Inc.*, 306 F.3d 1293, 1297 (2d Cir. 2002). In
contrast, discretionary accounts are accounts in which "individuals . . . delegate authority to a
broker who will make decisions in their best interests without prior approval."[5] But whether
a brokerage account is non-discretionary (the issue resolved by Section A of the Customer
Agreement) is a completely different question than whether the broker may deploy securities
in the account for the broker's own use. That is so because a broker's use of customer
securities does not involve any transaction made on the customer's behalf or for the
customer's account.

Here, the alleged sales of plaintiffs' assets *were not for plaintiffs' accounts.*
Nor do plaintiffs allege that RCM made any representation to the contrary. Indeed, as
plaintiffs acknowledge, RCM's customer account statements (i) continued to show securities
used by RCM (s*ee VR* Compl. ¶¶ 157-60; *Capital* Compl. ¶¶ 125-28; Class Compl. ¶¶ 129-
32), (ii) acknowledged in that way that RCM had a contractual duty to reconvey the
securities to plaintiffs (subject to the repayment of margin loans and other contractual
conditions), and (iii) are therefore incompatible with any theory that RCM's use of these
securities was for plaintiffs' accounts. Plaintiffs do not allege any statement by RCM that
such sales were for the customer's account, or that RCM charged its customers any fees or
commissions for these sales.

Thus, the Customer Agreement undermines plaintiffs' claims for fraud in
several ways. The Customer Agreement contains no affirmative misrepresentation that RCM

---

[5]     *SEC v. Zandford*, 535 U.S. 813, 823 (2002); *see also Puckett v. Rufenacht, Bromagen & Hertz, Inc.*, 903
F.2d 1014, 1016 (5th Cir. 1990) ("The [plaintiffs'] accounts were non-discretionary. In other words, they
made all the trading decisions themselves—[the brokerage] could not make unauthorized trades *on their
behalf.*") (emphasis added).

would *not* use customer securities.  It thus cannot serve as the basis for a fraud claim.  Even if the Customer Agreement is interpreted as barring RCM's use of customer securities in some circumstances, plaintiffs could state a claim only by pleading with particularity, among other things, facts demonstrating that RCM used their securities *in a manner and to an extent not permitted by the Customer Agreement*.  Plaintiffs have pleaded no such facts.

2.    ***Judge Drain's Ruling***

Plaintiffs argue that Judge Drain expressly rejected the interpretation of the Customer Agreement advanced by the THL Defendants.  (Opp'n at 23-24.)  That is not correct.  Judge Drain did not decide the extent to which RCM could use customer securities.  Judge Drain instead addressed only whether RCM's customers had entered into an "'entrustment' of property with the . . . broker-dealer [RCM]" under the Bankruptcy Code.  (Transcript of Hearing at 245:16-19, *In re Refco, Inc.*, No. 05-60006 (Bankr. S.D.N.Y. Mar. 14, 2006), Rosen Decl., Ex. C.)  As Judge Drain explained, if an "entrustment" had occurred, RCM's customers would qualify as "customers," and RCM would qualify as a "stockbroker," for purposes of Sections 741(2) and 101(53A), respectively, of the Bankruptcy Code.  (*Id.* at 242-45.)

Judge Drain emphasized that an "entrustment" can occur even when the broker is entitled to use, and has in fact used, customer securities.  Entrustment of securities, he observed, can occur by "parties who have margin accounts and engage in financing activities . . . with a stockbroker" (*id.* at 245:22-24; *see id.* at 254), and entrusted securities "may be commingled and . . . need not be segregated" (*id.* at 246:4-5).[6]  Judge Drain also

---

[6]    Judge Drain commented that in *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 67 B.R. 557 (D.N.J. 1986), "it's clear from the recitation of facts that . . . the debtor there hypothecated and commingled securities that were involved in repos as a matter of course and yet the repo participants were found to be 'customers' . . . ."  (Tr. at 261:24-262:2.)

noted that "entrustment" can occur when securities are conveyed to broker-dealers "who are unregulated under the U.S. securities laws." (Tr. at 250-51.)[7]

Judge Drain ruled that RCM customers had entrusted securities to RCM. Judge Drain's ruling is consistent with the proposition that under the Customer Agreement, RCM could use customer securities in any amount that were deposited in the account of a customer with margin loans. Judge Drain did not rule that RCM was limited to using securities in such a customer's account only up to the amount of the customer's margin loans.

Furthermore, Judge Drain did not rule that the Customer Agreement implicitly prohibited RCM from using customers securities in the accounts of customers without margin loans, provided that RCM reconveyed such securities to such customers on demand. The issue before him—namely, whether the promises made to RCM's customers were so evanescent that they were not "customers," and RCM was not a "stockbroker," for purposes of the Bankruptcy Code—was quite different. His ruling thus does not support plaintiffs' contention that the Customer Agreement contained misrepresentations for purposes of a fraud claim.

3.     *The Assertion that Some Class Members Had No Outstanding Margin Loan at the Time of the Refco Bankruptcy*

Plaintiffs also assert that, when they sought the return of their securities in October 2005—at the time RCM filed for bankruptcy—they had no outstanding margin balances, and RCM was nonetheless unable to comply. (Opp'n at 22 n.64.) Plaintiffs

---

[7]     Parties before Judge Drain had argued that "it was clear that RCM . . . was unregulated under the U.S. securities laws, . . . and, therefore, that the customers would not be protected under SIPA [the Securities Investor Protection Act] . . . or in respect of various requirements of the U.S. securities laws that pertain to margin trading and the like . . . ." (Tr. at 250:16-22.) In that context, Judge Drain held that entrustment to an unregulated broker could occur. (*Id.* at 250-51.)

suggest that because RCM did not reconvey their securities to them in October 2005, RCM must have improperly used "their" securities.

Of course, many members of the class did have large outstanding margin balances at that time, and therefore this argument does not save their claims. Beyond this, this theory does not help even plaintiffs who had no outstanding margin loan, for the simple reason that RCM did not segregate customer securities[8] and had no obligation to do so. Plaintiffs have not properly pleaded that any such failure to segregate assets of each client constituted a breach of any representation made to plaintiffs. The question, on plaintiffs' own reading of the Customer Agreement, is therefore whether, *in the aggregate*, RCM had used customer securities in excess of the *total* amount of margin loans outstanding to all customers combined in October 2005.[9] Plaintiffs do not plead, with particularity or otherwise, that RCM had done so. Because plaintiffs have not pleaded (with particularity or otherwise) that RCM did not have enough assets on hand to satisfy, as of any relevant date, the contractual rights of all customers who had no outstanding margin loans, they fail to state a claim.

Plaintiffs also say that RCM was allegedly using their securities at other times when they had no outstanding margin balance. (Opp'n at 22 n.64.) Plaintiffs do not plead that claim with particularity: they do not plead facts demonstrating the specific times other than October 2005 at which they had no margin balances, and they do not plead with particularity that at such times, RCM had used customer securities in excess of the aggregate

---

[8]    *See VR* Compl. ¶ 179; *Capital* Compl. ¶ 144; Class Compl. ¶ 98.

