Scott A. Edelman (SE 5247)
Sander Bak (SB 2263)
Michael Shepherd (MS 1313)
**MILBANK, TWEED, HADLEY & McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY  10005
(212) 530-5000

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re REFCO CAPITAL MARKETS, LTD. BROKERAGE CUSTOMER SECURITIES LITIGATION | 06 Civ. 643 (GEL) |
| VR GLOBAL PARTNERS, L.P., et al, Plaintiffs, <br><br> - against - <br><br> PHILLIP R. BENNETT, et al, Defendants. | 07 Civ. 8686 (GEL) |
| CAPITAL MANAGEMENT SELECT FUND LTD., et al, Plaintiffs, <br><br> - against - <br><br> PHILLIP R. BENNETT, et al, Defendants. | 07 Civ. 8688 (GEL) |

**PLAINTIFFS' SUR-REPLY MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS**

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................... ii

I. THE MARGIN AGREEMENT AND TRI-PARTY AGREEMENT PROVIDE NO SUPPORT FOR DEFENDANTS' MOTIONS .......................................................... 1

II. THE COMPLAINTS ALLEGE FRAUD AND DECEPTION, SEPARATE AND APART FROM BREACH OF CONTRACT ................................................................... 7

III. DEFENDANTS' OFFER OF SELECT TESTIMONY FROM THE CONVERSION HEARING IS MISLEADING AND PROVIDES NO BASIS FOR DISMISSAL ................................................................................................................... 9

## **TABLE OF AUTHORITIES**

**Page(s)**

### **CASES**

*Caiola v. Citibank N.A.*,
   295 F.3d 312 (2d Cir. 2002) ............................................................................................. 7, 9

*Cortec Indus., Inc. v. Sum Holding L.P.*,
   949 F.2d 42 (2d Cir. 1991) ..................................................................................................... 2

*In re Bausch & Lomb, Inc. Sec. Litig.*,
   No. 01-CV-6190-CJS, 2003 WL 23101782 (W.D.N.Y. Mar. 28, 2003) .................................. 2

*In re IPO Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003) ..................................................................................... 7

*Indep. Energy Corp. v. Trigen Energy Corp.*,
   944 F. Supp. 1184 (S.D.N.Y. 1996) ........................................................................................ 3

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
   146 F.3d 66 (2d Cir. 1998) ..................................................................................................... 1

*Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Invs. Ltd.*,
   154 F. Supp. 2d 682 (S.D.N.Y. 2001) ..................................................................................... 1

*Kavowras v. N.Y. Times Co.*,
   328 F.3d 50 (2d Cir. 2003) ..................................................................................................... 1

*Keady v. J.P. Morgan Chase & Co.*,
   No. 07 Civ. 9896 (JSR), 2008 WL 638444 (S.D.N.Y. Mar. 3, 2008) ...................................... 1

*Kramer v. Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991) ................................................................................................... 2

*Pross v. Baird, Patrick & Co.*,
   83 Civ. 2830 (WCC), 1983 WL 1349 (S.D.N.Y. August 1, 1983) .......................................... 9

*Tierney v. Omnicom Group Inc.*,
   No. 06 Civ. 14302 (LTS)(THK), 2007 WL 2012412 (S.D.N.Y. July 11, 2007) ..................... 2

*Vitol S.A., Inc. v. Koch Petroleum Group, LP*,
   No. 01CV2184 (GBD), 2005 WL 2105592 (S.D.N.Y. Aug. 31, 2005) ................................... 6

**OTHER AUTHORITIES**

*In re Registration Requirements for Foreign Broker-Dealers*,
  Exchange Act Release No. 27017, No. S7-11-88, 1989 WL 1097092, (July 11, 1989) ............ 6

**RULES**

17 CFR § 240.15c3-1 ................................................................................................................. 6

17 CFR § 240.15c3-3 ................................................................................................................. 6

Plaintiffs respectfully submit this Sur-Reply to respond to new arguments raised in the Reply Memorandum of Law filed by the THL Defendants (the "THL Reply").[1]

## I. THE MARGIN AGREEMENT AND TRI-PARTY AGREEMENT PROVIDE NO SUPPORT FOR DEFENDANTS' MOTIONS

In their reply, the THL Defendants rely on copies of two agreements – a Margin Agreement and a Tri-Party Agreement – nowhere referenced in the Complaints or any of the defendants' initial motions. As demonstrated below, those documents provide no support for the motions to dismiss.