[9]    As explained above, in fact the Customer Agreement empowered RCM to use *all* assets in the accounts of customers with margin loans. *Supra*, Point I.B. RCM therefore did not use customer assets in excess of its explicit authority under the Customer Agreement unless the aggregate amount of customer securities used by RCM exceeded the total amount of assets in the accounts of customers with margin loans. The Trade Confirmation conferred even broader authority to use customer securities on RCM. *Infra*, Point I.E.

outstanding margin loans of its customers.  They also do not plead that RCM would have been unable to reconvey their securities to them at these unspecified times, had they so requested.  Thus, even accepting (as the THL Defendants do not) plaintiffs' reading of the Customer Agreement, plaintiffs have not pleaded facts demonstrating injury in support of this branch of their claim.

> ### E.    RCM's Standard-Form Trade Confirmation Further Demonstrates that Plaintiffs Have Alleged No Misrepresentation or Deceptive Conduct Respecting RCM's Use of Plaintiffs' Securities
>
> #### 1.    *The Trade Confirmation*

RCM's standard form of Trade Confirmation authorized RCM to use customer securities.[10]  The Trade Confirmation states in its first paragraph that "IT IS AGREED BETWEEN YOU AND [RCM] THAT . . . RCM does not segregate any collateral or other property deposited with it and RCM shall have the right to sell, pledge, hypothecate, assign, invest or use, such collateral or property deposited with it." (Trade Confirmation ¶ 1, Rosen Decl., Ex. A.)  The Trade Confirmation thus grants RCM unqualified authority to use customer assets.[11]

---

[10]    Memorandum of Law in Support of the THL Defendants' Motion to Dismiss at 18 ("THL Brief").

[11]    Plaintiffs argue that the Court cannot properly consider the Trade Confirmation in deciding the pending motions to dismiss.  (Opp'n at 26.)  Plaintiffs are mistaken; "[i]n deciding a Rule 12(b)(6) motion, the Court may consider . . . documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint . . . ."  *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003).  Contrary to plaintiffs' statement that "[t]he trade confirmations cited by defendants are not discussed or referenced in the Complaints" (Opp'n at 26), all of the complaints refer to the Trade Confirmation.  (*See VR* Compl. ¶¶ 105, 170; *Capital* Compl. ¶ 145; Class Compl. ¶ 142.)

Further, the Opposition's claim that "there is no allegation or evidence that such trade confirmations were provided to any of the Plaintiffs" (Opp'n at 26) is without merit.  Plaintiffs' own allegations show that plaintiffs received the confirmations.  First, as discussed above, all plaintiffs allege that they traded on margin (*see VR* Compl. ¶ 96; *Capital* Compl. ¶¶ 68, 80, 93; Class Compl. ¶ 130), meaning that they would have received the RCM trade confirmation as proof of the execution of their trades.  Second, the *VR* plaintiffs outright allege that they relied on the "representations in . . . the RCM-issued . . . trade confirmations" (*VR* Compl. ¶ 105), making clear that they received the confirmations.  Finally, two of the

Plaintiffs, citing the third paragraph of the Trade Confirmation, argue that the Trade Confirmation allowed RCM only to "use [customer] securities as collateral against a loan balance when a customer borrowed on margin." (Opp'n at 26.) That paragraph, however, deals only with cross-margining, i.e., with the right of Refco entities to "transfer [customer property]" from a customer's account at one Refco entity to that customer's account at another Refco entity to the extent necessary to satisfy the margin requirements or debits in the customer's Refco accounts.[12] The third paragraph does not qualify RCM's broad authority to use customer securities already in an account at RCM.[13]

Plaintiffs also point to the sixth paragraph of the Trade Confirmation, which states that transactions with RCM are "subject to all applicable laws, rules, practices and customs." (Opp'n at 27.) According to plaintiffs, this language induced RCM's customers to believe that RCM was complying with applicable regulations. (*Id.*) RCM, however, expressly announced in the Trade Confirmation that it was entitled to use customer securities. This express entitlement cannot reasonably be read as narrowed or eliminated by the subsequent statement in the Trade Confirmation that transactions are "subject to" whatever law might be "applicable."[14]

---

*Capital* plaintiffs outright allege securities trading that also would have generated trade confirmations for them. (*Capital* Compl. ¶¶ 79, 92.)

[12]  The entire paragraph reads as follows: "Refco Entities may in their discretion, without prior notice to you, apply or transfer any cash, securities or other property interchangeably between any of your accounts at any Refco Entity, as may be deemed necessary for margin or to satisfy or reduce any deficit or debit balance in any such account." (Trade Confirmation ¶ 3.)

[13]  Plaintiffs further point out that the fourth paragraph of the Trade Confirmation refers to "custodian" accounts. (Opp'n at 26-27.) According to plaintiffs, customers therefore reasonably believed that RCM was not using their securities. (*Id.*) That paragraph, however, does not state that RCM maintained "custodian" accounts for its customers. It states that a third party, such as "a bank, broker or other custodian," might be "utilized by RCM" to act as custodian of customer assets. (Trade Confirmation ¶ 4.)

[14]  Finally, according to plaintiffs, the THL Defendants' reading of the authorization language in the Trade Confirmation would "void[] Section A of the Customer Agreement, which requires that customer securities

2.    *Judge Drain's Comments on the Trade Confirmation*

Plaintiffs misdescribe Judge Drain's comments concerning the Trade Confirmation.  He held that "to read out customer status [under Section 741(2) of the Bankruptcy Code]" based on the language of the Trade Confirmation "would be a real stretch." (Tr. at 255:19-21.)  Judge Drain noted that the Trade Confirmation "does say that RCM does not segregate any collateral or other property deposited with it." (*Id.* at 255:4-6.) That language was consistent with "plenty of testimony," he said, "that it's more often than not industry practice not to segregate into specific accounts collateral but to permit hypothecation of securities and cash and other property at least when a customer is trading in margin." (*Id.* at 255:11-14.)  As the phrase "at least" clearly indicates, Judge Drain did *not* rule that RCM could not use securities in the accounts of customers with no margin loans. Judge Drain was not required to express a view, and did not express a view, on that question. Indeed, Judge Drain acknowledged that the Trade confirmation "arguably refers not only to RCM's right to sell, pledge, hypothecate, assign, invest or use such collateral, but also says or property deposited with it . . . ." (Tr. at 255:16-19.)

---

only be dealt with pursuant to express customer instructions." (Opp'n at 27.)  That is not so.  As already discussed, RCM's use of customer securities did not involve transactions for or on behalf of the customer. That use was therefore entirely compatible with Section A of the Customer Agreement, which concerned only transactions that *were* for or on behalf of the customer.  *See supra* Point I.C.

RCM's reservation in the Trade Confirmation of the right to use customer securities in *all* accounts is consistent with RCM's reservation in the Customer Agreement of the right to use customer securities in accounts with margin loans.  Part B.2 of the Customer Agreement allows RCM to use customer collateral while imposing on RCM the "sole obligation" to return the collateral only "to the extent they are not deemed to be collateral to secure Transactions entered into pursuant to this Agreement." (Rosen Decl., Ex. B at 1.)  That is, RCM need not return customer collateral pursuant to the Customer Agreement until the owner of the collateral settles all outstanding margin loans from RCM.

The Trade Confirmation, on the other hand, does not allow RCM to refuse to return customer assets in the face of a customer demand.  Thus, where RCM uses, in accordance with the Trade Confirmation, the assets of a customer without any outstanding margin loans and that customer demands the return of the assets, RCM must comply with the demand.