First, the fact that these documents were exhibits in a bankruptcy proceeding does not render them appropriate for consideration on a motion to dismiss.[2] Courts may take judicial notice that a prior litigation occurred; courts may not, however, take judicial notice of evidence just because it was submitted to another court in a prior litigation.[3] In the Conversion Hearing,[4] Judge Drain considered testimony from multiple witnesses and over 600 exhibits in, among other things, reaching the conclusion urged by Plaintiffs here that RCM was not permitted to use customers' securities as it was doing. Consideration of that evidence on a motion to dismiss is not appropriate, particularly when the THL

---

[1] The entities and individuals that comprise the "THL Defendants" are listed in Plaintiffs' Memorandum of Law in Opposition to Motions to Dismiss ("Opposition" or "Pl. Opp.") at 5, n. 9.

[2] *See* THL Defendants Reply Memorandum of Law ("THL Reply") at 5, n. 4; Declaration of Richard A. Rosen in Further Support of the THL Defendants' Motion to Dismiss, executed on June 9, 2008 ("Rosen Reply Decl.") ¶¶ 2-3.

[3] *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (factual record in prior litigations not admissible); *Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Invs. Ltd.*, 154 F. Supp. 2d 682, 689-90 (S.D.N.Y. 2001) (refusing to take judicial notice of account statements and letters presented as evidence in prior related action). The cases cited by the THL Defendants simply apply this well-settled rule. In *Kavowras v. N.Y. Times Co.*, 328 F.3d 50, 57 (2d Cir. 2003), the court took judicial notice of an NLRB charge to establish that another litigation had occurred, not to establish any of the facts proven in the prior proceeding. *See also Keady v. J.P. Morgan Chase & Co.*, No. 07 Civ. 9896 (JSR), 2008 WL 638444, at *2 (S.D.N.Y. Mar. 3, 2008) (judicial notice taken of fact of litigation, not of any part of the factual record developed in litigation).

[4] The Conversion Hearing refers to the hearing before Judge Drain in connection with the Motion to Convert Refco Capital Markets, Ltd.'s Chapter 11 Proceeding to a Chapter 7 Stockbroker Liquidation in *In re Refco, Inc., et al.*, Case No. 05-60006 (RDD).

Defendants urge an interpretation of the evidence that is contrary to Judge Drain's own conclusion.[5]

Second, this case illustrates the danger associated with consideration of isolated documents on a motion to dismiss.  On the basis of two Margin Agreements, one signed by Investment and Development Finance Corp. ("IDF") in 1996, and one signed by IDC Financial S.A. ("IDC") in 1998, and one Tri-Party Agreement, signed by IDC in 1998,[6] the THL Defendants would have this Court draw the incorrect inference that such agreements were operative as to all of the Plaintiffs during all relevant periods.  Plaintiffs are entitled to discovery to develop a factual record to show that any such inference would be incorrect.  For example, neither the VR plaintiffs nor Capital Management appears ever to have been a party to any such agreement.[7]  And it appears that, by no later than 1999, RCM replaced the Margin Agreement and the Tri-Party Agreement with the Customer Agreement.  Thus:

---

[5] The THL Defendants fare no better with their argument that the Court may consider the Margin Agreement and Tri-Party Agreement because one of the plaintiffs filed these documents with its proof of claim in the Refco bankruptcy proceedings.  See THL Reply at 5, n. 4; Rosen Reply Decl. ¶¶ 2-3.  In limited circumstances, the Second Circuit has held that a Court may consider "public disclosure documents" that are required to be filed by law, such as SEC filings.  Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991).  But that is not this case.  Here, the THL Defendants seek a rule of law that would permit consideration of any document attached by a litigant to any pleading (in this case, a proof of claim in Bankruptcy Court).  The rule in Cortec is not nearly that elastic.  See, e.g., Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991) (noting the "publicly filed" aspect of judicial notice extends only to documents "required by law to be filed . . . and not to other forms of [public] disclosure such as press releases or announcements at shareholder meetings"); Tierney v. Omnicom Group Inc., No. 06 Civ. 14302 (LTS)(THK), 2007 WL 2012412, at *4 (S.D.N.Y. July 11, 2007) (refusing to take "judicial notice of certain prior statements by Plaintiff that are reflected in publicly-filed documents"); In re Bausch & Lomb, Inc. Sec. Litig., No. 01-CV-6190-CJS, 2003 WL 23101782, at *17 (W.D.N.Y. Mar. 28, 2003) (refusing to take judicial notice of a transcript that was not "a publicly filed disclosure document").

[6] Attached as Exhibits A and B to Rosen Reply Decl.

[7] See Declaration of Michael Shepherd in Support of Plaintiffs' Sur-Reply in Opposition to Motions to Dismiss, executed on June 27, 2008 (the "Shepherd Decl."), at ¶ 4.

2

- ➢ The record of the Conversion Hearing reveals no copies of the Margin Agreement or Tri-Party Agreement dated after 1998;[8]
- ➢ One of the signatories to the Tri-Party Agreement is Refco Securities, Inc., an entity that changed its name to Refco Securities, LLC on December 3, 1999;[9]
- ➢ In contrast to the Tri-Party Agreement, which states that it provided "a facility for executing transactions" and the Margin Agreement, which states that it provided "a facility for financing transactions," the Customer Agreement states that it provided "a facility for executing *and* financing Transactions," indicating that the Tri-Party Agreement and Margin Agreement were consolidated into and superseded by the Customer Agreement;
- ➢ The first two numbered paragraphs in the Tri-Party Agreement, titled "Authorization" and "Collateral," are almost identical to Sections A and B of the Customer Agreement, titled "Authorization" and "Margin"; and
- ➢ IDC, which signed the Tri-Party Agreement and Margin Agreement, subsequently signed the Customer Agreement in 2001,[10] with the result that the Customer Agreement governs IDC's rights and obligations and supersedes the terms of the prior agreements.[11]

Finally, even assuming, *arguendo*, that Plaintiffs' relationship with RCM had been governed by the Margin Agreement and Tri-Party Agreement, Judge Drain found that the nearly identical provisions of those agreements that appear in the Customer Agreement did not allow RCM to use customers' securities in the manner alleged in the Complaints. Although the THL Defendants refuse to acknowledge it, with all of the relevant agreements before him, Judge Drain rejected the very interpretation of the Customer Agreement that the THL Defendants now advance:

> [t]he objectors to the motion point to the customer agreement, and in particular, Paragraph B of that agreement where they had a margin, to suggest that the customers of RCM normally took the risk that RCM could do whatever it pleased with the securities and other property that they left with RCM in their customer accounts notwithstanding Section A of the customer agreement, quoted above, and therefore, that there was no real entrustment.

---

[8] *Id.*

[9] *See* Exhibit A to the Shepherd Decl.

[10] *See* Exhibit B to the Shepherd Decl.

[11] *See Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1195-96 (S.D.N.Y. 1996) ("a subsequent contract regarding the same subject matter supersedes the prior contract").

3

Having read the two paragraphs in Section B of the customer agreement, I don't accept that argument…[12]

The THL Defendants' reading of the Customer Agreement ignores its most relevant provisions, which by and large are also contained in the Margin Agreement and the Tri-Party Agreement that predated the Customer Agreement.  Under Section A of the Customer Agreement (which substantially tracks Section 1 of the Tri-Party Agreement), RCM could only "purchase, sell, borrow, lend, pledge or otherwise transfer Financial Instruments (including any interest therein) for [customer accounts] in accordance with [customers'] oral or written instructions."[13]  Absent such instructions, RCM was not authorized to make use of customers' securities.