While Judge Drain did comment in passing that the last sentence in paragraph 1 of the Trade Confirmation "*could be* read as referring again to collateral," he did not specify the meaning of "collateral" in this context, and he did not hold that paragraph 1 was necessarily limited to collateral.  (Tr. at 255:23 (emphasis added).)  Nor did he explain the significance he would give to the words "other property" in the key phrase "any collateral and other property," as used in paragraph 1 of the Trade Confirmation.  At any rate, Judge Drain's *ruling* was that the relationship between RCM and its customers was not so evanescent as to preclude regarding RCM as a "stockbroker," and its customers as statutory "customers," under the Bankruptcy Code.  He was not required to address, and did not address, the precise scope of RCM's permitted use of customer securities.

### F.    In Any Event, Plaintiffs May Not Base a Claim for Fraud Merely on an Alleged Breach of Contract by RCM

Plaintiffs' claims, as framed in their brief, depend on their assertion that the Customer Agreement itself contains misrepresentations.  In substance, plaintiffs are attempting to plead a claim for promissory fraud.  Under that "disfavored"[15] doctrine, a plaintiff must allege that when a contract was made, the defendants "secretly intended not to perform or knew that [they] would not perform."  *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993).  If a defendant has such specific intent, the doctrine regards the contract as "the misrepresentation of a present fact, that being the defendant's state of mind or intent when the promise is made."  26 *Williston on Contracts* § 69:11, at 542-43.  For this reason, the scienter element and the misrepresentation element of such a claim are closely related:  if the defendant did not *intend* to breach at the time the contract was made, then the defendant did not misrepresent his intentions and lacked scienter.

---

[15]    26 Richard A. Lord, *Williston on Contracts* ("*Williston on Contracts*") § 69:11, at 544 (4th ed. 2003).

Plaintiffs have clearly failed to plead facts showing that the THL Defendants, as alleged primary violators, knew any of the relevant details of RCM's contracts, made any misrepresentations respecting RCM's intentions, or intended that RCM not perform its contracts. *See also infra*, Point IV. Plaintiffs have also failed to plead the elements of a claim for promissory fraud by RCM. Even assuming *arguendo* that RCM's use of securities in the accounts of customers without margin loans constituted breaches of the Customer Agreements, at the very least the Customer Agreement was ambiguous on this point. Thus, plaintiffs have not pleaded with particularity, as they must, facts demonstrating that RCM intended to breach the terms of the Customer Agreements, as RCM understood those terms, at the time RCM entered into the agreements. And RCM did not have a *secret* intent (as required for a claim of promissory fraud) to use securities in the accounts of customers without margin loans. To the contrary, the Trade Confirmation openly stated RCM's position that it could use *all* securities deposited with it by all of its customers. *See Elliott Assocs., L.P. v. Hayes*, 141 F. Supp. 2d 344, 355 (S.D.N.Y. 2000) (holding that there was no "*secret*" intent not to perform where relevant documents suggested the possibility of breach).

## II.    PLAINTIFFS HAVE ALSO FAILED TO PLEAD WITH PARTICULARITY FACTS DEMONSTRATING ANY MISREPRESENTATION, OMISSION, OR DECEPTIVE CONDUCT APART FROM THE CUSTOMER AGREEMENT

### A.    RCM's Customer Account Statements Were Not Deceptive

In substance, plaintiffs allege that the account statements they received from RCM contained misrepresentations, because those account statements listed all of plaintiffs' securities, including those that RCM had used. (Opp'n at 24-25.)

As the THL Defendants explained in their opening brief, the account statements did not contain misrepresentations because those statements accurately reflected the securities that plaintiffs, on demand, were contractually entitled to receive from RCM.

These statements were similar in that respect to bank statements, which reflect the full value of customer deposits, even though banks keep cash on hand in amounts equal to only a fraction of customer deposits. (THL Br. 23-24 (citing *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 703 (2d Cir. 1998)).)

In rejecting the bank analogy, plaintiffs first state that banks pay interest in return for the use of customer funds, while RCM did not compensate its customers for the use of their assets. (Opp'n at 35.) As a preliminary matter, RCM (and unregulated offshore brokerages generally) do offer advantages, as compared to regulated U.S. brokerages, that are important to some customers. (*See infra* Part II.C.) If they did not, unregulated offshore brokerages would not exist. And banks are not limited to using customer funds only if interest is paid; checking accounts, for example, often do not pay interest.

More importantly, whether RCM compensated customers for the use of their assets is irrelevant to whether RCM's account statements were false. The argument is not that banks operate in exactly the same way that RCM did. The THL Defendants simply contend that RCM's account statements were not false because those account statements set forth the securities customers were contractually entitled to receive from RCM, rather than the securities actually maintained by RCM, just as bank statements constructed in a similar manner are not false.[16]

---

[16]    Plaintiffs claim that it was illegal for RCM to use "fully paid" customer assets, whereas banks can legally use customer deposits. (Opp'n at 35-36.) In fact, plaintiffs' complaint does not plead facts demonstrating that RCM was subject to U.S. regulation or that, in consequence, RCM was barred from using "fully paid" customer securities. In any event, as the Court has explained, an alleged violation of regulatory law by RCM cannot appropriately be reframed as an alleged fraud. *See infra* p. 18. Nor does plaintiffs' assertion that plaintiffs "continued to exercise property rights in the securities they entrusted to RCM" (Opp'n at 36) change anything. A bank customer is able to draw on or otherwise make use of deposited funds in his or her account, whether or not the bank is physically holding those funds.

Plaintiffs also assert that RCM's use of customer assets was deceptive because plaintiffs "were led to believe their securities were being held in custody" through the Customer Agreement. (Opp'n at 36-37.)

### B.    Plaintiffs Fail to Plead Any Oral Misrepresentation

As the THL Defendants have already explained in their opening brief, plaintiffs fail to identify any oral misrepresentations with the necessary particularity. And in light of the disclosures in the Customer Agreement and Trade Confirmation, plaintiffs could not have been misled by, and could not have reasonably relied on, any oral representations to the effect that RCM would not use customer securities. (THL Br. 21-23; *cf.* Opp'n at 29-30.)

In their opposition brief, plaintiffs state in conclusory fashion that, for example, a broker "misrepresented that RCM held as custodian the property entrusted to it by Plaintiffs." (Opp'n at 29.) Plaintiffs fail to describe the alleged misrepresentation with any greater specificity. Plaintiffs even go so far as to suggest that allegations of internal Refco communications not involving plaintiffs at all—but tending to show what plaintiffs were "seeking" in a brokerage—somehow constitute particularized allegations of oral misrepresentations *to plaintiffs by Refco brokers*. (Opp'n at 29 & n.85.) For the reasons the THL Defendants stated in their opening brief, however, these allegations lack the requisite particularity. The representations alleged by the *VR* plaintiffs (Opp'n at 30) are not representations about whether RCM would use customer securities. (*See* THL Br. 22.)[17]

---

But as shown above, the Customer Agreement does not represent that RCM would not use customer securities. Plaintiffs cannot base a claim for fraud on subjective inferences that those customers allegedly drew from documentation that was not itself false or misleading.

[17]    Plaintiffs also suggest that Refco brokers "failed to disclose" RCM's use of customer securities. (Opp'n at 29; *see also* Class Compl. ¶ 141; *VR* Compl. ¶ 169; *Capital* Compl. ¶ 144.) But the Customer Agreement and Trade Confirmation did disclose those activities. And as this Court has explained, RCM's alleged noncompliance with allegedly applicable U.S. regulatory law does not constitute a fraud in the absence of either an affirmative misrepresentation on the subject or an omission coupled with a duty to disclose. *See RCM I*, 2007 WL 2694469, at *8. Plaintiffs do not identify any such misrepresentation or duty.