Section B of the Customer Agreement only "applies in the event Refco finances any of your Transactions from time-to-time in Financial Instruments."  Section B.1 (which substantially tracks Section 2 of the Margin Agreement) provides that RCM could require customers to maintain collateral in their accounts to secure any margin loans. The THL Defendants ignore, however, that Section B.1 (as well as Section 2 of the Margin Agreement) required RCM to advise customers of the amount of collateral that RCM required.  Consistent with Plaintiffs' interpretation of the Customer Agreement (and contrary to the interpretation advanced by the THL Defendants), it was RCM's practice on its account statements to reduce the securities position held in a customer's account by the number of securities posted as collateral and restore the appropriate number of securities to the customer's account on the account statement when the margin

---

[12] *In re Refco, Inc., et al.*, Case No. 05-60006 (RDD), Transcript of Hearing Before The Honorable Robert D. Drain, March 14, 2006 (the "Judge Drain Order") at 252:20 – 254:11, attached as Exhibit C to the Declaration of Richard Rosen in Support of THL Defendants' Motion to Dismiss, executed on February 21, 2008 (the "Rosen Moving Brief Decl.").

[13] *See* Exhibit B to the Rosen Moving Brief Decl.

4

loan was repaid in whole or in full,[14] thereby confirming and reinforcing the customers' understanding that only securities held as collateral were subject to use by RCM.

Consistent with Plaintiffs' reading, Section B.2 of the Customer Agreement (which substantially tracks Section 2 of the Margin Agreement), entitled "Rights and Use of Margin," states that RCM could use customers' securities "until settlement in full of all Transactions entered into pursuant to this Agreement," again making clear that where customers had no loans outstanding, RCM could not use those customers' securities. That provision also states that Refco could use customers' securities "as may be deemed necessary for margin or to satisfy or reduce any deficit or debit balance in any such account," clearly implying that in the absence of such a debit balance, RCM was not permitted to use the securities, and that even when customers had a margin balance, RCM could use as collateral only such amount of securities "deemed necessary for margin" -- not every security in the customer's account.

The THL Defendants pin much of their new arguments in their Reply on a provision that did not make its way into the Customer Agreement at all: Paragraph 4 of the Margin Agreement (which also appears as Paragraph 5 of the Tri-Party Agreement). That provision states that "[t]o the extent permitted by applicable law and governmental regulations" RCM could use customers' securities "for the sum due to Refco thereon or for a greater sum." Even were the agreements in which this provision is contained operative, together with the other provisions of the Margin Agreement and Tri-Party Agreement, Paragraph 4 of the Margin Agreement (and its counterpart in the Tri-Party Agreement) should be read as making clear that customers are consenting to RCM's use

---

[14] *See* Pl. Opp. at 24-5; Class Action Compl. ¶ 130; CM Compl. ¶ 126-136; VR Compl. ¶ 158.

of their securities, but only to the extent of the amount of the collateral that RCM identified to the customers.[15] Where there were loan balances, those provisions could not permit RCM to make use of any securities beyond those identified on the account statements as collateral. *A fortiori*, those provisions did not allow RCM to use Plaintiffs' securities during periods when they had no margin balance at all.[16] It makes no sense to read these non-surviving paragraphs of the Margin Agreement and the Tri-Party Agreement, as the THL Defendants would have it, as overriding the other provisions and giving RCM an unconditional license to use all of a customer's securities, regardless of the existence or extent of a customer's margin loan.

Furthermore, the THL Defendants ignore the fact that the initial clause in Paragraph 4 of the Margin Agreement (and its Tri-Party Agreement counterpart) reads "to the extent permitted by applicable law and governmental regulations." The Margin Agreement (and, later, the Customer Agreement) were expressly governed by New York law.[17] And, whether or not RCM was subject to U.S. regulation, it was required by virtue of operating in the United States to segregate its customers' fully paid and excess margin securities.[18] Thus, even accepting the THL Defendants' strained interpretation of the phrase "a greater sum" – which phrase is not in the Customer Agreement – the

---

[15] *See Vitol S.A., Inc. v. Koch Petroleum Group, LP*, No. 01CV2184 (GBD), 2005 WL 2105592, at *6 (S.D.N.Y. Aug. 31, 2005) ("The primary rules of contract construction requires the Court to construe all the contract provisions together in harmony, rather than conducting a critical analysis of a single or isolated provision, and reasonable, as oppose to unreasonable, interpretations are favored.")