**C.    Plaintiffs Do Not Plead With Particularity Any Representation that RCM Was Subject to U.S. Regulatory Law**

According to plaintiffs' unparticularized allegations, RCM engaged in activities that brought it within the ambit of regulation under the federal securities laws, and thus was not entitled to operate as an offshore unregulated broker.  (*See* Class Compl. ¶ 136; *VR* Compl. ¶ 164; *Capital* Compl. ¶ 139.)[18]  The question before this Court is not whether RCM was regulated or unregulated, but whether plaintiffs have alleged any facts establishing any representation to RCM customers that RCM was regulated under the federal securities laws.  As this Court has noted, "[w]hether RCM was actually permitted by U.S. regulations to engage in that conduct is beside the point; what matters is that plaintiffs were well aware it intended to do so."  *RCM I*, 2007 WL 2694469, at *9.

Nowhere in any of the complaints do plaintiffs plead that RCM, the THL Defendants, or anyone else stated to plaintiffs, or engaged in deceptive conduct that caused plaintiffs reasonably to believe, that RCM was a federally regulated broker-dealer.  This Court correctly stated in *RCM I*, based on the First Amended Class Action Complaint, that "RCM advertised itself as an offshore brokerage, not subject to U.S. brokerage regulation." *Id.* at *1.[19]  In that Complaint, plaintiffs stated as follows:  "Refco publicly described RCM, its third operating subsidiary, as a purportedly 'offshore' securities and foreign exchange

---

[18]    Plaintiffs quote Judge Drain's ruling in purported support of their contention that RCM was subject to federal regulation.  (Opp'n at 33-34 (quoting Tr. at 252).)  That quotation, we note, is not presented fairly.  In the relevant passage, Judge Drain was explaining why subchapter 3 of Chapter 7 of the Bankruptcy Code, which deals with bankruptcy proceedings under U.S. law for a stockbroker that is not regulated by the SEC (*see* Tr. at 242), applied to RCM.  Some of the parties to the bankruptcy proceeding evidently suggested that subchapter 3 did not apply to foreign brokers; Judge Drain responded that RCM, although a foreign broker, had sufficient U.S. contacts to be subject to "the statute"—i.e., subchapter 3.  (*Id.* at 252.)  He was not addressing the applicability of federal regulatory law to RCM.

[19]    *See also id.* at *9 ("[T]he only representation mentioned in the complaint is RCM's representation that it was an offshore brokerage not subject to U.S. regulations.").

broker which *was not subject* to these requirements [of federal securities law]." (First Am. Class Action Compl. ¶ 72 (emphasis added).)

Plaintiffs, obviously realizing the difficulties this allegation creates for them in light of the Court's prior opinion, have excised this allegation from the complaints currently before the Court. But the current complaints do not overtly contradict the First Amended Class Action on this point. The current complaints, like the First Amended Class Complaint, thus "never identify any requirement to which RCM claimed it would adhere that prohibited brokerages from using customer assets for loans to affiliated companies." *RCM I*, 2007 WL 2694469, at *9. This failure is fatal to plaintiffs' claims.

Plaintiffs rest their argument as to federal regulation on several faulty propositions. First, they now make the following unsupported and conspicuously tentative allegation: "Plaintiffs," they say, "and other Class members had every reason to believe that both RSL and RCM would comply with these provisions of federal law." (Class Compl. ¶ 141; *see also VR* Compl. ¶ 169; *Capital* Compl. ¶ 144.) A bare allegation that plaintiffs "had every reason" to believe something was true is insufficient as a matter of law. Plaintiffs must plead with particularity facts establishing a misrepresentation asserting that RCM was subject to federal regulation or a deceptive act communicating that proposition. Plaintiffs do not do so.

As the founder and President of plaintiff VR, Richard Deitz, testified under oath before Judge Drain in the bankruptcy court, VR knew that RCM held itself out to an offshore brokerage not subject to U.S. regulation:

> Q.    You made the point that when you entered into your business arrangements with Refco Capital Markets you understood them to be an *unregistered, unregulated* Bermuda broker dealer; right? That's what they were.

> A.    I said that.

(Transcript of Testimony at 174:21-25, *In re Refco, Inc.*, No. 05-60006 (Bankr. S.D.N.Y.

Feb. 14, 2006), Rosen Reply Decl., Ex. C (emphasis added).)[20]

Mr. Deitz further swore that "[w]e were told that . . . Refco Securities LLC

was a U.S. regulated broker dealer and that Refco Capital Markets was a Bermuda broker

dealer non-regulated."  (*Id.* at 177:14-17.)  Mr. Deitz later reiterated this point:

> Q.    And then RCM, you understood, wasn't an U.S. registered or
> regulated broker dealer when you entered into the agreement; right?
>
> A.    I think—
>
> Q.    Right?
>
> A.    Yes.
>
> Q.    And your understanding of Refco Capital Markets in that regard
> never changed, did — you always understood it to be an unregulated
> unregistered entity; right?
>
> A.    Correct.

(*Id.* at 196:21-197:5.)[21]

---

[20]    This testimony is consistent with a standard-form supplemental risk disclosure for RCM, which indicates that RCM will hold funds deposited for foreign-exchange trading in a "non-segregated" manner in accounts "not subject to [CFTC] regulation."  (Rosen Reply Decl., Ex. F.)

[21]    VR's complaint quotes testimony from the same trial before Judge Drain (*see VR* Compl. ¶¶ 117-18, 250), and plaintiffs' brief relies extensively on its account of Judge Drain's findings.  The Court may therefore consider Mr. Deitz's testimony on this motion.

Given the nature of the misrepresentations alleged, it must, by now, be evident that no class of RCM investors  could ever be certified under Rule 23.  To state a claim under § 10(b) and Rule 10b-5, plaintiffs must prove reliance on specific alleged misrepresentations by RCM.  *See, e.g.*, *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S.Ct. 761, 769 (2008) ("Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action.");  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007).  Specifically, plaintiffs must show that, "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction."  *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).  Plaintiffs could not prove individual reliance in a way consistent with the elements of predominance, commonality, and manageability that are required for class certification under Rule 23(b)(3) of the Federal Rules of Civil Procedure.

Second, plaintiffs contend that "no rational customer" would have allowed RCM to use its securities in the manner alleged in the complaints. (Opp'n at 28.) The issue before this Court, however, does not turn on plaintiffs' current account of their unarticulated subjective beliefs, let alone on their assertions about what thousands of class members subjectively believed. It turns on whether plaintiffs have pleaded facts demonstrating any relevant misrepresentations attributable to the THL Defendants. Plaintiffs have not done so.

In addition, plaintiffs' arguments fail even on their own terms. Sophisticated institutions regularly use the services of unregulated, offshore firms like RCM. (*See* Bank of International Settlements, *Triennial Bank Survey, Foreign Exchange and Derivatives Market Activity in 2004* 15 (March 2005), Rosen Reply Decl., Ex. D ("Between April 2001 and April 2004 average daily turnover in OTC derivatives markets . . . increased by 73%, to

---

Nor can plaintiffs avail themselves of the "fraud-on-the-market" presumption of reliance adopted by *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), to establish reliance on a class-wide basis. The presumption applies only "where materially misleading statements have been disseminated into an impersonal, well-developed market for securities." *Id.* at 247. In such a case, an investor is presumed to rely on the integrity of the market price, and thus is presumed to have relied on a material misrepresentation that affects that price without needing to show that she directly relied on the misrepresentation. *See id.*; *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, Nos. 02 MDL 1484, 07 CIV 6677 (JFK), 2008 WL 2019680, at *8 (S.D.N.Y. May 8, 2008).