[16] *See* CM Compl. ¶¶ 68-69, 80, 93 (alleging that for each of Plaintiffs Capital Management, IDF, and IDC their securities were fully-paid with no margin balance at the time of the bankruptcy); VR Compl. ¶ 110 ("Plaintiffs in this action did not have any margin balance at the point in time when Refco filed for bankruptcy"); Class Action Compl. ¶¶ 68, 98 (alleging that RCM took fully-paid securities from customers' accounts).

[17] *See* Exhibit A to Rosen Reply Decl., and Exhibit B to Rosen Moving Brief Decl.

[18] *See* Pl. Opp. at 34, discussing *In re Registration Requirements for Foreign Broker-Dealers*, Exchange Act Release No. 27017, No. S7-11-88, 1989 WL 1097092, at *31 n.22, (July 11, 1989) ("[m]any of the statutory and regulatory provisions cited below as applicable to registered broker-dealers actually are applicable by their terms to other unregistered broker-dealers. *E.g.*, …Rules 15c3-1, 15c3-3").

introductory clause to the paragraph would have limited RCM's ability to use customer securities in accordance with federal law, thereby rendering the THL Defendants' reading of the provision incorrect with respect to fully paid or excess margin securities.[19]

## II. THE COMPLAINTS ALLEGE FRAUD AND DECEPTION, SEPARATE AND APART FROM BREACH OF CONTRACT

The THL Defendants argue for the first time in their Reply that Plaintiffs' claim is nothing more than one for breach of contract.[20] Surely, the Complaints do allege acts constituting a breach of contract. But the Complaints allege deception and fraudulent conduct as well. The THL Defendants would have the Court ignore the allegations that:

---

[19] The THL Defendants also argue that the various Plaintiffs fail to plead with particularity that RCM used their particular securities in violation of the applicable agreements. The Complaints clearly contain such allegations. *See* CM Compl. ¶¶ 68-69, 80, 93 (alleging that for each of Plaintiffs Capital Management, IDF, and IDC their securities were fully-paid with no margin balance at the time of the bankruptcy); VR Compl. ¶ 110 ("Plaintiffs in this action did not have any margin balance at the point in time when Refco filed for bankruptcy"); Class Action Compl. ¶¶ 68, 98 (alleging that RCM took fully-paid securities from customers' accounts). Moreover, the THL Defendants overlook the Complaints' allegations, based on the testimony of an RCM employee from the Conversion Hearing, that RCM would sell or re-hypothecate "anything held in a Refco account," making clear that RCM made use of *all* customers' securities – fully-paid, excess margin, or otherwise – to suit RCM's purpose. CM Compl. ¶ 108; Class Action Compl. ¶ 105; VR Compl. ¶ 117.

If the THL Defendants mean to argue that the Complaints must allege for each Plaintiff the precise date(s) throughout the relevant period that its securities were fully paid and the precise date(s) that it had a margin loan, that goes well beyond what is required at the pleadings stage. *See In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 375, n.137 (S.D.N.Y. 2003) ("Defendants argue that Plaintiffs have not pled loss causation with sufficient particularity because they did not allege 'when the inflation [of the transaction price] began and ended' and 'whether the amount of alleged inflation varied over time'. This argument lacks any merit. So long as Plaintiffs allege a coherent scheme to defraud that accounts directly for their losses, loss causation has been adequately pled." (internal citations omitted)).

The THL Defendants seek to distinguish *Caiola v. Citibank N.A.*, 295 F.3d 312 (2d Cir. 2002) and the numerous cases holding that a customer whose broker engages in unauthorized trading of the customer's securities has standing under Section 10(b). (THL Reply at 33.) Their argument appears to be that where a broker makes unauthorized trades for the customer's benefit, the customer has standing, but somehow where the broker makes unauthorized trades for the broker's own benefit, the customer has no standing. THL's argument makes no sense at all. In both cases, the customer has been defrauded and injured through the unauthorized purchase and sale of the customer's securities. That is all that is required for a customer to have standing under Section 10(b). *See* cases cited in Pl. Opp. at 43-45. In support of its argument, THL takes the *Caiola* Court's statement – "if the transactions were for Caiola's own account, he has standing" -- completely out of context. The issue in *Caiola* was whether the Complaint alleged that Citibank had traded the customer's property or Citibank's own property. That issue is not present in this case where it is clearly alleged in the Complaints that it was Plaintiffs' securities that were sold and hypothecated without their knowledge.