The alleged misrepresentations in this case were not of the type covered by the fraud-on-the-market presumption. Plaintiffs did not buy or sell securities in reliance on the market price. Therefore, plaintiffs are not entitled to a presumption of reliance, and each individual plaintiff is required to prove direct reliance on one or more alleged misrepresentations by RCM. *See Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 78 (2d Cir. 2004) ("[I]f plaintiffs are not entitled to the *Basic* presumption because they cannot plead fraud on the market, reliance must be proved separately as to each class member, and common issues may not predominate over individual issues."); *In re Initial Public Offering Sec. Litig.*, 544 F. Supp. 2d 277, 297 (S.D.N.Y. 2008) (holding that absent a presumption of reliance under the fraud-on-the-market theory, each plaintiff "would be required to make individual showings of reliance"); *Teamsters Local 445 Freight Div. Pension Fund v. Bombadier, Inc.*, No. 05 Civ. 1898 (SAS), 2006 WL 2161887, at *12 (S.D.N.Y. Aug. 1, 2006) ("Because Teamsters cannot rely on . . . the fraud on the market presumption[] of transaction causation, Teamsters cannot prove reliance on a class-wide basis, and each plaintiff will have to prove reliance individually.").

Because each member of the class must individually prove reliance as an element of their claim, the class will not be able to satisfy the requirements of Rule 23(b)(3). *See Hevesi*, 366 F.3d at 78; *Teamsters Local 445*, 2006 WL 2161887, at *12 ("[W]hen plaintiffs must individually prove reliance—an element of their Rule 10b-5 material misrepresentation claim—the putative class action fails the predominance requirement.").

$2,317 billion."); A. Bernheim, *Repeal of the Ten Commandments: The Impact on the Offshore Hedge Fund Administration Industry*, http://www.hedgefundnews.com/news n info/article detail.php?id=260, Rosen Reply Decl. Ex. E (noting that "many offshore administration companies provide services to a much wider market than U.S.-managed hedge funds" and that "[m]ost foreign investors will continue to insist on investing through an offshore structure" in order to avoid U.S. regulations).)   The Class Complaint itself concedes that "many securities firms, for convenience [hold] particular customer securities collectively . . . ."   (Class Compl. ¶ 98.)   Customers regularly forgo the protection of depositing their securities with a broker subject to federal regulation in order to secure different advantages offered by unregulated offshore brokers.   For example, non-U.S. broker-dealers are not subject to the SEC's comprehensive regulation of securities credit transactions, including SEC regulation of the size and other terms of margin loans under Regulation T, or to regulations promulgated by the New York Stock Exchange that are applicable to member firms.   *See* 22 Charles F. Rechlin, *Securities Credit Regulation* §§ 3:2-32 (2d ed. 2007) (discussing Regulation T rules for margin accounts) [22]; *id.* at §§ 3:33-48 (discussing New York Stock Exchange Rule 431 regulations for margin accounts).[23]

---

[22]   For example, Regulation T limits the category of "margin-eligible" securities, which includes government securities, municipal securities, exchange-traded securities, investment company shares, "foreign margin stock," and convertible debt securities, among others.   *Id.* at § 3:13.   Regulation T also establishes requirements for such account events as new securities transactions, margin deposits, liquidation of securities in the event of unmet margin calls, withdrawals, borrowing of cash, day trading and periodic debits, among others.   *Id.* §§ 3:16-32.   Margin maintenance requirements under Regulation T vary from 50% of current market value for long positions in margin-eligible equity securities, to 100% of current market value for a short position in a nonequity security to 150% of current market value for a short position in a "nonexempted security."   *Id.* § 3:14.

[23]   NYSE Rule 431, for example, "mandat[es] the deposit of additional margin when, as a result of changes in market values, the customer's equity in the account falls below specified levels," "prescribes specific margin levels for transactions in securities for which Regulation T requires good faith margin—for example, exempted securities and nonequity securities," and "in certain cases . . . imposes high initial margin requirements for securities transactions than those imposed by Regulation T."   *Id.* § 3:33.

### III.    NEITHER RCM NOR THE THL DEFENDANTS BREACHED ANY FIDUCIARY DUTY TO PLAINTIFFS

Plaintiffs attempt to plead that RCM owed a fiduciary duty to them, and that RCM's alleged omission to disclose its use of customer securities was therefore fraudulent.[24]

Plaintiffs offer no opposition to the argument that brokers handling non-discretionary accounts, like plaintiffs' accounts, owe no general fiduciary duty to their customers.  (*See* THL Br. 32-33.)  Instead, plaintiffs assert that RCM had a relevant fiduciary duty on two faulty premises: (1) that Judge Drain found such a fiduciary duty (Opp'n at 40-41) and (2) that a brokerage firm owes a fiduciary duty arising out of customers' "leaving their securities with [the brokerage] in between transactions" (*Id.* at 38-39).

Judge Drain determined that RCM was a fiduciary to its customers only with respect to executing customer trades.  (Tr. at 249-50.)  He noted that for a broker to "be a fiduciary to its customer . . . is largely redundant or overlaps with the notion that the customer entrusts its securities with the broker *to effectuate a transaction*, because, again, in the words of *Press* [*v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999)], it's *in that context* that a broker becomes a fiduciary; that is, in *completing the securities transaction that the customer has asked*."  (Tr. at 249:12-18 (emphasis added).)  RCM was thus, in Judge Drain's view, a fiduciary only insofar as it was "taking customer instructions in *effectuating transactions in securities*."[25]  As explained in the THL Defendants' opening brief, plaintiffs

---

[24]    Plaintiffs do not dispute the THL Defendants' demonstration in their opening brief that the THL Defendants did not owe plaintiffs any fiduciary duty.  (*See* THL Br. 31-32.)

[25]    Tr. at 249-50; *see also* Transcript of Hearing at 131:21-22, *Kirschner v. Bencorp Casa de Bolsa, C.A.*, No. 05-60006 (Bankr. S.D.N.Y. Dec. 29, 2006), Declaration of Ruth A. Braun in Support of Grant Thornton LLP's Motion to Dismiss the Complaint, Ex. G (there was "no fiduciary duty owed whatsoever to the customer" holding a non-discretionary account at RCM).

do not allege that RCM failed to execute transactions as instructed by customers. (THL Br. 33).