[20] *See* THL Reply at 14-15.

(1) RCM represented to Plaintiffs and other RCM customers that RCM was providing custodial services when Plaintiffs deposited their securities for safekeeping;[21] (2) RCM's customer account statements reinforced the misrepresentation that RCM was holding customer securities in safekeeping, exclusively for the benefit of the customers;[22] (3) RCM's use of customer securities without compensating its customers for such use was contrary to universal custom and practice in the securities business;[23] and (4) RCM's unauthorized sale of Plaintiffs' securities was prohibited by federal law, whether or not RCM was exempt from regulation, thus reinforcing customers' reasonable expectations that their securities were being held in custody.[24]

As the Class Action Complaint explains, RCM's officers took affirmative steps to conceal the theft of customer securities by "rotating the financial institutions with whom [RCM] would fail to make settlement . . . so as not to arouse suspicion that Refco was in fact unable to fulfill its daily settlement obligations."[25] Moreover, the Complaints contain detailed allegations about the manner in which RCM's account statements falsely portrayed securities as being held in customer accounts, except when those securities were being held by RCM as collateral for a margin loan.[26] None of the Defendants address those allegations, which must be accepted as true on this motion, and which establish fraudulent conduct that is alleged to have deceived all of the Plaintiffs.

In short, this plainly is a securities fraud case. RCM and the defendants set out to conceal from Plaintiffs that they were routinely converting Plaintiffs' property. The fact

---

[21] Class Action Compl. ¶¶ 74-94; CM Compl. ¶¶ 64-75, 76-99; VR Compl. ¶¶ 84-105.
[22] Class Action Compl. ¶¶ 129-32; CM Compl. ¶¶ 125-136; VR Compl. ¶¶ 157-60.
[23] Class Action Compl. ¶¶ 13, 99; CM Compl. ¶¶ 11, 102; VR Compl. ¶¶ 12, 108.
[24] Class Action Compl. ¶¶ 24, 98, 136-41; CM Compl. ¶¶ 21, 139-44; VR Compl. ¶¶ 22, 164-69.
[25] Class Action Compl. ¶ 106.
[26] Class Action Compl. ¶¶ 129-32; CM Compl. ¶¶ 125-136; VR Compl. ¶¶ 157-60.

8

that RCM and the Defendants were deceiving Plaintiffs about conduct that was also in breach of contract does not immunize Defendants from liability for their deception under the federal securities laws. *Cf. Caiola v. Citibank N.A.*, 295 F.3d 312 (2d Cir. 2002) (upholding Rule 10b-5 allegations where the acts constituting the securities fraud violation also breached agreements); *Pross v. Baird, Patrick & Co.,* 83 Civ. 2830 (WCC), 1983 WL 1349, at *2 (S.D.N.Y. August 1, 1983) (allowing securities fraud claim where complaint also contained breach of contract claim based on the same allegations).

### III. DEFENDANTS' OFFER OF SELECT TESTIMONY FROM THE CONVERSION HEARING IS MISLEADING AND PROVIDES NO BASIS FOR DISMISSAL

In their Reply and in a June 19, 2008 letter to the Court, the THL Defendants offer deposition and trial testimony from Fernando Balzaretti and Richard Dietz, two representatives of certain of the Plaintiffs, that they knew RCM was unregulated, in an apparent effort to establish that those plaintiffs were not deceived about RCM's use of their fully-paid securities. Such testimony is beside the point.

First, whether or not some Plaintiffs were advised that RCM was unregulated, the Complaints plainly allege the critical fact in dispute: customers were deceived about RCM's misuse of their securities. Being unregulated is not a license to steal or defraud. Whether or not RCM was regulated, its customers had no reason to suspect that RCM was using fully-paid customer securities for its own benefit, thereby placing Plaintiffs, who believed their securities were being held in custody, at risk.