Plaintiffs also suggest that a fiduciary duty on the part of a broker arises from customers' "leaving their securities with [a brokerage] in between transactions." (Opp'n at 38-39.) Plaintiffs do not cite any case directly supporting the existence of such a duty, and *Bissell v. Merrill Lynch & Co., Inc.*, 937 F. Supp. 237, 246-47 (S.D.N.Y. 1996), *aff'd*, 157 F.3d 138 (2d Cir. 1998), indicates that there is no such duty. There, in rejecting a claim for breach of fiduciary duty, the court noted the SEC's statement that when brokerage customers "leave free credit balances with a broker-dealer," the relationship between the brokerage and the customer is not a fiduciary one, but rather "that of creditor-debtor." *See id.* Plaintiffs, then, by depositing securities with RCM, created a creditor-debtor relationship with RCM, not a fiduciary relationship.[26]

## IV.   PLAINTIFFS FAIL TO PLEAD PRIMARY LIABILITY AS TO THE THL DEFENDANTS

For two related reasons, plaintiffs' attempts to show a primary 10b-5 violation by the THL Defendants fail. First, under *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008), to plead such a violation, plaintiffs must set forth facts demonstrating reliance on the deceptive acts of the THL Defendants, as opposed to those of others. 128 S. Ct. at 769 ("Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action."). Plaintiffs identify three alleged

---

[26]   *See also* Dec. 29, 2006 Bankr. Tr., *supra* note 25, at 132:22-133:9 (quoting *Bissell* for the proposition that "when [customers] leave free credit balances with a broker-dealer, the funds generally are not segregated . . . but are commingled with other assets of the broker-deal and used in the operation of the business," which proposition "comports with the general rule . . . that when funds are deposited with another party, the presumption is that the relationship between the parties is not one of bailor and bailee, but, rather, creditor and debtor").

acts by the THL Defendants that supposedly constituted participation in a fraudulent scheme: (1) implementing a "compensation structure that encouraged the conversion of RCM customer assets," (2) "approving the resolution authorizing Refco to acquire Cargill Investor Services," and (3) "allowing the Suffolk loans to be extended." (Opp'n at 82-83.) None of these acts, however, is itself alleged to have caused any plaintiff to believe anything that was not true. In other words, these alleged acts are not like market manipulation or other acts intended to deceive—i.e., acts which have inherent deceptive content. *See, e.g., In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 616, 626 (S.D.N.Y. 2005). Furthermore, plaintiffs say not a word about their reliance on any of these acts. (*See* Opp'n at 81-85.) Under *Stoneridge*, then, plaintiffs fail to plead a primary violation by the THL Defendants.

There is no merit to plaintiffs' idea that *Stoneridge* "has no bearing on the present action where the claims . . . are for violations of Rule 10b-5(a) and (c)," rather than 10b-5(b). (*See* Opp'n at 77-78.) *Stoneridge's* holding applies to "the § 10(b) private cause of action," including claims under 10b-5(a) and (c). 128 S. Ct. at 769; *see also RCM I*, 2007 WL 2694469, at *7 n.5 (noting reliance as an element of 10b-5(a) and (c) claims).

The second reason plaintiffs have failed to plead a primary violation by the THL Defendants is that plaintiffs' claims are not cognizable under 10b-5(a) or (c) at all. Their claims arise exclusively from supposed *misrepresentations* or *statements* (the province of 10b-5(b) claims). Plaintiffs try to premise deception on representations *by RCM* in the Customer Agreement and customer account statements, and on oral statements *by Refco brokers*. (*See* Opp'n at 20-35.) These representations and statements are not deceptive *schemes* within the meaning of 10b-5(a) and (c), and plaintiffs cannot avail themselves of any benefits of proceeding under 10b-5(a) and (c) simply by dressing up their 10b-5(b)

claims under 10b-5(a) and (c).[27]  Put otherwise, because plaintiffs are trying to hold the THL Defendants primarily liable for misleading statements by RCM and Refco brokers, plaintiffs cannot use 10b-5(a) and (c) "as 'a short cut to circumvent [the] limitations on liability [in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)] for a secondary actor's involvement in [making misleading statements].'"  *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 337 n.17 (S.D.N.Y. 2004) (some alteration in original).  The THL Defendants "may only be held liable for specific false statements [by RCM and Refco brokers] to the extent that [they] can be said to have made those statements under Rule 10b-5(b)."  *Id.*  But, of course, the THL Defendants did *not* make any of the allegedly misleading statements (RCM and Refco brokers did), and plaintiffs do not claim otherwise (Opp'n at 81-85).  Accordingly, the THL Defendants committed no primary violation.

## V.    PLAINTIFFS DO NOT PLEAD FACTS ESTABLISHING A "STRONG INFERENCE" OF SCIENTER AS TO THE THL DEFENDANTS

Plaintiffs' claim is evidently that RCM or the THL Defendants, through misrepresentations, omissions, or deceptive conduct, caused RCM customers to conclude that RCM would not use securities in their accounts.  Plaintiffs do not plead facts demonstrating a "strong inference" of scienter on the part of the THL Defendants with respect to any such alleged fraud.

---

[27]    *See Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177-78 (2d Cir. 2005) ("We hold that where the sole basis for such [10b-5] claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c) . . . ."); *TCS Capital Mgmt., LLC v. Apax Partners, L.P.*, No. 06-CV-13447 (CM), 2008 WL 650385, at *22 (S.D.N.Y. 2008) (holding that, where a plaintiff "merely re-labels . . . alleged misstatements and omissions as 'manipulative and deceptive conduct,'" that "sleight of hand does not magically transform" a 10b-5(b) claim into one under 10b-5(a) and (c)).

A.      **Plaintiffs Fail to Allege Facts Showing that THL Defendants Had Both Motive and Opportunity to Commit the Alleged Fraud**

To support an allegation of securities fraud, a purported motive and opportunity must be "concrete and personal" and "unusual." *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 441 (S.D.N.Y. 2006) (internal quotation marks omitted); *see Shields* v. *Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir. 1994). Motives that are "generally possessed" by most parties in the THL Defendants' positions do not suffice. *Kalnit v. Eichler*, 264 F.3d 131,139 (2d Cir. 2001). In looking for a sufficient allegation of motive, courts "assume that the defendant is acting in his or her informed economic self-interest." *Shields*, 25 F.3d at 1130.

Plaintiffs' allegations respecting the IPO, the greenshoe dividend, and the THL Defendants' supposed wish to recruit new investors are accordingly not sufficient. Shareholders and directors of an issuing company "always have a nonspecific interest in a successful IPO." *Geiger v. Solomon-Page Group, Ltd.*, 933 F. Supp. 1180, 1189-90 (S.D.N.Y. 1996).

Plaintiffs allege that "the THL Defendants knew that truthful disclosure of RCM's practices would have made a successful IPO impossible and left the THL Defendants unable to unload over $220 million of their investment." (Opp'n at 66.) Plaintiffs' argument is circular: in order to demonstrate scienter, they allege motive and opportunity; but to allege motive and opportunity, they rely on their assumption that the THL Defendants knew of the alleged fraud.