Second, the Customer Agreement in Paragraph G.1. provides in pertinent part that: "RSL is a U.S. corporation and a broker-dealer registered with [the SEC]. Refco [RCM] is a Bermuda corporation." There is no further representation concerning the status of RCM in the Customer Agreement, let alone any representation that RCM was

9

not subject to customer security segregation requirements with respect to its operations in the United States. And as our Opposition established, whether or not RCM was subject to regulation, it remained subject to requirements that it segregate customer securities. Defendants nowhere challenge our citation of the relevant SEC Release on that point.[27]

Third, as discussed above, consideration of such testimony on a motion to dismiss is entirely improper. *See supra* at Section I. As demonstrated by footnote 28, the THL Defendants take the testimony of these witnesses entirely out of context, failing to advise the Court that the witnesses at issue testified that they did not believe they were taking any custodial risk in dealing with Refco and that they were unaware that fully-paid securities in their accounts were being repoed without their knowledge.[28]

In sum, what matters at this stage of the proceeding is that Plaintiffs have alleged they were deceived about the use of their securities. A motion for summary judgment (at the conclusion of discovery) would be the procedural vehicle to attack those allegations, not a motion to dismiss on which consideration of factual matters is inappropriate.

---

[27] *See infra*, n. 13.

[28] Balzaretti testified that he was not concerned about leaving his securities with RCM because when "I learned that it was a New York-based entity, no, it didn't become a concern" and that "[i]t was our understanding that it was all managed in New York, and given that it's a U.S. territory, we felt comfortable with that." (Balzaretti Tr. 157-58). Balzaretti also testified that he did not distinguish between the two entities that were parties to his customer agreement, the purportedly unregulated RCM and the regulated entity, RSL: "I had always referred to Refco as one entity, and I was not aware that I was dealing with separate entities." (Balzaretti Tr. 46). *See* Exhibit C to the Shepherd Decl. Likewise, Dietz clearly testified that without regard to his understanding that RCM purported to be unregulated, he had no reason to understand that his fully-paid securities were being repoed out to counterparties without his knowledge. *See* Deitz Tr. 168-69 ("But if you're asking did we authorize them to repo, without our knowledge, securities held in our account, absolutely not. It wasn't something that we even conceived could happen.") *See* Exhibit D to the Shepherd Decl. Moreover, Vytenis Rasutis, the representative of Plaintiff Capital Management Select Fund (whose testimony the THL Defendants do not cite), testified that he did not believe that RCM was unregulated. *See* Rasutis Tr. 91-92 ("I thought [RCM] was part of the whole Refco entity and it was regulated by entities that controlled -- or that regulated the whole Refco entity . . . . Everything was Refco. It was Refco offices. It was the U.S. headquarters that opened up the account. Normally, if you're operating in the U.S., you have to be registered and regulated in the U.S."). *See* Exhibit E to the Shepherd Decl.

## CONCLUSION

For the reasons discussed herein and in the Opposition, the Defendants' motions to dismiss should be denied and the Plaintiffs in the Class Action, Capital Management and VR Complaints should be permitted to proceed to discovery on their claims.

Dated: New York, NY
       June 27, 2008

        MILBANK, TWEED, HADLEY & McCLOY LLP

        /s/  Scott A. Edelman

        Scott A. Edelman (SE 5247)
        Sander Bak (SB 2263)
        Michael Shepherd (MS 1313)
        1 Chase Manhattan Plaza
        New York, NY 10005
        (212) 530-5000
        sbak@milbank.com
        *Counsel for the Capital Management and VR Plaintiffs; Co-Lead Counsel for Lead Plaintiffs and the Putative Class*

        KIRBY McINERNEY & SQUIRE, LLP

        /s/  Mark A. Strauss

        Richard L. Stone (RS 5324)
        Mark A. Strauss (MS 2288)
        830 Third Avenue
        New York, NY  10022
        Tel.: (212) 371-6600
        Fax:  (212) 751-2540
        mstrauss@kmllp.com
        *Co-Lead Counsel for Lead Plaintiffs and the Putative Class*