Plaintiffs further assert that the THL Defendants benefited in a "concrete and personal way" by "selling their own inflated shares to the public as selling shareholders in Refco's IPO." (Opp'n at 66.) But even when a defendant stands to benefit financially from

a purported fraud, motive to commit securities fraud is demonstrated only if the benefit is "unusual." *See Rothman* v. *Gregor*, 220 F.3d 81, 94 (2d Cir. 2000) (insider's profit of $1.6 million on his sale of stock was not unusual enough to establish motive). Courts look at a variety of factors to determine whether insider sales are "unusual," including the value of the sales and the percentage sold of a defendant's total holdings. *See id.*[28]

Plaintiffs' argument is further undercut by the fact that private equity firms *typically* sell large quantities of stock when they take a company public. Indeed, the usual reason that a private equity firm takes a company public is to unlock the value of the firm's investment.[29]

Moreover, the THL Defendants continued to own more than 42% of Refco after the IPO. Purportedly based on an analogy to a passage in *In re Refco Sec. Litig.*, 503 F. Supp. 2d 611, 647 (S.D.N.Y. 2007), plaintiffs respond that "[t]he THL Defendants may have been gambling that the RCM Securities Fraud could be hidden indefinitely and that Refco's stock would therefore continue to rise." (Opp'n at 68.)[30] *Tellabs, Inc. v. Makor Issues &*

---

[28]  Class plaintiffs allege that the THL Defendants sold 7.72 million of a total of over 56.5 million shares owned by them. (Class Compl. ¶¶ 317-19; *see* VR Compl. ¶ 502; *Capital* Compl. ¶ 321.) That constitutes a little over 13% of the THL Defendants' total holdings in Refco, which is far from enough to demonstrate an "unusual" sale sufficient to establish motive. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (insufficient pleading of motive where insider sold less than 11% of holdings); *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (insider sale of 40 percent of stock holdings in company sufficiently "unusual" to plead motive); *High View Fund, LP v. Hall*, 27 F. Supp. 2d 420, 427 (S.D.N.Y. 1998) ("averments of 'unusual' insider trading occurring shortly after a misrepresentation is made may satisfy the standard for pleading scienter, but the allegation that a corporate officer sold ten percent of his common stock holdings does not sufficiently state a motive to defraud.") (citing *Acito*, 47 F.3d at 54).

[29]  *See* Andrew R. Sorkin, *When Private Equity Stays the Course*, N.Y. Times (Aug. 13, 2006), at C6, http://www.nytimes.com/2006/08/13/business/yourmoney/13deal.htm?dlbk (noting that private equity firms typically take a company public and earn large dividends from their investments); Victor Fleischer, *The Missing Preferred Return*, 21 Iowa J. Corp. L. 77, 83 (2005) ("Buyout funds then eventually sell each portfolio company to a trade buyer, break it up and sell off the assets, or take the portfolio company public again, selling shares back to public shareholders at a profit.").

[30]  The relevant passage in the Court's prior decision did not concern any of the THL Defendants and did not concern any alleged fraud at RCM. It concerned the "RGHI receivable."

*Rights, Ltd.*, 127 S. Ct. 2499 (2007), which was issued after the decision on which plaintiffs attempt to rely, held that, for there to be the requisite "strong inference" of scienter, the plaintiff's inference of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 2510. Plaintiffs' speculation on why the THL Defendants retained so large a stake in Refco, notwithstanding their alleged knowledge of frauds at RCM, fails the *Tellabs* test.

### B.     Plaintiffs Fail to Allege Facts Constituting Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness

Having failed to demonstrate that defendants had motive and opportunity to commit fraud, plaintiffs must alternatively allege "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). In order to satisfy their burden of pleading scienter in this way, plaintiffs must at a minimum "specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

Plaintiffs therefore bear the burden of pleading facts demonstrating that the THL Defendants (i) were aware of the allegedly deceptive misrepresentations, and (ii) were aware of the existence of information revealing the falsity of those misrepresentations.[31] More specifically, plaintiffs must plead facts showing:

- that the THL Defendants were aware of the Customer Agreement and the allegedly fraudulent oral misrepresentations by Refco brokers;

- that the THL Defendants interpreted the relevant provisions of the Customer Agreement to prohibit RCM from using customer

---

[31]     Contrary to plaintiffs' suggestion (Opp'n at 51), the THL Defendants concede neither of these elements.

securities in amounts exceeding currently outstanding margin loans at RCM;

- that the THL Defendants were aware of RCM's alleged use of customer securities in a way and to an extent beyond the use permitted by the Customer Agreement; and

- that the THL Defendants were aware that RCM's use of impermissible quantities of customer securities in this way was sufficiently deliberate and systematic so as to constitute a fraud, and did not merely reflect careless management practices amounting only to breaches of contract.

Plaintiffs plead no such facts. Their brief focuses principally on their insistence that the THL Defendants were supposedly "firmly in control of Refco, which provided them with access to all material information regarding the fraud." (Opp'n at 53.) Plaintiffs, however, confuse mere control with either actual discovery of the alleged fraud or a genuine opportunity to discover the alleged fraud that was consciously or recklessly ignored.

Plaintiffs do not allege with particularity that the THL Defendants actually discovered the alleged fraud. Reckless behavior, for purposes of scienter, must involve behavior that was "highly unreasonable" and "an extreme departure from the standards of ordinary care." *Honeyman v. Hoyt (In re Carter-Wallace, Inc. Sec. Litig.)*, 220 F.3d 36, 39 (2d Cir. 2000). In order to establish recklessness, plaintiffs must allege more than supposed control by defendants of the entity that committed the frauds and the existence at the entity of non-public information that supposedly contradicts the allegedly fraudulent statements. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73 (2d Cir. 2001) (plaintiffs must do more than make "an unsupported general claim that confidential [ ] reports existed to contradict public statements"). Plaintiffs must allege that the THL Defendants either knew or recklessly disregarded specific evidence of the alleged fraud. *See id.*

The THL Defendants were shareholders and directors of an indirect parent of RCM. *See RCM I*, 2007 WL 2694469, at *1. That position scarcely constitutes notice to them of the sorts of alleged events at RCM summarized above. Plaintiffs describe various reports and actions at Refco that allegedly came to the attention of the THL Defendants, and they try to link these reports and actions to RCM. (Opp'n at 54-55.) None of these reports or actions, however, is alleged to have provided notice to the THL Defendants of RCM's supposedly impermissible use of customer securities.[32]

Cases cited by plaintiffs offer no support for the proposition that control itself is enough to establish scienter. In *Hollins*, the plaintiffs alleged that the defendants "'not only had access to . . . data [that could have revealed the fraud], *but also reviewed it*.'" *Id.* at 71 (quoting from the plaintiffs' complaint) (emphasis added). In *Fraternity Fund Ltd. v. Beacon Hill Asset Management LLC*, the chief financial officer "allegedly 'had access to the pricing sheets reflecting Beacon Hill's internal valuations [which could have revealed the fraud], and supervised the calculation of NAV using these prices.'" 376 F. Supp. 2d 385, 404 (S.D.N.Y. 2005). Plaintiffs do not allege that the THL Defendants had any comparable degree of direct access or direct supervision.

In *In re Veeco Instruments, Inc. Securities Litigation*, the plaintiffs alleged specific facts of "accounting manipulations" by the defendants, including open discussions about the poor quality of the company's products, actual instructions to reverse an accrual of

---

[32]   Plaintiffs allege, for example, that the THL Defendants "received 'regular reports . . . showing the amount of customer assets that could be fraudulently converted and used to sustain Refco's business operations and acquisitions.'" (Opp'n at 55) (quoting Class Compl. ¶¶ 164-65; *Capital* Compl. ¶¶ 166-67; *VR* Compl. ¶¶ 248-49)  What this evidently means is that the THL Defendants allegedly received reports showing amounts of customer assets—a fact that obviously does not establish scienter. Plaintiffs do not allege that the reports contained any actual reference, implicit or otherwise, to fraudulent conversion, and plaintiffs' papers would have featured the reports far more prominently if plaintiffs contended that the "reports" did contain such a reference.

costs that should have been recorded, and receipt by the defendants of specific materials that would have revealed relevant facts about the fraud. 235 F.R.D. 220, 231-233 (S.D.N.Y. 2006). Plaintiffs read out of context that opinion's statements to the effect that knowledge of accounting irregularities relating to core operations of the company may be imputed to officers and directors involved in "day-to-day operations of the company." *Id.* at 233; (*see* Opp'n at 56). The *In re Veeco* Court made such references in the context of the "group pleading doctrine," under which, in very narrow circumstances, plaintiffs need not allege individualized knowledge on the part of specific corporate officers if they were collectively involved in relevant day-to-day operations of the entity that committed the fraud. Plaintiffs do not and could not allege facts demonstrating that the THL Defendants formed part of a group that collectively supervised RCM's use of customer securities or RCM's account management practices. The case is therefore inapposite.

        Plaintiffs next argue that allegations concerning "the magnitude, scope and financial significance" of the alleged fraud are sufficient to plead scienter on the part of the THL Defendants. (Opp'n at 56.) This argument, however, is substantially undercut by plaintiffs' concession that RCM could properly have used customer securities up to the amount of existing margin loans. In the face of that concession, plaintiffs cannot maintain that the transfer of funds or securities from RCM to other Refco entities was inherently suspicious.[33]

---

[33] Furthermore, plaintiffs misread the relevant case law. For example, in *Cosmas v. Hassett*, the defendant corporation, whose revenue depended heavily on sales to China, made rosy claims about future sales despite public statements by the Chinese government that it was restricting foreign imports. 886 F.2d 8 (2d Cir. 1989). In the circumstances of that case, the Second Circuit found that China's public statements concerning a subject of great importance to the corporation gave rise to a strong inference that defendants knew of the statements. No comparable inference can be drawn here about the THL Defendants' alleged recklessness in not discovering a secret alleged fraud at RCM.

## VI.    PLAINTIFFS LACK STANDING TO BRING A 10b-5 CLAIM

In an effort to establish that they are sellers of securities for purposes of standing under Section 10(b) and Rule 10b-5, plaintiffs rely on *Caiola v. Citibank, N.A.*, 295 F.3d 312 (2d Cir. 2002) . Plaintiffs cite *Caiola* for the proposition that "where a broker purchases or sells a client's securities without authorization—as plaintiffs allege that RCM did—the customer has standing to bring a Section 10(b) claim . . . ." (Opp'n at 42.) The sales at issue in this case, however, were not for plaintiffs' accounts. As the Second Circuit stated in *Caiola*, "*if the transactions were for Caiola's account*, he has standing." 295 F.3d at 322. The Second Circuit stressed that, "the Complaint adequately alleges that Citibank, acting as Caiola's 'broker-agent,' bought physical stock *on Caiola's behalf and for his account*, albeit without his authorization." *Id.* at 323. Here, plaintiffs have not alleged that RCM engaged in securities transactions on plaintiffs' behalf or for plaintiffs' accounts.

Plaintiffs' citation to "churning" cases is also inapposite, as those cases involved the purchase or sale of securities for the plaintiffs' accounts or on plaintffs' behalf.[34] Thus, plaintiffs' claims should be dismissed for lack of standing.

---

Likewise, in *In re Philip Services Corp. Securities Litigation*, the plaintiffs alleged that the auditor defendants had actually seen evidence of a "highly suspicious" and "massive" increase of the company's copper inventories, a qualified opinion issued by an auditor indicating "the difficulty of verifying inventory levels at the subsidiary," and "the existence of material unrecorded liabilities," among other things. 383 F. Supp. 2d 463, 475 (S.D.N.Y. 2004). The "enormity" of the fraud made the finding of scienter "particularly appropriate," but the mere size of the fraud was not the only basis for that finding. *Id.*

Plaintiffs also argue that the THL Defendants ignored various "red flags" and "had ample reason to be concerned about the legalities of Refco's business practices." (Opp'n at 60.) These alleged red flags, however, did not even arguably provide the THL Defendants with notice of any problems relating to RCM's use of customer securities. They, along with the other allegations described by plaintiffs, are insufficient to support a finding of scienter.

[34]    *See, e.g., Komanoff v. Mabon, Nugent & Co.*, 884 F. Supp. 848, 856 (S.D.N.Y. 1995) ("The Amended Complaint states that Ms. Komanoff advised defendants of her investment objectives and that defendants overtraded her account . . . ."); *Jaksich v. Thomson McKinnon Sec., Inc.*, 582 F. Supp. 485, 488-492 (S.D.N.Y. 1984) (detailing mismanagement of plaintiff's account for plaintiff's risk).

## VII.    PLAINTIFFS FAIL TO PLEAD A VIOLATION OF RULE 10b-16

Plaintiffs do not state a claim under Rule 10b-16 because (1) for the reasons stated by co-defendants, there is no private right of action under that rule, (2) RCM disclosed the nature of the liens it asserted over customer collateral and accurately disclosed credits and debits in customer account statements, and (3) some of the 10b-16 claims are time-barred.

As the THL Defendants showed in their opening brief, RCM disclosed the liens that it asserted over customer collateral in the Customer Agreement.  (*See* THL Br. 26.) Plaintiffs' response consists of a citation to a passage in their brief that does not address or refute the THL Defendants' point.  (*See* Opp'n at 100 (citing *id.* at 20-24 (discussing whether the Customer Agreement authorized RCM to use customer securities as it did)).)

Furthermore, RCM acted properly in not disclosing its use of customer securities as debits to plaintiffs' accounts.  That is so because RCM's customers remained contractually entitled to receive any customer securities that RCM used, subject to the terms of the Customer Agreement and other documentation relating to the repayment of margin loans, the settlement of transactions, and similar matters.  (*See* THL Br. 27.)[35]

---

[35]   Plaintiffs purport to assert 10b-16 claims arising from RCM's supposed failure to make a written disclosure of interests or liens on customer collateral.  The THL Defendants' opening brief showed that certain of these claims are time-barred.  (THL Br. 25 n.8.)  Plaintiffs do not address that point; they discuss only their purported 10b-16 claims arising from RCM's alleged failure to properly disclose debits in plaintiffs' accounts.  (Opp'n at 98-99.)  Thus, plaintiffs offer no opposition to the THL Defendants' argument that, insofar as the 10b-16 claims arise out of a failure to disclose, at the time of the opening of the account, interests or liens asserted on customer collateral, certain of those claims are time-barred. (THL Br. 25 n.8.)

In addition, because plaintiffs have failed to establish either (1) a primary 10b-5 or 10b-16 violation, *see* Point IV, or (2) the THL Defendants' scienter, *see* Point V, or any other showing of these defendants' culpable participation in any alleged fraud, plaintiffs do not state a claim under Section 20(a) against them for control-person liability.  (*See* THL Br. 52-54.)

## Conclusion

For the foregoing reasons, this Court should dismiss all claims asserted against the THL Defendants.

Dated:  New York, New York
        June 9, 2008

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:  /s/ Richard A. Rosen
     Richard A. Rosen (rrosen@paulweiss.com)
1285 Avenue of the Americas
New York, NY  10019
Tel.: (212) 373-3000
Fax: (212) 757-3990

WEIL, GOTSHAL & MANGES LLP
Greg A. Danilow
767 Fifth Avenue
New York, NY  10153
Tel. (212) 310-8000

Attorneys for Defendants Thomas H. Lee Partners, L.P.,
Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee
Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman)
Fund V., L.P., THL Equity Advisors V, LLC, Thomas H.
Lee Investors Limited Partnership, The 1997 Thomas H.
Lee Nominee Trust, Thomas H. Lee, David V. Harkins,
Scott L. Jaeckel, and Scott A. Schoen